**Appeal No. 24-10373-AA**

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

_____

CHG Medical Staffing Inc,
*Plaintiff-Appellee*

vs.

Rachel Shafer
*Defendant-Appellant*

_____

Appeal from the United States District Court
for the Southern District of Florida
Hon. Raag Singhal
Case No. 0:23-cv-61703-AHS

**APPELLANT'S APPENDIX**

Shlomo Y. Hecht
SHLOMO Y. HECHT, PA
3076 N. Commerce Pkwy
Miramar, FL 33025
*Attorney for Defendant-Appellant*
Rachel Shafer

# INDEX

| Document Name | Page No. | Tab No. |
|---|---|---|
| Docket Sheet | 3 | DS |
| Complaint | 16 | DE 1 |
| Complaint Exhibit A | 63 | DE 1-2 |
| Complaint Exhibit B | 75 | DE 1-3 |
| Complaint Exhibit I | 78 | DE 1-10 |
| Evidentiary Hearing Transcript Day I | 84 | DE 59 |
| Evidentiary Hearing Transcript Day II | 238 | DE 63 |
| Shafer Affidavit | 444 | DE 75-1 |
| Order Denying Motion to Amend | 446 | DE 86 |
| Order on Motion for Clarification | 451 | DE 96 |
| Order Denying Motion to Stay | 455 | DE 101 |

# DOCKET SHEET

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CIVIL DOCKET FOR CASE #: 0:23-cv-61703-AHS

CHG Medcial Staffing, Inc v. Shafer et al
Assigned to: Judge Raag Singhal
Case in other court: USCA, 24-10373-A
Cause: 18:1836(a) Injunction against Misappropriation of Trade Secrets

Date Filed: 09/05/2023
Jury Demand: Defendant
Nature of Suit: 880 Defend Trade Secrets Act (of 2016)
Jurisdiction: Federal Question

### Plaintiff

**CHG Medical Staffing, Inc.**
*a Delaware Corporation*
*doing business as*
RNnetwork

represented by **Adam Grant Schultz**
Jackson Lewis P.C.
2 South Biscayne Blvd.
Ste 3500
Miami, FL 33131
305-577-7600
Email: Adam.Schultz@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Schwartz**
Jackson Lewis P.C.
One Biscayne Tower
2 South Biscayne Blvd.
Suite 3500
Miami, FL 33131
305-577-7600
Fax: 305-373-4466
Email:
Jennifer.Schwartz@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Rachel Shafer**
*an individual*

represented by **Shlomo Y Hecht**
Shlomo Y Hecht PA
3076 N Commerce Parkway
Miramar, FL 33025
9548610025
Email: sam@hechtlawpa.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Defendant

**Lisley Rossi**
*an individual*

represented by **Gregory Steven Sconzo**
Sconzo Law Office, P.A.

3825 PGA Blvd
Suite 207
33410
Palm Beach Gardens, FL 33410
561-729-0940
Email: greg@sconzolawoffice.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**AHS Staffing, LLC**
*an Oklahoma Limited Liability Company*

represented by **John Cody German**
Cole Scott Kissane PA
9150 South Dadeland Boulevard
Suite 1400
Miami, FL 33156
305-350-5300
Email: Cody.German@csklegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Horacio Jose Ruiz-Lugo**
Cole, Scott and Kissane
9150 South Dadeland Boulevard
Suite 1400
Miami, FL 33156
7862686892
Email: Horacio.Ruiz-Lugo@csklegal.com
*ATTORNEY TO BE NOTICED*

**Justin Steven Maya**
Cole, Scott , Kissane P.A.
9150 S. Dadeland Blvd
Suite 1400
Miami, FL 33156
7862686752
Email: justin.maya@csklegal.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/05/2023 | 1 | COMPLAINT against AHS STAFFING, LLC, LISLEY ROSSI, RACHEL SHAFER. Filing fees $ 402.00 receipt number AFLSDC-16894037, filed by CHG MEDICAL STAFFING, INC. d/b/a RNNETWORK, a Delaware Corporation. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L)(Schwartz, Jennifer) (Entered: 09/05/2023) |
| 09/05/2023 | 2 | Clerks Notice of Judge Assignment to Judge Raag Singhal. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Alicia O. Valle is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (wce) (Entered: 09/05/2023) |
| 09/05/2023 | 3 | **NOTICE OF COURT PRACTICE** |

Unless otherwise specified by the Court, every motion, legal memorandum, brief, and otherwise shall: be double-spaced, in justified alignment, in 12-point font, using either Times New Roman or Arial typeface. This Notice does **not** supplant the requirements and provisions of Local Rule 7.1(c). The Court cautions parties against excessive use of footnotes.

Multiple Plaintiffs or Defendants shall file joint motions (and responses to motions) with co-parties unless there are clear conflicts of position. If conflicts of position exist, parties shall explain the conflicts in their separate motions (and responses).

Parties are encouraged to seek extensions of time in a timely fashion. "A motion for extension of time is not self-executing; no motion is, unless expressly provided for by the applicable rule. Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." *Compere v. Nusret Miami, LLC*, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted).

Exhibits to pleadings and motions shall be docketed in accordance with the Courts CM/ECF procedures, Rule 3L.(2):

> **(2) Describing an Attachment to a Docket Entry**
>
> A party filing an attachment to a document shall select one of the prescribed attachment categories from the drop-down menu (e.g., affidavit, transcript), provide an alphabetical or numerical designation (e.g., Exhibit A, Exhibit 1), **and descriptively name each attachment (e.g., Exhibit 1 - Affidavit of Boo Radley**) in a manner that enables the Court to easily locate and distinguish attachments. (Emphasis added.)

Local Rule 16.4, Local Rules for the United States District Court for the Southern District of Florida, requires that a Notice of Settlement "shall be filed and served jointly by counsel for all parties to the settlement." A unilateral notice of settlement will not stay pre-trial deadlines or hearings.

**Failure to comply with any of these procedures may result in the imposition of appropriate sanctions.**

Signed by Judge Raag Singhal on 9/5/2023. (jgr) (Entered: 09/05/2023)

| 09/05/2023 | 4 | **PAPERLESS ORDER TO FILE CERTIFICATE OF INTERESTED PERSONS**<br><br>Within **SEVEN (7) DAYS** of entry of an appearance, each party, including governmental parties, must file certificates of interested parties and corporate disclosure statements that contain a complete list of persons, associated persons, firms, partnerships, or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party. The parties shall not include Judge Singhal or the paired magistrate judges unless they have an interest in the litigation. Throughout the pendency of the action, the parties are under a continuing obligation to amend, correct, and update the certificates.<br><br>Signed by Judge Raag Singhal on 9/5/2023. (jgr) (Entered: 09/05/2023) |
| --- | --- | --- |
| 09/05/2023 | 5 | ORDER REQUIRING SCHEDULING REPORT. Signed by Judge Raag Singhal on 9/5/2023. *See attached document for full details.* (ebz) (Entered: 09/06/2023) |

| 09/07/2023 | 6 | NOTICE of Filing Proposed Summons(es) by CHG Medical Staffing, Inc. re 1 Complaint, filed by CHG Medical Staffing, Inc. (Attachments: # 1 Summon(s) AHS, # 2 Summon(s) Rossi, # 3 Summon(s) Shafer) (Schwartz, Jennifer) (Entered: 09/07/2023) |
|---|---|---|
| 09/07/2023 | 7 | Summons Issued as to AHS STAFFING, LLC, LISLEY ROSSI, RACHEL SHAFER. (pcs) (Entered: 09/07/2023) |
| 09/08/2023 | 8 | NOTICE of Filing Proposed Summons(es) *(Revised for AHS)* by CHG Medical Staffing, Inc. re 1 Complaint, filed by CHG Medical Staffing, Inc. (Attachments: # 1 Summon(s) Revised Summons) (Schultz, Adam) (Entered: 09/08/2023) |
| 09/08/2023 | 9 | Summons Issued as to AHS STAFFING, LLC. (pcs) (Entered: 09/08/2023) |
| 09/12/2023 | 10 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by CHG Medical Staffing, Inc.. AHS STAFFING, LLC served on 9/11/2023, response/answer due 10/2/2023; LISLEY ROSSI served on 9/9/2023, response/answer due 10/2/2023. (Attachments: # 1 Summon(s) Return of Service for Rossi)(Schwartz, Jennifer) (Entered: 09/12/2023) |
| 09/18/2023 | 11 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by CHG Medical Staffing, Inc.. RACHEL SHAFER served on 9/18/2023, response/answer due 10/10/2023. (Schwartz, Jennifer) (Entered: 09/18/2023) |
| 09/19/2023 | 12 | Plaintiff's MOTION for Preliminary Injunction by CHG Medical Staffing, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L)(Schwartz, Jennifer) (Entered: 09/19/2023) |
| 09/20/2023 | 13 | Plaintiff's Certificate of Other Affiliates/Corporate Disclosure Statement by CHG Medical Staffing, Inc. identifying Corporate Parent CHG Companies, Inc. for CHG Medical Staffing, Inc. (Schultz, Adam) (Entered: 09/20/2023) |
| 09/26/2023 | 14 | NOTICE of Attorney Appearance by John Cody German on behalf of AHS Staffing, LLC. Attorney John Cody German added to party AHS Staffing, LLC(pty:dft). (German, John) (Entered: 09/26/2023) |
| 09/26/2023 | 15 | NOTICE of Attorney Appearance by Justin Steven Maya on behalf of AHS Staffing, LLC. Attorney Justin Steven Maya added to party AHS Staffing, LLC(pty:dft). (Maya, Justin) (Entered: 09/26/2023) |
| 09/29/2023 | 16 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint, by AHS Staffing, LLC. (Attachments: # 1 Text of Proposed Order Text of Agreed Order)(German, John) (Entered: 09/29/2023) |
| 09/29/2023 | 17 | PAPERLESS ORDER granting 16 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document by AHS Staffing, LLC. Response/Answer due 10/10/2023. Signed by Judge Raag Singhal on 9/29/2023. (pb00) (Entered: 09/29/2023) |
| 09/29/2023 | 18 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer *to Complaint* by Lisley Rossi. Attorney Gregory Steven Sconzo added to party Lisley Rossi(pty:dft). (Attachments: # 1 Text of Proposed Order)(Sconzo, Gregory) (Entered: 09/29/2023) |
| 09/29/2023 | 19 | PAPERLESS ORDER granting 18 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document by Lisley Rossi. |

| | | |
|---|---|---|
| | | Response/Answer due 10/12/2023. Signed by Judge Raag Singhal on 9/29/2023. (pb00) (Entered: 09/29/2023) |
| 10/09/2023 | [20](#) | NOTICE of Attorney Appearance by Shlomo Y Hecht on behalf of Rachel Shafer. Attorney Shlomo Y Hecht added to party Rachel Shafer(pty:dft). (Hecht, Shlomo) (Entered: 10/09/2023) |
| 10/10/2023 | [21](#) | MOTION for Extension of Time to respond to Complaint and Prelinary Injunction re [12](#) Plaintiff's MOTION for Preliminary Injunction , [1](#) Complaint, by Rachel Shafer. Responses due by 10/24/2023 (Hecht, Shlomo) (Entered: 10/10/2023) |
| 10/10/2023 | [22](#) | Defendant's MOTION to Dismiss [1](#) Complaint, by AHS Staffing, LLC. Responses due by 10/24/2023 (Attachments: # [1](#) Exhibit Contract with Forum Selection Clause)(Maya, Justin) (Entered: 10/10/2023) |
| 10/11/2023 | 23 | PAPERLESS ORDER granting [21](#) Defendant Rachel Shafer's Motion for Extension of Time to file response to Plaintiff's complaint and to Plaintiff's motion for preliminary injunction. Defendant has until 10/20/2023 to file her responses. Signed by Judge Raag Singhal on 10/11/2023. (jgr) (Entered: 10/11/2023) |
| 10/11/2023 | | Reset Deadlines as to [12](#) Plaintiff's MOTION for Preliminary Injunction .( Responses due by 10/20/2023, Reset Response/Answer Due Deadline: Rachel Shafer response/answer due 10/20/2023. (ls)(per DE #23) (Entered: 10/12/2023) |
| 10/11/2023 | [24](#) | ORDER SETTING HEARING. ORDER Setting Hearing on Motion [12](#) Plaintiff's MOTION for Preliminary Injunction : Motion Hearing set for 10/31/2023 10:00 AM in Fort Lauderdale Division before Judge Raag Singhal. Signed by Judge Raag Singhal on 10/11/2023. *See attached document for full details.* (nan) (Entered: 10/12/2023) |
| 10/13/2023 | [25](#) | Joint MOTION for Permanent Injunction by CHG Medical Staffing, Inc.. (Attachments: # [1](#) Exhibit A)(Schwartz, Jennifer) (Entered: 10/13/2023) |
| 10/13/2023 | [26](#) | "STRICKEN" NOTICE of Settlement *(Joint)* by CHG Medical Staffing, Inc. (Schwartz, Jennifer) Modified on 10/16/2023 (ls). (per DE #28) (Entered: 10/13/2023) |
| 10/13/2023 | [27](#) | NOTICE of Attorney Appearance by Horacio Jose Ruiz-Lugo on behalf of AHS Staffing, LLC. Attorney Horacio Jose Ruiz-Lugo added to party AHS Staffing, LLC(pty:dft). (Ruiz-Lugo, Horacio) (Entered: 10/13/2023) |
| 10/13/2023 | 28 | PAPERLESS ORDER STRIKING [26](#) Notice of Settlement as to Defendant Lisley Rossi. The Eleventh Circuit's recent decision in *City of Jacksonville v. Jacksonville Hosp. Holdings, L.P.*, No. 22-12419, 2023 WL 5944193, at *1 (11th Cir. Sept. 13, 2023) and Fed. R. Civ. P. 41(a)(1)(A)(ii) require all parties who have appeared in a litigation to sign stipulations of dismissal as to any individual defendants dismissed from the action. Signed by Judge Raag Singhal on 10/13/2023. (jgr) (Entered: 10/13/2023) |
| 10/16/2023 | [29](#) | Defendant's Certificate of Other Affiliates/Corporate Disclosure Statement by AHS Staffing, LLC identifying Corporate Parent American Health Staffing Group, Inc for AHS Staffing, LLC (Maya, Justin) (Entered: 10/16/2023) |
| 10/17/2023 | 30 | PAPERLESS ORDER for the parties to file exhibit and witness lists for the 10/31/2023 hearing on [12](#) Plaintiff's MOTION for Preliminary Injunction by 10/27/2023 at 5:00pm. Signed by Judge Raag Singhal on 10/17/2023. (jgr) (Entered: 10/17/2023) |
| 10/17/2023 | [31](#) | Defendant's MOTION to Stay re [24](#) Order Setting Hearing on Motion, *for Preliminary Injunction* by AHS Staffing, LLC. Responses due by 10/31/2023 (Maya, Justin) (Entered: 10/17/2023) |

| 10/18/2023 | 32 | PAPERLESS ORDER expediting Plaintiff's response to Defendant's Motion to Stay 31. Plaintiff's response is due 10/24/2023. Since Plaintiff's response to Defendant's Motion to Dismiss 22 is due by 10/24/2023 and both Defendant's Motion to Dismiss 22 and Motion to Stay 31 raise similar issues, Plaintiff can respond to both motions with one response. Signed by Judge Raag Singhal on 10/18/2023. (jgr) (Entered: 10/18/2023) |
|---|---|---|
| 10/18/2023 | | Reset Deadlines as to 31 Defendant's MOTION to Stay re 24 Order Setting Hearing on Motion, *for Preliminary Injunction*. Responses due by 10/24/2023 (ls)(per DE #32) (Entered: 10/19/2023) |
| 10/20/2023 | 33 | Unopposed Motion for Extension of Time to File Response/Reply/Answer as to 12 Plaintiff's MOTION for Preliminary Injunction by AHS Staffing, LLC. Responses due by 11/3/2023 (Attachments: # 1 Text of Proposed Order Agreed Order)(Maya, Justin) Modified Relief on 10/25/2023 (ls). (Entered: 10/20/2023) |
| 10/20/2023 | 34 | MOTION for Extension of Time to File Response/Reply/Answer as to 12 Plaintiff's MOTION for Preliminary Injunction by Rachel Shafer. (Hecht, Shlomo) (Entered: 10/20/2023) |
| 10/20/2023 | 35 | MOTION TO DISMISS 1 Complaint, FOR FAILURE TO STATE A CLAIM by Rachel Shafer. Responses due by 11/3/2023 (Hecht, Shlomo) (Entered: 10/20/2023) |
| 10/20/2023 | 36 | RESPONSE in Opposition re 12 Plaintiff's MOTION for Preliminary Injunction filed by AHS Staffing, LLC. Replies due by 10/27/2023. (Maya, Justin) (Entered: 10/20/2023) |
| 10/24/2023 | 37 | RESPONSE in Opposition re 31 Defendant's MOTION to Stay re 24 Order Setting Hearing on Motion, *for Preliminary Injunction*, 22 Defendant's MOTION to Dismiss 1 Complaint, *(Omnibus)* filed by CHG Medical Staffing, Inc.. Replies due by 10/31/2023. (Schwartz, Jennifer) (Entered: 10/24/2023) |
| 10/24/2023 | 38 | RESPONSE in Opposition re 12 Plaintiff's MOTION for Preliminary Injunction filed by Rachel Shafer. Replies due by 10/31/2023. (Hecht, Shlomo) (Entered: 10/24/2023) |
| 10/25/2023 | 39 | Clerk's Notice to Filer re 33 Unopposed MOTION for Extension of Time to Respond to Plaintiffs Motion for Preliminary Injunction, re 12 Plaintiff's MOTION for Preliminary Injunction . **Filer Selected the Wrong Motion Relief(s)**; ERROR - The Filer selected the wrong motion relief(s) when docketing the motion. The correction was made by the Clerk. It is not necessary to refile this document but future motions filed must include applicable reliefs. (ls) (Entered: 10/25/2023) |
| 10/26/2023 | 40 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 36 Response in Opposition to Motion by CHG Medical Staffing, Inc.. (Attachments: # 1 Text of Proposed Order)(Schultz, Adam) (Entered: 10/26/2023) |
| 10/26/2023 | 41 | PAPERLESS ORDER denying as moot 33 Motion for Extension of Time to File Response in light of Defendant AHS Staffing filing a timely response 36 . Signed by Judge Raag Singhal on 10/26/2023. (jgr) (Entered: 10/26/2023) |
| 10/26/2023 | 42 | PAPERLESS ORDER granting 34 Defendant Rachel Shafer's Motion for Extension of Time to File Response to Motion for Preliminary Injunction. The Court accepts Defendant Shafer's response on 10/24/2023 38 as compliant with the extension. Signed by Judge Raag Singhal on 10/26/2023. (jgr) (Entered: 10/26/2023) |
| 10/26/2023 | 43 | PAPERLESS ORDER granting 40 Motion for Extension of Time to File Reply Defendants Response in Opposition to Plaintiffs Motion for Preliminary Injunction. Reply is due by 10/30/2023. Signed by Judge Raag Singhal on 10/26/2023. (jgr) (Entered: 10/26/2023) |

| | | |
|---|---|---|
| 10/27/2023 | 44 | Exhibit and Witness List by CHG Medical Staffing, Inc... (Schwartz, Jennifer) (Entered: 10/27/2023) |
| 10/27/2023 | 45 | ORDER denying 22 Motion to Dismiss and 31 Motion to Stay. The case will proceed with the hearing on Plaintiff's Motion for Preliminary Injunction on October 31, 2023 at 10:00 AM. Signed by Judge Raag Singhal on 10/27/2023. *See attached document for full details.* (jgr) (Entered: 10/27/2023) |
| 10/27/2023 | 46 | Exhibit and Witness List *for Preliminary Injunction Hearing Scheduled 10.31.2023* by Rachel Shafer.. (Attachments: # 1 Exhibit Notice of Termination of Employment 10.20.23, # 2 Exhibit Kerry Black Email Dated June 16, 2023, # 3 Exhibit Keela Briles Email Dated April 7, 2023, # 4 Exhibit Gross Margin Details Forward March 23, 2023, # 5 Exhibit Working and Awaiting Forward March 9, 2023, # 6 Exhibit Mary Coombs Gross Margin Details May 1, 2023, # 7 Exhibit Message to Griffin Kabala using Rachel's Name from RNN on 10/10, 2023.)(Hecht, Shlomo) (Entered: 10/27/2023) |
| 10/27/2023 | 47 | CONSENT ORDER of PERMANENT INJUNCTION re 25 Joint Motion for Entry of Permanent Injunction Order. Signed by Judge Raag Singhal on 10/27/2023. *See attached document for full details.* (ls) (Entered: 10/30/2023) |
| 10/30/2023 | 48 | Plaintiff's REPLY to Response to Motion re 12 Plaintiff's MOTION for Preliminary Injunction filed by CHG Medical Staffing, Inc.. (Attachments: # 1 Exhibit A)(Schwartz, Jennifer) (Entered: 10/30/2023) |
| 10/30/2023 | 49 | Plaintiff's MOTION for Extension of Time to File Response/Reply/Answer as to 38 Response in Opposition to Motion by CHG Medical Staffing, Inc.. (Attachments: # 1 Text of Proposed Order)(Schultz, Adam) (Entered: 10/30/2023) |
| 10/31/2023 | 50 | PAPERLESS Minute Entry for proceedings held before Judge Raag Singhal: Evidentiary Hearing held on 10/31/2023. Witnesses Eleonore Ruffy, Amy Reed, and Keela Briles testified. Hearing will be continued on 11/7/2023 at 10:00 AM in Fort Lauderdale Division before Judge Raag Singhal. Total time in court: 5 hours : 00 minutes. Attorney Appearances: Justin Steven Maya, Jennifer A. Schwartz, Adam Grant Schultz and Shlomo Y Hecht. Court Reporter: Karl Shires, 954-769-5496 / Karl_Shires@flsd.uscourts.gov. (jgr) (Entered: 10/31/2023) |
| 11/02/2023 | 51 | PAPERLESS ORDER granting 49 Motion for Extension of Time to File Reply. CHG's reply is due by 11/6/2023. Signed by Judge Raag Singhal on 11/2/2023. (jgr) (Entered: 11/02/2023) |
| 11/02/2023 | 52 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 35 MOTION TO DISMISS 1 Complaint, FOR FAILURE TO STATE A CLAIM by CHG Medical Staffing, Inc.. (Attachments: # 1 Text of Proposed Order)(Schultz, Adam) (Entered: 11/02/2023) |
| 11/03/2023 | 53 | Plaintiff's MOTION to Strike 46 Exhibit and Witness List,, by CHG Medical Staffing, Inc.. Responses due by 11/17/2023 (Schwartz, Jennifer) (Entered: 11/03/2023) |
| 11/03/2023 | 54 | PAPERLESS ORDER granting 52 Motion for Extension of Time to File Response to Motion to Dismiss. Plaintiff's response is due by 11/10/2023. Signed by Judge Raag Singhal on 11/3/2023. (jgr) (Entered: 11/03/2023) |
| 11/03/2023 | 55 | ORDER granting 53 Motion to Strike Defendant Rachel Shafer's Exhibits Numbers 4, 5, and 6 from the Court's Docket. (DE 53 ). The Clerk of Court is directed to RESTRICT access to docket entry 46-4, 46-5, and 46-6. Plaintiff shall re-file these documents under seal. Signed by Judge Raag Singhal on 11/3/2023. *See attached document for full details.* (scn) (Entered: 11/06/2023) |

| | | |
|---|---|---|
| 11/03/2023 | 56 | NOTICE of Compliance re 55 Order on Motion to Strike. Per order at DE#55, Docket entries 46-4, 46-5, and 46-6 are restricted. (scn) (Entered: 11/06/2023) |
| 11/06/2023 | 57 | Plaintiff's REPLY to Response to Motion re 12 Plaintiff's MOTION for Preliminary Injunction filed by CHG Medical Staffing, Inc.. (Schwartz, Jennifer) (Entered: 11/06/2023) |
| 11/06/2023 | 58 | MOTION to Quash *Subpoena* by AHS Staffing, LLC. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Maya, Justin) (Entered: 11/06/2023) |
| 11/08/2023 | 59 | TRANSCRIPT of Preliminary Injunction - Day 1 held on 10/31/2023 before Judge Raag Singhal, 1-172 pages, Court Reporter: Karl Shires, 954-769-5496 / Karl_Shires@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/29/2023. Redacted Transcript Deadline set for 12/11/2023. Release of Transcript Restriction set for 2/6/2024. (Shires, Karl) (Entered: 11/08/2023) |
| 11/08/2023 | 60 | "STRICKEN" PAPERLESS Minute Entry for proceedings held before Judge Raag Singhal: Evidentiary Hearing held on 11/8/2023. Witnesses Eleonore Ruffy and Rachel Shafer testified. Total time in court: 7 hours: 00 minutes. Attorney Appearances: Jennifer A. Schwartz, Adam Grant Schultz and Shlomo Y Hecht. <br><br> The parties are to submit their proposed findings of facts and conclusions of law by close of business 11/16/2023. Court Reporter: Karl Shires, 954-769-5496 / Karl_Shires@flsd.uscourts.gov. (jgr) Modified on 11/14/2023 (ls). (per DE #64) (Entered: 11/08/2023) |
| 11/08/2023 | 61 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint, by AHS Staffing, LLC. (Attachments: # 1 Text of Proposed Order Proposed Order)(Maya, Justin) (Entered: 11/08/2023) |
| 11/09/2023 | 62 | PAPERLESS ORDER granting 61 AHS Staffing, LLC's Motion for Extension of Time to File Answer to Complaint. Answer due 11/20/2023. Signed by Judge Raag Singhal on 11/9/2023. (jgr) (Entered: 11/09/2023) |
| 11/09/2023 | 63 | TRANSCRIPT of Preliminary Injunction Hearing - Day 2 held on 11/7/2023 before Judge Raag Singhal, 1-228 pages, Court Reporter: Karl Shires, 954-769-5496 / Karl_Shires@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/30/2023. Redacted Transcript Deadline set for 12/11/2023. Release of Transcript Restriction set for 2/7/2024. (Shires, Karl) (Entered: 11/09/2023) |
| 11/13/2023 | 64 | PAPERLESS ORDER STRIKING 60 Minute Entry. <br><br> PAPERLESS Minute Entry for proceedings held before Judge Raag Singhal: Evidentiary Hearing held on 11/7/2023. Witnesses Eleonore Ruffy and Rachel Shafer testified. Total time in court: 7 hours: 00 minutes. Attorney Appearances: Jennifer A. Schwartz, Adam Grant Schultz and Shlomo Y Hecht.The parties are to submit their proposed findings of facts and conclusions of law by close of business 11/16/2023. Court Reporter: Karl Shires, 954-769-5496 / Karl_Shires@flsd.uscourts.gov. (jgr) (Entered: 11/08/2023) Signed by Judge Raag Singhal on 11/13/2023. (jgr) (Entered: 11/13/2023) |
| 11/13/2023 | 65 | RESPONSE in Opposition re 35 MOTION TO DISMISS 1 Complaint, FOR FAILURE TO STATE A CLAIM filed by CHG Medical Staffing, Inc.. Replies due by 11/20/2023. (Schwartz, Jennifer) (Entered: 11/13/2023) |

| 11/15/2023 | 66 | NOTICE by CHG Medical Staffing, Inc. re 12 Plaintiff's MOTION for Preliminary Injunction *(Of Filing Declaration of Eleonore Ruffy)* (Attachments: # 1 Exhibit A) (Schwartz, Jennifer) (Entered: 11/15/2023) |
|---|---|---|
| 11/15/2023 | 67 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 65 Response in Opposition to Motion by Rachel Shafer. (Hecht, Shlomo) (Entered: 11/15/2023) |
| 11/15/2023 | 68 | Joint MOTION for Extension of Time to File Proposed Findings of Fact and Conclusions of Law by CHG Medical Staffing, Inc.. Responses due by 11/29/2023 (Attachments: # 1 Text of Proposed Order Granting Joint Motion for Extension of Time to File Proposed Findings of Fact and Conclusions of Law)(Schwartz, Jennifer) (Entered: 11/15/2023) |
| 11/20/2023 | 69 | PAPERLESS ORDER granting 68 Motion for Extension of Time. The Parties shall submit their proposed Findings of Fact and Conclusions of Law on or before 5:00 p.m. on Tuesday, 11/21/2023. Signed by Judge Raag Singhal on 11/20/2023. (jgr) (Entered: 11/20/2023) |
| 11/20/2023 | 70 | PAPERLESS ORDER granting 67 Defendant Rachel Shafer's Motion for Extension of Time to File Reply in Support of her Motion to Dismiss. Reply due by 11/27/2023. Signed by Judge Raag Singhal on 11/20/2023. (jgr) (Entered: 11/20/2023) |
| 11/20/2023 | 71 | Joint Motion for Preliminary Injunction by CHG Medical Staffing, Inc.. (Attachments: # 1 Exhibit A)(Schwartz, Jennifer) Modified Relief on 11/21/2023 (ls). (Entered: 11/20/2023) |
| 11/20/2023 | 72 | ANSWER and Affirmative Defenses to Complaint with Jury Demand by AHS Staffing, LLC. (Maya, Justin) (Entered: 11/20/2023) |
| 11/21/2023 | 73 | Clerk's Notice to Filer re 71 Joint MOTION FOR ENTRY OF PRELIMINARY INJUNCTION ORDER . **Filer Selected the Wrong Motion Relief(s)**; ERROR - The Filer selected the wrong motion relief(s) when docketing the motion. The correction was made by the Clerk. It is not necessary to refile this document but future motions filed must include applicable reliefs. (ls) (Entered: 11/21/2023) |
| 11/21/2023 | 74 | Proposed Findings of Fact and Proposed Conclusions of Law by CHG Medical Staffing, Inc.. (Schwartz, Jennifer) (Entered: 11/21/2023) |
| 11/21/2023 | 75 | Proposed Findings of Fact and Proposed Conclusions of Law by Rachel Shafer. (Attachments: # 1 Affidavit Ex. A - Shafer Aff.)(Hecht, Shlomo) (Entered: 11/21/2023) |
| 11/22/2023 | 76 | Plaintiff's NOTICE by CHG Medical Staffing, Inc. *(Notice of Filing Exhibits Offered Into Evidence at the Hearing on its Motion for Preliminary Injunction)* (Attachments: # 1 Exhibit Plaintiff 2, # 2 Exhibit Plaintiff 5, # 3 Exhibit Plaintiff 8, # 4 Exhibit Plaintiff 9, # 5 Exhibit Plaintiff 11, # 6 Exhibit Plaintiff 11, # 7 Exhibit Plaintiff 15, # 8 Exhibit Plaintiff 19, # 9 Exhibit Plaintiff 20, # 10 Exhibit Plaintiff 22, # 11 Exhibit Plaintiff 23, # 12 Exhibit Plaintiff 26, # 13 Exhibit Plaintiff Rebuttal 3, # 14 Exhibit Plaintiff Rebuttal 4) (Schwartz, Jennifer) (Entered: 11/22/2023) |
| 11/27/2023 | 77 | Joint NOTICE by CHG Medical Staffing, Inc. *Of Filing Stipulated Confidentiality Agreement and Protective Order between Plaintiff and Defendant AHS Staffing, LLC* (Attachments: # 1 Exhibit 1) (Schwartz, Jennifer) (Entered: 11/27/2023) |
| 11/27/2023 | 78 | MOTION for Leave to File *Amended Proposed Findings of Facts and Conclusions of Law in Light of New Evidence Raised for the First Time in Rachel Shafer's Filing and Her Admission of Spoliation of Key Evidence* by CHG Medical Staffing, Inc.. (Attachments: # 1 Exhibit A)(Schwartz, Jennifer) (Entered: 11/27/2023) |

| | | |
|---|---|---|
| 11/27/2023 | 79 | Unopposed MOTION to Seal *Exhibits Admitted Into Evidence at Hearing* per Local Rule 5.4 by CHG Medical Staffing, Inc.. (Attachments: # 1 Text of Proposed Order) (Schultz, Adam) (Entered: 11/27/2023) |
| 11/27/2023 | 80 | REPLY to Response to Motion re 35 MOTION TO DISMISS 1 Complaint, FOR FAILURE TO STATE A CLAIM filed by Rachel Shafer. (Hecht, Shlomo) (Entered: 11/27/2023) |
| 12/06/2023 | 81 | STIPULATED PRELIMINARY INJUNCTION ORDER. Signed by Judge Raag Singhal on 12/6/2023. *See attached document for full details.* (ls) (Entered: 12/07/2023) |
| 12/08/2023 | 82 | ORDER Granting 79 Plaintiff's Unopposed Motion To File Under Seal Exhibits Admitted Into Evidence At Hearing. The Exhibits will remain under seal until the case is closed. Once the case is closed, the Clerk will destroy all copies of the Exhibits. Signed by Judge Raag Singhal on 12/8/2023. *See attached document for full details.* (kpe) (Entered: 12/11/2023) |
| 12/11/2023 | 83 | RESPONSE in Opposition re 78 MOTION for Leave to File *Amended Proposed Findings of Facts and Conclusions of Law in Light of New Evidence Raised for the First Time in Rachel Shafer's Filing and Her Admission of Spoliation of Key Evidence* filed by Rachel Shafer. Replies due by 12/18/2023. (Hecht, Shlomo) (Entered: 12/11/2023) |
| 12/12/2023 | | SYSTEM ENTRY - Docket Entry 84 [misc] restricted/sealed until further notice. (1711985) (Entered: 12/12/2023) |
| 12/18/2023 | 85 | Plaintiff's REPLY to 78 MOTION for Leave to File *Amended Proposed Findings of Facts and Conclusions of Law in Light of New Evidence Raised for the First Time in Rachel Shafer's Filing and Her Admission of Spoliation of Key Evidence And in Support of Its Motion for Leave to File Amended Proposed Findings of Fact and Conclusion of Law* by CHG Medical Staffing, Inc.. (Schultz, Adam) (Entered: 12/18/2023) |
| 12/18/2023 | 86 | ORDER denying 78 Motion for Leave to File Amended Proposed Findings of Facts and Conclusions of Law. Signed by Judge Raag Singhal on 12/19/2023. *See attached document for full details.* (ls) (Entered: 12/19/2023) |
| 12/20/2023 | 87 | STIPULATED CONFIDENTIALITY AGREEMENT and PROTECTIVE ORDER Between Plaintiff and Defendant AHS Staffing, LLC. Signed by Judge Raag Singhal on 12/20/2023. *See attached document for full details.* (ls) (Entered: 12/21/2023) |
| 12/26/2023 | 88 | Joint MOTION for Entry of Stipulated Forensic Data Protocol Order re 81 Order on Motion for Preliminary Injunction, by CHG Medical Staffing, Inc.. (Schwartz, Jennifer) (Entered: 12/26/2023) |
| 12/28/2023 | 89 | MOTION for clarification 86 Order on Motion for Leave to File *and retain forensic expert* by Rachel Shafer. Responses due by 1/11/2024 (Hecht, Shlomo) (Entered: 12/28/2023) |
| 01/02/2024 | 90 | STIPULATED FORENSIC DATA PROTOCOL ORDER granting 88 Joint Motion for Entry of Stipulated Forensic Data Protocol Order. Signed by Judge Raag Singhal on 1/2/2024. *See attached document for full details.* (ls) (Entered: 01/03/2024) |
| 01/09/2024 | 91 | RESPONSE to Motion re 89 MOTION for clarification 86 Order on Motion for Leave to File *and retain forensic expert* filed by CHG Medical Staffing, Inc.. Replies due by 1/16/2024. (Schwartz, Jennifer) (Entered: 01/09/2024) |
| 01/16/2024 | 92 | REPLY to Response to Motion re 89 MOTION for clarification 86 Order on Motion for Leave to File *and retain forensic expert* filed by Rachel Shafer. (Hecht, Shlomo) (Entered: 01/16/2024) |

| 01/28/2024 | 93 | NOTICE *of clarification* by Rachel Shafer re 92 Reply to Response to Motion (Hecht, Shlomo) (Entered: 01/28/2024) |
|---|---|---|
| 01/29/2024 | 94 | Unopposed Motion for Hearing/Status Conference by CHG Medical Staffing, Inc.. (Attachments: # 1 Text of Proposed Order)(Schwartz, Jennifer) Modified Relief on 1/30/2024 (ls). (Entered: 01/29/2024) |
| 01/30/2024 | 95 | Clerk's Notice to Filer re 94 Unopposed MOTION For Status Conference . **Filer Selected the Wrong Motion Relief(s)**; ERROR - The Filer selected the wrong motion relief(s) when docketing the motion. The correction was made by the Clerk. It is not necessary to refile this document but future motions filed must include applicable reliefs. (ls) (Entered: 01/30/2024) |
| 02/01/2024 | 96 | ORDER on 89 Motion for Clarification on Court Forensic Expert Order. Signed by Judge Raag Singhal on 2/1/2024. *See attached document for full details.* (ls) (Entered: 02/01/2024) |
| 02/02/2024 | 97 | Notice of Interlocutory Appeal as to 96 Order on Motion for Clarification, 86 Order on Motion for Leave to File by Rachel Shafer. Filing fee $ 605.00 receipt number AFLSDC-17262960. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Hecht, Shlomo) (Entered: 02/02/2024) |
| 02/05/2024 | | Transmission of Notice of Appeal, Orders under appeal, and Docket Sheet to US Court of Appeals re 97 Notice of Interlocutory Appeal, Notice has been electronically mailed. (apz) (Entered: 02/05/2024) |
| 02/07/2024 | 98 | Acknowledgment of Receipt of NOA from USCA re 97 Notice of Interlocutory Appeal, filed by Rachel Shafer. Date received by USCA: 2/5/2024. USCA Case Number: 24-10373-A. (apz) (Entered: 02/07/2024) |
| 02/14/2024 | 99 | MOTION to Stay re 96 Order on Motion for Clarification, 86 Order on Motion for Leave to File *While Appeal is Pending* by Rachel Shafer. Responses due by 2/28/2024. (Hecht, Shlomo) (Entered: 02/14/2024) |
| 02/20/2024 | 100 | Plaintiff's MOTION for Contempt *against Defendant Rachel Shafer* by CHG Medical Staffing, Inc.. Responses due by 3/5/2024. (Attachments: # 1 Exhibit A - Emails from Forensic Expert, # 2 Exhibit B - Screenshot, # 3 Exhibit C - Stipulated Forensic Protocol)(Schwartz, Jennifer). Added MOTION for Sanctions, MOTION to Compel Defendant Rachel Shafer to Comply with the Court's Orders [D.E. 86 and D.E. 96] on 2/21/2024 (ls). (Entered: 02/20/2024) |
| 02/21/2024 | 101 | ORDER denying 99 Motion to Stay Pending Appeal. Signed by Judge Raag Singhal on 2/21/2024. *See attached document for full details.* (ls) (Entered: 02/21/2024) |
| 02/21/2024 | 102 | Clerk's Notice to Filer re 100 Plaintiff's MOTION for Contempt *Against Defendant Rachel Shafer, for Entry of Sanctions, and to Compel Defendant Rachel Schafer to Comply with the Courts Order [D.E. 86 and D.E. 96]*. **Motion with Multiple Reliefs Filed as One Relief**; ERROR - The Filer selected only one relief event and failed to select the additional corresponding events for each relief requested in the motion. The docket entry was corrected by the Clerk. It is not necessary to refile this document but future filings must comply with the instructions in the CM/ECF Attorney User's Manual. (ls) (Entered: 02/21/2024) |
| 02/21/2024 | 103 | PAPERLESS ORDER expediting response to 100 Plaintiff's Motion for Contempt against Defendant Rachel Shafer. Response is due by 2/23/2024 at 5:00 PM EST. Plaintiff's |

| | | |
|---|---|---|
| | | Reply, to the extent it wishes to file one, is due by 2/27/2024 at 5:00 PM EST. Signed by Judge Raag Singhal on 2/21/2024. (jgr) (Entered: 02/21/2024) |
| 02/21/2024 | | Reset Deadlines as to 100 Plaintiff's MOTION for Contempt *against Defendant Rachel Shafer* MOTION for Sanctions MOTION to Compel Defendant Rachel Shafer to Comply with the Court's Orders [D.E. 86 and D.E. 96]. Responses due by 2/23/2024. Replies due by 2/27/2024. (ls)(per DE #103) (Entered: 02/21/2024) |
| 02/23/2024 | 104 | RESPONSE in Opposition re 100 Plaintiff's MOTION for Contempt *against Defendant Rachel Shafer* MOTION for Sanctions MOTION to Compel Defendant Rachel Shafer to Comply with the Court's Orders [D.E. 86 and D.E. 96] filed by Rachel Shafer. Replies due by 3/1/2024. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Hecht, Shlomo) (Entered: 02/23/2024) |
| 02/26/2024 | 105 | TRANSCRIPT INFORMATION FORM by Rachel Shafer re 97 Notice of Interlocutory Appeal,,. No Transcript Requested. (Hecht, Shlomo) (Entered: 02/26/2024) |
| 02/27/2024 | 106 | Plaintiff's REPLY to Response to Motion re 100 Plaintiff's MOTION for Contempt *against Defendant Rachel Shafer* MOTION for Sanctions MOTION to Compel Defendant Rachel Shafer to Comply with the Court's Orders [D.E. 86 and D.E. 96] filed by CHG Medical Staffing, Inc.. (Schwartz, Jennifer) (Entered: 02/27/2024) |
| 03/29/2024 | 107 | Pursuant to 11th Cir. R. 11-2 and 11th Cir. R. 11-3, the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 97 Notice of Interlocutory Appeal, Appeal No. 24-10373-AA. The entire record on appeal is available electronically. (apz) (Entered: 03/29/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/03/2024 16:19:26 | | |
| **PACER Login:** | shlomo.hecht | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 0:23-cv-61703-AHS |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

# DE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

CHG MEDICAL STAFFING, INC.
d/b/a RNNETWORK, a Delaware
Corporation,

Plaintiffs,

v.

RACHEL SHAFER, an individual,
LISLEY ROSSI, an individual,
AHS STAFFING, LLC, an Oklahoma Limited
Liability Company,

Defendants.                                    /

## **VERIFIED COMPLAINT**

Plaintiff, CHG Medical Staffing, Inc. d/b/a RNnetwork (hereafter "RNN"), by and through

the undersigned counsel, hereby files this Verified Complaint against Defendants, Rachel Shafer

("Shafer"), Lisley Rossi ("Rossi"), (Shafer and Rossi collectively, the "Individual Defendants"),

and AHS Staffing, LLC ("AHS") (collectively, "Defendants") for temporary and permanent

injunctive relief and damages based on breach of contract; violations of the Defend Trade Secrets

Act ("DTSA"), 18 U.S.C. § 1836; violations of the Florida Uniform Trade Secrets Act ("FUTSA")

Fla. Stat. § 688.001 *et seq.*; conversion; breach of fiduciary duty; civil conspiracy; and tortious

interference with contractual and business relationships and in support thereof states as follows:

## **JURISDICTION AND VENUE**

1.       RNN is a Delaware corporation and, at all times material, was registered to do

business in the State of Florida and was doing business in Broward County, Florida.

**App. 017**

CASE NO.: _____

2.      Defendant AHS is an Oklahoma limited liability company, and at all times material, was registered and doing business in the State of Florida, engaged in substantial activity within the state of Florida, and continues to do so.

3.      Upon information and belief, Defendant Shafer is, and at all times material hereto was, an individual residing in Broward County, Florida.

4.      Upon information and belief, Defendant Rossi is, and at all times material hereto was, an individual residing in Broward County, Florida.

5.      This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action raises claims under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same operative facts as its federal claims.

6.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

7.      Personal jurisdiction is proper in Florida because Defendants Shafer and Rossi are citizens of and reside in Florida and, at all times material hereto, AHS operated, conducted, engaged in, and carried on a business or business venture in the State of Florida.  Moreover, personal jurisdiction is proper over all Defendants because the Individual Defendants breached their contracts in Broward County, Florida, and AHS and Shafer tortiously interfered with those contracts in Broward County, Florida.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the Individual Defendants reside in this district and the events or omissions giving rise to the claims against all Defendants occurred and continue to occur in this district.

9.      All conditions precedent to bringing this action have occurred, have been satisfied, or have otherwise been waived.

## BACKGROUND FACTS
### RNN's Business

10.      RNN is a nurse staffing and recruiting agency in the business of national recruiting, staffing and placing of travel nurses with healthcare facilities (*i.e.*, hospitals, clinics, medical practices, long-term care facilities) on a permanent and/or temporary basis, nationwide.

11.      The nurse staffing industry is a highly competitive industry with numerous major participants nationwide, all of which compete with RNN in some or all aspects of its business.

12.      RNN employs recruiters whose primary job duties are to identify nurses looking for an employment opportunity, developing relationships with those nurses so that they can make repeat placements over many years, particularly for temporary travel nurse positions, assembling names and information related to the nurses with whom they speak into a database (whether interested in an opportunity at the present or whether they are a future prospect), and then drawing from the nurses in the database to fill open positions at healthcare facilities. Then, when a staffing need arises at a healthcare facility, either an RNN recruiter will learn of it through his/her relationships with the facility or the facility will notify RNN and competitor staffing companies of the particular need it may have for a nursing placement.

13.      Upon receipt of a notice that a healthcare facility has a particular staffing need, RNN and its competitor staffing companies seek to recruit an appropriate candidate for the position from their databases of qualified nursing professionals or through the development of new relationships with interested nursing professionals.

14.      RNN and its competitors will then present qualified candidates to the requesting facility and will compete with other staffing companies to persuade the facility to accept the

candidate that it is presenting rather than candidates presented by its competitors. A staffing company is generally only compensated by a facility upon a decision to accept a candidate presented to it by that staffing company.

15.     The value RNN provides to its nurses depends on its network of relationships and its goodwill.  RNN's reputation, course of dealing, and history with facilities can lead to a level of trust and confidence in RNN, which renders a facility more likely to hire a candidate presented to it. This goodwill is developed not only through assurance that only highly qualified and skilled professionals are presented for consideration, but also based upon the relationships developed over the course of time between facilities and RNN personnel with whom they interact on a regular basis.

16.     RNN's goodwill with its nurses is just as important and valuable.  Nurses often have many choices of staffing agencies through whom they may seek work opportunities.

17.     It is important that the nurse professionals develop a level of trust and confidence in RNN through their interactions with RNN's personnel so that they know they will not be contacted for positions in geographic locations which are unacceptable, for positions for which they are not qualified or outside their expertise, or for positions where the compensation is simply not adequate.

18.     Because several candidates may be presented for any particular open position by any number of staffing agencies, it is common that a nurse professional may not be selected for the first position for which they are presented.  RNN will, however, retain that candidate's information and maintain a relationship with those professionals in the event another, perhaps more suitable opportunity arises in the future. It is important to RNN that its employees maintain

positive, long-term relationships with its nurse professionals and that the nurses remain affiliated with and willing to consider positions proposed by RNN.

19.     Shafer and Rossi, both former employees of RNN, had frequent contact with the nurse professionals with whom RNN has developed relationships, many of whom had been placed before in multiple temporary staffing positions through RNN over the course of many years. Among other duties, Shafer and Rossi were responsible for maintaining RNN's relationships with nurse professionals and ensuring that RNN has a substantial database of interested and willing professionals from which to recruit upon notification of an employment opportunity by one of the facilities with which RNN contracts.

20.     RNN has expended substantial amounts of time, money, and effort to develop its recruiters, like Shafer and Rossi, as well as its trade secrets and/or valuable confidential business information provided to its recruiters, to enable them to perform their jobs.  This includes compiled, detailed information regarding its nurse professionals developed over time with input from numerous different recruiters.  RNN derives independent economic value from this information not being generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use.

21.     In order to stay competitive in the industry, RNN has, over the course of more than a decade, developed a secure database comprised of confidential and proprietary information, including, among other things, facility client and nurse provider lists; nurse contact and assignment information; client and nurse preferences; spreadsheets updated by numerous recruiters noting nurse preferences (e.g., the states they want to work in, preferred days, hours and rates), business strategies and models; pricing information; market research and analysis; leadership training,

coaching and other employee development programs and methods; and cost control strategies (the "Confidential Information and Trade Secrets").

22.     The majority of RNN's Confidential Information and Trade Secrets is housed in Bullhorn, a cloud based computing and storage company that provides customer relation management, application tracking systems, and operations software to the staffing industry. RNN also keeps its Confidential Information and Trade Secrets on its secure SharePoint server, which is only accessible through authorized credentials.

23.     RNN has taken affirmative steps to preserve the secrecy of its Confidential Information and Trade Secrets.

24.     It employs an IT Department and sophisticated, passcode protected software programs to store, protect and track the flow of its data.  Further, RNN has implemented additional protective services from Okta, Inc., an identity and access management software company, to secure user authentication into RNN's applications, website services, email, and devices. RNN periodically reviews the access given to its employees to ensure that only current RNN employees have access to its secure network and to immediately terminate an employee's access and credentials upon a termination of employment.

25.     Additionally, RNN mandates that its employees execute non-competition, non-solicitation and confidentiality agreements as a condition precedent to employment and to being granted access to its Confidential Information and Trade Secrets.

26.     RNN promulgates policies expressly notifying its employees of the confidential nature of its information and prohibiting employees from copying, removing, using, or disclosing RNN's confidential information to anyone outside of the Company.

CASE NO.: _____

27.     RNN's physical facilities are locked at all times and require the use of a trackable keycard for access.

**Shafer's Employment with RNN**

28.     On or about July 26, 2012, RNN hired Shafer for the position of Recruiter and later promoted her to the position of Senior Healthcare Recruiter.

29.     As a Senior Healthcare Recruiter, Shafer was responsible for developing relationships with nurses and placing them on temporary assignments with healthcare facilities.

30.     Through her employment with RNN, Shafer had direct and frequent contact with RNN's nursing clients in all aspects of recruiting, staffing, credentialing, licensing, and hiring.

31.     Shafer was responsible for, among other duties, identifying nurse client prospects for job opportunities, developing and maintaining RNN's relationships with nurse clients and assuring that RNN has a substantial database of interested and willing nurses from which to recruit upon notification of an employment opportunity by one of the facilities with which RNN contracts.

32.     Throughout Shafer's employment, RNN expended substantial amounts of time, money, and effort to develop and train Shafer, who had no experience in recruiting prior to her hire at RNN.

33.     Throughout her employment, Shafer was educated and trained by RNN on the ways in which it conducts recruiting and staffing services for travel nurses, as well as permanent placements, as requested.

34.     During her nearly 11 years of employment with RNN, Shafer gained knowledge of trade secrets and other confidential and proprietary information of RNN, including, but not limited to, information relating to current, former and prospective nurse and facility clients; nurse preferences (e.g., locations, hours, types of work, rates and fees) learned over time and developed

CASE NO.: _____

through relationships that enabled her to make placements faster than RNN's competitors; assignment information so she was aware of when certain contracts would end and when certain nurses would be looking and available for another opportunity; strategies for competitive credentialing of nurses; and financial information relating to the business of RNN.

35.     By virtue of her employment with RNN, Shafer was provided the education and training to perform her role and granted access to RNN's trade secrets and confidential and proprietary information, including ***client lists***, nurse contact and preference information, nurse assignment and contract information, spreadsheets updated by numerous employees noting nurse preferences, rates, gross margin and profit information and contract dates, business strategies and models, pricing information, market research and analysis, and cost control strategies.  Shafer utilized the training, knowledge, and skills she received from RNN, as well as her access to RNN's confidential and proprietary information, to cultivate, develop and maintain relationships with RNN's clients and physicians.

36.     Shafer was a successful recruiter at RNN.  For years, she was one of the top producers making a high number of placements.  In 2022, she generated over $6,000,000 in gross margins (profit minus costs), placing her the top third recruiter in the company.

37.     Shafer was also one of the highest paid recruiters at RNN.  In 2022, RNN paid Shafer in excess of $615,411 in salary and commissions.

38.     As Shafer's success grew, she began taking liberties with RNN's procedures, selectively deciding when she would comply with them and when they were inconvenient, she increasingly violated Company rules, procedures and protocols to make placements, became insubordinate to leaders, was disrespectful to co-workers, and created significant discord within

RNN's operations, which did not improve despite coaching, counseling, and a number of Performance Improvement Plans ("PIP").

39.     On February 17, 2023, Shafer was issued a final PIP based on her behavior and ongoing failure to follow company processes and procedures.

40.     More than seven weeks after she was issued the 2023 PIP, Shafer's performance did not improve and complaints about her aggressive and disrespectful behavior continued to be reported.

41.     Ultimately, RNN terminated Shafer's employment, effective March 30, 2023.

### Shafer's Confidentiality, Non-Competition and No-Solicitation Agreement with RNN

42.     As an express condition of her employment with RNN, Shafer entered into an Employment Agreement Including Confidentiality, Non-Competition and Non-Solicitation Provisions with RNN on July 26, 2012 (the "Shafer Agreement"). *See* Shafer Agreement attached hereto as **Exhibit A**.

43.     The Shafer Agreement contains, *inter alia*, the following provisions which describe Shafer's obligations to protect RNN's confidential and proprietary business and trade secret information ("Confidential Business Information"), including client lists she compiled, supplemented, maintained and used, both during and after her employment with RNN:

### Duty of Confidentiality

(a)     Employee covenants and agrees to not, at any time or in any manner, use any of the Confidential Business Information for any purpose other than as reasonably necessary in the performance of Employee's duties for [RNN] and for the exclusive benefit of [RNN]. Employee shall not at any time, both during and after employment with [RNN] (regardless of the manner or reason of termination or cessation of employment with [RNN]), or in any form or manner, either directly or indirectly, copy, disseminate, divulge, disclose, transfer or communicate any Confidential Business Information to

CASE NO.: _____

any other employee or to any other person or entity except as reasonably necessary in the performance of Employee's duties for [RNN].

(b)       Employee agrees that all Confidential Business Information is the sole and exclusive property of [RNN]. Employee further agrees that all files, documents, works, papers, electronic files and information and other materials containing any Confidential Business Information or information which Employee prepares, uses, possesses or controls that affects or relates to the business of [RNN] are the sole property of [RNN]. Employee agrees to take all steps necessary, and all steps requested by [RNN], to ensure that the Confidential Business Information is kept confidential and to comply with all applicable policies and procedures of [RNN] regarding the use, disclosure, maintenance and security of the Confidential Business Information.

(c)       Upon the termination of Employee's employment with [RNN] (regardless of the manner or reason of termination), **Employee shall immediately return to [RNN] all Confidential Business Information**, [RNN] assets, and other information and property obtained from or relating to [RNN] or to which Employee has access, in good condition, normal wear and tear excepted, and **shall not retain any copies thereof**, whether in hard copy or electronic form.

*See* Exh. A ¶ 4 (emphasis added).

44.       Shafer also agreed she would not compete with RNN for a period of twelve (12) months after her employment ended to, among other reasons, enable the Company to have a new recruiter establish relationships with the nurses with whom she worked following her departure:

**Non-Competition Agreement**. Employee agrees that, beginning on the Effective Date and continuing for one (1) year from the later of (i) the date Employee's employment with the Company is terminated or otherwise ceases (regardless of the manner or reason of termination or cessation) or (ii) the latest date on which Employee breaches any of the provisions of Sections 4, 5, 6, or 7 hereof (the later one-year period being referred to as the "Covenant Period"), Employee shall not, anywhere in the United States, directly or indirectly, individually or jointly, whether as an . . . employee, agent, independent contractor, advisor, consultant . . . be employed by or otherwise render services to any person or entity that is engaged in or competes with the type(s) of staffing that Employee was engaged in at any time during Employee's last three (3) years of employment with the Company. The Company and Employee agree that for purposes of this Section 5, the "types" of staffing the Company engages in include, without limitation, physician staffing, nurse staffing, allied staffing and such other segment of staffing engaged in by the Company in the future. Employee

CASE NO.: _____

> further agrees and understands that regardless of the type(s) of staffing engaged in by Employee during Employee's last three years of employment with the Company, this restriction applies to both temporary (including "locum tenens") and permanent staffing within such type(s) of staffing . . . By way of further example, if Employee worked in, supported, managed or otherwise engaged in, in any capacity, physician staffing and nurse staffing at any time during Employee's last three years of employment with [RNN], Employee agrees not to work in, support or manage or otherwise engage in, in any capacity, physician and nurse staffing on a permanent or temporary basis during the Covenant Period. Employee acknowledges that because of Employee's access to [RNN]'s Confidential Business Information, and because of the nationwide nature of the Business, a violation of this covenant will cause irreparable injury to the Company.

*Id.*, ¶ 5.

45.     Shafer further agreed that for a period of twelve months following her last date of employment with RNN, she would not:

> in any manner, either directly or indirectly, for Employee's own behalf or for or on behalf of any other person or entity (other than the Company), **solicit, recruit, offer or otherwise provide services, or attempt to solicit, recruit, offer or otherwise provide services, that are the same as or similar to the Business to any current, former or prospective Healthcare Personnel or Clients of the Company with whom Employee worked with or serviced**, communicated with, had contact in any manner, or otherwise was aware of during Employee's last three (3) years of employment with the Company. Employee further agrees that, during the Covenant Period, **Employee shall not, in any manner, either directly or indirectly, induce, encourage, solicit or cause, or attempt to induce, encourage, solicit or cause Healthcare Personnel or Clients to cease doing business with, or otherwise change or diminish the Healthcare Personnel or Clients' business with, the Company**.

*Id.,* ¶ 6 (emphasis added).

46.     The restraints on disclosure, competition and solicitation specified in the Shafer Agreement are reasonably necessary to protect the legitimate business interests of RNN including, but not limited to, its: (1) trade secrets; (2) valuable confidential business or professional information; (3) substantial relationships with specific existing clients and nurse professionals; (4)

CASE NO.: _____

client and nurse professional goodwill within RNN's specific geographic market area; and (5) the investment in education and training of an employee.

47.     On the day of her termination, March 30, 2023, Shafer was provided with a Separation Letter reminding her of her non-compete, non-solicit and confidentiality obligations under the Agreement she signed and providing her with another copy of the Agreement. *See* March 30, 2023 letter **at Exhibit B.**

### Rossi's Employment with RNN

48.     In 2014, Rossi began working as a recruiter, and later a senior recruiter, at RNN responsible for placing travel nurses in positions at client healthcare facilities throughout the United States.

49.     On January 1, 2023, Rossi was promoted to leadership and became responsible for managing a team of recruiters and assisting them in making placements of travel nurses throughout the nation.  As part of her new role, Rossi received numerous leads of nurses interested in travel positions, and she was responsible for passing those leads onto her team of recruiters so that her team would be successful.

50.     Within months of her promotion, Rossi decided she did not enjoy managing other recruiters and requested to move back to a senior recruiting job.  She returned to a recruiter position on April 1, 2023.

51.     Rossi was a successful recruiter at RNN.  For years, she was one of the top producers making a high number of placements.  Indeed, in 2022, Rossi generated over $2,000,000 in gross margins, placing her at the top 20% of recruiters at RNN.

52.     Rossi was paid more than $200,000 in salary and commissions in 2022.

CASE NO.: _____

53.  Throughout Rossi's employment, RNN expended substantial amounts of time, money and effort to develop and train Rossi, who had no experience in recruiting prior to her hire at RNN.

54.  Throughout her employment, Rossi was educated and trained by RNN on the ways in which it conducts recruiting and staffing services for travel nurses, as well as permanent placements when requested.

55.  During her 8 years of employment with RNN, Rossi gained knowledge of trade secrets and other confidential and proprietary information of RNN, including, but not limited to, information relating to current, former and prospective nurse and facility clients; nurse preferences (e.g., locations, hours, types of work, rates and fees) learned over time and developed through relationships that enabled her to make placements faster than RNN's competitors; assignment information so she was aware of when certain contracts would end and when certain nurses would be looking and available for another opportunity; strategies for competitive credentialing of nurses; and financial information relating to the business of RNN.

56.  By virtue of her employment with RNN, Shafer was provided the education and training to perform her role and granted access to RNN's trade secrets and confidential and proprietary information, including *client lists*, nurse contact and preference information, nurse assignment and contract information, spreadsheets updated by numerous employees noting nurse preferences, rates, gross margin and profit information and contract dates, business strategies and models, pricing information, market research and analysis, and cost control strategies.  Rossi utilized the training, knowledge, and skills she received from RNN, as well as her access to RNN's confidential and proprietary information, to cultivate, develop and maintain relationships with RNN's clients and physicians.

57.     In April 2023, shortly after her return to a senior recruiter position, RNN discovered that Rossi had engaged in acts of dishonesty.  Specifically, Rossi had edited information in RNN's Bullhorn server to take credit for other recruiters' placements, causing her or attempting to cause her to receive commission she did not earn.  When confronted with this finding, Rossi admitted to her misconduct.

58.     Consequently, on April 27, 2023, RNN informed Rossi that her employment with was terminated.

### Rossi's Confidentiality, Non-Competition and No-Solicitation Agreement with RNN

59.     As an express condition of her employment with RNN, Rossi entered into an Employment Agreement Including Confidentiality, Non-Competition and Non-Solicitation for Employees with RNN (the "Rossi Agreement").  *See* Rossi Employment Agreement is attached as **Exhibit C**.

60.     The Rossi Agreement contains, *inter alia*, the following provisions which describe Rossi's obligations to protect RNN's confidential and proprietary business and trade secret information ("Confidential Business Information"), including facility and nurse client lists she compiled, supplemented, maintained and used, both during and after her employment with RNN:

### Duty of Confidentiality

(a)     Employee covenants and agrees to not, at any time or in any manner, use any of the Confidential Business Information for any purpose other than as reasonably necessary in the performance of Employee's duties for [RNN] and for the exclusive benefit of [RNN]. Employee shall not at any time, both during and after employment with [RNN] (regardless of the manner or reason of termination or cessation of employment with [RNN]), or in any form or manner, either directly or indirectly, copy, disseminate, divulge, disclose, transfer or communicate any Confidential Business Information to any other employee or to any other person or entity except as reasonably necessary in the performance of Employee's duties for [RNN].

CASE NO.: _____

(b)     Employee agrees that all Confidential Business Information is the sole and exclusive property of [RNN]. Employee further agrees that all files, documents, works, papers, electronic files and information and other materials containing any Confidential Business Information or information which Employee prepares, uses, possesses or controls that affects or relates to the business of [RNN] are the sole property of [RNN]. Employee agrees to take all steps necessary, and all steps requested by [RNN], to ensure that the Confidential Business Information is kept confidential and to comply with all applicable policies and procedures of [RNN] regarding the use, disclosure, maintenance and security of the Confidential Business Information.

(c)     Upon the termination of Employee's employment with [RNN] (regardless of the manner or reason of termination), **Employee shall immediately return to [RNN] all Confidential Business Information**, [RNN] assets, and other information and property obtained from or relating to [RNN] or to which Employee has access, in good condition, normal wear and tear excepted, and **shall not retain any copies thereof**, whether in hard copy or electronic form.

*See* Exh. C, ¶ 4 (emphasis added).

61.     Rossi also agreed she would not compete with RNN for a period of twelve (12) months after her employment ended to, among other reasons, enable the Company to have a new recruiter establish relationships with the nurses with whom she worked following her departure:

62.     **Non-Competition Agreement**. Employee agrees that, beginning on the Effective Date and continuing for one (1) year from the later of (i) the date Employee's employment with the Company is terminated or otherwise ceases (regardless of the manner or reason of termination or cessation) or (ii) the latest date on which Employee breaches any of the provisions of Sections 4, 5, 6, or 7 hereof (the later one-year period being referred to as the "Covenant Period"), Employee shall not, anywhere in the United States, directly or indirectly, individually or jointly, whether as an . . . employee, agent, independent contractor, advisor, consultant . . . advise or assist others with, be employed by or otherwise render services to any person or entity that is engaged in or competes with the type(s) of staffing that Employee was engaged in at any time during Employee's last three (3) years of employment with the Company. The Company and Employee agree that for purposes of this Section 5, the "types" of staffing the Company engages in include, without limitation, physician staffing, nurse staffing, allied staffing and such other segment of staffing engaged in by the Company in the future. Employee further agrees and understands that regardless of the type(s) of staffing engaged in by Employee during Employee's last three years of employment with the Company, this restriction applies to both temporary

CASE NO.: _____

> (including "locum tenens") and permanent staffing within such type(s) of staffing . . . By way of further example, if Employee worked in, supported, managed or otherwise engaged in, in any capacity, physician staffing and nurse staffing at any time during Employee's last three years of employment with the Company, Employee agrees not to work in, support or manage or otherwise engage in, in any capacity, physician and nurse staffing on a permanent or temporary basis during the Covenant Period. Employee acknowledges that because of Employee's access to the Company's Confidential Business Information, and because of the nationwide nature of the Business, a violation of this covenant will cause irreparable injury to the Company.

*Id.*, ¶ 5.

63.    Rossi further agreed that for a period of twelve months following her last date of employment with RNN, she would not:

> in any manner, either directly or indirectly, for Employee's own behalf or for or on behalf of any other person or entity (other than the Company), **solicit, recruit, offer or otherwise provide services, or attempt to solicit, recruit, offer or otherwise provide services, that are the same as or similar to the Business to any current, former or prospective Healthcare Personnel or Clients of the Company with whom Employee worked with or serviced**, communicated with, had contact in any manner, or otherwise was aware of during Employee's last three (3) years of employment with the Company. Employee further agrees that, during the Covenant Period, **Employee shall not, in any manner, either directly or indirectly, induce, encourage, solicit or cause, or attempt to induce, encourage, solicit or cause Healthcare Personnel or Clients to cease doing business with, or otherwise change or diminish the Healthcare Personnel or Clients' business with, the Company**.

*Id.*, ¶ 6 (emphasis added).

64.    The restraints on disclosure, competition and solicitation specified in the Rossi Agreement are reasonably necessary to protect the legitimate business interests of RNN.

65.    Specifically, RNN's legitimate business interests include, but are not limited to, its: (1) trade secrets; (2) valuable confidential business or professional information; (3) substantial relationships with specific existing facility and nurse clients; (4) client goodwill within RNN's specific geographic market area; and (5) the investment in education and training of an employee.

CASE NO.: _____

66.     On the day of her termination, April 27, 2023, Rossi was provided with a Separation Letter reminding her of her non-compete, non-solicit and confidentiality obligations under the Agreement she signed and providing her with another copy of the Agreement.  *See* April 27, 2023 letter as **Exhibit D.**  Despite RNN's repeated requests, Rossi has refused to return her RNN issued laptop computer, which still remains in her possession as of the filing of this Complaint.

### AHS's Business

67.     Like CHG Medical Staffing, Inc., AHS is a healthcare staffing company that places travel nurses, as well as other healthcare professionals, in temporary and permanent positions with healthcare facilities throughout the United States.

68.     AHS is engaged in the same business of RNN (temporary placement of nurses with healthcare facilities throughout the country), competes for the same nursing clients as RNN, competes for the same healthcare facility clients, and is in all respects a direct competitor of RNN.

69.     AHS advertises on its website that it is a "Top 10 travel nurse staffing agency," and its claimed mission is to "help nurses find top-paying travel assignments that match their personal and career ambitions. We go above and beyond to help [nurses] find [their] dream job.  *See* Screenshot of AHS's website attached hereto as **Exhibit E**.

### Shafer's Violation of Her Agreements With RNN

70.     Within weeks of her termination from RNN, during the 12-month restricted period, Shafer accepted a job with AHS as a Senior Healthcare Recruiter.

71.     Shafer is performing the exact same job duties at AHS that she performed during her employment with RNN – recruiting travel nurses for temporary and permanent placement at healthcare facilities throughout the United States.

CASE NO.: _____

72.     Shafer's employment with AHS is a direct violation of her Agreement, as she is directly competing with RNN to recruit existing and potential nursing clients for placement at AHS.

73.     Shortly after Shafer's employment was terminated, a number of RNN nurses abruptly ceased doing business with RNN, several expressly stating they were choosing to follow Shafer at her new employer.

74.     For example, on July 14, 2023, Alaina Robertson, an RNN recruiter, reached out to H. H.,[1] a provider with whom RNN does business, regarding a potential placement.  H. H. told Ms. Robertson that she is going back to her "old recruiter," who is Shafer:



*See* July 14, 2023 text message attached hereto as **Exhibit F**.

75.     Shafer also brazenly contacted a current RNN recruiter asking for information concerning a RNN nursing client for the clear purpose of planning to solicit and/or place her.

76.     Between July and August 2023, RNN became aware of a handful of instances in which it appeared that Shafer was soliciting RNN's nurse clients, and RNN began to suspect that

---

[1] In order to protect the identities of the non-party nurses listed throughout this Complaint, RNN provides only the initials of the nurse's first and last names.

CASE NO.: _____

Shafer improperly retained RNN's Confidential Information and Trade Secrets in violation of her Agreement.

77.    RNN's suspicions were confirmed when an anonymous caller from AHS contacted RNN to report various unethical business practices Shafer was committing in concert with AHS.

78.    The anonymous caller informed RNN that:

a.  Shafer induced several nurses to terminate their placement secured by Shafer while she worked at RNN and to seek a new placement through Shafer at AHS. Some of these providers included, without limitation: S. S., T. M., M. R., D. C. N. V., J. N., A. M., M. D., and S. L.

b.  Shafer has added historical information about a number of RNN nurse providers into the AHS database, information regarding contract rates, dates, placement locations and facilities, which could not be known absent a misappropriation of RNN's confidential information.

c.  Within a couple of months of her joining AHS, Shafer solicited and placed 43 nurses with whom she was working and doing business at RNN, 8 of whom are already on active assignment.

d.  Shafer has 80 nurse candidate submissions per week, presumably because she is using information, she retained from RNN.

e.  Shafer is being praised by AHS's management for the volume of business she is bringing into AHS, despite clear evidence that she is using RNN's Confidential Information and Trade Secrets to solicit RNN's nursing clients.

79.    After being put on notice that Shafer was likely using RNN's Confidential Information and Trade Secrets, and that Shafer's post-employment solicitation went far beyond

just a handful of isolated instances, RNN commenced an investigation of Shafer's activities in the weeks leading up to what she knew was likely going to be her termination (based on the final PIP she was issued and prior disciplinary discussions about her failure to improve her behavior).

80.     RNN's investigation revealed that in early March 2023, after Shafer was placed on her final PIP and became aware that her continued employment at RNN was in serious jeopardy, Shafer emailed numerous documents from her RNN secure Outlook email account to her personal Gmail account.

81.     These documents, taken and generated from RNN's secure Bullhorn and SharePoint servers, contain significant company trade secrets belonging to RNN which would give any competitor, such as AHS, an unfair competitive advantage in the industry and which can be, and apparently has been, used to undermine RNN.

82.     For example, Shafer emailed to her personal Gmail account numerous Working and Awaiting ("WA") spreadsheets containing information pertaining to over 2000 nurses, such as their names, email addresses, specialties (*e.g.,* RN-Pediatric ICU or Surgical or Emergency Room), date of their current placement, the state and location of their current placement, their shifts and hours per shift, the facility client where each nurse is working, bill rates, gross margins for each separate nurse placed, assignment end dates and durations, provider contact information, whether the contract was new, renewed or extended, and other information which would make it very easy for a staffing agency like AHS to solicit these providers from RNN.

83.     Shafer also emailed to her personal Gmail account Gross Margin Detail ("GM") spreadsheets which show confidential profit margin information on an individual nurse basis, as well as confidential information regarding each nurse's assignment, duration, rates, and assignment expiration dates.

84.     The information contained in the GM and WA spreadsheets reveal not only where a nurse is placed, the nurse's compensation, RNN's profit and margin details per each nurse, and when a nurse's assignment is set to end, but all of this information is contained in a well-organized, distilled and easily searchable Excel spreadsheet which would help a recruiter to make a quick placement when an opportunity arises.  Effectively, this information gives a recruiter confidential and proprietary, trade secret information with respect to every area of a nursing client's employment, the time frame in which the nurse will be seeking a subsequent assignment, and how to get in contact with the nurse (as well as the nurse's location, hours, shifts and compensation preferences) to convey a new opportunity.

85.     Shafer intentionally stole this information from RNN with the intent of using it in a competing capacity, knowing her employment was about to end, either voluntarily or involuntarily.  This is clear from the fact that on March 9, 2023, Shafer began emailing herself nurse recruiter job postings from competing nurse recruiting agencies, such as Aya Healthcare, along with her updated resume.  She forwarded these emails from her RNN email account to her personal Gmail account on that day, in addition to numerous RNN documents containing the Company's confidential and trade secret information, which she could then take with her to her new nurse recruiting job.

86.     On March 23, 2023, Shafer forwarded from her RNN email account to her personal Gmail account two emails containing information she exported off of RNN's secure servers entitled "CONFIDENTIAL – FEBRUARY COMMISSION DETAIL SHEET."  The emails contain five documents converted from an Excel spreadsheet identifying Gross Margin Details for numerous nurse providers, the healthcare facility client where they were working, their start and

end dates of their contracts, the number of days billed, compensation paid, total revenue, provider compensation, RNN's financial margins per nurse, and more.

87.     The confidential, trade secret information in the documents Shafer stole are extremely valuable to RNN, and in the hands of a competitor like AHS, provide all the information needed to divert RNN's nursing clients to AHS.

88.     Upon information and belief, Shafer has used and/or disclosed and continues to use and/or disclose the confidential, proprietary information and trade secrets she stole from RNN in the course of her new business activities, for the benefit of herself and for AHS.

**<u>Rossi's Violations of Her Agreement With RNN</u>**

89.     Within weeks of her April 27, 2023 termination from RNN, Rossi accepted a job with AHS as a nurse recruiter. Upon information and belief, Rossi became aware that AHS would employ her, notwithstanding her non-compete agreement with RNN, because Shafer reached out to notify her of the opportunity after learning of Rossi's termination.

90.     As a nurse recruiter at AHS, Rossi recruits and places travel nurses in temporary and permanent roles at health care facilities throughout the United States – the identical job duties she performed for RNN.

91.      Rossi's employment with AHS within the 12-month non-compete period constitutes a direct violation of her Agreement.  *See* Exh. C.

92.     RNN learned of Rossi's breach of her Agreement from RNN's nurse providers who Rossi reached out to while attempting to solicit them from RNN to place them through AHS.

93.     For example, in June 2023, Rossi initiated a conversation with S.G., a nurse working with RNN, about available positions:

CASE NO.: _____



*See* June 20, 2023, text message attached hereto as **Exhibit G**.

94.    S.G.'s information initially came to RNN as a lead, so she had not worked directly

with Rossi at RNN.  Rossi had S.G.'s information because leads for her team went directly to Rossi

during the brief time she was in management, just prior to her termination.

95.    Rossi informed S.G. that she did not work at RNN and attempted to find an

available position for her through AHS:

CASE NO.: _____



*See id.*

96.     Rossi then sent S.G. a link to AHS's candidate portal for S.G. to set up a provider

account through AHS:

CASE NO.: _____



*See* Email dated June 20 attached hereto as **Exhibit H**.

97.     S.G. then notified RNN of Rossi's attempts to poach her to be a client of AHS.

CASE NO.: _____

98.     Upon information and belief, Rossi could not have been aware of S.G.'s existence, placement status, or contact information absent Rossi taking confidential client contact information from RNN.

99.     Upon information and belief, Rossi misappropriated client contact information belonging to numerous RNN nurses – not just S.G. – and has solicited other RNN nursing clients, in violation of her non-competition and non-solicitation Agreement using the information she stole.

100.    Upon information and belief, Rossi has used and/or disclosed and continues to use and/or disclose the confidential, proprietary information and trade secrets she stole from RNN in the course of her new business activities, for the benefit of herself and for AHS.

101.    If divulged to a competitor, such as AHS, the trade secrets could be and likely already have been used to lure away RNN's clients, undermine RNN's marketing efforts, and damage its competitive standing in the industry.

### AHS's Tortious Interference With The Shafter and Rossi Agreements

102.    On July 14, 2023, RNN sent a letter to Shafer demanding that she cease and desist breaching her Agreement and using RNN's Confidential Information and Trade Secrets that she took from RNN and demanding that she immediately return all such information.  *See* July 14, 2023, Letter to Shafer attached hereto as **Exhibit I.**

103.     Shafer, through her attorney, responded with a blatant denial of her misconduct and refusal to comply with her Agreement.

104.    On July 14, 2023, RNN also sent a letter to Rossi demanding that she cease and desist breaching her Agreement and using RNN's Confidential Information and Trade Secrets that

she took from RNN and demanding that she immediately return all such information.  *See* June 14, 2023, Letter to Rossi attached hereto as **Exhibit J**.

105.    Rossi failed to respond to RNN's letter.

106.    Based on the "Notice to Subsequent Employer" provisions in their Agreements expressly permitting RNN to provide a copy of their Agreements to their subsequent employers, and based on their responses (or lack thereof) to the cease and desist letters, on July 26, 2023, RNN sent a letter to AHS notifying it of the Shafer and Rossi Agreements and requesting that it (i) refrain from enabling Shafer and Rossi to violate their Agreements,  (ii) cease from using any Confidential Information and Trade Secrets misappropriated from RNN, and (iii) requesting that AHS immediately return RNN's information.  *See* July 26, 2023, Letter to AHS attached hereto as **Exhibit K**.

107.    On July 31, 2023, AHS's in-house counsel sent a brief response to the letter asserting, without explanation, that the Shafer and Rossi Agreements are unenforceable and that it allegedly does not possess any of RNN's Confidential Information and Trade Secrets, despite evidence to the contrary *See* July 31, 2023 Letter to RNN attached hereto as **Exhibit L**.

108.    AHS's representation – that it does not possess RNN's Confidential Information and Trade Secrets – cannot be reconciled with Shafer and Rossi's post-employment actions and solicitation of RNN's nursing clients.

## Damage to RNN

109.    As a result of Defendants' misconduct, RNN has suffered damages including loss of business, loss of its confidential and trade secret information, loss of reputation and client goodwill, and other damages not yet known at this time.

110.    RNN has retained the services of the undersigned counsel to represent it in this matter and is obligated to pay its counsel a reasonable attorney's fee.  In the event it is the prevailing party in this matter, RNN is entitled to an award of attorney's fees as against the Individual Defendants pursuant to Fla. Stat. § 542.335(k), 18 U.S.C. §1836, and Fla. Stat. § 688.005.

111.    The subject Agreements also contain agreed upon remedies in the event of any breach of the Agreement. The Individual Defendants "agree[d] that money damages might not be a sufficient remedy for any breach or threatened breach of this Agreement by the Recipient or its Representatives." As such, Shafer and Rossi agreed that RNN "may, in addition to the other remedies which may be available to it, file a suit in equity to enjoin [them] from violation and breach of this Agreement."  *See* Exhs. A, C.

## COUNT I – BREACH OF CONTRACT
### (Against Shafer and Rossi)

112.    RNN repeats and reasserts each and every allegation contained in paragraphs 1 through 111 of this Verified Complaint, as though fully set forth herein.

113.    Shafer and Rossi entered into  enforceable Employment Agreements, as set forth above, wherein they agreed, among other things, (1) not to employed by or work on behalf of any business in competition with RNN for a period of twelve months following their separation from employment with RNN; (2) not to retain, use or disclose RNN's Confidential Business Information and trade secrets and to return all such documents and information in their possession upon their termination from employment; and (3) not to solicit clients or employees of RNN for a period of twelve months following the date their employment terminates. *See* Exhs. A, C.

114.    Shafer and Rossi each breached their respective Employment Agreements, by, *inter alia*, (1) accepting employment with a direct competitor of RNN – AHS -  within weeks of their

terminations from RNN; (2) taking, retaining and disclosing RNN Confidential Business Information and Trade Secrets days prior to resigning and failing to return it even after being reminded to do so in their Separation Letters; and (3) soliciting clients of RNN to cease working with RNN and instead to work with them at AHS, during the 12-month restricted period.

115.    RNN is entitled to specific performance of the Shafer Agreement and Rossi Agreement in the form of the enforcement of their non-competition agreements and the immediate return of all copies of RNN's Confidential Business Information and Trade Secrets, and independent verification that no such property remains in their or AHS's possession.

116.    As a direct and proximate result of Shafer's and Rossi's respective breaches of their Agreements, RNN has suffered and will continue to suffer damages.

117.    RNN does not have an adequate remedy at law for the harm and damage which Defendants' breaches of their Agreements have caused.

118.    RNN has suffered economic losses as a result of Shafer's and Rossi's respective breaches of their Agreements.

WHEREFORE, RNN demands the following:

(a)    injunctive relief enforcing the Shafer Agreement and the Rossi Agreement and enjoining all conduct in violation thereof;

(b)    injunctive relief preventing Shafer and Rossi, and any individuals and entities with whom they are associated, including AHS, from utilizing RNN's Confidential Business Information and Trade Secrets, and requiring the immediate return of all Confidential Business Information and Trade Secrets of RNN in any of their possession, custody, or control;

CASE NO.: _____

(c)      injunctive relief prohibiting Shafer and Rossi from continuing to work for AHS and any other nurse staffing company that competes with RNN for the entirety of the twelve (12) month restricted period commencing on the date of the entry of the order;

(d)      actual damages flowing from the breaches;

(e)      attorneys' fees and costs incurred in bringing this action to enforce the Individual Defendants' Employment Agreements, pursuant to applicable statutes including, but not limited to, Fla. Stat. § 542.335; and

(f)      all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT II- MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836) (Against Shafer and Rossi)

119.     RNN repeats and reasserts each and every allegation contained in paragraphs 1-111 of this Verified Complaint, as though fully set forth herein.

120.     The purpose of the Defend Trade Secrets Act ("DTSA"), codified at 18 U.S.C. §§ 1831-1839, is to "equip companies with the ... tools they need to protect their proprietary information ... [so that U. S. companies will] continue to lead the world in creating new and innovative products, technologies, and services." H.R. Rep. No. 114-529, at 6 (2016).

121.     Under 18 U.S.C. § 1836(b), an owner of a trade secret that is misappropriated may bring a civil action if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

122.     Per 18 U.S.C. § 1836(b)(2), the Court may grant an *ex parte* application for an order providing for the seizure of property necessary to prevent the propagation or dissemination of the

CASE NO.: _____

Proprietary Files.

123.    Per 18 U.S.C. § 1836(b)(3), the Court may grant remedies of (a) an injunction to prevent actual or threatened misappropriation, (b) an award of damages, (c) an award of exemplary damages if the trade secret was willfully and maliciously misappropriated, and (d) an award of attorneys' fees if the trade secret was willfully and maliciously misappropriated.

124.    The trade secrets at issue are RNN's Confidential Information and Trade Secrets, as described above.

125.    The Confidential Information and Trade Secrets is related to services used in, or intended for use in, interstate or foreign commerce, as it is used to place providers located throughout the country on assignments in facilities located throughout the United States.

126.    RNN is the "owner" of the Confidential Information and Trade Secrets stolen by Shafer and Rossi under 18 U.S.C. § 1839(4) because it is the entity in which rightful legal or equitable title to, or license in, the Confidential Information and Trade Secrets is reposed.

127.    The Confidential Information and Trade Secrets constitute a "trade secret" under 18 U.S.C. § 1839(3) because they are a form of financial, business, scientific, technical, economic, or engineering information; RNN has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

128.    RNN has made reasonable efforts under the circumstances to maintain the secrecy of its Confidential Information and Trade Secrets by numerous taking steps to protect it.  These efforts include, but are not limited to employing sophisticated, passcode protected software programs to store and protect data, to track the flow of data, and to limit different levels of access

CASE NO.: _____

to data to certain authorized individuals on a need-to-know basis, mandating its employees execute non-competition, non-solicitation and confidentiality agreements as a condition precedent to employment and to being granted access to its Confidential Information and Trade Secrets, promulgating policies expressly notifying its employees of the confidential nature of its information and prohibiting employees from copying, removing, using, or disclosing RNN's confidential information to anyone outside of the Company, and ensuring its physical facilities are locked at all times and require the use of a trackable keycard for access.

129.    The Confidential Information and Trade Secrets were misappropriated by Shafer and Rossi under 18 U.S.C. § 1839(5)(A) because they acquired them through improper means, namely outright and flagrant theft and breach of their duties to maintain their secrecy.

130.    The Confidential Information and Trade Secrets also were misappropriated by Shafer and Rossi under 18 U.S.C. § 1839(5)(B) because they used improper means to acquire Confidential Information and Trade Secrets (namely theft and breach of their duties to maintain their secrecy).

131.    RNN has suffered substantial economic loss as a direct and proximate result of the Shafer and Rossi's violations of the DTSA alleged herein. RNN is entitled to an award of actual damages from Shafer and Rossi, plus exemplary damages of up to two times actual damages, plus attorney's fees and costs.

132.    Shafer and Rossi have been unjustly enriched by profiting from their misappropriation, use, and/or disclosure of RNN's Confidential Information and Trade Secrets. RNN is entitled to imposition of a constructive trust requiring Shafer and Rossi to disgorge to RNN any amounts they have received or benefitted through their violations of the DTSA.

133.    For all these reasons, RNN is entitled to bring a civil action under DTSA for

CASE NO.: _____

misappropriation of trade secrets.

WHEREFORE, RNN demands the following:

(a) an order to seize Shafer's and Rossi's personal and AHS email accounts, cloud storage accounts, smart phones, tablets, IPads, desktop computers, laptop computers, and disks, memory files, flash drives, hard drives, and the like;

(b) injunctive relief preventing Shafer and Rossi and any person or entity to whom they disclosed the Confidential Information and Trade Secrets (including AHS) from utilizing RNN's Confidential Information and Trade Secrets, and requiring the immediate return of all Confidential Information and Trade Secrets of RNN in their possession, custody, or control;

(c) an order requiring independent verification that none of RNN's Confidential Information and Trade Secrets remain in the possession, custody, or control of Shafer or Rossi or any individuals and entities with which they are associated, including AHS;

(d) actual damages flowing from Shafer's and Rossi's misappropriation of RNN's Confidential Information and Trade Secrets;

(e) an order requiring Shafer and Rossi to return the RNN Confidential Information and Trade Secrets and other documents and materials they took as well as to destroy all remaining information regarding RNN and its clients in their possession, custody, or control;

(f) an order requiring Shafer and Rossi to make their personal email accounts, cloud storage accounts and hard drives available for forensic inspection and

requiring all Individual Defendants to make their AHS email accounts available for forensic inspection to ensure all RNN's information was deleted;

(g)     attorneys' fees and costs incurred by RNN in bringing this action; and

(h)     all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT III– MISAPPROPRIATION OF TRADE SECRETS/VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT (Fla. Stat. § 688.001, *et seq.*) (Against Shafer and Rossi)

134.    RNN repeats and reasserts each and every allegation contained in paragraphs 1-111 of this Verified Complaint, as though fully set forth herein.

135.    RNN possesses trade secrets, which include non-public information relating to current, former, and prospective nurse and facility clients; methods and types of services preferred by RNN's clients; sales and marketing techniques; negotiated contract terms and pricing, and financial information relating to RNN's business (the "Trade Secrets"). These Trade Secrets derive independent economic value, actual or potential, from not being generally known to the public and not being readily ascertainable by proper means by the public or any other person who may obtain commercial or economic value from the disclosure of such information.

136.    RNN has made reasonable efforts under the circumstances to maintain the secrecy of such Trade Secrets by taking steps to protect it, as described above.

137.    Shafer and Rossi intentionally misappropriated RNN's Trade Secrets without the knowledge or consent of RNN and with the purpose of utilizing them for their own benefit and/or the benefit of their new employer, AHS.

138.    Shafer and Rossi knew that RNN's Trade Secrets were the property of RNN and

CASE NO.: _____

that such property constituted confidential trade secrets, that they had a duty to RNN and a contractual obligation to maintain their secrecy, and that they were not permitted to remove, utilize, or disclose the Trade Secrets.  Their actions, therefore, were willful and malicious.

139.    Upon information and belief, Shafer and Rossi have utilized RNN's Trade Secrets for their personal gain and/or for the benefit of AHS.

140.    The actions of Shafer and Rossi constitute misappropriation of RNN's Trade Secrets under Section 688.002 of the Florida Statutes.

141.    Shafer and Rossi, and AHS, have been unjustly enriched by their unlawful use of RNN's Trade Secrets, and RNN is entitled to damages, including but not limited to loss of profits and disgorgement and the immediate return of all Trade Secrets of RNN in the any of the Defendants' possession, custody, or control.

142.    Shafer and Rossi's actions were taken in willful, wanton, and/or reckless disregard of RNN's rights and warrant the imposition of exemplary damages.

WHEREFORE, RNN demands the following:

(a)    injunctive relief preventing Shafer and Rossi from utilizing RNN's Trade Secrets, and requiring the immediate return of all RNN's Trade Secrets in their possession, custody, or control, including those they have residing on their AHS devices and email accounts;

(b)    injunctive relief in the form of independent verification that none of RNN's Trade Secrets remains in the possession, custody, or control of Shafer and Rossi or any individuals and entities with which they are associated, including AHS;

(c)    actual damages flowing from Shafer and Rossi's misappropriation of

CASE NO.: _____

RNN's Trade Secrets;

(d)     an order requiring Shafer and Rossi to return the RNN's Trade Secrets and any other documents and materials they took, as well as destroy all remaining information regarding RNN and its clients in their possession, custody, or control;

(e)     an order requiring Shafer and Rossi to make their personal and AHS email accounts, cloud storage accounts and hard drives available for forensic inspection to ensure all RNN information was deleted;

(f)     attorneys' fees and costs incurred by RNN in bringing this action; and

(g)     all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT IV – CONVERSION
### (Against Shafer and Rossi)

143.     RNN repeats and reasserts each and every allegation contained in paragraphs 1 through 111 of this Verified Complaint, as though fully set forth herein.

144.     Shafer and Rossi surreptitiously took RNN's Confidential Information and Trade Secrets without RNN's knowledge or consent and, upon information and belief, provided the Confidential Information and Trade Secrets to AHS.

145.     In so doing, Shafer and Rossi improperly and without authorization exercised dominion and control over RNN's Confidential Information and Trade Secrets.

146.     Further, Rossi has failed to return to RNN her RNN issued laptop, notwithstanding RNN's repeated requests for her to return its property, depriving RNN of the use of the use of the laptop.

CASE NO.: _____

147.    RNN is the exclusive owner of the Confidential Information and Trade Secrets and the laptop.

148.    Shafer and Rossi actions with respect to the Confidential Information and Trade Secrets and laptop are inconsistent with the property rights of RNN and has deprived RNN of its exclusive ownership of the Confidential Information and Trade Secrets and laptop.

149.    As a direct and proximate result of Shafer's and Rossi's conduct, RNN has suffered and will continue to suffer damages in an amount to be determined at trial.

150.    Shafer's and Rossi's actions were willful and intentional, entitling RNN to punitive damages upon the filing of a proper motion.

151.    RNN has been required to retain legal counsel to prosecute this action and is entitled to recover their reasonable attorneys' fees and costs.

WHEREFORE, RNN demands the following:

(a)     injunctive relief preventing Shafer, Rossi, and AHS from utilizing RNN's Confidential Information and Trade Secrets, and requiring the immediate return of all RNN's Confidential Information and Trade Secrets in Shafer's and Rossi's possession, custody, and/or control;

(b)     attorneys' fees and costs incurred in bringing this action;

(c)     actual damages flowing from the conversion; and

(d)     all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Shafer and Rossi)

152.    RNN repeats and reasserts each and every allegation contained in paragraphs 1-111 of this Verified Complaint, as though fully set forth herein.

37
**App. 053**

CASE NO.: _____

153.    RNN had significant confidence and trust in Shafer and Rossi, which led to their promotions to Senior Recruiters.  Rossi also was promoted to a leadership position in management.

154.    In light of their senior positions, significant compensation, and duties and the trust and confidence RNN had reposed in them, Shafer and Rossi had a fiduciary duty during their employment to*, inter alia,*  act in the best interests of RNN at all times, to safeguard and protect RNN's Confidential Information and Trade Secrets, to not use and/or retain the RNN's Confidential Information and Trade Secrets or any materials acquired or developed by them during the course of their employment for their personal benefit and/or the benefit of RNN's competitors, like AHS, and to not breach their agreements or to tortiously interfere with other agreements by soliciting RNN's clients to resign their positions and seek reassignment through AHS.

155.    This fiduciary duty continued post-employment, in that the Shafer and Rossi owed RNN a duty to, *inter alia*, not use or disclose to RNN's competitors any information, knowledge, or materials acquired or developed by them during the course of their employment for their own benefit and/or the benefit of RNN's competitors, like AHS, and not to use information they acquired at RNN to tortiously interfere with RNN's business relationships and solicit its clients to work with AHS.

156.    By virtue of, *inter alia*, taking, retaining, using and/or disclosing RNN's Confidential Information and Trade Secrets following their terminations from RNN, and by tortiously interfering with RNN's relationships with its nurse clients for their personal benefit, for the benefit of a competitor and/or to disadvantage RNN, Shafer and Rossi breached their fiduciary duty to RNN.

157.    Additionally, by virtue of, *inter alia*, taking with them RNN's Confidential Information and Trade Secrets *during their employment*, to enable them to induce RNN's clients

CASE NO.: _____

to cease doing business with RNN and instead to do business with them at AHS, Shafer and Rossi breached their fiduciary duty to RNN.

158.    As a direct and proximate result of Shafer and Rossi's breach of their fiduciary duties, RNN has suffered and will continue to suffer damages in an amount to be determined at trial.

159.    Shafer and Rossi's actions were willful and intentional, entitling RNN to punitive damages.

WHEREFORE, RNN demands the following:

(a)    injunctive relief preventing the Individual Defendants from utilizing RNN's Confidential Information and Trade Secrets, and requiring the immediate return of all RNN's Confidential Information and Trade Secrets in their possession, custody, or control;

(b)    actual damages flowing from the Individual Defendants' breach of fiduciary duty; and

(c)    all other remedies available at law or in equity as this Court deems just and appropriate.

### COUNT VI – CIVIL CONSPIRACY
### (against all Defendants)

160.    RNN repeats and reasserts each and every allegation contained in paragraphs 1-111 of this Verified Complaint, as though fully set forth herein.

161.    Upon information and belief, all Defendants conspired to misappropriate RNN's Confidential Information and Trade Secrets, interfere with RNN's existing and potential relationship with its nurse clients (including without limitation S.G, S. S., T. M., M. R., D. C., N.

V., J. N., A. M., M. D., S. L., and H. H.), breach Shafer and Rossi's fiduciary duties and contractual obligations owed to RNN, and various other wrongful acts alleged herein.

162.    In the course of this civil conspiracy, Defendants committed several unlawful and overt acts, including misappropriating RNN's Confidential Information And Trade Secrets and soliciting several nurses to cease their relationship with RNN and instead to do business with AHS.

163.    As a direct and proximate result of Defendants' conspiracy against RNN, RNN has suffered and will continue to suffer special damages specific to the civil conspiracy including, but not limited to, reputational damage and loss of goodwill due to Defendants' betrayal and the conspiracy itself.

164.    Defendants' conspiracy and their respective overt acts caused RNN to suffer damages.

WHEREFORE, RNN demands the following:

(a)    injunctive relief preventing Shafer and Rossi and any individuals and entities with which they are associated (such as AHS) from utilizing RNN's Confidential Information and Trade Secrets, and requiring the immediate return of all Confidential Information and Trade Secrets of RNN in any of their possessions, custody, or control;

(b)    injunctive relief in the form of independent verification that none of RNN's Confidential Information or Trade Secrets remains in the possession, custody, or control of Defendants and/or any individuals and entities with which they are associated;

(c)     actual damages flowing from Defendants' conspiracy; and

(d)     all other remedies available at law or in equity as this Court deems just and
appropriate.

**COUNT VII –TORTIOUS INTERFERENCE WITH
ADVANTAGEOUS BUSINESS AND CONTRACTUAL RELATIONSHIPS
(against all Defendants)**

165.    RNN repeats and reasserts each and every allegation contained in paragraphs 1-111
of this Verified Complaint, as though fully set forth herein.

166.    RNN has valid, enforceable and advantageous contractual relationships with Shafer
and Rossi, and the Agreements these Individual Defendants entered into with RNN contain
restrictive covenants, including non-competition, non-solicitation, and confidentiality provisions.
*See* Exhs. A and C.

167.    AHS was well aware of the Shafer and Rossi Agreements and nevertheless
employed and continue to employ them with full knowledge of their Agreements not to work for
a competitor for a period of twelve (12) months following their separation from RNN.

168.    AHS knows that Shafer and Rossi are violating their Agreements with RNN by
working for it, and that RNN has an advantageous contractual relationship with each of them.
RNN is fully aware of Shafer's and Rossi's Agreements, which prohibit them from competing
with RNN by, *inter alia,* accepting employment with direct competitors, such as AHS, and
disclosing RNN's Confidential Information and Trade Secrets.

169.    AHS is benefitting from Shafer's and Rossi's actions and incentivizing them to do
so through compensation and other benefits.

170.    AHS intentionally and unjustifiably interfered with RNN's contractual
relationships with Shafer and Rossi by inducing them to and/or assisting them in breaching their

CASE NO.: _____

restrictive covenants by commencing work at AHS, RNN's direct competitor, by having them

bring with them and utilize RNN's Confidential Information and Trade Secrets, and by permitting

them to solicit RNN's clients for AHS's benefit.

171.    RNN has suffered damages as a result of AHS's unjustified interference.

172.    RNN also has advantageous business and contractual relationships with its facility

clients and nurse providers, including without limitation S.G., S, S., T. M., M. R., D. C., N. V., J.

N., A. M., M. D., S.  L., and H. H.

173.    Defendants, who are well aware of these relationships, nevertheless actively

solicited and continue to solicit a number of RNN's nurse clients and, upon information and belief,

facility clients, with full knowledge of their business relationships and contracts with RNN.

174.    Defendants intentionally and unjustifiably interfered with RNN's contractual and

business relationships with its nurse clients by inducing them to and/or assisting them to quit their

placements secured through RNN and/or choosing not to continue doing business with RNN and

instead to do business with Shafer and Rossi at AHS.

175.    Upon information and belief, Defendants have diverted business opportunities from

RNN by directly contacting facility clients about placements Shafer and Rossi were working on or

learned about at RNN in order to fill those opportunities through AHS and by soliciting them to

do business with AHS instead of RNN.

176.    RNN has suffered damages as a result of Defendants' unjustified interference with

its client contracts and business relationships.

WHEREFORE, RNN demands the following:

(a)    injunctive relief preventing Defendants from continuing to interfere with

RNN's business relationships and contracts;

42

**App. 058**

CASE NO.: _____

    (b)      actual damages flowing from the tortious interference; and

    (c)      all other remedies available at law or in equity as this Court deems just and appropriate.

### COUNT VIII –AIDING AND ABETTING BREACH OF CONTRACT
### (against AHS)

177.    RNN repeats and reasserts each and every allegation contained in paragraphs 1-111 of this Verified Complaint, as though fully set forth herein.

178.    RNN has valid and enforceable agreements with Shafer and Rossi.

179.    Upon information and belief, AHS knew at the time they hired Shafer and Rossi that such would be a violation of the Shafer and Rossi Agreements.

180.    When AHS received the Cease and Desist Letter, AHS knew that its continued employment of Shafer and Rossi was a violation of the Shafer and Rossi Agreements.

181.    Defendants, who are well aware of the Shafer and Rossi Agreements, nevertheless hired and continued to employ Shafer and Rossi in violation of same.

182.    AHS encouraged, instigated and substantially assisted Shafer and Rossi to breach their restrictive covenants by hiring them, and as a result thereof, is jointly liable with Shafer and Rossi for any and all appropriate and effective relief permitted by law and equity, including section 542.225(j).

183.    RNN has suffered damages as a result of AHS's aiding and abetting Shafer and Rossi's breach of their Agreements.

WHEREFORE, RNN demands the following:

    (d)      injunctive relief preventing AHS from continuing to aid and abet Shafer and Rossi's restrictive covenants;

    (e)      actual damages flowing from the tortious interference; and

CASE NO.: _____

     (f)     all other remedies available at law or in equity as this Court deems just and appropriate.

### COUNT IX – INJUNCTIVE RELIEF
### (against all Defendants)

184.    RNN repeats and reasserts each and every allegation contained in paragraphs 1-111 of this Verified Complaint, as though fully set forth herein.

185.    If not enjoined, Shafer and Rossi will continue to violate their restrictive covenant agreements, and all of the Defendants, including AHS, will continue to use and disclose RNN's Confidential Information and Trade Secrets they unlawfully obtained to undermine RNN in the industry, to cause RNN to sustain reputational harm, and to cause RNN the ongoing loss of its Confidential Information and Trade Secrets, which will result in additional irreparable harm for which monetary damages would be an inadequate remedy.

186.    Accordingly, RNN seeks an order enjoining Shafer and Rossi from continuing to violate the restrictive covenants in their Agreements and enjoining all of the Defendants, including AHS, from continuing to use, transfer and/or disclose RNN's Confidential Information and Trade Secrets, which they improperly obtained and/or retained.

187.    Finally, RNN seeks an order enjoining Shafer, Rossi, and AHS from continuing to tortiously interfere with RNN's contractual and business relationships with its clients.

188.    RNN also seeks an order requiring Defendants to immediately return to RNN all of RNN Confidential Information and Trade Secrets and other documents and property in their possession, custody and/or control.

WHEREFORE, RNN demands the following:

     (a)     injunctive relief enjoining Shafer, Rossi, and AHS from directly or indirectly transferring, using, or disclosing RNN's Confidential

**App. 060**

CASE NO.: _____

Information;

(b)     injunctive relief enjoining Shafer and Rossi from violating their non-competition and non-solicitation agreements;

(c)     injunctive relief enjoining AHS from using RNN's Confidential Information and Trade Secrets it has obtained through its employment of the Shafer and Rossi;

(d)     injunctive relief enjoining Defendants from tortiously interfering with RNN's business relationships with its provider clients; and

(e)     all other remedies available at law or in equity as this Court deems just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, RNN respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A.     Injunctive relief (including a preliminary injunction and permanent injunction) against Shafer, Rossi, and AHS (i) enjoining them from retaining and/or using RNN's Confidential Information and Trade Secrets that they took and/or improperly obtained; (ii) directing them to return to RNN the Confidential Information and Trade Secrets in whatever form in which they exist in Defendants' possession; (ii) enjoining the transfer of the Confidential Information and Trade Secrets to any third party; (iii) requiring Defendants to identify all copies and all transfers of the Confidential Information and Trade Secrets, including the identity of any third party receiving or obtaining the Confidential Information and Trade Secrets or a copy thereof; (iv) prohibiting Defendants from misappropriating, using, or disclosing RNN's Confidential Information and Trade Secrets in their possession; and (v) enjoining Shafer and Rossi from violating the restrictive covenants in their Agreements;

B.     An award of monetary damages in an amount to be determined at trial including, but not limited to, the disgorgement of all profits Defendants were and/or will be paid by RNN's clients as a result of their misconduct;

C.     An award of exemplary damages.

CASE NO.: _____

    D.      An award of attorneys' fees and costs.

    E.      An award of RNN's costs and expenses of this suit.

    F.      Such other and further relief that the Court deems just and proper.

Dated: September 5, 2023

                              Respectfully submitted,

                              By: *s/ Jennifer A. Schwartz*
                                  Jennifer A. Schwartz, Esq.
                                  Florida Bar No. 502431
                                  E-mail:  *jennifer.schwartz@jacksonlewis.com*
                                  Adam Schultz, Esq.
                                  Florida Bar No. 121111
                                  E-mail:  *adam.schultz@jacksonlewis.com*
                                  JACKSON LEWIS P.C.
                                  One Biscayne Tower, Suite 2500
                                  Two South Biscayne Boulevard
                                  Miami, Florida  33131
                                  Telephone:  (305) 577-7600
                                  Facsimile:  (305) 373-446
                                  *Counsel for the Plaintiff*

## VERIFICATION

Pursuant to 28 U.S. Code § 1746, I declare under penalties of perjury that I am Vice President of RNN, and that I have read the foregoing Verified Complaint, and that the facts stated in it are true and correct to the best of my knowledge and belief.

Lynne Gross, President

# DE 1-2

# EXHIBIT A

## EMPLOYMENT AGREEMENT
## INCLUDING CONFIDENTIALITY, NON-COMPETITION
## AND NON-SOLICITATION PROVISIONS

This Employment Agreement Including Confidentiality, Non-Competition and Non-Solicitation Provisions (this "Agreement") is hereby made and entered into by and between CHG Healthcare Services, Inc., and all of its parent, subsidiary, and affiliated corporations, companies, and business entities, including but not limited to CHG Companies, Inc., CHG Medical Staffing, Inc., CHG Management, Inc., CompHealth Associates, Inc. and Weatherby Locums, Inc. (collectively, the "Company"), and Rachel Shafer ("Employee"), on July 26, 2012 (the "Effective Date").

### RECITALS

WHEREAS, the Company is engaged in the business of recruiting, staffing and placing healthcare and healthcare-related personnel, including, without limitation, physicians, nurses, pharmacists and allied healthcare professionals of all specialties and other staffing candidates (collectively, "Healthcare Personnel"), for positions with healthcare institutions, medical practices, clinics, hospitals, healthcare businesses, retailers, and other businesses, customers or clients (collectively, "Clients") on a permanent and/or temporary basis (collectively, with any future business the Company conducts, the "Business");

WHEREAS, the Company has developed and acquired and will continue to develop and acquire, at great cost and expense, Confidential Business Information (as defined below), to which Employee, in the course of employment with the Company, will have access;

WHEREAS, the Confidential Business Information is critical to the effective and successful conduct of the Business and the Company's goodwill, and derives independent economic value from not being generally known and readily ascertainable;

WHEREAS, great loss and damage would be sustained by the Company if, during the term of this Agreement or following its termination, Employee were to make any of the Confidential Business Information available to other persons or entities engaged in competition with the Company or use the same in competition with the Company;

WHEREAS, the Company desires to protect its goodwill, its investment in the education and training of Employee, its Client and Healthcare Personnel relationships, its present and future Confidential Business Information and its competitive advantage and present and future business prospects; and

WHEREAS, Employee desires to be employed by the Company on an at-will basis, and the Company is willing to employ and train Employee only upon the terms, conditions and restrictions set forth herein, and the parties desire to define the duties, responsibilities, covenants, and restrictions of each of the parties hereto.

**AGREEMENT**

NOW THEREFORE, in consideration of the promises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties hereby agree as follows:

1. **Exclusive Employment; Duties; Compensation.**

(a)     The Company hereby agrees to employ Employee as an at-will employee pursuant to the terms and conditions set forth herein, and Employee agrees to become so employed by the Company. Employee agrees to devote Employee's exclusive business time, attention and skill to the business of the Company. Employee agrees not to accept any other employment that would conflict with the performance of the duties prescribed by the Company while this Agreement is in effect, except with the prior written consent of the Company. Employee's compensation hereunder shall be determined from time to time by the Company and in the Company's sole discretion.  Employee shall be entitled to participate in those employee benefit plans and other benefits and incentives as the Company shall determine in its sole discretion.

(b)     Employee shall, at all times and to the best of Employee's ability, experience and talent, perform all duties and render all services that may be required of and from Employee pursuant to the terms hereof or as may be directed from time to time by Employee's superior employees.  Such duties shall be rendered at such places and times as the Company shall in good faith require or as the interests, needs, business and opportunities of the Company shall require or make advisable.

2. **Confidential Business Information.** "Confidential Business Information" shall mean, individually and collectively, any and all trade secrets and other confidential and proprietary information of the Company (including confidential and proprietary information of a third party in the possession of the Company), whether in oral, written, electronic or other form, and whether or not legended or otherwise identified as Confidential Business Information, including, without limitation, information relating to current, former and prospective Clients (including, without limitation, names, addresses, telephone numbers, email addresses, mailing lists, contact persons, records of Client usage, preferences, requirements, job openings and staffing needs, rates, fees and compensation information, licensing and credentialing information and requirements, contract terms, and prospects), current, former and prospective Healthcare Personnel (including, without limitation, names, addresses, telephone numbers, email addresses, mailing lists, other personal and contact information, records of Healthcare Personnel staffing history, preferences, and requirements, licensing and credentialing information and requirements, rates, fees, benefits, and compensation information, contract terms, and prospects), methods and types of recruitment and placement services, methods of service preferred by Clients and Healthcare Personnel, sales and marketing information, methods and programs (including, without limitation, sales and marketing data, promotional strategies and programs, advertising plans, market research and analyses, and sales techniques), leadership, training, coaching and employee development programs and methods, documents, agreements, contracts and other arrangements, employee, independent contractor and consultant information (including, without limitation, compensation and benefits information, terms and conditions of employment or engagement, and performance reviews and evaluations), matters of internal organization, plans, policies, procedures, manners of operation, customized software, computer and management

**App. 066**

information systems, passwords, manuals, trade secrets, know-how and other intellectual property, business plans and forecasts, financial statements, budgets, financial reports and analyses, accounting and statistical data, other financial information relating to the business of the Company, and other confidential and proprietary information of the Company.

3.    **Assignment of Certain Rights.**

(a)    "Invention" means any and all inventions; innovations; discoveries; improvements; designs; works of authorship; derivative works; processes; computer software and related information; patent applications; databases; mask works; trade secrets; know-how; technology; copyrights; trademarks, trade dress, trade names, or service marks; Website ideas and plans, including but not limited to look and feel; and other intellectual property or proprietary information rights, whether tangible or intangible, or any part of or modification, renewal, extension, continuation, registration or existing or future rights with respect to the foregoing (whether or not reduced to practice, patentable, or registrable under trademark, copyright or similar laws). "Employee Invention" means any and all Inventions that are: conceived, developed, authored, invented, reduced to practice, or otherwise created by Employee, either alone or jointly with others, (i) as a result of any work, services or duties performed by Employee for the Company or otherwise within the scope of Employee's employment, (ii) on the Company's time, and/or (iii) with the aid, assistance, or use of any of the Company's property, equipment, facilities, supplies, resources, or Confidential Business Information.

(b)    Employee hereby irrevocably grants, conveys, and assigns to the Company all right, title, and interest in and to any and all Employee Inventions. Employee hereby forever waives and agrees never to assert any rights that Employee may have in or regarding any Employee Invention, even after termination of Employee's employment with the Company for any reason. Employee further agrees that all works of authorship that he/she creates (including, without limitation, any Employee Invention), whether alone or jointly with others, within the scope of and during any employment with the Company are "works made for hire" authored and owned by the Company under the United States Copyright Act.

(c)    Employee agrees: (i) to promptly and fully inform the Company of any Employee Invention; (ii) to assist and maintain complete and accurate records of all Employee Inventions; (iii) to acknowledge and deliver promptly to the Company (without charge to, but at the expense of, the Company) such written instruments and to do such other acts as may be necessary in the Company's opinion to obtain, maintain and enforce patents, copyrights, mask work rights, trademarks, trade secrets, and other legal protections for any Employee Inventions.

(d)    Attached hereto as Exhibit A is a list describing all Inventions (if any) which were made, authored, created or developed by Employee prior to employment with the Company (collectively referred to as "Prior Inventions"), which relate to the Company's existing or proposed business and which are not assigned to the Company.  If a list is not attached as Exhibit A, Employee represents that there are no such Prior Inventions. If, in the course of employment with the Company, Employee incorporates a Prior Invention into an Invention of the Company (whether or not an Employee Invention), Employee hereby grants to the Company a nonexclusive, royalty-

free, irrevocable, perpetual, worldwide license to make, have made, modify, create derivative works of, register copyright in the name of the Company, use, and sell such Prior Invention as part of or in connection with such Invention of the Company.

### 4.   Duty of Confidentiality.

**(a)**   Employee covenants and agrees to not, at any time or in any manner, use any of the Confidential Business Information for any purpose other than as reasonably necessary in the performance of Employee's duties for the Company and for the exclusive benefit of the Company. Employee shall not at any time, both during and after employment with the Company (regardless of the manner or reason of termination or cessation of employment with the Company), or in any form or manner, either directly or indirectly, copy, disseminate, divulge, disclose, transfer or communicate any Confidential Business Information to any other employee or to any other person or entity except as reasonably necessary in the performance of Employee's duties for the Company.

**(b)**   Employee agrees that all Confidential Business Information is the sole and exclusive property of the Company. Employee further agrees that all files, documents, works, papers, electronic files and information and other materials containing any Confidential Business Information or information which Employee prepares, uses, possesses or controls that affects or relates to the business of the Company are the sole property of the Company. Employee agrees to take all steps necessary, and all steps requested by the Company, to ensure that the Confidential Business Information is kept confidential and to comply with all applicable policies and procedures of the Company regarding the use, disclosure, maintenance and security of the Confidential Business Information.

**(c)**   Upon the termination of Employee's employment with the Company (regardless of the manner or reason of termination), Employee shall immediately return to the Company all Confidential Business Information, Company assets, and other information and property obtained from or relating to the Company or to which Employee has access, in good condition, normal wear and tear excepted, and shall not retain any copies thereof, whether in hard copy or electronic form.

**5.   Non-Competition Agreement.**   Employee agrees that, beginning on the Effective Date and continuing for one (1) year from the later of (i) the date Employee's employment with the Company is terminated or otherwise ceases (regardless of the manner or reason of termination or cessation) or (ii) the latest date on which Employee breaches any of the provisions of Sections 4, 5, 6, or 7 hereof (the later one-year period being referred to as the "Covenant Period"), Employee shall not, anywhere in the United States, directly or indirectly, individually or jointly, whether as an officer, director, partner, shareholder, member, owner, employer, employee, agent, independent contractor, advisor, consultant, debtor, guarantor or otherwise, engage in, have an interest or investment in, lend funds or become indebted to, be associated with, advise or assist others with, be employed by or otherwise render services to any person or entity that is engaged in or competes with the type(s) of staffing that Employee was engaged in at any time during Employee's last three (3) years of employment with the Company. The Company and Employee agree that for purposes of this Section 5, the "types" of staffing the Company engages in include, without limitation, physician staffing, nurse staffing, allied staffing and such other segment of staffing engaged in by the Company in the future. Employee further agrees and understands that regardless of the type(s) of staffing engaged in by Employee during

Employee's last three years of employment with the Company, this restriction applies to both temporary (including "locum tenens") and permanent staffing within such type(s) of staffing (e.g. Employee could not work in allied temporary staffing if Employee had worked in allied permanent staffing at any time during Employee's last three years of employment with the Company). By way of example, if Employee worked in, supported, managed or otherwise engaged in, in any capacity, physician staffing at any time during Employee's last three years of employment with the Company, Employee agrees not to work in, support, manage or otherwise engage in, in any capacity, physician staffing on a permanent or locum tenens basis during the Covenant Period. By way of further example, if Employee worked in, supported, managed or otherwise engaged in, in any capacity, physician staffing and nurse staffing at any time during Employee's last three years of employment with the Company, Employee agrees not to work in, support or manage or otherwise engage in, in any capacity, physician and nurse staffing on a permanent or temporary basis during the Covenant Period. Employee acknowledges that because of Employee's access to the Company's Confidential Business Information, and because of the nationwide nature of the Business, a violation of this covenant will cause irreparable injury to the Company. The ownership of less than two percent (2%) of a publicly-traded corporation or entity shall not be deemed, by itself, to violate the non-competition provisions of this Section 5.

6. **Non-Solicitation of Healthcare Personnel or Clients.**  Employee agrees that, during the Covenant Period, Employee shall not, in any manner, either directly or indirectly, for Employee's own behalf or for or on behalf of any other person or entity (other than the Company), solicit, recruit, offer or otherwise provide services, or attempt to solicit, recruit, offer or otherwise provide services, that are the same as or similar to the Business to any current, former or prospective Healthcare Personnel or Clients of the Company with whom Employee worked with or serviced, communicated with, had contact in any manner, or otherwise was aware of during Employee's last three (3) years of employment with the Company. Employee further agrees that, during the Covenant Period, Employee shall not, in any manner, either directly or indirectly, induce, encourage, solicit or cause, or attempt to induce, encourage, solicit or cause Healthcare Personnel or Clients to cease doing business with, or otherwise change or diminish the Healthcare Personnel or Clients' business with, the Company.

7. **Non-Solicitation of Employees.**  Employee agrees that, during the Covenant Period, Employee shall not, in any manner, either directly or indirectly, for Employee's own behalf or for or on behalf of any other person or entity (other than the Company), solicit, divert, induce or otherwise cause, attempt to cause or encourage employees or agents of the Company to terminate employment with the Company, enter into any employment, consulting or advisory arrangement or contract with or to perform any services for or on behalf of Employee or any other person or entity (other than the Company), or to enter into any kind of business, including without limitation the Business or any similar business. Employee further agrees that, during the Covenant Period, Employee shall not, in any manner, either directly or indirectly, for Employee's own behalf or for or on behalf of any other person or entity (other than the Company), hire or engage or attempt to hire or engage, in any capacity, any employee or agent of the Company. For purposes of this Section 7, "employee" or "agent" (whether in the singular or plural) shall mean and refer to any individual who was an employee or agent of the Company at the time of the attempted or actual solicitation, diversion, inducement, encouragement, hiring, engagement or similar action.

8. **Notice to Subsequent Employer.**  Employee agrees that, during the Covenant Period, Employee will provide a copy of this Agreement to any subsequent employer of Employee. Employee further agrees that the Company may provide a copy of this Agreement to

any subsequent employer of Employee and that such action by the Company shall not be used as the basis for a claim of negligent or intentional interference with contract or prospective economic advantage, breach of the covenant of good faith and fair dealing, blacklisting, or otherwise.

**9.   Prior Agreements.** Employee hereby represents that Employee is not restricted by any prior agreement(s) with any other person or entity that would, in any way, conflict with or prevent the execution of the responsibilities that pertain to Employee's position with the Company. Employee shall not disclose to the Company, or use in the performance of his/her work or responsibilities for the Company, any proprietary or confidential information, trade secret, or other intellectual property of (a) Employee, (b) any former employer of Employee, or (c) any other individual or entity, unless the Company has received written authorization from Employee or such former employer or other Person and the Company has instructed Employee in writing to do so.  The provisions of this Section 9 are not intended to create any rights as an intended or third-party beneficiary for any third party.

**10.   Miscellaneous.**

**(a)   Acknowledgement of Restrictions.** Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions set forth herein (including without limitation, the scope, the time period of restriction and the geographical areas of restriction set forth in Sections 5, 6, and 7 hereof) are fair and reasonable and are reasonably required for the protection of the business interests and goodwill of the Company and to prevent irreparable harm to the foregoing.

**(b)   Reformation; Severability.** The Company intends to restrict Employee under this Agreement only to the extent necessary for the protection of the Company's legitimate business interests.  The Company and Employee agree that the scope, duration, and geographic area provisions are reasonable.  In the event a court of competent jurisdiction concludes that any provision of this Agreement is too restrictive, such provision(s) shall nevertheless be valid and enforceable to the fullest extent permitted by such court, and such provision(s) shall be reformed to the maximum scope, time, and/or geographic limitations determined appropriate by such court. If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**(c)   Injunctive Relief.** Employee specifically acknowledges that a breach of this Agreement by Employee (particularly with respect to the covenants and restrictions in Sections 3, 4, 5, 6, and 7) will cause the Company to suffer irreparable damage and other damages beyond those that can be calculated. Employee further agrees and acknowledges that money damages would not be a sufficient remedy for a breach of this Agreement and that the Company shall be entitled to equitable relief, including, without limitation, injunctive relief and specific performance, as a remedy for any actual or threatened breach of this Agreement (particularly with respect to the covenants and restrictions in Sections 3, 4, 5, and 7).  Employee hereby expressly waives any and all right or requirements to prior notice or for security or the posting of any bond in connection with temporary injunctive relief or other such equitable or injunctive remedies on behalf of the Company. The rights and remedies provided for in this Agreement are cumulative, and such rights, remedies and equitable relief shall not be deemed to be the

exclusive remedies for a breach of this Agreement by Employee, but shall be in addition to all other remedies available at law or equity to the Company.

**(d)      Assignment.**  Employee shall not assign or delegate Employee's rights, duties or obligations pursuant to this Agreement to any other person.  Employee acknowledges and agrees that the Company may assign any of its rights or obligations under this Agreement without the consent of Employee, including, without limitation, an assignment to any purchaser or successor of the Company.

**(e)      Entire Agreement; Survival.**  This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between Employee and the Company with respect thereto. Notwithstanding the foregoing, nothing in this Agreement shall be construed as relieving Employee of the duty to comply with the Company's rules, policies, and practices.

The provisions of this Agreement shall survive the termination of this Agreement (including, without limitation, the provisions of Sections 3, 4, 5, 6 and 7), except that the Company and Employee shall have no further obligations under Section 1 hereof.

**(f)      Governing Law; Venue.**  Employee and the Company agree that the validity, interpretation, construction, effect, and enforcement of this Agreement shall be governed by the laws of the State of Utah, without regard to any conflict-of-law rules or principles that would require the application of the substantive law of a State other than Utah. Each party hereto  (i) agrees that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in the courts of the State of Utah or of the United States of America located in the State of Utah, Salt Lake County; (ii) waives any objection that such party may have now or hereafter to the venue of any such suit, action or proceeding; and (iii) irrevocably consents and submits to the personal jurisdiction of the courts of the State of Utah and the United States of America located in the State of Utah, Salt Lake County, in any such suit, action or proceeding.

**(g)      Litigation; Jury-Trial Waiver; Attorney's Fees and Costs.**  The parties to this Agreement acknowledge and agree that any litigation to enforce or defend any rights under this Agreement, and any litigation arising out of or in connection with Employee's employment by the Company, **SHALL BE CONDUCTED BEFORE AND TRIED TO A JUDGE WITHOUT A JURY, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY WAIVING THEIR RIGHT TO TRIAL BY JURY. THIS PROVISION APPLIES TO ALL CLAIMS BY EMPLOYEE AGAINST THE COMPANY ARISING OUT OF EMPLOYEE'S EMPLOYMENT, INCLUDING BUT NOT LIMITED TO CLAIMS ARISING UNDER THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, THE AGE DISCRIMINATION IN EMPLOYMENT ACT, AS AMENDED, THE AMERICANS WITH DISABILITIES ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE FAIR LABOR STANDARDS ACT, THE EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA"), AS AMENDED, THE CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT ("COBRA"), ANY STATE OR FEDERAL "WHISTLEBLOWER" PROTECTION LAWS, ANY STATE OR LOCAL CIVIL RIGHTS OR EMPLOYMENT DISCRIMINATION LAWS, ANY CLAIMS OR CAUSES OF ACTION BASED ON TORT OR CONTRACT THEORIES, AND ANY OTHER CLAIM OR CAUSES OF ACTION ARISING UNDER FEDERAL, STATE OR LOCAL**

**STATUTORY OR COMMON LAW**.

In any dispute under this Agreement, each party agrees to pay for its own direct, indirect or incidental expenses incurred, including, but not limited to, its own attorney's fees, court costs and other expenses incurred throughout all negotiations, trials or appeals undertaken in order to enforce its rights under this Agreement, despite any statutory or case law to the contrary.

**(h)** **Waiver; Amendment.** No failure or delay by either party in exercising any right, power, privilege or restriction hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or waiver thereof preclude any other or further exercise thereof or the exercise of any other right, power, privilege or restriction hereunder. This Agreement may be amended or modified only by written agreement executed by all of the parties hereto.

**(i)** **Company Affiliates**. Employee understands and agrees that this Agreement is executed by the Company on its own behalf and on behalf of each of its subsidiaries and affiliates, including the particular entity by whom Employee is employed, and that Employee's obligations under this Agreement shall apply equally to each of the Company and its subsidiaries and affiliates. In the event that Employee is transferred or assigned to or otherwise becomes employed by any other of the Company's subsidiaries or affiliates, Employee's obligations under this Agreement shall continue to apply equally to each of such subsidiary or affiliate and to the Company and its other subsidiaries and affiliates and any of such parties may enforce this Agreement in its own name as if it were a party to this Agreement.

**(j)** **Notices.** All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly given only upon hand delivery thereof or upon the fifth (5th) business day after mailing by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

> To the Company: Attn: Director of Human Resources
>
> 6440 South Millrock Drive, Suite #175
>
> Salt Lake City, Utah 84121

> To Employee: The last known address the Company has on file for Employee
>
> 11313 Coral Reef Drive
> Boca Raton, FL 33498

or to such other address or such other person as any party shall designate, in writing, to the other for such purposes and in the manner hereinabove set forth.

**(k)** **Further Assurances.** The parties hereto will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purposes of this Agreement.

**(l)** **Voluntary Nature of the Agreement.** Employee acknowledges and agrees that Employee has carefully read and understands this Agreement, has had the opportunity to consult with counsel of Employee's own choosing about this Agreement, and that Employee is entering this Agreement knowingly and voluntarily.

**(m)** **Headings; Singular/Plural.** The headings used in this Agreement are for convenience only and are not intended to be used in its construction or interpretation. In

interpreting this Agreement, the singular shall include the plural, and the plural the singular, as appropriate to the content and context of the provision at issue.

**EMPLOYEE IS AN EMPLOYEE AT WILL AND MAY RESIGN OR BE TERMINATED BY THE COMPANY, AT EITHER PARTY'S SOLE DISCRETION, AT ANY TIME, WITH OR WITHOUT NOTICE, WITHOUT NEED TO SHOW REASON OR CAUSE, SUBJECT TO THOSE OBLIGATIONS HEREUNDER THAT SURVIVE TERMINATION OF THIS AGREEMENT. EMPLOYEE AGREES THAT (A) NO EMPLOYEE HANDBOOK OR OTHER POLICY OR PROCEDURE FOLLOWED BY THE COMPANY OR (B) NO WRITTEN OR ORAL STATEMENT MADE BY ANY OFFICER, DIRECTOR, MANAGER, SUPERVISOR, OR CO-WORKER OF THE COMPANY CAN MODIFY THE AT-WILL NATURE OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY AS SET FORTH IN THIS AGREEMENT.**

**IN WITNESS WHEREOF,** the undersigned parties have executed the foregoing Employment Agreement Including Confidentiality, Non-Competition and Non-Solicitation Provisions as of the date first above written.

EMPLOYEE                                    COMPANY

_Rachel Shafer_                             _Ann Suh_
Signature of Employee                       Signature

_Rachel Shafer_                             _Mgr. Administration_
Name of Employee (Typed or Printed)         Title

**App. 073**

**EXHIBIT A**

**<u>PRIOR INVENTIONS</u>**

# DE 1-3

# EXHIBIT B

3/30/23

Rachel Shafer
10064 Boca Vista Dr
Boca Raton, FL 33498

Re: Employment Agreement

Dear Rachel,

I am writing to remind you of your obligations under the employment agreement you executed during your employment and provide a copy of this agreement.  Please review the entire agreement with special attention to the sections concerning Non-Competition, Non-Solicitation of Customers and Non-Solicitation of Employees.

We anticipate that you will not participate in any of these activities; however we did want to bring these obligations to your attention.  If you do violate the obligations you agreed to, we will not hesitate to take all necessary legal actions to force you to stop all violations.

If you have any questions regarding the agreement, please do not hesitate to contact me at the number listed below.  I wish you the best of luck in your future career endeavors.

Sincerely,

*Keela Briles*

Keela Briles
Consultant, Employee Relations
Keela.Briles@chghealthcare.com
954-837-2694

Enclosures: Employee Agreement

**App. 077**

# DE 1-10

# EXHIBIT I

# JacksonLewis

Jackson Lewis P.C.
One Biscayne Tower
2 South Biscayne Blvd, Suite 3500
Miami FL 33131
(305) 577-7600 Direct
(305) 373-4466 Fax
jacksonlewis.com

My Direct Dial is: 305.577.7603
My Email Address is: Jennifer.schwartz@jacksonlewis.com

July 14, 2023

**SENT VIA EMAIL & CERTIFIED MAIL**

Rachel Shafer
10064 Boca Vista Dr
Boca Raton, FL 33498
Email: rachel.shafer@gmail.com

> Re:   **Cease and Desist Violating Non-Compete Agreement**
> **Post-Employment Obligations to CHG Healthcare Services, Inc.**

Dear Ms. Shafer:

We serve as counsel to your former employer, CHG Healthcare Services, Inc. ("CHG" or the "Company"). As you are aware, on July 26, 2012, you entered into an Employment Agreement Including Confidentiality, Non-Competition and Non-Solicitation Provisions (the "Agreement") with CHG, which contains certain post-employment obligations. It has come to CHG's attention that you have failed to comply with those obligations and engaged in conduct that violates the Agreement.

CHG has learned that since your employment ended on April 3, 2023, you have been working for its competitor, AHS Staffing ("AHS"), another healthcare staffing company, in an identical or nearly identical position recruiting and placing Nurses and Nurse Practitioners. CHG also has learned that you improperly retained confidential client and provider contact information that you acquired during your employment and that you have been soliciting CHG's clients and providers (collectively "Clients") to do business with you at AHS. Your employment with AHS, retention of CHG's information, and solicitation of CHG's Clients constitute a direct violation of your Agreement. This letter is to remind you that you are subject to legally enforceable non-competition, non-solicitation and confidentiality provisions set forth in the Agreement. A copy of the Agreement is enclosed herein.

## A.   Non-Competition Agreement

In Section 5 of the Agreement, you agreed that during your employment and for a period of one (1) year following your separation from employment with CHG (until April 3, 2024), you would not directly or indirectly be employed by or otherwise render services to any person or entity that is engaged in or competes with the type(s) of staffing that [you] were engaged in at any time during [your] last three (3) years of employment with the Company." You agreed that "types of staffing" include, without limitation, physician staffing, nurse staffing and allied staffing . . ." This means that you are contractually prohibited from recruiting, placing and staffing physicians and nurses, both on a permanent and locums basis, through at least

**App. 080**

**JacksonLewis**

Rachel Shafer
July 14, 2023
Page 2

April 3, 20204.  However, it has come to CHG's attention  - through its Clients – that you have been contacting them on behalf of AHS and soliciting their business.  This is precisely the type of competition that is prohibited by your Agreement, and your actions constitute a direct and material breach of your Agreement.

**B.       Confidentiality Agreement**

In Section 4(a) of the Agreement, you agreed to not "at any time or in any manner, use any of [CHG's] Confidential Business Information for any purpose other than as reasonably necessary in the performance of [your] duties for the Company and for the exclusive benefit of the Company."  You also agreed to not "at any time, both during and after employment with the Company . . . directly or indirectly, copy, disseminate, divulge, disclose, transfer or communicate any Confidential Business Information to any other employee or to any other person or entity except as reasonably necessary in the performance of Employee's duties for the Company.  "Confidential Business Information"  is defined in Section 2 to include "information relating to current, former and prospective Clients (including without limitation names, addresses, telephone numbers, email addresses, mailing lists, contact persons, records of Client usage, preferences, requirements, job openings and staffing needs, rates, fees and compensation, licensing and credentialing information and requirements, contract terms and prospects), methods and types of recruitment and placement services, methods of service preferred by Clients . . .  and other confidential and proprietary information of the Company."

This means not only are you required to keep confidential information, such as client names, provider names, and contact information, among other things, confidential, but that you also cannot use this information to further your interests at AHS or to harm CHG subsequent to your separation from the Company.  The fact that you have retained client and provider contact information and have been using it to place providers you worked with at CHG through AHS is a direct breach of your confidentiality agreement.

**C.       Remedies Including Injunctive Relief**

Finally, pursuant to Section 10 (c) of the Agreement, you specifically acknowledged and agreed that "a breach of this Agreement by [you] … will cause the Company to suffer irreparable damage and other damages beyond those that can be calculated."  You further agreed "that money damages would not be a sufficient remedy for a breach of this Agreement and that the Company shall be entitled to equitable relief, including, without limitation, injunctive relief and specific performance, as a remedy for any actual or threatened breach of this Agreement."  Should you continue to violate the terms of your Agreement by working for a competitor and continuing to solicit CHG's clients during the restricted period, we will take appropriate legal action and seek all remedies available pursuant to your Agreement, in addition to those available by law.

*       *       *

CHG intends to enforce the terms of your Agreement.  If you do not take immediate corrective steps to comply with your Agreement, CHG has instructed us to take all appropriate legal action and seek all remedies available to it by law.  Among other things, CHG will ask the Court for entry of an order enjoining you from continuing to work for its competitor, AHS.  We also will ask the Court to enjoin you from soliciting CHG's clients and providers and from using its Confidential Business Information you retained in order to

**App. 081**

# JacksonLewis

do so.  Finally, we will seek an order from the Court requiring you to pay damages to the Company for the harm your actions have caused, as well as other monetary losses, reputational harm, and other damages that may be revealed during the discovery process.

Please confirm in writing directed to me no later than **Friday, July 21, 2023**, that you will refrain from further violations of the Agreement.   In other words, please confirm you will abide by your Agreement and that you will refrain from recruiting and/or placing physicians, nurses, physician assistants, pharmacists and allied health professionals of all specialties during the one (1) year restricted period and cease your employment with AHS until that time.  We also require written confirmation from AHS that you have, in fact, provided it with a copy of the Agreement.  **If we do not receive written confirmation from AHS that you provided it with a copy of the Agreement on or before Friday, July 21, 2023, we will provide AHS with a copy of the Agreement**.

Additionally, as you are now on clear notice of CHG's claims, you are hereby instructed to gather, preserve, protect, and not destroy all potentially relevant evidence in this matter, including, but not limited to, all documents, emails, and text messages regarding your communications with CHG clients during your employment with AHS and your communications with CHG's employees about their leaving to work at AHS. Your failure to do so may give rise to a claim for spoliation of evidence.  Should CHG file a lawsuit, you can expect the Company to serve discovery requests on you seeking certain evidence, including evidence which may reside on your computers or that of any third party (including any servers, handheld/mobile devices, tablets or cell phones).  To avoid spoliation, you will need to preserve data that may be relevant and that we may request on the original media.  Do not simply make copies of files that you believe to be relevant or responsive to document requests.

Because electronic evidence can be modified, corrupted or deleted, you are hereby on notice of your obligation to take reasonable steps to preserve any and all potentially relevant electronic evidence. In particular, you must refrain from deleting or overwriting any hard drive(s), backup tape(s) and other mass storage media that may contain such evidence. You also must refrain from deleting text messages, emails and photos contained on computers, servers, handheld/mobile devices, tablets and/or cell phones which are owned and/or operated by you and/or any third party (or its owners, members, or principals) and/or which are used by you for business purposes.

The instructions contained in this letter should supersede any and all data or record retention policies maintained by you, AHS and/or any third party who has appropriated the information you have taken from CHG.  Documents which would ordinarily be destroyed as part of a routine record management program (such as emails moved to the trash or deleted items folders) must now be preserved. If potentially relevant evidence exists in paper form, then you must keep, protect and maintain such documents, organized in the manner in which you would normally keep them for business purposes.  Any and all potentially relevant documents should be kept, protected and maintained at a location within your control. Your counsel can further advise you about your legal duty to keep, protect and maintain potentially relevant evidence, as well as the severe consequences which can result should you fail to comply with such duty.

Finally, you must return to CHG, through me, by no later than **Friday, July 21, 2023**, any and all copies of documents, emails and other Confidential Business Information you took with you and retained after your employment ended, whether in hard copy or electronic form (including, but not limited to, all

# JacksonLewis

customer lists and contact information and any written work product you prepared during your employment, such as agreements and details of placements, fees, and related information and/or terms with clients).  You must include in the package a signed letter verifying that you have produced all CHG documents to me and that you are no longer in possession of any CHG information.

*       *       *

In view of the above, we ask that you immediately preserve the identified documents and electronically stored information and contact us by **Friday, July 21, 2023,** to discuss, in good faith, a plan by which you can fulfill your legal preservation obligations to CHG, as well as your contractual obligations under the Agreement.  Should you fail to communicate with me by July 21, 2023, I will assume you have no intention of complying with your Agreement. In that event, CHG has instructed us to take all appropriate legal action against you to enforce your post-employment obligations under the Agreement.   We hope that will not be necessary.

Sincerely,

**JACKSON LEWIS P.C.**

Jennifer A. Schwartz
Ranjiv Sondhi

JAS/RS/vp
Enclosure

cc: Nicholas Call, Esq.

# DE 59

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-CIV-61703-SINGHAL

CHG MEDICAL STAFFING, INC, d/b/a   )
RNNETWORK, a Delaware Corporation, )
                                   )
        Plaintiff,                 )
                                   )
    -v-                            )
                                   )
RACHEL SHAFER, an individual,      )
LISLEY ROSSI, an individual, AHS   )
STAFFING, LLC, an Oklahoma Limited )
Liability Company,                 )
                                   )
        Defendants.                )   Fort Lauderdale, Florida
                                   )   October 31, 2023
_____)   10:10 a.m.


TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS

BEFORE THE HONORABLE RAAG SINGHAL

U.S. DISTRICT JUDGE

Appearances:


For the Plaintiff:          JACKSON LEWIS PC
                            BY:  JENNIFER SCHWARTZ, ESQ.
                            BY:  ADAM SCHULTZ, ESQ.
                            2 South Biscayne Boulevard
                            Miami, Florida  33131

For the Defendant:          SHLOMO HECHT, ESQ.
Shafer                      3076 North Commerce Parkway
                            Miramar, Florida  33025



Reporter:                   Karl Shires, RMR, FCRR
(954) 769-5496              Official Court Reporter
                            299 East Broward Boulevard, # 110B
                            Fort Lauderdale, Florida  33301

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1  Appearances:  (continued)

2  For the Defendant:          COLE, SCOTT, KISSANE PA
   AHS Staffing, LLC           BY:  JUSTIN MAYA, ESQ.
3                              BY:  HORACIO RUIZ-LUGO, ESQ.
                               9150 South Dadeland Boulevard
4                              Suite 1400
                               Miami, Florida  33156
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

WITNESS                                                    PAGE

ELEONORE RUFFY, PLAINTIFF'S WITNESS, SWORN ...............35
DIRECT EXAMINATION BY MS. SCHWARTZ ......................35

AMY REED, PLAINTIFF'S WITNESS, SWORN ...................106
DIRECT EXAMINATION BY MS. SCHWARTZ .....................106
CROSS-EXAMINATION BY MR. HECHT .........................114
REDIRECT EXAMINATION BY MS. SCHWARTZ ...................121
RECROSS-EXAMINATION BY MR. HECHT .......................122

KEELA BRILES, PLAINTIFF'S WITNESS, SWORN ...............123
DIRECT EXAMINATION BY MS. SCHWARTZ .....................123
CROSS-EXAMINATION BY MR. HECHT .........................133


EXHIBITS                                              RECEIVED

PLAINTIFF'S EXHIBIT(S) 10 ...............................49
PLAINTIFF'S EXHIBIT(S) 2 ................................61
PLAINTIFF'S EXHIBIT(S) 5 ................................62
PLAINTIFF'S EXHIBIT(S) 13 ...............................73
PLAINTIFF'S EXHIBIT(S) 12 ...............................78
PLAINTIFF'S EXHIBIT(S) 19 ...............................81
PLAINTIFF'S EXHIBIT(S) 15 ...............................83
PLAINTIFF'S EXHIBIT(S) 20 ...............................85
PLAINTIFF'S EXHIBIT(S) 11 ...............................87
PLAINTIFF'S EXHIBIT(S) 23 ...............................90
PLAINTIFF'S EXHIBIT(S) 9 ................................92
PLAINTIFF'S EXHIBIT(S) 8 ................................93
PLAINTIFF'S EXHIBIT(S) 26 ..............................114
PLAINTIFF'S EXHIBIT(S) 22 ..............................132

1    (Call to Order of the Court.)

2    THE COURT:  Okay.  We're here this morning on CHG

3 Medical Staffing, Incorporated versus Rachel Shafer, et al.

4 We're here for a preliminary injunction hearing.  And let me

5 begin by getting appearances, please.

6    MS. SCHWARTZ:  Jennifer Schwartz and Adam Schultz from

7 the law firm of Jackson Lewis on behalf of the plaintiff CHG

8 Medical Staffing.  And with us is our corporate representative

9 and witness Eleonore Ruffy, who is the vice president at

10 RNnetwork.

11    THE COURT:  Great.  Nice to see you all here this

12 morning.

13    And how about for the defense?

14    MR. HECHT:  Good morning, Your Honor.  This is Sam

15 Hecht on behalf of the defendant Rachel Shafer.  And Rachel is

16 along with me.

17    THE COURT:  Good morning.  Good morning.

18    MR. MAYA:  Good morning, Your Honor.  Justin Maya and

19 Horacio Ruiz with Cole, Scott, and Kissane on behalf of the

20 codefendant AHS Staffing, LLC.

21    THE COURT:  Great.  Okay.  Good to have all of you

22 with us.

23    Of course with regard to Lisley Rossi, there was a

24 consent judgment type of document that was entered I guess late

25 last week I would think.

1    So with regard to today's hearing, I do have witness

2    lists and exhibits that I printed last night.  I see some other

3    ones that are up.  These seem to be the same ones.  Nothing new

4    came in since last night though, right, either side?

5    MS. SCHWARTZ:  No, Your Honor.

6    THE COURT:  Okay.  Great.  With regard to the

7    witnesses and kind of the plan going forward, any idea before

8    we start in terms of a time frame?  I know you had asked for a

9    day and a half to two days.

10    In all candor, here's why I'm asking.  The last one

11    that we did, they asked for five hours and it took four days.

12    I really would like to kind of narrow things down as much as I

13    can.  I know you all have your jobs to do.  But to the extent I

14    can help with that, if there's any parameters or anything we

15    can set, I am happy to do that.  What do you think?

16    MS. SCHWARTZ:  Well, Your Honor, we actually this

17    morning reached a resolution with AHS Staffing.  And so I think

18    part of the reason I believe this would take so long is because

19    there were three different lawyers -- at one point four

20    different lawyers that were going to be cross-examining the

21    witnesses.

22    THE COURT:  Okay.

23    MS. SCHWARTZ:  So with this resolution that we'll put

24    on the record in a moment, now I think that will streamline

25    proceedings and hopefully get us out of here in one day.

1          THE COURT:  Okay.  And listen, I'm not going to -- I

2     guess to the chagrin of many of my colleagues, I'm not one who

3     rushes people.  So I'm not trying to say that.  But I just

4     wanted to, at the outset, see if there's anything that I can do

5     to help.

6          Okay.  So then why don't you, Ms. Schwartz, talk to me

7     about the resolution.  And then once you and I guess Mr. Maya

8     have put that on the record, we can move forward with just CHG

9     versus Rachel Shafer.

10          MS. SCHWARTZ:  Do you want me to go?

11          MR. MAYA:  Good morning, Your Honor.  I just want to

12     quickly call to the Court's correction a minor correction that

13     needed to be noted to docket entry 36 --

14          THE COURT:  Sure.

15          MR. MAYA:  -- which is AHS' response in opposition to

16     the preliminary injunction.

17          Your Honor, in that response we took the position,

18     assertion that at the time of the interviews, at the time of

19     hiring, that AHS did not know of the noncompetes.  Since that

20     filing, Your Honor, that is no longer accurate.  So I just

21     wanted to call to the Court's attention that there needs to be

22     a correction to that docket entry 36.

23          And as the Court probably saw, much of the response

24     was dedicated to this lack of knowledge.  Plaintiff and I have

25     agreed to terms to stipulate to narrow the issues before the

1  Court today.  Those include the plaintiff identifying -- or

2  this is my understanding.

3      MS. SCHWARTZ:  Do you want me to put it on the record?

4      MR. MAYA:  Yes.

5      MS. SCHWARTZ:  Okay.  So the resolution reached

6  between the plaintiff and AHS Staffing is that AHS Staffing

7  will agree to the entry of a preliminary injunction at this

8  time prohibiting the company from using, disclosing,

9  transferring, and retaining any of the documents and

10  information that Rachel Shafer had provided to it and/or

11  uploaded to its systems.

12      And the parties had agreed that in order to locate

13  that information, we will agree to search terms and to have

14  AHS' systems searched either by its own internal IT department,

15  Cole, Scott and Kissane, or an outside forensic consultant, and

16  the parties will determine amongst themselves which is more

17  economically feasible to do.

18      THE COURT:  Okay.  And then you'll do some kind of

19  confidentiality agreement or something like that, or that's not

20  necessary since you're going to do it internally?

21      MS. SCHWARTZ:  We may need to do a stipulated

22  confidentiality agreement and --

23      THE COURT:  So typically on those, just so you know,

24  you all will submit them.  We tend to look at them in case

25  there's formatting issues.  But we rarely change any words in

1    terms of a stipulation on a confidentiality agreement.  So
2    whatever you all agree to, if you just submit that, we'll go
3    ahead and get that in as a docket entry.
4              MS. SCHWARTZ:  Okay.  Thank you.
5              THE COURT:  Sure.
6              Okay.  Then let me do this.  How does that affect
7    Rachel Shafer or does it not affect Rachel Shafer in terms of
8    your presentation here today?  Because, obviously, you're
9    learning about this for the first time as well.
10             MR. HECHT:  Yes, Your Honor.  At this point we don't
11   see any way it's going to affect us, so we don't have a reason
12   to object.
13             THE COURT:  Okay.  So we're good to go forward just in
14   that way.
15             With regard to you, I guess the team for AHS, are you
16   still going to be involved in the hearing?  I mean, I don't
17   need you to stay here if you don't think you need to be here.
18   I know a lot of times people will stay until the judge says
19   you're excused.  So I guess that's really what I'm trying to
20   get at.
21             MR. MAYA:  Your Honor, we won't be, I don't think,
22   participating, but --
23             THE COURT:  You're going to monitor.
24             MR. MAYA:  -- if you don't mind, if we can just
25   monitor.

1           THE COURT:  Okay.  No worries then.

2           All right.  Then given all of that I guess,

3   Ms. Schwartz, you'll just present some things in written form

4   over the next couple days, or if not -- I'm not saying today,

5   because you're going to be in court all day, but you'll just

6   provide that to me as soon as you can?

7           MS. SCHWARTZ:  Yes, Your Honor.  We'll prepare an

8   agreed-upon preliminary injunction order similar to what we've

9   submitted for Ms. Rossi, although that one was permanent.

10          THE COURT:  Yes.  Okay.  Then I have in front of me

11  plaintiff's witness and exhibit lists.  I have the defendant's

12  exhibit list and witness list.

13          So the last thing before we start up that sometimes

14  helps is with regard to the exhibit lists, obviously it's

15  understood that you all will be calling witnesses that will

16  talk about these exhibits, but many times there aren't

17  objections to the exhibits or there aren't objections to many

18  of them.  Have you all gone through those just to figure out

19  whether they're all objected to, all un-objected to, anything

20  like that?

21          MS. SCHWARTZ:  No, Your Honor.  I did request on a

22  couple of occasions that Mr. Hecht meet with me in advance of

23  the hearing today to go through the exhibits, but he did not

24  respond to those requests.

25          THE COURT:  I mean, a lot of times on this type of

 1  hearing it's difficult to do that.  But I just --

 2        Mr. Hecht, any idea with regard to plaintiff's exhibit

 3  lists?  You just want to hear it and go as we go or do you

 4  think there's maybe a wholesale no objections and that can

 5  streamline what they offer as well?  What's your thought?

 6        MR. HECHT:  Your Honor, our initial thought is the

 7  Court ordered by last Friday for all the parties to file their

 8  witness and exhibit lists.  We did ours.  We filed.  We

 9  redacted and uploaded our exhibit list.  They haven't.  And we

10  haven't received prior to this hearing any of their exhibit

11  lists.  So we are not really sure -- and that's actually

12  prejudicing us to some degree because I could not review them

13  with my client or prepare for any response to those exhibits.

14  So we are at somewhat of a disadvantage starting this hearing

15  without really knowing what all of the exhibit are.

16        THE COURT:  So did you see docket entry 44?  That's

17  the plaintiff's witness and exhibit lists.  It was filed

18  actually almost at the same time as yours.

19        MR. HECHT:  Yes, Your Honor.  We saw the lists, but we

20  didn't see the actual documents, the actual exhibits itself.

21        THE COURT:  All right.

22        MS. SCHWARTZ:  If I may briefly respond, Your Honor.

23        THE COURT:  Well, you can respond, although as I look

24  at it, I mean, it's the defendant's pay records, the

25  defendant's employment agreements, emails from the defendant.

1    And when I say "defendant," I'm talking about Ms. Shafer.

2          I mean, certainly if the exhibits included some

3    internal documents that you all have that Ms. Shafer isn't

4    copied on, that's one thing.  But I mean --

5          Mr. Hecht, before I get a response, talk to me

6    specifically about which ones you feel you would need to see

7    that aren't already in your possession.

8          MR. HECHT:  So Exhibit No. 1 is pay records.  We don't

9    know what pay records they're referring to and how they want to

10   use it and whether it's accurate or not.  So we haven't seen

11   that.

12         We don't have the -- number 4, the performance

13   improvement plan that was emailed 2/17.  We don't have a copy

14   of that.

15         We don't have number 8, email from Alaina Robertson to

16   Chrissy Evans, nurses leaving to work, that was dated 7/14.

17         We don't have number 9.  Also, an email 7/14, which

18   seems to be an internal email.

19         We don't have -- I don't believe we have number 10,

20   which is email from Eleonore Ruffy to Kerry Black.

21         We have an email dated I believe -- they referencing a

22   an email dated March 28, '23.  We don't have that email.  We

23   have another email that's dated March 23, not March 28.  We're

24   not sure if they're referring to the same one.  But email dated

25   March 28 we don't have.

1          THE COURT:  Okay.

2          MR. HECHT:  And same thing.  We have an email dated

3  March 9, but we don't have number 12, which is an email dated

4  March 10.

5          And the same applies to March 14 and 15.  We don't

6  have 14.  We don't have 15.

7          And we don't have the email March -- number 16, the

8  email dated March 15, '23.

9          The same thing with -- so we have an email with some

10 text messages from March 12th.  I'm not sure why those -- we've

11 seen some text messages that they have attached to their

12 preliminary injunction, but we're not sure if those are the

13 same that we are referring to here because those text messages

14 do not have an email date on it.

15         Same with 21.

16         Same with 22, which is an internal email dated

17 August 9, which we don't have.

18         Exhibit No. 23, an email dated August 30, which is

19 also an email we don't have.

20         We don't have 24.

21         25 says generically "AHS Website."  AHS is a large

22 website, and we don't know exactly which portion of the website

23 they're trying to use and for what use they want to make out of

24 the information on that website.

25         Number 26, they're some screenshots of computer

property we haven't seen.  We don't know what they are.

Same thing number 27, an email from Nela De La Vega, dated March 7.  We haven't seen this email.

And there's a text message in number 29 between Lisley Rossi and SG dated 6/20.  We have seen some text messages that were attached to the complaint.  We're not sure if it's the same or they're referring to a different text message.

Number 30.  We have an attachment to one of our emails that has this -- that has a similar filing, but we're not sure -- we haven't seen this particular file, what they are referring to for "RS W&A Week 6 2023."

I believe we have seen 31 because we have a file with the same name.  But we are -- again, we're not sure if the file that they are presenting differs from the file that we have.

I believe, actually, right before this hearing I had a brief conversation with opposing counsel, and it does seem that there's a discrepancy between the two files based on our conversation and based on their filings as well.  So I'm not sure exactly what their -- how their file looks like and how to -- and how it differs from ours.

And then there is an affidavit from Lisley Rossi.  I believe we have seen an affidavit that they filed yesterday in reply.  I'm not sure if this is the affidavit that they're referring to or if there's another affidavit.

So, yeah, that's -- these are the exhibits that they

1   have identified, we haven't seen, and we are completely

2   prejudiced by not being able to prepare a response to those.

3       THE COURT:  Okay.  And then in light of all of that,

4   now, Ms. Schwartz, response.

5       MS. SCHWARTZ:  Okay.  Your Honor, the order required

6   the parties to file their witness and exhibit lists, which is

7   standard in these restrictive covenant cases.  It did not order

8   an exchange of exhibits.  Nevertheless, as I always do in these

9   cases, I invited Mr. Hecht to meet with me in advance of today

10  to go through the exhibit so we could stipulate to the

11  admissibility of them.  He did not respond to my invitations to

12  do that.  I tried to do it right before we began.  He said we

13  wouldn't have enough time.

14      But I think we basically agree that there shouldn't be

15  really any objections because all of the documents are things

16  that either Ms. Shafer had or sent to herself or were given to

17  her at some point in time, with the exception of maybe a

18  couple, and I just don't think that it should create much --

19  any sort of delay.  Because when you see them, it's documents

20  that are obvious as to what they are and that she had them at

21  some point.  There really wouldn't be a basis for objecting to

22  their admissibility.

23      THE COURT:  All right.  So a couple things.  When you

24  filed this witness list, certainly the expectation was this

25  hearing was going to be against three different defendants.

1   It's now proceeding against one defendant.  So right off the

2   top it may not be that you're going to use all 38 of these

3   exhibits.

4           MS. SCHWARTZ:  Right.

5           THE COURT:  And so certainly some of the ones that

6   were identified just now by Mr. Hecht may not even be ones that

7   you use.  So I think the best course would be -- it would be

8   just to move forward.

9           Mr. Hecht, as each document is going to be used, if it

10  is, you raise your objection, and I'll deal with them

11  individually with regard to just the context in terms of how

12  they come in.

13          But again, let's see, let's see which ones actually

14  are going to be used and which ones aren't, and we'll kind of

15  move forward from that.

16          MS. SCHWARTZ:  One other housekeeping item, Your

17  Honor, is that Mr. Hecht did file exhibits with his exhibit

18  list.

19          THE COURT:  Yes.

20          MS. SCHWARTZ:  And he filed exhibits that did not

21  redact some of my client's confidential and proprietary

22  information that does not belong in the public record.  And we

23  had considered filing a motion to strike that.  And I'm not

24  sure if that is the most appropriate way to remove that data

25  from the public filing.

1      THE COURT:  So what we can do -- I think you would

2  have to file something.  What we can do is basically enter an

3  order that keeps the public from getting access to this --

4  well, it keeps everybody from getting access to this document.

5      And then, Mr. Hecht, what you can do is refile the

6  exhibits under seal.  And then that way you all could get

7  access to it, but nobody else can.  That would be the normal

8  way that we would do it to the extent that you agree that it's

9  proprietary type of information.

10      MR. HECHT:  Your Honor, I just wanted to quickly

11  respond to that.  We did take painstaking steps to make sure to

12  redact all the information we saw we thought was confidential,

13  like all the names, emails addresses, locations.  I'm not sure

14  exactly which information she claims are still confidential

15  that are left there, but certainly our intent was not to

16  disclose anything that they deemed confidential.  And I'm sure

17  if she points out to me what those are, we can come to an

18  agreement to file them under seal.

19      THE COURT:  Sure.  You know, I'm not making any

20  decision based on the argument in terms of, hey, did you do

21  something nefarious.  I don't think that's what's happening

22  here.  I think basically it's just -- for example, in a lot of

23  cases we'll have documents that are filed and it has someone's

24  Social Security number on there.  And people have redacted all

25  sorts of things, but they just missed something.  So it

1  could -- that's kind of how I'm viewing it.  So if you all

2  would talk about it.

3          But we do have a procedure where we can take care of

4  it.  Unfortunately, it's a little more complicated than it

5  sounds.  But this wouldn't be the first case that it's

6  happened.  It happens every couple weeks on something.

7          Okay.  Then given all of that, do you want to give

8  me -- you don't have to -- like a brief opening, each side, or

9  do you want to just jump right into a witness?  What's your

10  collective preference?

11          MS. SCHWARTZ:  I would like to do a brief opening.

12          THE COURT:  Okay.  So we'll do that.

13          And then, Mr. Hecht, if you want, you can also give me

14  a brief opening or we can just go from the initial opening into

15  the witnesses.  You decide after her opening.  Okay?

16          MR. HECHT:  All right.

17          MS. SCHWARTZ:  I will now be even more brief that I

18  don't have to address AHS.  And I might accidently.  So I

19  apologize, but I'll try not to.

20          We are here this morning seeking the entry of a

21  preliminary injunction enjoining the defendant Rachel Shafer

22  from using, disclosing, and retaining the trade secrets and

23  confidential information that she misappropriated from her

24  former employer, the plaintiff, RNNetwork and enjoining

25  Ms. Shafer from continuing to violate the terms of her

1  noncompetition and her non-solicitation agreements with the

2  plaintiff.

3        This case involves the theft of significant employer

4  trade secrets in a highly competitive industry by former

5  employees and their -- it had been about their new former

6  employer AHS' use of the stolen information for its own profit.

7        We have evidence that we are ready to present today,

8  Your Honor, that will establish the following facts:

9        The plaintiff RNnetwork is a travel staffing nurse --

10  is a travel nurse staffing company.  They place nurses in

11  temporary positions all throughout the United States, and these

12  positions usually last about three months at a time.  So the

13  relationships in this industry are critical because the

14  placements are short-term and the nurses are frequently looking

15  for new jobs.  That is why noncompete and non-solicit

16  agreements are standard in this industry.

17        The evidence will show that the individual defendants,

18  Rachel Shafer and Lisley Rossi, are former employees of

19  RNnetwork.  Ms. Shafer -- I'll just refer to Ms. Shafer since

20  Ms. Rossi is no longer a part of the proceedings.  Ms. Shafer

21  was employed from more than a decade, and she had received

22  significant training in the nurse staffing industry,

23  particularly because she had no experience in this industry

24  before her hire.

25        She received a promotion to the position of senior

1   health care recruiter, and she signed an employment agreement

2   containing noncompete, non-solicit, and confidentiality

3   provisions, and that she was required to sign this agreement as

4   a condition of her employment.

5          Recruiters in this industry, and particularly those

6   hired by RNNetwork, and most likely AHS Staffing, are required

7   to sign these agreements because as recruiters they are given

8   access to highly confidential trade secret information,

9   including access to RNNetwork's secure database which contains

10  basically the entirety of its business.  All of its clients'

11  names and nurses' names, contact information, their

12  preferences, their rates that they charge, their contract

13  terms, their financial data, and spreadsheets of data that is

14  honed and refined over the course of many, many years, not just

15  by them in particular, not just by Ms. Shafer, but by all of

16  the employees who work for RNnetwork, everything that a

17  competitor in this industry would pay high dollars to get

18  within a matters of minutes.  And this is after RNNetwork paid

19  its employees and spent significant resources, financial

20  resources to develop these trade secrets.

21         You will hear testimony and see evidence today

22  demonstrating that Ms. Shafer did, in fact, misappropriate

23  significant company trade secrets just before she joined direct

24  competitor AHS Staffing.

25         The evidence will show that Ms. Shafer took

1  spreadsheets of documents that she compiled from information

2  that was maintained in RNnetwork's database with client and

3  provider lists organized into an Excel spreadsheet so that it's

4  easily searchable and you could find what states they work in,

5  the specialties that they work in, their email addresses, their

6  shift preferences, the gross margins that RNNetwork would make,

7  the rates that they would charge the health care facilities

8  they place them in, and more.  Not just for the nurses

9  Ms. Shafer placed, but for thousands of nurses, over 2,000

10  nurses over the course of a 60-day period.

11        And this is not information that you can find in a

12  Google search.  It's not publicly available anywhere on the

13  Internet.  This information can only be derived from

14  conversations and years of experience working with these

15  nurses.

16        The evidence will show that as soon as Ms. Shafer

17  realized her job with RNnetwork was in jeopardy, she

18  immediately began transferring spreadsheets of this data to her

19  personal email account.  And again, this data identifies even

20  which clients used travel nurses, something that is not easy to

21  determine without work and conversations and time and effort,

22  and in which locations and which specialties.  She took

23  spreadsheets that were generated from information that she and

24  other employees worked on over many, many years for RNNetwork.

25        The evidence will show that despite signing the

noncompete agreements prohibiting her from working for another
nurse staffing company for only a period of 12 months,
Ms. Shafer accepted a nurse recruiter job at AHS Staffing
within weeks of her separation.  And although that alone
constitutes a breach of her agreement, the fact that she took
trade secrets with her and used those trade secrets to divert
RNNetwork's nurses to AHS makes it far worse.  And the evidence
that we have today will show that that is in fact what
occurred.

So while RNNetwork has been able to resolve the
dispute with Ms. Rossi and now with AHS, Ms. Shafer still
refuses to return the information that she wrongfully took, and
she refuses to abide by the restrictions in her agreement.  And
even though we understand that she's now been terminated from
AHS, she has made it very clear that she's not going to abide
by those agreements and she's going to seek another job working
in the nurse recruiting industry using the information that she
should not have in her possession.  So the defendant's conduct
has left RNnetwork with no option but to file the instant
action and to seek preliminary injunctive relief from the
Court.

And, Your Honor, we do realize that injunctive relief
is an extraordinary remedy, but it is warranted here.  And in
these circumstances, given the significant confidential
information and trade secrets that Ms. Shafer took and the

1   breach of her valid and enforceable agreement, irreparable harm

2   is presumed both under Florida law and Utah law, whichever law

3   that we're operating under today. Both state laws are very

4   similar. And in other cases where I've had injunction hearings

5   in Florida courts on behalf of this client, typically the

6   parties have agreed to just proceed under Florida law.

7        In any event, an injunction is necessary because my

8   client needs to get its data back and to stop Ms. Shafer from

9   using it and creating further damage. We've already seen

10   significant loss.

11        So for that reason, in addition to an injunction, Your

12   Honor, we also are requesting an order that Ms. Shafer be

13   required to turn over her personal devices and cloud storage

14   accounts to an outside third party neutral forensic consultant

15   who can image the devices and conduct a search for and

16   permanently remove RNnetwork's information from her possession

17   pursuant to an agreed upon stipulated forensic protocol.

18        Thank you.

19        THE COURT: Thank you, Ms. Schwartz.

20        Mr. Hecht, would you like to give a brief opening?

21        MR. HECHT: Sure.

22        THE COURT: Okay.

23        MR. HECHT: Good morning, Your Honor.

24        THE COURT: Good morning.

25        MR. HECHT: Ms. Shafer has been working for the last

1   17 years, pretty much her entire adult life, as a nurse

2   recruiter.  She has dedicated all of her time, effort, and

3   energy into recruiting nurses for RNN.  In fact, we will

4   present evidence to show that not only did she do a good job

5   for RNN, she excelled in her position.  She became the number

6   three nurse recruiter in the company.  She earned a significant

7   amount of money both for RNN and as her earned commissions.

8   And she was constantly awarded for her performance in the

9   company.

10          So the question is why did RNN fire Ms. Shafer.  They

11  fired her.  We are not talking here about an employee that just

12  decided to one day quit, take information with her and start

13  stealing and competing with RNN.  We're talking here about the

14  firing.  So the question is why did they fire her.

15          And, Your Honor, the answer is because Ms. Shafer is a

16  disabled individual.  Ms. Shafer has a mental disability.  We

17  will hear testimony today.  She's been diagnosed.  She's being

18  treated for that disability.  And, in fact, in February 2023,

19  just one month before they fired her, she made an official

20  request to the company for an ADA accommodation because of her

21  disability.

22          And what happened after she made the request for the

23  ADA accommodation?  The company did not take it well.  They

24  dismissed her request.  They gave her a whole bunch of forms to

25  fill out, and they immediately denied it.  And within a matter

1  of weeks after she made that request, her employment was

2  terminated for no valid reason.  She was still on top three

3  performing.  She was still top three performing for the

4  company.

5       Plaintiff itself acknowledges that she did a few

6  million dollars in sales in the last year that she was working

7  there.  There was no deterioration of her performance.  The

8  only reason, the only valid reason or the only illegal reason

9  that they used to terminate her employment is because she made

10  an ADA accommodation request.

11       And Ms. Shafer, in fact, filed a complaint with the

12  EEOC.  There is currently a complaint with the EEOC pending for

13  wrongful termination under the ADA statute, and it's still

14  being reviewed.

15       So we ask this Court to see what is really happening

16  here.  This is not a company trying to protect trade secrets.

17  As we will show later, all these documents that they claim

18  Ms. Shafer took that supposedly are alleged trade secrets,

19  these are commission documents that she got.  In fact, she got

20  paid with commissions every week.  That was the majority of her

21  salary.  Almost 90 percent of what she earned in that company,

22  $600,000 in the year 2022, was commissions that she earned from

23  nurses that she recruited.

24       Ms. Shafer was sent these documents on a weekly basis

25  so she can keep track exactly what nurses she recruited, how

1    much -- where these nurses worked, what their pay rate was,

2    what's the gross margin, because her commission directly

3    dependent on it.

4          And, in fact, we will show evidence here that on

5    numerous occasions RNN underpaid her.  They didn't give her her

6    full commission.  And the only way she was able to recover her

7    full commission was through those documents, through those

8    commission reports Ms. Shafer received on a weekly basis where

9    she was able to point out, hey, here's a nurse you didn't pay

10   me, what's going on.  And we will see here documents on the

11   record, evidence, that in some occasions they acknowledge that

12   they made mistakes, and they paid her.  At some point it was

13   like nine or $10,000 they underpaid her in one week.

14         So Ms. Shafer had a legitimate, a legitimate need for

15   these documents.  And the documents that she got were only

16   documents that were related to the nurses she recruited.  All

17   of the documents were related to the pay that her nurses

18   received from which she would receive a commission.

19         And, Your Honor, the most outrageous fact that we

20   gonna show here today also is that on May 1st, which is more

21   than a month after they terminated Ms. Shafer's employment,

22   they still continued to send to her personal email account

23   those same commission sheets with all the list of nurses that

24   now they're claiming these are confidential trade secrets that

25   she so nefariously tried to steal.  If they really thought that

1  she was stealing secrets with those documents, why would send

2  it to her in May after they terminated her employment and they

3  knew she's no longer working for them.

4      So we ask the Court to find that -- they're not trying

5  here to enforce a noncompete agreement.  They know Ms. Shafer

6  is not competing with them.  Ms. Shafer didn't take any secrets

7  from them.  Ms. Shafer is not abusing or misusing any of their

8  trade secrets.  This is just harassment and intimidation for

9  her EEOC complaint that she filed, and this is the way to get

10  back at her.

11      Now, let's move over to the actual allegations of what

12  they are complaining.  They're complaining -- their entire

13  complaint is based own two premises.  One, they have certain

14  emails where Ms. Shafer sent herself these documents before she

15  was terminated.  And as we have already presented to this

16  Court, these documents had a legitimate need for Ms. Shafer.

17  She had a legitimate need for that to reconcile her

18  commissions.  These were not trade secrets from the company

19  that were not related to her commissions.

20      But more importantly, Your Honor, they have to

21  allege -- they're alleging that she misused those trade secrets

22  based on some anonymous caller.  They don't have -- they didn't

23  present any proof or they won't be able to resent any proof

24  today that Ms. Shafer actually misused any trade secrets at her

25  new employ.  The only thing they rely on is an anonymous

1　caller.　They cannot identify who this caller is.　We don't

2　even know if such a caller exists.　But what we do know, Your

3　Honor, is every single fact that they are quoting this

4　anonymous caller is false.

5　　　　　　Supposedly the anonymous caller told them that

6　Ms. Shafer has recruited 80 nurses.　That's a far cry from the

7　truth.　Supposedly they claim that Ms. Shafer has recruited 43

8　per week.　That's a far cry from the truth.　In reality, she's

9　recruited maybe a total of 15 nurses, and maybe four or five

10　per week.　That's what you're going to hear the testimony from

11　Ms. Shafer today to show that whatever this anonymous caller

12　they rely on is definitely not accurate on the facts, if that

13　person even exists.

14　　　　　　The facts will also show here that when Ms. Shafer did

15　get to her new employ, the new employer had lists of nurses.

16　The new employer had databases that they used that they have

17　established themselves through their own network of nurse

18　recruiters.　The facts will show Ms. Shafer was able to utilize

19　publicly available websites that are specifically designed to

20　find nurse recruiters, and that's what she utilized to get new

21　nurse recruiters for the new company.　She has -- in fact, they

22　won't be able -- they cannot produce and they have no -- they

23　have not alleged any plausible allegation that Ms. Shafer

24　misused any of their confidential trade secrets.

25　　　　　　Now let's move onto the preliminary injunction and the

1   type of relief that they're looking for today.  Your Honor,

2   they're suing under a contract.  That contract has clearly a

3   Utah clause in it.  And, therefore, they have absolutely no

4   basis to move for this complaint or for the preliminary

5   injunction under Florida law.  Florida law does not apply here.

6   The parties agreed to Utah, and there's absolutely no

7   reasonable basis why the Court should not bind the parties to

8   their agreement.

9           And under Utah law --

10          THE COURT:  Let me ask you this.  So your argument is,

11  with regard to that, that the case should stay here but that

12  the Court should apply Utah law?

13          MR. HECHT:  That is correct, Your Honor.

14          THE COURT:  Okay.

15          MR. HECHT:  Although we did have -- the Court pointed

16  out in its most recent decision we could have moved to transfer

17  it.  But the parties are allowed to waive the forum.  And we

18  waived the forum enforcement clause, but we're not waiving Utah

19  law.  So we still want to proceed on the Utah law.

20          THE COURT:  Okay.

21          MR. HECHT:  So under Utah law, there are a few

22  critical points that are very relevant to this case.  Number

23  one on the Utah law, Utah law does not allow -- as a matter of

24  law does not allow noncompete agreements for a common calling.

25  In other words, under Utah law the only type of employment that

1　a noncompete agreement can be enforceable.  The language that's

2　used by Utah Courts is that it has to be unique, special, or

3　extraordinary skills.  And, Your Honor, we are positing here

4　today that a nurse recruiter is not unique, not special, nor

5　does it require any extraordinary skills.  It's a simple

6　recruitment job.

7　　　　　And, Your Honor, we have cited in our brief many cases

8　in Utah, as well as other jurisdictions, where they

9　specifically found that -- there's a Utah case that talks about

10　medical staffers, that they are not unique, special, or

11　extraordinary.  And we have also a case that's on point, which

12　is the Nursing Enterprises, Inc. v Marr, where it was almost

13　identical to the allegations in this case.  It was a nurse

14　recruiter that went out competing, and they also alleged that

15　she stole lists of nurses and she used their financial

16　information and whatnot.  And the Court found there that that

17　noncompete agreement was not enforceable.

18　　　　　So we ask the Court if the Court finds that Utah law

19　governs this relationship between the parties, if Utah law

20　governs the noncompete agreement, under Utah law such a

21　noncompete agreement is not enforceable.

22　　　　　Also under Utah law there's a specific -- there's

23　specific body of case law that applies in Utah, and it also

24　applies in a lot of different jurisdiction, where it says that

25　any noncompete agreement that's in the restriction of medical

services to the public is strongly disfavored and it's against public policy. We have cited to a few cases on that point in our brief as well.

We are asking this Court -- when the Court does the analysis about issuing a preliminary injunction, the first step the Court has to take into account is the likelihood of success. Given the Utah case law about the strict requirements that a job with a common calling is not enforceable, given the Utah case law that they have to show that there is unique, extraordinary skills by the employee in order to enforce a noncompete agreement, we ask this Court to find that there is a very low likelihood of success on the merits by the end of the day.

And speaking about success, Your Honor, we are also citing to a case that establishes a higher degree of likelihood of success that is required when the type of relief they're seeking is affirmative relief. Your Honor, one of their requests that they are making here is to get access to Ms. Shafer's personal devices and Ms. Shafer's -- all of her personal data. That's a request for affirmative relief, Your Honor. And we ask the Court to find that they have to establish it to a much higher degree.

Number two, they have to show that there is irreparable harm. Your Honor, that's a major flaw in this case. They have alleged harm from lost sales, harm to

1  reputation and goodwill.  Your Honor, we are citing cases that

2  this is -- the exact type of harm, arm of law sales, are

3  monetarily compensated.  And the arm of potential loss of

4  reputation and goodwill is not a concrete harm that entitles

5  them to injunctive relief.  This is also something that can

6  monetarily be compensated.  And this is especially true in this

7  case.

8          This case here, Your Honor, she -- there is no

9  dispute.  AHS terminated Ms. Shafer's employment as of

10 October 20.  Ms. Shafer currently is unemployed.  She's not

11 working at the moment.  So what is the imminent and irreparable

12 harm they are seeking to enjoin Ms. Shafer from?  There is no

13 imminent or irreparable harm they can prove in this case.

14         And then, Your Honor, there is the balance of the

15 equites here.  And I think this is something that's really

16 important to point out here.  Ms. Shafer has been working her

17 entire adult life as a nurse recruiter.  She excelled in that

18 position.  She has no other position, no other job that she can

19 do.  And the plaintiff in this case fired her.  She didn't

20 willfully quit.  She didn't decide one day to just move on and

21 go off and compete with them.  Plaintiff fired Ms. Shafer.  And

22 we posit that they fired her for an invalid illegal reason,

23 that is, because she asked for an ADA accommodation as we have

24 demonstrated in the charge that we filed with the EEOC.

25         So we ask the Court to find the balance of the

1  equites, that it's extremely unfair.  When you have an employer

2  that fires an employee and then the employee doesn't even have

3  at the moment another job, to go and say we going to enjoin you

4  for the next 12 months that you cannot earn a decent living.

5        And lastly, the Court has to look at the public

6  policy.  And we ask this Court to take notice of Utah law.

7  That when it comes to public policy, the restriction of medical

8  staffers, which is a health -- they're providing health needs

9  to the public, is strongly disfavored and it's against public

10  policy of the Utah law.

11        So based on all of these, we ask the Court to deny

12  their motion.

13        THE COURT:  All right.  Mr. Hecht, thank you for your

14  opening as well.

15        My initial thought, but before we get into the

16  witnesses, is -- and I have read all of the papers that you

17  both have filed.  But with regard to the EEOC complaint and

18  with regard to the ADA action that you're talking about, that

19  seems to me to be separate from the issue in the following

20  sense.

21        Assuming that everything you say is 100 percent

22  correct, and assuming that everything that Ms. Schwartz says is

23  100 percent correct, we still have a problem here.  The fact

24  that your client may have been terminated because there's an

25  ADA issue that plaintiff didn't want to make a reasonable

1  accommodation for wouldn't allow her to still take confidential

2  business information if all of those findings were made.

3       So I do want to kind of make sure we do stay focused

4  on the purpose of the hearing.  Obviously, I'll allow you to

5  say, look, here's the reason why the case is here.  But I don't

6  know how much we need to get into the ADA part.  But that's --

7  I'm not going to tell you how to try the case.  I'm just saying

8  I view it as two completely separate cases, if you will.  Does

9  that make sense?

10       MR. HECHT:  Yes.  Your Honor, I just want to point

11  out, though, that you may take into account -- I mean, do the

12  balance of the equites, that it may fall into that category.

13       THE COURT:  Okay.  Well, what I am saying is I will

14  consider it, but I don't necessarily want you to devote a huge

15  portion of your questions to the ADA portion of it because, you

16  know, I take you at your word that there's an issue out there,

17  there's a pending EEOC complaint.  Obviously, I'm not going to

18  say that plaintiff agrees with the ADA part.  But I just -- I

19  think that even if the ADA part is a hundred percent correct,

20  that doesn't entitle her to take confidential business

21  information if they're able to prove that.  Make sense?

22       MR. HECHT:  Yes.

23       THE COURT:  Okay.  Same goes for your side.  I'm

24  viewing them as two separate cases almost.

25       MS. SCHWARTZ:  Yes, Your Honor.

```
1          THE COURT:  Okay.  Then I guess you can call your
2    first witness.
3          And then with regard to the Utah law issue, we can
4    deal with that at the close of the case.  Because a couple
5    things that I would want to know also with regard to that are
6    if there's a covenant or a restrictive covenant that
7    specifically says Utah law, but Utah doesn't recognize
8    restrictive covenants for that particular type of job, then
9    what does the Court do?  Does the Court just remove that clause
10   and enforce the rest of the contract or is the whole contract
11   bad?  You know, I'm going to need to know that.
12         I'm also going to need to know whether you agree that
13   Utah law applies based on this employment contract.  It looks
14   like it's 10f in the employment contract in terms of what I'm
15   looking at here.  So we'll deal with all of that.
16         MS. SCHWARTZ:  Okay.  And, Your Honor, if I can just
17   very briefly state that while Utah law may not allow medical
18   providers like doctors to have noncompete agreements, that's
19   not the case here where we're dealing with a nursing recruiter,
20   a staffer.  So that was a misstatement that will be
21   clarified --
22         THE COURT:  Okay.
23         MS. SCHWARTZ:  -- at the closings and in our briefing
24   papers.  But since we're here for the evidentiary portion
25   today, we're running out of time.
```

1          THE COURT:  Okay.

2          MS. SCHWARTZ:  If could proceed, that would be great.

3          THE COURT:  Perfect.

4          MS. SCHWARTZ:  All right.  So the plaintiff calls her

5    first witness, Eleonore Ruffy.

6          THE COURT:  Sure.

7          All right.  Ma'am, could you raise your right hand for

8    me.

9          ELEONORE RUFFY, PLAINTIFF'S WITNESS, SWORN

10         THE COURT:  Just grab a seat, adjust the microphone so

11   that everyone can hear you, and --

12         THE WITNESS:  Can you hear me?

13         THE COURT:  Yes, yes.  Tell me your name.

14         THE WITNESS:  Eleonore Ruffy.

15         THE COURT:  Great.  Whenever you're ready.

16                   DIRECT EXAMINATION

17   BY MS. SCHWARTZ:

18   Q.  Ms. Ruffy, are you currently employed?

19   A.  I am.

20   Q.  Who is your current employer?

21   A.  CHG Medical Staffing doing business at RNnetwork or

22   commonly knowns as RNN.

23   Q.  What is your position with RNnetwork?

24   A.  I'm a vice president of sales.

25   Q.  And what does RNnetwork do?

1  A.  So RNnetwork is a nurse travel staffing agency.  We staff

2  nurses in health care facilities, like hospitals, medical

3  clinics.  Mostly temporary, occasionally permanent placement as

4  well.

5  Q.  Okay.  And where does RNnetwork place nurses?

6  A.  We place them nationwide.

7  Q.  Are you familiar with a company called AHS Staffing?

8  A.  Yes.  They are also a nurse staffing company.  They do

9  other staffing as well.  And they are also nationwide.  And

10 they're a direct competitor of ours.

11 Q.  When you say "they are also nationwide," what do you mean

12 by that?

13 A.  They staff nurses all across the country.

14 Q.  Do you know the individual defendant Rachel Shafer?

15 A.  I do.

16 Q.  And how do you know her?

17 A.  She was formerly employed at RNNetwork.  She's been -- she

18 has been with us for 17 years.

19 Q.  What was Ms. Shafer's position at RNnetwork?

20 A.  She was a health care recruiter, senior recruiter.

21 Q.  What were her responsibilities as a senior recruiter?

22 A.  So her key responsibilities involved developing

23 relationships with our nurses to qualify them and place them in

24 a health care facility somewhere in the country.  We work with

25 thousands of facilities nationwide.  She would develop the

**App. 120**

1  relationship with the nurse, explain who RNnetwork is, qualify

2  them, get their resume ready for consideration to a position,

3  and then place them at a facility.

4  Q.  Is developing relationships with nurses a big part of the

5  recruiter job?

6  A.  Yeah, I would say it's the most important part of the job

7  because nurses can travel.  As you said, every three months

8  they change jobs.  And there are thousands of agencies to

9  choose from.  It's a highly competitive industry.  So creating

10 a strong relationship is key to keep them with RNnetwork.

11 Q.  You may have heard Mr. Hecht state in his opening that

12 Ms. Shafer would get information about the nurses she sought to

13 recruit through Internet searches.  How do recruiters like

14 Rachel Shafer get information to develop relationships with

15 travel nurses at RNnetwork?

16 A.  Yeah, so we pay for leads in a couple of different ways.

17 We pay to post our job postings, our client job postings on

18 boards like CareerBuilder or indeed.com, and our nurses will

19 find our jobs across -- on those websites and apply.

20        A secondary way we get leads is through paying third

21 party sources who seek out travel nurses who are interested in

22 travel nursing today, and they send us the leads.  All those

23 leads come in through our front desk personnel who enter them

24 in a database and then send them to a recruiter and the

25 recruiter calls the provider -- the nurse or provider, we call

1   them, from there.

2          Thank you.

3          So there's no cold calling in our -- in the

4   recruiter's role.  At RNnetwork we provide them 10 to 12 leads

5   a week through that format.

6   Q.  And so when you provide the nurse recruiters like

7   Ms. Shafer leads, are you providing them the contact telephone

8   numbers for these nurses?

9   A.  Yes.

10  Q.  Are you providing them email addresses for the nurses?

11  A.  Yes.

12  Q.  Are you providing them information about the type of shifts

13  that these nurses are preferring to work?

14  A.  Yes.

15  Q.  Are you providing these recruiters like Ms. Shafer

16  information about the specific specialty that each nurse works

17  in?

18  A.  Yes.

19  Q.  And when you provide these leads to nurses like Ms. Shafer,

20  are you providing information about positions that the nurse is

21  already interested in taking?

22  A.  Yes.

23  Q.  So in order to actually make these placements, did

24  Ms. Shafer have direct and frequent contact with RNN's nurse

25  clients?

1  A.  Yes, it was very important in her role to have direct

2  contact with these nurses to -- as I mentioned before, to

3  qualify them.  Whatever job they applied for when they first

4  came in, it was Rachel's job to decide if they were qualified

5  to apply for that role, then collect the information necessary

6  to help them apply, and then oversee the application process.

7         Once the facility sent an offer in, it was Rachel's

8  duty to oversee the -- help the qualifying of the rates and

9  help the pay rates in negotiating the pay for the nurse.

10        Once the nurse was accepted at the hospital, Rachel's

11 role was to oversee the credentialing process to make sure the

12 nurse arrives on site on day one, and then keeps regular

13 contact throughout the 13-week assignment is typical.

14        And then towards the end of the assignment it was

15 Rachel's job to make sure that she could prepare her to place

16 her somewhere else, either extend at the current facility or

17 place her somewhere else within RNN's network.

18 Q.  We heard during the opening from Mr. Hecht that Ms. Shafer

19 was very successful.  I think he said the third recruiter for

20 RNNetwork in the county.  Is that right?

21 A.  Yes, that's correct.  She was one of our top recruiters.

22 Q.  Did she develop close relationships with RNnetwork's

23 nurses?

24 A.  Yes, she was quite good at it.  She had to to be as good as

25 she was.

1          THE COURT REPORTER:  I'm sorry.  I need everyone to

2    slow down.

3          THE COURT:  All right.  So, listen, Karl has to take

4    down every word that everyone says.  So I just need you all to

5    slow down a little bit so he can take it down.  Cumulatively it

6    gets to be a whole lot over the course of a day.

7          So you were just talking about Ms. Shafer being one of

8    your top recruiters.  So if you want to continue on with that

9    answer.

10          THE WITNESS:  Yes, she was as -- she was one of our

11    top recruiters.  Last year was our number three recruiter.

12    BY MS. SCHWARTZ:

13    Q.  Did she develop close relationships with RNnetwork's

14    nurses?

15    A.  Yes, she did.  She was very good at what she did and

16    developed very strong relationships with them.

17    Q.  Did Ms. Shafer have any experience in nurse staffing before

18    she was hired at RNnetwork?

19    A.  She did not.  She was hired upon -- this was her first job

20    out of college.

21    Q.  Does Ms. -- I'm sorry.

22          Does RNnetwork typically hire experienced nurse

23    recruiters?

24    A.  We do not.  Throughout CHG we typically don't hire

25    experienced recruiters in order to avoid situations just like

1    this.  We don't want to be accused of violating any type of

2    agreement.  As you said in your opening statement, agreements

3    are very noncompete.  Restrictive covenants are very common in

4    our industry because it is a very -- I'm sorry.  I have to

5    speak more slowly.  Because it is a very competitive industry

6    and travel nurses are few and far between and can charge jobs

7    every quarter.  In fact, at CHG we always prescreen our

8    candidates.  If they have worked within our industry, we

9    specifically ask about a noncompete.  And if they've signed

10   anything, we don't interview them.

11   Q.  Does the company invest any resources or training in its

12   nurse recruiters particularly since you just said you do not

13   hire experienced recruiters?

14   A.  We do.  Because we hire new recruiters with no prior

15   experience, we have a quite robust training program for new

16   recruiters.  We have a training staff dedicated to training

17   brand-new recruiters in their first eight weeks.  We put them

18   through what we call a core training program.  After eight

19   weeks they are put on a sales floor.  And we have a secondary

20   training team that will work with them weekly and train them

21   from week eight to month nine.  Besides that, we have a

22   training team, and our leaders that train all recruiters,

23   including senior recruiters, weekly and monthly for ongoing

24   training.  We also require all of our leaders to do weekly

25   desk-site coaching.  So we do have a very robust training

1  program.

2  Q.  Did Ms. Shafer receive any training at RNnetwork?

3  A.  She did.  Throughout her career she received the same

4  training as all other recruiters, either weekly or monthly.

5  Q.  And was Ms. Shafer given access to RNnetwork's confidential

6  information and trade secrets as a recruiter to do her job?

7  A.  Yes, she did.  All of those leads I mentioned earlier were

8  entered in by our front desk into our database.  It's called

9  Bullhorn.  It's a secure applicant tracking system.

10         We have 400,000 candidates in that system today,

11 including candidate's name, when they first inquired about a

12 job with us, what specialty, their phone numbers, their emails,

13 what states they're licensed in, and where they live and where

14 they're interested in.  All of that is in our secure database

15 that Rachel would have access to in order to develop the

16 relationships she needed to make her placements.

17 Q.  What steps does the company take to protect its

18 confidential trade secret information from getting into the

19 hands of a competitor?

20 A.  So all employees throughout CHG are required to sign the

21 noncompete, non-solicit, confidentiality agreement that was

22 mentioned earlier.  And besides that, we have a fairly robust

23 security system.  In our building we all have badges to get

24 into the building.  We have an alarm system and cameras within

25 the building.  If we do have paper files, we file them in a

1  separate storage unit that's locked and only accessible by

2  certain folks.

3       Software-wise we have passwords and passcodes to get

4  into our software.  We have a separate password to get into the

5  Bullhorn applicant tracking system I mention earlier where all

6  of our most privy information is.  We have third party

7  authentication and firewalls.  So we are fairly secure.

8  Q.  Okay.  And you mentioned that one of the steps the company

9  takes is to require its employees to sign noncompete,

10 non-solicit, and confidentiality agreements.  If a candidate or

11 an employee refuses to sign such an agreement, are they allowed

12 to work or will they still be hired by RNnetwork?

13 A.  No, they will not.

14 Q.  Do you recall when Ms. Shafer began working at RNnetwork?

15 A.  In 2006.

16 Q.  Okay.  Was she employed as a nurse recruiter throughout her

17 time there?

18 A.  Uhm, she took a part-time -- a break from 2009 to 2012, at

19 which time she was a nursing student and worked part time in an

20 assistant capacity.  I was not there, but I understand it was

21 an assistant capacity.  And then joined us again full time in

22 2012.

23 Q.  Was she -- you said she was successful at her job, right?

24 A.  Yes, absolutely.

25 Q.  How much money in revenue did she generate for the business

1  last year in 2022?

2  A.  In 2022 she generated $6 million in gross margin.

3  Q.  How much money did she make in commissions?

4  A.  Over $615,000 in total compensation.

5  Q.  And did Ms. Shafer receive any promotions during her

6  employment at RNnetwork?

7  A.  She did.  She was promoted to a senior recruiter.

8  Q.  How did her employment end?

9  A.  Well, as Rachel became more and more successful, she took

10 more -- began taking more liberties in her job.  In particular,

11 she would violate some company policies and processes on a

12 regular basis, which created extra work for business partners

13 and team members.  She was insubordinate with her managers from

14 time to time.  And she also had inappropriate nonprofessional

15 communication with many of her assistants and the business

16 partners who were there to assist her in her role.

17        She was counseled several times.  We put her on formal

18 performance improvement plans, several of them, starting in

19 2018, and latest one is 2021, and just -- we had HR involved.

20 And despite all the coaching we gave her -- we hate to lose a

21 recruiter of that magnitude and somebody this good at what she

22 did, but despite all the years of coaching, we were unable to

23 see improvement, and ultimately we had to part ways.

24 Q.  When was Ms. Shafer given the last performance improvement

25 plan that she was issued?

1   A.  This is in 2021.  Sorry.  February 21st of '23.  This year,

2   right?

3   Q.  Yes.

4   A.  Sorry.

5   Q.  When was Ms. Shafer's employment terminated?

6   A.  March 30th.

7   Q.  Of?

8   A.  2023.

9   Q.  And how long after her termination did you find out that

10  Ms. Shafer was working as a nurse recruiter for AHS?

11  A.  In the summer.  Around June of this year.

12  Q.  How did you find out that Ms. Shafer was working as a nurse

13  recruiter at AHS Staffing?

14  A.  Several of her former nurses that worked with her while she

15  was at RNnetwork reached out to us and let us know she was

16  reaching out.

17          MS. SCHWARTZ:  May I approach the bench, Your Honor?

18          THE COURT:  Sure.

19  BY MS. SCHWARTZ:

20  Q.  I'm showing you, Ms. Ruffy, what has been marked with

21  Plaintiff's Exhibit 10.  Do you recognize this email?

22  A.  I do.  This is an email I sent to CHG corporate showing

23  concerns about Rachel Shafer showing -- Rachel Shafer reached

24  out to Amanda Fobar and a prior --

25          MS. SCHWARTZ:  Ms. Shafer, you can't speak in the

1   middle of the hearing.

2   BY MS. SCHWARTZ:

3   Q.  Sorry.  You can continue.

4   A.  Oh, okay.

5          THE COURT:  I didn't hear that.

6          MS. SCHWARTZ:  During the testimony Ms. Shafer is

7   answering and responding to questions as I'm asking Ms. Ruffy.

8   I just asked her if she could wait.

9          THE COURT:  Okay.  Thanks.  You're doing my job for

10  me.

11  BY MS. SCHWARTZ:

12  Q.  Okay.  So you were answering the question of what this

13  email is.

14  A.  Yes, this is an email from me to our CHG ER department

15  sharing concerns that we had -- because we received proof that

16  Rachel had reached out to some of her former RNN nurses.

17  Q.  Who is Leslie Miller?

18  A.  She's a CHG employee.  At the time she was a RNN sales

19  director.  And a fellow recruiter -- senior recruiter of

20  Rachel's reached out with this employment agreement offer

21  snapshot that you see here.

22  Q.  Well, was Leslie Miller the recruiter that took over

23  Ms. Shafer's relationship with nurse Amanda Jean Fobar?

24  A.  No, Leslie was the leader of the recruiter that took over.

25  Q.  So what is this image that appearances at the bottom of the

1  email?

2  A.  So this is an employment agreement offer between Amanda

3  Fobar and AHS, our direct competitor, where Rachel Shafer went

4  to work.  And the recruiter here is Rachel Shafer.  And she

5  placed her at Presbyterian Hospital.

6  Q.  Just to be clear, who is Amanda Jean Fobar?

7  A.  So Amanda Jean Fobar is a RNN nurse that worked with Rachel

8  at the time that Rachel was here that is no longer with us

9  anymore.  She's gone to work for Rachel at AHS.

10 Q.  And how did RNnetwork come to be in possession of this AHS

11 Staffing employment agreement offer with Amanda Jean Fobar in

12 June of 2023?

13 A.  Amanda reached out to -- Amanda reached out to our

14 recruiter to let her know that she was working with Rachel at

15 AHS and sent us this screenshot.

16 Q.  Okay.  Was Rachel allowed under the agreement she signed

17 with RNnetwork to immediately go work for another nurse

18 staffing agency?

19 A.  She was not.  She's not able to work for a direct

20 competitor for a period of 12 months.

21 Q.  Now, did -- you may have heard Mr. Hecht say in the

22 openings that this agreement would prohibit Ms. Shafer from

23 working in the only industry she's ever known.  But did her

24 noncompete agreement prohibit her from working in all types of

25 recruiting for the year after she left RNN?

1   A.  No.  Our noncompetes restrict us from our specific

2   specialty.  In Rachel's case it would be nurse staffing.  She

3   could go into physician staffing or allied health professional

4   IT staffing.  Any other kind of staffing would be fine.

5          MS. SCHWARTZ:  Your Honor, at this time I would like

6   to move to have Plaintiff's 10 admitted into evidence.

7          THE COURT:  Okay.  Mr. Hecht, any objection?  This is

8   one of the ones you had mentioned at the outset.

9          MR. HECHT:  Yes, Your Honor.  We object to this

10  exhibit.  We've never seen it.  It's extremely prejudicial to

11  my client.  They have never mentioned this name in their motion

12  for preliminary injunction.  They haven't mentioned this name

13  in their complaint that they filed.  It's the first time we see

14  it.  I hadn't had a chance to properly discuss it and get a

15  proper response from my client about it.  So we ask based on

16  prejudice and based on the fact that they didn't disclose it

17  before to not allow this exhibit.

18         THE COURT:  Okay.  So essentially your objection is

19  lack of notice?

20         MR. HECHT:  Yes, Your Honor.

21         THE COURT:  All right.  So this particular document is

22  Plaintiff's 10.  It's on the plaintiff's exhibit list that was

23  filed on CM/ECF on the 27th of October.  And while I understand

24  the objection, I think under the Court's order notice was given

25  and then Ms. Schwartz has indicated there was an attempt to

1    confer as well.  But for those reasons I'll overrule the

2    objection.

3        (Received in evidence Plaintiff's Exhibit(s) 10.)

4        MR. HECHT:  Your Honor, may I respond about the

5    attempt to confer just to clarify the record?

6        THE COURT:  Sure.

7        MR. HECHT:  I sent her an email yesterday morning that

8    I'm going to be in a deposition all day, I'm not going to have

9    time.  She offered 9 o'clock this morning to go over the

10   exhibits, like an hour before the hearing.  That's the only

11   time that she offered to confer and review it.  And given the

12   time constraint I had and the meeting with my client still

13   before the hearing, that was the only -- that was not an option

14   that was available for me.

15       THE COURT:  Okay.  So, look, I don't mean any

16   disrespect, but what would have been better?  8 o'clock?

17       MR. HECHT:  If she would have sent it to me Friday

18   afternoon by 5 o'clock as the Court ordered.

19       THE COURT:  The Court didn't order that.  The Court

20   ordered disclosure of a list of witnesses and exhibits.  And

21   then beyond that there's an expectation that lawyers will

22   attempt to work together.

23       But I just want to make sure because, you know, I like

24   a clean record.  You're saying that she did offer to go over

25   everything with you at 9 o'clock.  This hearing was set to

1   start at 10 o'clock.  So, in essence, you could have seen this

2   particular document at 9 o'clock, shown it to your client, or

3   you could have on Friday or yesterday, Monday, said, hey,

4   Judge, I'm in court all day, I really need to see these

5   exhibits, can we start at 1:30.

6          I just need to know -- I mean, are you saying you need

7   a week to look at these?  Are you saying you need a couple

8   hours?  Are you -- just tell me what you're saying so I can

9   make a ruling.

10         MR. HECHT:  I just need a reasonable time to discuss

11  it first with my client outside of this courtroom to check who

12  this individual is, what exactly transpired, and then we can

13  prepare an adequate response to it.

14         THE COURT:  Okay.  So let me get back to the question

15  then.  What are you saying is a reasonable time?

16         MR. HECHT:  I would say maybe 30 minutes, 45 minutes.

17         THE COURT:  Okay.  So she said 9 o'clock.  The hearing

18  wasn't supposed to start until 10:00.  So, anyway, for those

19  reasons it's overruled.

20         MR. MAYA:  Your Honor, may I raise a separate

21  objection to the document to the extent that it was used for an

22  employment agreement with AHS as hearsay.

23         THE COURT:  So you're still part of the hearing?

24         MR. MAYA:  Your Honor, I did want to just lodge an

25  objection as to that.

1        THE COURT:  Okay.  Then I'll tell you what.  I haven't

2    signed anything, so I'm going to say you guys haven't worked

3    anything out.  So you go ahead and defend the way you want to

4    and go ahead and lodge your objection.  What's your objection?

5    But keep in mind then you're defending.  Don't expect me to

6    sign whatever you provide me in the next couple days.

7        MR. MAYA:  Your Honor, as it relates to this email as

8    an attempt to introduce an employment agreement, I would just

9    lodge that as hearsay.

10       THE COURT:  Okay.  This is a preliminary injunction

11   hearing.  So what are the hearsay rules with regard to that

12   type of hearing versus a trial?

13       MR. MAYA:  Your Honor, I would like to at least see

14   the employment agreement being referenced.  This is an expert

15   that's attempting to say that this in of itself is some

16   employment agreement.  I just haven't seen that agreement in of

17   itself.

18       THE COURT:  All right.  And do you have an issue with

19   the authenticity?  Is that what you're saying?

20       MR. MAYA:  I do not, Your Honor.

21       THE COURT:  Okay.  You don't have an issue with the

22   authenticity.  You represent AHS Staffing.  This is an AHS

23   Staffing employment agreement, and you're saying you haven't

24   seen it.

25       MR. MAYA:  Correct.  I haven't seen this exact

1  document, Your Honor, this employment offer agreement to

2  confirm whether it's accurate or not.

3          THE COURT:  I mean, your client has it, right?

4          MR. MAYA:  I would have to confirm, Your Honor.  I

5  can't say one way or the other here.  I guess this goes to the

6  point in terms of seeing the documents in advance.

7          THE COURT:  Is your client here?

8          MR. MAYA:  No, Your Honor.

9          THE COURT:  You need to get him here now.  We'll take

10 ten minutes.  Step outside, make a call, get him here within

11 ten minutes.

12         MR. MAYA:  Your Honor, can that be through telephonic?

13         THE COURT:  No, they need -- there's nothing worked

14 out for your client.  Your client needs to be here to defend

15 this preliminary injunction hearing.

16         MR. MAYA:  Your Honor, my client is out of state --

17         THE COURT:  Well --

18         MR. MAYA:  -- and won't be able to be here in ten

19 minutes.

20         THE COURT:  Why aren't they here to defend this

21 preliminary injunction hearing?

22         MR. MAYA:  Counsel is here, Your Honor.  We didn't

23 notice any witnesses on our witness list.

24         THE COURT:  But you're going to make arguments that

25 even documents that bear your client's letterhead are things

 1   you haven't seen?

 2          MR. MAYA:  Correct.  As to the authenticity, Your

 3   Honor.

 4          THE COURT:  So wait, wait, wait.  So now you're saying

 5   you have an authenticity objection.  Because, remember, that's

 6   how I started, and you said no authenticity objection.

 7          MR. MAYA:  Your Honor, hearsay as to this document.

 8   Not sure the accuracy of this excerpt as an employment

 9   agreement.  It's just an excerpt, half of a page of what

10   appears to be a DocuSign.

11          THE COURT:  All right.  So get someone who can

12   represent your client either via Zoom or over the phone that

13   has the authority to look up a DocuSign Envelope ID and tell me

14   whether this is what it is or not, and then we'll continue on

15   be in ten minutes.

16          MR. MAYA:  Thank you, Your Honor.

17          THE COURT:  Thanks.

18      (Recess at 11:24 a.m.)

19      (Call to Order of the Court.)

20          THE COURT:  Okay, everyone.  Please have a seat.

21          We're back on the record on CHG Medical Staffing

22   versus Rachel Shafer and now AHS Staffing LLC with regard to

23   our preliminary injunction hearing.

24          Counsel, you've been able to get your client on the

25   line?

1          MR. MAYA:  I have, Your Honor.  They're still

2     confirming the document.  I just want to clarify and thank you

3     Your Honor for your patience.

4          We'll withdraw that objection.  We'll stand by the

5     stipulation, if the Court is still okay with that.  And the

6     parties stipulated that the evidence that's being introduced is

7     just for the preliminary injunction hearing today, in which

8     case we won't be making further objections or comment.

9          THE COURT:  Okay.  So I think with every preliminary

10    injunction hearing the evidence is supposed to be just for that

11    hearing.  So I typically don't say that at the beginning, but I

12    should say it just so it's clear for all of you.  You don't

13    even have to file a stipulation in that regard.

14          What's your position in terms of your client

15    participating?  I mean, I'd kind of like to have them here if

16    you think there -- this is the first exhibit.  I mean, there's

17    38 listed.  He might have other issues with other ones.  So if

18    you think that might happen, we should probably have your

19    client participate electronically.

20          MR. MAYA:  Your Honor, I think as long as we stand by

21    the stipulation which addresses the scope of the documents that

22    are identified by the plaintiffs, and then my client will take

23    the opportunity to identify it, there won't really be any

24    additional participation on our end going forward.

25          THE COURT:  Okay.  Ms. Schwartz, you're okay with the

1   stipulation still?

2           MS. SCHWARTZ:  Yes.  Just to be clear, AHS Staffing

3   has indicated it still wishes to go ahead with the resolution

4   of today's hearing that we put on the record in the beginning

5   and that they will not be making any further objections during

6   the proceedings, understanding that our position will be these

7   exhibits are admissible just for the preliminary injunction

8   aspect of the case.

9           THE COURT:  Understood.  Okay.  Then with that, let's

10  continue on.  Where we are is Plaintiff's 10 is going to come

11  into evidence over objection.

12          I would also say, Mr. Hecht, I'm assuming you're going

13  to have a similar objection to a number of other exhibits.  I'm

14  perfectly comfortable with you saying "same objection," or you

15  can make the record, however is better for you.  Okay?

16          MR. HECHT:  Thank you.

17          THE COURT:  All right.  Ms. Schwartz.

18          MS. SCHWARTZ:  May I approach, Your Honor?

19          THE COURT:  Sure.

20  BY MS. SCHWARTZ:

21  Q.  I'm showing you what has been premarked as Plaintiff's

22  Exhibit 2.  And, for the record, this is a document entitled

23  "Employment Agreement, Including Confidentiality,

24  Non-Competition and Non-Solicitation Provisions."  Do you

25  recognize this document?

1  A.  Yes, this is the document that Rachel Shafer signed on

2  July 26, 2012.

3  Q.  And did she sign this document when she came back to work

4  for RNnetwork full time as a nurse recruiter?

5  A.  Yes.

6  Q.  And do you recognize Ms. Shafer's signature on the last

7  page of this document?

8  A.  Yes, I do.

9  Q.  Now, before she was allowed to begin working at RNnetwork,

10  was Ms. Shafer required to sign this agreement?

11  A.  Yes, she was.

12  Q.  And why was it a condition of her employment that she sign

13  a confidentiality, noncompetition and non-solicitation

14  agreement in order to work at RNnetwork?

15  A.  Because at -- all of our employees are required to sign

16  this.  But, in particular, recruiters have access to our

17  confidential database, which has the 4,000 candidates I

18  mentioned earlier.  In order to do her job, she needs to farm

19  that and see all that confidential information, the names, the

20  phone numbers, the email address, the specialties.  And it is

21  important to us that all of our employees sign this document so

22  that they aren't able to take it with them if they were to

23  leave the organization.

24  Q.  If Ms. Shafer had refused to sign this agreement, would she

25  have been allowed to work at RNnetwork?

1   A.   No, she would not have.

2   Q.   I would like to direct your attention to paragraph 2, which

3   is entitled "Confidential Business Information" on the second

4   page.

5   A.   Uh-huh.

6   Q.   This paragraph identifies what constitutes confidential

7   information of RNnetwork.  And I won't read it into the record

8   here.  But you can see that the provision references data such

9   as information about the company's clients and providers,

10  names, addresses, numbers, email addresses, preferences, rates,

11  staffing needs, and more.

12          Based on your knowledge of the files that we will see

13  today that Ms. Shafer took from RNnetwork just before her

14  termination, did any of it constitute confidential or trade

15  secret information?

16  A.   Yes, absolutely.  All of the nurses we consider health care

17  personnel are considered clients.  So in this paragraph we're

18  specifically talking about nurses and hospital systems.  Those

19  are all clients to us.

20  Q.   What kind of information -- well, we'll look at the

21  documents themselves later.

22          I would like to direct your attention paragraph 4

23  entitled "Duty of Confidentially."  Can you please read

24  paragraph (b) out loud?

25  A.   Yes.  "Employee agrees that all Confidential Business

1   Information is the sole and exclusive property of the Company.

2   Employee further agrees that all files, documents, works,

3   papers, electronic files and information and other materials

4   containing any Confidential Business Information or information

5   which Employee prepares, uses, possesses or controls that

6   affects or relates to the business of the Company are the sole

7   property of the Company.  Employee agrees to take all steps

8   necessary, and all steps requested by the Company, to ensure

9   that the Confidential Business Information is kept confidential

10  and to comply with all applicable policies and procedures of

11  the Company regarding the use, disclosure, maintenance and

12  security of the Confidential Business Information."

13  Q.  Did Ms. Shafer have permission to remove any electronic

14  copies of confidential business information from the company's

15  systems?

16  A.  No, she did not.

17  Q.  Did she have -- was it a violation of company policy for

18  her to email to her personal Gmail account spreadsheets

19  containing RNN's confidential business information and trade

20  secret?

21  A.  Yes, absolutely.

22  Q.  In paragraph 4(c) the agreement states that she, quote,

23  shall immediately return to the company all confidential

24  business information and, quote, that she shall not retain any

25  copies thereof, whether in hard copy or electronic form, end

1    quote.

2            Did Ms. Shafer return any copies of the electronic

3    documents that she had emailed to herself when she was

4    terminated?

5    A.  No, she did not.

6    Q.  Was she reminded of her obligation to return documents to

7    the company after her employment was terminated?

8    A.  She was.  She was reminded on the day of her termination,

9    and she was also sent a letter.

10   Q.  And did Ms. Shafer return anything after she received the

11   letter?

12   A.  She did -- other than her laptop, she did not return any

13   other documents.

14   Q.  I would like to direct your attention to paragraph 5

15   entitled "Non-Competition Agreement."  And according to this

16   provision, the employee agrees that for a period of one year

17   from the later of the date of -- that the employee's employment

18   is terminated or the last date on which the employee breaches

19   any of the restrictive covenants, that the employee shall not

20   be employed by any entity that is engaged in or competes with

21   the types of staffing that employee was engaged in during the

22   last three years of the employee's employment with the company.

23           Is Rachel Shafer's employment with AHS as a nurse

24   recruiter a violation of this noncompete agreement?

25   A.  Yes, absolutely.  AHS does exactly the same thing that

1  RNnetwork does in nurse staffing, and Rachel Shafer went to

2  work and did exactly the same job there as she did for us at

3  RNnetwork.

4  Q.  And understanding that AHS Staffing no longer employs

5  Ms. Shafer, if she were to become employed as a nurse recruiter

6  for another nurse staffing company between now and

7  October 20th, 2024, which was the date of her termination from

8  AHS, the later of the breach language in this agreement, would

9  that be a violation of her noncompetition agreement?

10  A.  Yes, absolutely.

11  Q.  Now, this noncompetition provision says that the

12  restriction is for any competitive business within the United

13  States.  Is it a reasonable geographic scope for it to be that

14  broad, the entire United States?

15  A.  Yes, it's very common in nurse staffing.  Health care

16  systems have facilities across the United States.  So you might

17  have one client with jobs in California and Arizona and

18  Florida.  So we place nationwide.

19       AHS, for example, is an Oklahoma-based company.  They

20  hired Rachel Shafer who's in Florida and who staffs nationwide.

21  So it's quite common in our industry for all of us to work

22  across the United States.

23       MS. SCHWARTZ:  Your Honor, I would like to move to

24  admit Plaintiff's Exhibit 2 into evidence.

25       THE COURT:  Any objection?

1          MR. HECHT:  No objection, Your Honor.

2          THE COURT:  Okay.  So Plaintiff's Exhibit 2, which is

3    the employment agreement, will come into evidence.

4      (Received in evidence Plaintiff's Exhibit(s) 2.)

5    BY MS. SCHWARTZ:

6    Q.  You testified that Ms. Shafer was reminded of her

7    obligations in the employment agreement when her employment

8    ended.  Was that reminder verbal or in writing?

9    A.  It was in a letter.

10         MS. SCHWARTZ:  May I approach, Your Honor?

11         THE COURT:  Sure.

12   BY MS. SCHWARTZ:

13   Q.  I'm showing you what has been premarked as Plaintiff's

14   Exhibit 5.  Is this the separation letter that was sent to

15   Ms. Shafer after her employment was terminated?

16   A.  Yes.

17   Q.  And was this letter emailed to her?

18   A.  It was mailed to her.

19   Q.  Look at the second page.  Does it indicate whether it was

20   also emailed?

21   A.  Oh.  And emailed to her, yes.

22   Q.  Was Ms. Shafer provided another copy of her employment

23   agreement with this letter?

24   A.  Yes, she was.

25   Q.  And did Ms. Shafer return any documents after she received

1   this letter?

2   A.   She did not.

3   Q.   Did you come to learn that she did retain RNN records and

4   nurse client lists after her employment ended?

5   A.   Yes, we were made aware shortly after that she had taken

6   confidential information with her --

7   Q.   Okay.

8   A.   -- and sent them to her personal email address.

9           MS. SCHWARTZ:   I move to admit Exhibit 5 into

10  evidence.

11          THE COURT:   Any objection on that?

12          MR. HECHT:   The same objection, Your Honor.

13          THE COURT:   Okay.  All right.  So Exhibit 5, which is

14  the letter from Keela Briles to Rachel Shafer, I'm going to go

15  ahead and admit it over objection.

16     (Received in evidence Plaintiff's Exhibit(s) 5.)

17  BY MS. SCHWARTZ:

18  Q.   Okay.  I'm going to show you what's been premarked as

19  Plaintiff's Exhibit 13.  And we also are going to try to put it

20  up here on the screen.

21          THE COURT:   You're going to put it on using the

22  computer?

23          MS. SCHWARTZ:   Yes, so that Your Honor can see

24  exactly -- you know, while I printed the entirety of the Excel

25  spreadsheet, I thought it would be better for you to see the

1   actual spreadsheet.

2           THE COURT:  Okay.  It should be on your computer as

3   well.

4           THE WITNESS:  I see it.  Thank you.

5           THE COURT:  Counsel, do you see it on your computer

6   monitors?

7           MR. MAYA:  Yes.

8           MR. HECHT:  Yes.

9           THE COURT:  Okay.  Thanks.

10          So before you go forward, just with regard to the last

11  objection as to Exhibit 5, which is the letter from Keela

12  Briles, I would note it's attached to the complaint.  It's at

13  docket entry 1-3.  So anyway, go on.

14  BY MS. SCHWARTZ:

15  Q.  Ms. Ruffy, I'm showing you what has been premarked as

16  Plaintiff's Exhibit 13.  Do you recognize this email and the

17  attachment?

18  A.  Yes, this is an email Rachel sent to her personal Gmail

19  from her business account on March 9th at 2:58 p.m.

20  Q.  And if you look at the attachments where it says "Team

21  Shafer W&A week 10 2023.xlsx," was this an Excel spreadsheet?

22  A.  Yes, this is the Excel spreadsheet we see on the screen and

23  the printout.

24  Q.  When did Rachel send this Excel spreadsheet to her personal

25  email address?

1   A.  On March 9th at 2:58 p.m. during working hours.

2   Q.  And was that a few weeks after she was placed on that last

3   performance improvement plan?

4   A.  Yes, it was -- she was still employed with us.  She had

5   received her performance improvement plan in February.  On

6   March 9th her leader, Chrissy Evans, had emailed her earlier

7   that day letting her know she wasn't meeting performance

8   expectations of the plan, after which she sent this to herself.

9   Q.  Okay.  So we have on the screen in front of you the

10  actual -- I know I handed you an enormous printout of the

11  entire Excel spreadsheet, but we were able to get it up on the

12  screen.  So I would like to direct your attention to the actual

13  spreadsheet on the screen and ask you, you know, just

14  generally, what is a W&A report at RNnetwork?

15  A.  So this report shows all of our working nurses, so any

16  nurse that's currently working at a facility today.  And then

17  awaiting nurses is any nurse that's contracted to go out

18  sometime in the near future but already employed at RNnetwork

19  as a working nurse.  So working and awaiting list.

20  Q.  Is this an internal report?

21  A.  It is an internal report.  It's highly confidential.  It's

22  something we would never want to see leave outside our doors.

23  Q.  In the first few columns we see the -- a columns entitled

24  Last Name, First Name, and Hospital.  What information appears

25  here?

1  A.  So last name and first name is the full name of the nurse

2  that is contracted with RNnetwork to go on assignment.  The

3  hospital is the facility location where the nurse is working or

4  about to go work.  And then the state is the state where the

5  facility is located.

6  Q.  So when you see all of these different states on this

7  spreadsheet, is that an indication of the different places

8  throughout the country these nurses are being placed?

9  A.  Correct.  As I mentioned before, facility systems have --

10  health systems have facilities all over the country, and so our

11  nurses are placed all throughout the United States.

12  Q.  The next few columns say Start Date, End date, Recruiter

13  and Consultant.  What information appears in those columns?

14  A.  So start date is the first day that the nurse started

15  working at that facility.  End date is the date they are -- he

16  or she is scheduled to end the assignment.  The recruiter would

17  be the recruiter who placed the provider.  And the consultant

18  is the client representative who works directly with the

19  hospital.  It's an internal employee that would have

20  facilitated the assignment transaction, along with the

21  recruiter.

22  Q.  Would it be important for a competitor company to know what

23  the end date of an assignment is?

24  A.  Yes, absolutely.  As I mentioned before, after their

25  assignment ends, the travel nurse is going to rebook somewhere

1  else.  So any competitor would want to know when they're

2  getting close to an end so they can reach out and try to

3  convince them to work through them versus RNnetwork.

4  Q.  The next few columns say N/R/E, HSG Type, Bill Rate, and

5  GM.  What information appears in these columns?

6  A.  So N/R/E tells us if it's a new nurse that has never worked

7  with RNnetwork before.  If they're extending, extension means

8  they are going to be working at that same facility for another

9  shift, another assignment.  Renew means they worked with

10  RNnetwork prior and they're being rebooked with a different

11  facility.  And then we also do have win back, which means they

12  worked for us in the past and they're now coming back to

13  RNNetwork.

14  Q.  And what is HSG?

15  A.  Housing.  We do provide housing assistance for our nurses.

16  And so this indicates internally for us if they've chosen to

17  utilize us for housing assistance or if they want a housing

18  stippen and they'll get their own housing.  Bill rate is the

19  rate we intend -- the hourly rate we intend to bill the client

20  for the nursing services.  And gross margin is the hourly

21  dollar amount that is left over to RNnetwork after we paid the

22  nurse.

23  Q.  So is that the profit?

24  A.  That's the profit.

25  Q.  Is information regarding what RNnetwork bills its clients

1  for its travel nurses considered confidential?

2  A.  Absolutely.  It's highly confidential.  Any competitor who

3  gets this could easily contact our client and undercut our bill

4  rate and take our assignment.

5  Q.  In the next few columns it says AE, Primary Email,

6  Specialty, and Shift.  What information do we see here?

7  A.  So AE is our internal employee.  It's an account executive.

8  We assign account executives to high-value clients, meaning

9  clients that we do a lot of business with.  So you'll see

10 there's sometimes a name, sometimes there's not.  Candidate

11 primary email is the nurses -- the nurse client's email

12 address.  Specialty is the specialty of both the nurse and the

13 job.  That's how we match the job to the nurse.  And then the

14 shift is the designated shift for that job, also the shift that

15 the nurses agree to work.

16 Q.  Would any of this information be useful to a competitor?

17 A.  Absolutely.  This is all of our business in a nutshell.

18 These are all the providers we've contracted that are working

19 with RNnetwork across the country.  There are about 4 million

20 nurses.  Only 50,000 of them want travel nursing.  RNnetwork

21 has spent a lot of years putting together -- contracting with

22 these nurses here who have agreed to do travel nurse

23 assignments.  So it's a very, very precious document for us.

24 Q.  Would this information -- for example, if you look at

25 line 2, let's take Priscilla Munodawafa.  Would this

1    information about Priscilla working at Providence St. John's

2    Health Center in California on an assignment ending March 11,

3    2023, with the specialty of RN telemetry, working 12-hour

4    shifts at night be helpful to a competitor?

5    A.   Absolutely.  For one thing, they now know Priscilla is a

6    travel nurse.  They know when Priscilla will end working at

7    Providence.  They also know Providence Health Care Services is

8    using travel nursing services at St. John's Health Center in

9    California, which narrows the scope down.  And then they also

10   know what we intend to bill the client at Providence.  So they

11   can call and give them a better deal, if you will.  And they

12   can do the math to see how much we paid the provider Priscilla

13   and call Priscilla.  They can email Priscilla, the email is

14   right there, and present a different opportunity for Priscilla

15   that might be attractive, and at that point we lose the nurse.

16   Q.   On this spreadsheet there appears information for how many

17   different nurses?  We're going to scroll to the bottom.

18   A.   2,451.

19   Q.   And are all -- are these all Rachel's nurse clients?

20   A.   No.  So you can see it's been filtered by Rachel.  That is

21   only a handful.  This report actually shows every single nurse

22   we have on assignment today.  So not only booked by Rachel, but

23   also booked by all the other recruiters we have on staff.

24   Q.   Okay.  So now that the -- now that we've just cleared the

25   filter, you can actually see that this pertains to 2,451

1  nurses, correct?

2  A.  Yes.

3  Q.  Is there any reason that you can think of that Rachel would

4  need to have this document after her employment ended with

5  RNnetwork?

6  A.  There's no reason she would need this.  As mentioned

7  earlier, she did receive a commission statement that would show

8  her assignments only, some very highly redacted information

9  that's not all of this, so that she can track her own

10 commissions and be sure that we pay her correctly.  This report

11 is obviously much more robust and shows every other provider

12 that -- or nurse that we have on assignment.

13 Q.  One of the arguments that Mr. Hecht made in the beginning

14 of these proceedings is that Ms. Shafer was given the

15 information that we're claiming was confidential to help her

16 determine her commissions even after her employment ended.

17      Did we -- did RNnetwork ever send Ms. Shafer working

18 and awaiting Excel spreadsheets after her employment ended?

19 A.  No.

20 Q.  Did RNnetwork send Ms. Shafer any information pertaining to

21 any nurses that were placed by any recruiters other than

22 Ms. Shafer?

23 A.  No.

24 Q.  And in any of the documents that RNnetwork sent to

25 Ms. Shafer after her job ended, did RNnetwork provide contact

1   information for nurses?

2   A.   No.

3   Q.   Did it provide specialty information for nurses?

4   A.   No.

5   Q.   Did it provide any information about the shifts that the

6   nurses prefer to work in?

7   A.   No.

8   Q.   Did RNnetwork give Ms. Shafer any information about the

9   type of housing that the nurses require?

10  A.   No.

11  Q.   The only information that was given was limited strictly to

12  her commissions, correct?

13  A.   Correct.

14  Q.   Is there any reason that you can think of that Ms. Shafer

15  would need to send this working and awaiting spreadsheet to her

16  personal Gmail account while she was performing work for the

17  company?

18  A.   No, there would be no reason for her to need to access it

19  while she was -- send it to her own personal.  She had full

20  access using her login credentials.  She could access it from

21  her phone, her home computer, anything, while she was an

22  employee.

23  Q.   Was it a violation of company policy to send this

24  information to her personal email account?

25  A.   Absolutely.  This is very highly private confidential

1  information.

2  Q.  Now, the document itself, with all of this information in

3  this neatly distilled, easy so search Excel format, is it

4  available publicly on the Internet anywhere?

5  A.  No, it is not.

6  Q.  What about the information itself that is contained in this

7  spreadsheet, is the information publicly available on the

8  Internet anywhere?

9  A.  No, it is not.

10 Q.  Can you think of anywhere on the Internet where you could

11 find personal email addresses for over 2,000 travel nurses in

12 one place?

13 A.  No.

14 Q.  Do you know who created this spreadsheet?

15 A.  So this spreadsheet would have been created by either

16 Rachel herself or perhaps her assistant.  You can pull the

17 information from our database.  You go into our database and

18 you request the information by clicking a few buttons, you

19 download it, and then you create an Excel spreadsheet.

20 Q.  How long did it take to -- for RNnetwork to input all of

21 these nurses' information into the Bullhorn database in order

22 for lists like this to be populated?

23 A.  So we've been in business for 25 years.  So I would say it

24 would take us at least that long.  Nurses, as we mentioned -- I

25 mentioned earlier, the lead comes in originally through our

 1  lead source generation efforts, and then it could take months

 2  and months or even years to place the nurse on an assignment.

 3  Q.  Now, I believe you testified earlier that RNnetwork has

 4  about 400,000 leads in the system; is that right?

 5  A.  Yes, that's correct.

 6  Q.  So this list, this working and awaiting list that

 7  Ms. Shafer emailed to herself, does this contain prospects or

 8  is this -- what is this list containing?

 9  A.  Yes, this is not a prospect list at all.  These are

10  actually nurses that have contracted to work at RNnetwork.

11  They are actually W-2 employees of RNnetwork that are either

12  working right now or about to be able to work and going through

13  the credentialing process.  There's not a prospect on here.

14  This is really our bread and butter, and all of our money is in

15  here, in this report.

16  Q.  So in that case do you consider this working and awaiting

17  document to be a trade secret?

18  A.  Absolutely.  It would be very detrimental to us if it got

19  into the hands of a competitor.

20       MS. SCHWARTZ:  I would like to move to have

21  Plaintiff's 13 admitted into evidence.

22       THE COURT:  Mr. Hecht, any objection to Plaintiff's

23  13?

24       MR. HECHT:  I would say same objection, but I want to

25  also add authenticity.  I just want to see who downloaded this

1  document that we are looking at right now.  Is that directly

2  from the witness?

3          MS. SCHWARTZ:  Yes, it's directly from the email that

4  Ms. Shafer sent to herself.  We took that email and clicked on

5  the Excel spreadsheet that is attached to that email.

6          MR. HECHT:  Did the witness do that?  I don't know if

7  we got that on the record, if the witness was the one.  Because

8  it looks different than the file we have, and I just want to

9  understand why is it.

10          THE WITNESS:  Did I personally open the file attached

11  to this email --

12          MR. HECHT:  Yes.

13          THE WITNESS:  -- when it was first made aware to me?

14  Yes, I did.

15          MR. HECHT:  Okay.  So this file that's opened is a

16  file that you downloaded.  Okay.

17          Yes, then we are not objecting on authenticity, but we

18  are still objecting that we didn't see this file before.

19          THE COURT:  Okay.  So on this particular one, this as

20  well was disclosed in docket entry 44.  And this document is an

21  email from your client to herself purportedly.  So I'm going to

22  overrule the objection on those grounds.

23          (Received in evidence Plaintiff's Exhibit(s) 13.)

24          MS. SCHWARTZ:  I would also note for the record that

25  this exhibit is on Ms. Shafer's exhibit list as Exhibit No. 5.

1          THE COURT:  Okay.  Yes, it looks like Exhibit 5 is the

2    same exhibit, but specifically the 112 nurses that are in this

3    document as opposed to the 2,451, correct?

4          MS. SCHWARTZ:  Plaintiff -- I'm sorry.  Ms. Shafer did

5    not attach the actual printout of the Excel spreadsheet from

6    what I can tell.  But you can see from the email the same Excel

7    spreadsheet attached to her exhibit.  What we provided the

8    Court was a printout of it in the event that we had a

9    technology malfunction and were unable to open the spreadsheet

10   today.

11         THE COURT:  Okay.  So let me just ask you this just

12   for clarification.  It's a good point.  What you're admitting

13   into evidence, is it the email from Ms. Shafer to herself plus

14   what you have is these two pages attached, or is it the

15   entirety, including the 2,451 nurses?

16         MS. SCHWARTZ:  It is the entirety of the 2,451 nurses

17   because that shows what she took.  However, in terms of filing

18   it with the Court, because that is the confidential trade

19   secret information, it would have to be under seal.

20         THE COURT:  I don't really need it going forward.  I'm

21   going to give you back what you handed me.

22         MS. SCHWARTZ:  Okay.

23         THE COURT:  But I don't know that you need to file it.

24   Okay.  That makes -- I understand then.

25         So this document is the same as docket entry 46-5,

 1  which is on Ms. Shafer's exhibit list as well.  So, okay, I'll

 2  overrule the objection.  We'll just call it Plaintiff's 13.

 3       MS. SCHWARTZ:  Thank you, Your Honor.

 4  BY MS. SCHWARTZ:

 5  Q.  I would like to show you what's been premarked as

 6  Plaintiff's Exhibit 12.

 7       MS. SCHWARTZ:  May I approach, Your Honor?

 8       THE COURT:  Sure.

 9  BY MS. SCHWARTZ:

10  Q.  I'm showing you what has been marked as Plaintiff's

11  Exhibit 12.  Do you recognize this email and attachment.

12  A.  Yes, this is another email Rachel sent to herself at her

13  home Gmail address with more confidential information.

14  Q.  Okay.  And can you tell from the subject line or the

15  attachment what information Ms. Shafer had forwarded to her

16  personal Gmail address on March 10th of 2023?

17  A.  Yes, she sent two documents.  One of them being the working

18  and awaiting, which is the same report we just looked at but

19  week six.  And then the current TOA, which is a list of every

20  recruiter and their traveling assignment.

21  Q.  Okay.  So when you say this is the same information that

22  was showing on the Exhibit 13 but this one is for week six, do

23  both Excel spreadsheet contain different information?

24  A.  They do.  So the week indicates the week and the year it

25  was created.  So week ten and week six.  Week six would have

1   been four weeks prior to week ten.  So she's capturing a

2   different set of nurses on assignment at a different time.

3   Q.  Can you think of any reason why Ms. Shafer would on

4   March 10th, the day after she sent the week ten spreadsheet to

5   herself, why she would go back and then forward to her personal

6   Gmail address all of this information for week six?

7   A.  It could only be to capture a bigger pool of providers or

8   perhaps there was a provider in her name she was looking for --

9   looking to capture that was no longer working in week ten.

10  Those are the only two reasons I can think of.

11  Q.  Okay.  So do we have exhibit -- do we have the spreadsheet

12  on the screen?

13  A.  Yes.

14  Q.  Okay.  If you look to the bottom of this exhibit, how many

15  nurses' information appear on this spreadsheet?

16  A.  2,543.

17  Q.  Okay.  Now, on the week ten spreadsheet we saw there was

18  information for 2,451.  Do you know why that number may have

19  changed from the week six spreadsheet?

20  A.  Because it's a different time period.  So depending on the

21  time period you select, you'll get -- you'll see the actual set

22  of working and awaiting nurses for that time.  So she pulled

23  two different time periods, meaning two different sets of data.

24  Q.  Now, during the company's investigation of what Ms. Shafer

25  took from RNnetwork, in the 17 years that she had worked there

did you find that she had ever emailed to her personal Gmail

account any working and awaiting documents prior to March 9th,

2023?

A.  We did not.  We only found the -- March 9th was the first

one at 2:58 p.m., and then the second one on March 10th at

9:21 a.m.

MS. SCHWARTZ:  Your Honor, I would like to move to

admit Exhibit 12 into evidence.

THE COURT:  Sure.  Any objection to Exhibit 12?

MR. HECHT:  I just want clarification on Exhibit 12.

THE COURT:  Okay.

MR. HECHT:  The text document that we have seems to

have only about a hundred something, like two pages, but I

think the document you're showing shows a few thousand.  Is

this the same document?

MS. SCHWARTZ:  So for demonstrative purposes we took a

screenshot of a couple of pages.  But when you expand the Excel

spreadsheet in its form -- in the original form on which she

sent it to herself, which is on your screen, you see the full

scope of the spreadsheet, and it contains 2,543 nurses.  I

didn't print the entire spreadsheet to hand out for this

exhibit.

MR. HECHT:  Same objection.

THE COURT:  Okay.  So I'm going to overrule that

objection.

1          (Received in evidence Plaintiff's Exhibit(s) 12.)

2               THE COURT:  If I might, I just have one question for

3     you.  Stands to reason that a substantial number of the 2,543

4     nurses that would be on the document that's on the screen are

5     the same as the 2,451 nurses in the previous document?

6               THE WITNESS:  Yes, that's correct.

7               THE COURT:  Okay.

8               THE WITNESS:  Yeah.  Because they're three-month long

9     assignments, so yes.

10              THE COURT:  Thank you.

11    BY MS. SCHWARTZ:

12    Q.  They are the same or they're different?

13              THE COURT:  Same.

14              THE WITNESS:  It's a little bit -- there's going to be

15    more nurses if you take both of them, but there will be

16    duplication across the boat.

17              THE COURT:  In other words, there's not 5,000

18    nurses --

19              MS. SCHWARTZ:  Oh, right.

20              THE COURT:  -- but there's closer to probably slightly

21    more than 2,543.

22              THE WITNESS:  Correct.

23              THE COURT:  Okay.

24    BY MS. SCHWARTZ:

25    Q.  So you testified earlier that Ms. Shafer started emailing

1  her personal Gmail account this confidential information after

2  it was apparent that her job was in jeopardy.  Why do you think

3  it was apparent to Ms. Shafer that her job was in jeopardy on

4  March 9th, 2023?

5  A.  So on that day she received an email recap from her leader

6  Chrissy Evans recapping how she was doing on her performance

7  improvement plan from February in which Chrissy shared that she

8  was struggling to perform on that plan.

9  Q.  Okay.  I would like to show you what I had premarked as

10 Plaintiff's Exhibit 9 (sic).

11       MS. SCHWARTZ:  May I approach the bench, Your Honor?

12       THE COURT:  Sure.

13       MS. SCHWARTZ:  Exhibit 19.

14 BY MS. SCHWARTZ:

15 Q.  Do you recognize this email?

16 A.  I do.  This is the email that Chrissy sent to Rachel.

17 Q.  Okay.  And did Rachel after receiving this email send it on

18 somewhere else?

19 A.  Yes, she forwarded it to her home Gmail account two minutes

20 later.

21 Q.  What is it about this recap week email that you think led

22 Rachel to believe her job was in jeopardy?

23 A.  Well, in paragraph 2 Chrissy explains, writes to her, "We

24 continue to discuss ongoing concerns with your communication

25 that do not align with our core values.  I have highlighted the

1  areas where expectations were not met with included examples of

2  what good looks like from a communication perspective."  And on

3  page 2 you'll see numerous examples that Chrissy sent.

4  Q.  What do you understand -- so on that same paragraph, the

5  next sentence, Chrissy wrote, "It is imperative that you bring

6  me in the loop prior to responding out of heightened emotion.

7  I'm here to support you.  However, I am noticing that you are

8  responding to emails in the moment causing a continued negative

9  impact on your brand."  What does that mean?

10 A.  Yes, so as I testified earlier, one of the struggles we had

11 with Rachel was in her inappropriate communication with

12 business partners or her assistants or client partners.  And

13 one of the -- that was one of the areas we've been working on

14 with her since 2018 closely.  This is her leader.  Several of

15 her leaders over time have recommended that they prescreen her

16 communication so that it could be sent out more appropriately.

17 That was one of our efforts to salvage this.  And Chrissy is

18 reminding her of that commitment which she did not meet.

19 Q.  On the second page after the list of expectations, Chrissy

20 wrote, quote, your professional brand throughout the

21 organization is compromised.  Internal partners have expressed

22 on numerous occasions and via different avenues of

23 communication their inability to productively and positively

24 support you due to your communication and have expressed their

25 desire to not, if at all possible, be assigned to you.  Your

1  communication is and has been at the core of your behavioral

2  issues and has reached a point of zero tolerance.

3          Do you read this as Chrissy conveying to Rachel her

4  job was in jeopardy?

5  A.  Yes.

6  Q.  And did you have discussions with Chrissy about Rachael's

7  job being in jeopardy?

8  A.  I did not, no.  I -- me personally, I had conversations

9  with Chrissy's leader, but yes.

10 Q.  At this point had Ms. Shafer been receiving performance

11 improvement plans for the same behaviors over the course of

12 years?

13 A.  Yes, her first one was in 2018, she had another one in

14 2020, and this was the third one.

15        MS. SCHWARTZ:  Okay.  So I would like to move to admit

16 Exhibit 19 into evidence.

17        THE COURT:  Any objection?

18        MR. HECHT:  Same.

19        THE COURT:  Okay.  So 19 is an email from the

20 defendant to herself.  I'm going to overrule that objection.

21    (Received in evidence Plaintiff's Exhibit(s) 19.)

22 BY MS. SCHWARTZ:

23 Q.  Before we move onto the next exhibit, if you can just take

24 note of the time that Ms. Shafer sent this email to her

25 personal Gmail address.  For the record, what time did she send

1  this?

2  A.  On March 9th at 2:19 p.m.

3  Q.  Okay.  Do you recall what time on March 9th she had sent

4  that working and awaiting week ten spreadsheet to her personal

5  email address?

6  A.  2:58 p.m.

7  Q.  So just about 40 minutes later?

8  A.  Yes.

9  Q.  I would like to show you what I've had premarked as

10 Plaintiff's Exhibit 15.

11         MS. SCHWARTZ:  May I approach, Your Honor?

12         THE COURT:  Sure.

13 BY MS. SCHWARTZ:

14 Q.  I'm showing you Plaintiff's Exhibit 15.  Do you recognize

15 this email?

16 A.  Yes, this is an email Rachel Shafer sent to herself that is

17 an Aya Healthcare job posting.

18 Q.  And what date and time did Ms. Shafer first send this job

19 posting link to herself?

20 A.  March 9th at 4:28 p.m.

21 Q.  So that's about 90 minutes after she forwarded the working

22 and awaiting spreadsheet?

23 A.  Correct.

24 Q.  What is Aya Healthcare?

25 A.  Aya Healthcare is another direct competitor to RNnetwork.

1  They do nurse staffing nationwide similar to ourselves and AHS.

2  And this is a career job posting link.

3  Q.  So what does this email indicate to you?

4  A.  It indicates to me that she intended to apply to Aya

5  Healthcare for an internal job.

6          MS. SCHWARTZ:  I would like to move Exhibit 15 into

7  evidence.

8          MR. HECHT:  Same.

9          THE COURT:  So I'll allow it in, but I don't know why

10 someone can't apply for another job.  It doesn't mean anything

11 to me, but I'll let it in.

12      (Received in evidence Plaintiff's Exhibit(s) 15.).

13 BY MS. SCHWARTZ:

14 Q.  Just to be clear, the date of this email, was that during

15 the time that Ms. Shafer was still employed by RNnetwork?

16 A.  Yes, she was still employed with us.

17 Q.  And based on the email was she looking at job postings for

18 jobs with competitors during her workday at RNnetwork?

19 A.  Yes.

20 Q.  And again, this happens to be the same day she forwarded

21 RNnetwork's confidential information to her personal Gmail

22 address?

23 A.  Yes.

24 Q.  After she received the cap email, correct?

25 A.  Correct.

1  Q.  I would like to show you what I had premarked as

2  Plaintiff's Exhibit 20.

3        Did RNnetwork discover that Ms. Shafer had emailed to

4  her personal Gmail account -- strike that.

5        I'm showing you Plaintiff's Exhibit 20.  Do you

6  recognize this email and attachment?

7  A.  Yes, this is an email Rachel sent to herself with attaching

8  her own personal resume.

9  Q.  Okay.  And what date did Ms. Shafer send this email from

10 her RNnetwork email to her personal Gmail address?

11 A.  On March 9th at 7:22 p.m.

12 Q.  So that's the same day that we've been seeing this flow of

13 other documents leaving RNnetwork and going to her personal

14 Gmail address, right?

15 A.  Yes.

16 Q.  Now, if we look at her resume, on the very first and second

17 sentences she wrote, under her senior recruiter job at

18 RNnetwork, over a hundred TOA March 2023 and over 185 TOA at

19 industry peak in 2022.  What does that tell a competitor in

20 this industry?

21 A.  So this indicates how many travelers on assignment Rachel

22 manged at any one time.  So at one point she had 100 travelers

23 working somewhere within the country, and at another point at

24 her peak 185.  This is terminology that is unique to nurse

25 staffing.  There's only one reason to put it on your resume

1    this way, and it's if you were to present your resume for

2    consideration with a travel nurse staffing company

3    specifically.

4    Q.   Okay.  So looking at all of these exhibits chronologically,

5    after Chrissy sent Rachel the PIP recap at 2:17 p.m. on

6    March 9th, did Rachel then spend the rest of that afternoon

7    updating her resume, looking for jobs at other nurse staffing

8    companies, and emailing client lists and confidential trade

9    secret information to her Gmail address?

10   A.   Yes, exactly.

11          MS. SCHWARTZ:  Your Honor, I would like to move to

12   admit Exhibit 20 into evidence.

13          THE COURT:  Any objection?

14          MR. HECHT:  Actually, Your Honor, we have no objection

15   to this one.

16          THE COURT:  So 20 will come into evidence.

17      (Received in evidence Plaintiff's Exhibit(s) 20.)

18   BY MS. SCHWARTZ:

19   Q.   Did RNnetwork discover that Ms. Shafer emailed to her

20   personal Gmail account more documents containing confidential

21   information and trade secrets than what we just looked at

22   today?

23   A.   Yes, there were some more discovered between March 9th and

24   last day on March 30th.

25   Q.   Apart from the employment agreement that was attached to

1   her March 30th separation letter, do you have any reason to

2   believe that Ms. Shafer knew taking the list and documents that

3   she emailed to herself or going to work for a competitor was

4   wrong?

5   A.   Yes.  We discovered that she emailed to herself our

6   internal non-solicitation and noncompete policy.  That's an RNN

7   document describing the policy itself.

8   Q.   Okay.  I would like to show you what's been premarked as

9   Plaintiff's Exhibit 11.

10        MS. SCHWARTZ:  May I approach, Your Honor?

11        THE COURT:  Sure.

12  BY MS. SCHWARTZ:

13  Q.   Do you recognize this email and document?

14  A.   Yes, this is an email that Rachel sent to herself that is a

15  link to our internal noncompete, non-solicitation process.

16  Q.   So on March 28th at 7:37 a.m., did Rachel Shafer send to

17  her email address a link to a company document entitled

18  "Noncompete non-solicit process RNN 10.2022."

19  A.   Yes.

20  Q.   What is this document?

21  A.   So this is an internal document that trains our employees

22  on how to mitigate situations just like this.  So if a

23  recruiter were to leave and go to a competitor, and somebody --

24  an internal employee is made aware, or if an employee leaves

25  and goes -- and solicits any nurses or internal -- other

1   internal candidates and a current internal employee finds out,

2   this process describes how to handle that escalation to make

3   sure our proper legal authorities know about it in our

4   organization.

5   Q.  Can you think of any reason why Ms. Shafer would send

6   herself a link to do this policy on March 28th?

7   A.  There would be no reason for her to need this unless she

8   intended to violate it herself.

9   Q.  Is this procedure another way in which RNnetwork protects

10  its confidential and trade secret information?

11  A.  Yes, absolutely.  It allows us to find out early and then

12  mitigate quickly if we find out an employee is -- has either

13  gone to a competitor or is soliciting employees.

14      MS. SCHWARTZ:  Your Honor, I move to have Exhibit 11

15  admitted into evidence.

16      MR. HECHT:  Your Honor, we will object on relevancy.

17  We don't see any relevance do that.

18      THE COURT:  Okay.  I understand the objection.  I'm

19  going to let it in.  And then, obviously, you can cross as to

20  what the reason is why that was proffered as to why she would

21  want this document.

22      (Received in evidence Plaintiff's Exhibit(s) 11.)

23  BY MS. SCHWARTZ:

24  Q.  Ms. Ruffy, we talked today about the documents and

25  information that Ms. Shafer took from RNnetwork before she

1    began working at competitor AHS, but do you have any evidence

2    that she used RNnetwork's information after joining AHS?

3    A.  Yes, we have -- we have examples of Rachel reaching out to

4    nurses after she left, our nurses after she left to solicit

5    them to work for AHS.

6    Q.  I would like to show you what's been premarked as

7    Plaintiff's Exhibit 23.

8         I'm showing you what has been marked as Plaintiff's

9    Exhibit 23, and it has three text messages on it from Rachel

10   Shafer to Emily Sporl.  If you can please turn your attention

11   to the last page so we can start from the beginning.

12        Now, the top shows a text of some type of chart dated

13   March 17th, 2022.  Was Ms. Shafer still employed by RNnetwork

14   on that date?

15   A.  She was, yes.  This is about a year before she left.

16   Q.  The next test message right underneath that from Rachel to

17   Emily is dated June 23, 2023.  Was Rachel employed by RNnetwork

18   on that date?

19   A.  No, she was no longer employed with us.

20   Q.  Okay.  So this text message was sent how long after

21   Ms. Shafer had left RNnetwork?

22   A.  Approximately three months.

23   Q.  And can you read that test message out loud, please.

24   A.  "Hi are you still travel nursing?  I would love to work

25   with you again.  Rachel Shafer, BSN AHS Stat Staffing."

1   Q.  And was Ms. Shafer working for AHS when she sent this text?

2   A.  I would assume so because she's using the title AHS stat

3   staffing.

4   Q.  Okay.  And did Emily respond to this test message?

5   A.  She did not.

6   Q.  Further down on the page Rachel texted Emily again on

7   August 17, 2023.  Can you please read that test message out

8   loud?

9   A.  Yes.  "Hi are you still travel nursing?  I would love to

10  work with you.  I have 17 years experience.  Rachel Shafer, BSN

11  AHS Stat Staffing."

12  Q.  Did Emily respond to that test message?

13  A.  She did not.

14  Q.  On the second page of the exhibit there is a third text

15  message from Rachel to Emily dated August 30th, 2023.  And what

16  did Rachel write in this test message?

17  A.  "Hi Emily, after 17 years I switched companies.  Are you

18  still travel nursing?  Rachel Shafer, BSN AHS

19  Staffing-NurseStat."  And then she provides her phone number

20  and her AHS Staffing email.

21  Q.  Now, how did RNnetwork learn that Rachel was sending these

22  solicitation test messages to Emily trying to get her to work

23  with AHS?

24  A.  So Emily Sporal is not a travel nurse.  She is an internal

25  employee of RNN, but her name is in our Bullhorn secure

1  database as a nurse.  Several of us had over time put in our

2  credentials, put in our names and addresses in our system as

3  pretend nurses so that we could test our software and also see

4  what kind of marketing materials would be sent out.  So Rachel

5  obviously assumed that she is a travel nurse and attempted to

6  reach out and have her work with her there.

7          MS. SCHWARTZ:  Your Honor, at this time I would like

8  to move to admit Exhibit 23 into evidence.

9          THE COURT:  Any objection?

10          MR. HECHT:  Your Honor, I would like to point out same

11  objection.  But as this -- this -- the content of this email I

12  think was attached to the preliminary injunction motion, some

13  of these test messages, but the cover page show which nurses

14  and giving us some more identifiable information was not

15  included.  So based on that we are objecting.

16          THE COURT:  I understand the objection.  I'm going to

17  overrule it.  P23 will come into evidence.

18      (Received in evidence Plaintiff's Exhibit(s) 23.)

19  BY MS. SCHWARTZ:

20  Q.  I'd like to show you what's been premarked as Exhibit 9,

21  Plaintiff's Exhibit 9.

22          I'm showing you Plaintiffs' Exhibit 9, which is an

23  email from Alaina Robertson to Chrissy Evans dated July 14th,

24  2023, with the title "Nurses leaving us to work with Rachel."

25          Who is Alaina Robertson?

1  A.  Alaina Robertson is a senior recruiter, health care

2  recruiter at RNnetwork.

3  Q.  What is it about this email that she forwarded that led you

4  or others at RNnetwork to think Rachel was soliciting

5  RNnetwork's nurses?

6  A.  So Haley is a nurse, an RNN nurse that was working with

7  Rachel, and we transitioned her to Alaina once Rachel left.

8  And you can see at the -- this is Alaina reaching out to Haley

9  the nurse.  And Haley responds, "Awesome thank you for that.

10  I'm probably going to go back to my old recruiter that you took

11  over for.  But again if the rate is right me and my friend will

12  travel with whoever pays the most."

13  Q.  So what about that email lead you to think Rachel is

14  soliciting Haley?

15  A.  There would be no other reason for Haley to know that

16  Rachel is working at a competitor if she hadn't reached out to

17  her, and she started a pay war.

18        MS. SCHWARTZ:  I would like to move to admit Exhibit 9

19  into evidence.

20        THE COURT:  Any objection on this one?

21        MR. HECHT:  Yes, same objection.

22        THE COURT:  And by saying -- the disclosure issue?

23        MR. HECHT:  Yes.

24        THE COURT:  Okay.  Same thing.  I'm going to allow it.

25  This is on plaintiff's exhibit list from 10/27.  And so it will

1    come in as Plaintiff's 9.

2         (Received in evidence Plaintiff's Exhibit(s) 9.)

3    BY MS. SCHWARTZ:

4    Q.  I'd like to show you what I've had marked as Plaintiff's

5    Exhibit 8.

6         MS. SCHWARTZ:  May I approach, Your Honor?

7         THE COURT:  Sure.

8    BY MS. SCHWARTZ:

9    Q.  I'm showing you Plaintiff's Exhibit 8.  And the top of the

10   email is the same one that we just looked at from Haley

11   Hohnhorst.  But there's another exchange below it that says it

12   was an inbound text directly from the nurse to the recruiter on

13   April 7th, 2023.  Can you explain to the Court what this is?

14   A.  Yes.  So if we use our text software, inbound and outbound

15   texts go into our Bullhorn system.  So the format you're

16   looking at here is the note made in our Bullhorn applicant

17   tracking system.  So what it shows is Jordan Newstadt is the

18   nurse communicating with her new recruiter Elizabeth Streber.

19   Q.  So if you look at the second page, there's a comment here

20   that says, "Oh, unfortunately RNN fired my favorite recruiter

21   after 17 years so I won't ever be working with this company

22   again.  Nothing personal but thank you."  Who sent that

23   message?

24   A.  So this would have been Jordan, the nurse, texting

25   Elizabeth Streber, the new recruiter that took over this nurse

1   from Rachel.

2   Q.  And does this message from Jordan Newstadt indicate -- lead

3   you to think that Ms. Shafer was reaching out to RNnetwork's

4   nurses?

5   A.  Yes.  We didn't publically share that she was fired.  We

6   would have no reason to share this information with Jordan, the

7   nurse.  And again, how did she know that her recruiter was

8   working again.

9   Q.  Do you know what agency Jordan Newstadt, the nurse, is

10  working with now?

11  A.  I presume she's working at AHS.

12          MS. SCHWARTZ:  I'd like to move to have Exhibit 8

13  admitted into evidence.

14          THE COURT:  Any objection?

15          MR. HECHT:  Yeah, Your Honor, the same objection.  But

16  we'll also add objection as to relevance.

17          THE COURT:  Are you sure?  This one doesn't seem to

18  hurt you.

19          MR. HECHT:  All right.  I will withdraw our objection,

20  Your Honor.

21          THE COURT:  All right.  Eight will come in.

22      (Received in evidence Plaintiff's Exhibit(s) 8.)

23  BY MS. SCHWARTZ:

24  Q.  I would like to direct your attention back to Exhibit 2,

25  which is the employment agreement.  If you can please turn to

1    paragraph 6, which is entitled "Non-solicitation of Healthcare

2    Personnel or clients."  Are nurses considered healthcare

3    personnel or clients?

4    A.  Yes, they are.  They're considered clients of ours.

5    Q.  So this non-solicitation provision says that the employee

6    agrees, during the covenant period, which is defined above as

7    one year following the employee termination, that she will not

8    solicit, recruit, offer or otherwise provide services or

9    attempt to solicit, recruit, offer or otherwise provide

10   services that are the same or similar to RNN's business to any

11   current, former, or prospective healthcare personnel or clients

12   of the company with whom the employee worked or serviced during

13   the last three years of the employee's agreement.

14          What does that mean?

15          MR. HECHT:  Objection.  Asking for a legal conclusion.

16          THE COURT:  You can rephrase it.  I mean, I'm going to

17   read everything and figure out what it means.

18   BY MS. SCHWARTZ:

19   Q.  So I'm not asking for a legal conclusion.  But as an

20   officer of the company that gives its employees these

21   agreements to sign, what does the language in this

22   non-solicitation provision mean to the business?

23   A.  It means that as a nurse recruiter Rachel is not allowed to

24   reach out to any nurses for travel nurse assignments or

25   permanent nurse assignments for a period of one year.

1  Q.  And was Ms. Shafer's communications with Haley Hohnhorst,

2  Jordan Newstadt, Emily Sporal, Amanda Fobar, were those

3  violations of her non-solicit agreement?

4  A.  Yes, absolutely.

5       THE COURT:  Well, how do you know Jordan Newstadt

6  didn't reach out to her first?

7       THE WITNESS:  I do not know that.

8       THE COURT:  Okay.

9       THE WITNESS:  Yes.

10      THE COURT:  All right.  Next question.

11 BY MS. SCHWARTZ:

12 Q.  We saw information pertaining to the thousands of nurses on

13 the exhibits we looked at earlier today that Rachel sent to

14 herself, as well as evidence that she had already moved some

15 nurses to AHS, or at least one nurse.  Is an injunction still

16 necessary?

17 A.  Yes, I believe so.  She's proven that she doesn't have

18 regard for the employment agreement she's signed, and she --

19 there's a high likelihood she may end up with another

20 competitor and she'll have all the information with her.  So

21 it's important to us that she honor her obligation to keep the

22 information she has confidential, to return anything that she

23 took from us, and for all of the information to be deleted.

24      MS. SCHWARTZ:  Moving on, because AHS and Lisley are

25 no longer --

1          THE COURT:  Sure.

2   BY MS. SCHWARTZ:

3   Q.  Okay.

4          THE COURT:  You know what?  How about this?  How about

5   we break for lunch, you can kind of look and see everything

6   that you covered, and you may not have anything else or you may

7   just have a little bit, and then we'll come back and keep going

8   at 2 o'clock.

9          MS. SCHWARTZ:  Okay.

10          THE COURT:  It's 12:45 now.

11          MR. HECHT:  Your Honor, I will make another request,

12   if possible.

13          THE COURT:  Sure.

14          MR. HECHT:  Given the volume and this amount of data

15   that you just received, and most of it we've seen for the first

16   time right now, I would ask for the Court to give us a little

17   more time to review it before we do cross on all of these

18   documents.

19          THE COURT:  Okay.  A couple things.  One is,

20   Ms. Schwartz, after this -- well, how much longer would you

21   think this witness will be?  Probably not much longer based on

22   where you are now.

23          MS. SCHWARTZ:  Maybe no more than three more minutes.

24          THE COURT:  Okay.  So I think -- we're still going to

25   break for lunch because three minutes can sometimes end up

**App. 180**

1   being much longer.  After this witness, do you have other

2   witnesses?

3        MS. SCHWARTZ:  I do.  The other two witnesses are very

4   short.

5        THE COURT:  Okay.

6        MS. SCHWARTZ:  And then there's Ms. Shafer.

7        THE COURT:  Okay.  And how much time are you asking

8   for, sir, to do what you need to do so that you can

9   meaningfully cross?

10        MR. HECHT:  Your Honor, I would say more than, more

11   than the rest of today.  I would say at least a few days would

12   be proper.  But say if we can get at least a day or two, I

13   think that will help us to prepare.

14        THE COURT:  Can you be more specific in terms of --

15   without playing out your defense, I'm not asking you to do

16   that, but I'm only trying to figure out an appropriate amount

17   of time based on your request.

18        MR. HECHT:  Yes, so I would say I probably need about

19   five to seven working hours to prepare and be able to

20   prepare -- to create a proper defense for cross on this witness

21   given the voluminous information that we have here.

22        I also want to point out to the Court that I do

23   have -- tomorrow I have a mediation scheduled that's probably

24   going to be the whole day.  It's not going to give me a lot of

25   time.  But if the Court does not approve, I will try to find a

1    suitable replacement that can be there instead of me.

2          THE COURT:  Well, here's my thought, actually.  I

3    don't know what to do about your mediation tomorrow.  The

4    problem with mediations is they're set well in advance and

5    there's Court requirements in terms of when they have to be.

6    If it's something where I can let the mediator know where we

7    are and maybe bump it to Friday or something for your

8    mediation, I'm happy to do that.

9          My thought is this.  Kind of retooling.  If you really

10   think three to fire minutes, I'll have you finish your

11   examination, we'll break for the day, that will give you the

12   balance of the day, we come back in the morning and keep going

13   and we knock this out by the end of tomorrow.

14         The initial ask was one and a half to two days.  So I

15   cleared out two days.  So we would still be on the proper time

16   frame.  I just want to finish everything in terms of the

17   evidence and the argument by close of business tomorrow.

18         MS. SCHWARTZ:  Your Honor, Ms. Ruffy has a flight

19   tomorrow out of town and she will not be here, available

20   tomorrow, so perhaps we can just finish this witness today.

21         THE COURT:  I mean, his whole --

22         MS. SCHWARTZ:  I know.

23         THE COURT:  -- request is as to this witness.

24         All right.  I'm getting like too personal with all of

25   these questions.  Where are you headed?

1        THE WITNESS:  A business conference in Las Vegas until

2    Friday.

3        THE COURT:  Okay.  And you're leaving out of here

4    tomorrow morning?

5        THE WITNESS:  6:00 a.m.

6        THE COURT:  Okay.  So the reverse red-eye.

7        MS. SCHWARTZ:  I have a suggestion.

8        THE COURT:  Yes, ma'am.

9        MS. SCHWARTZ:  What if we took some witnesses out of

10   turn.  We finish the direct examination of Ms. Ruffy.  We

11   finish the other two witnesses, because they will be very

12   short.  Maybe there's time to start Ms. Shafer, maybe not.  And

13   then Ms. Ruffy can come back next week or whenever Your Honor

14   would like her to to finish.

15       THE COURT:  Okay.  We can do that.  Whenever I have

16   these motions and the time is of the evidence, I'm tying to get

17   it through.  So as long as everyone is amenable to that, then

18   that will actually solve the problem on different levels too.

19   That will even give you more time, and you won't have to reset

20   your mediation or anything.

21       MR. HECHT:  Okay.

22       MS. SCHWARTZ:  The other option, Your Honor, is

23   because time is of the essence and we have been -- we are

24   concerned because of the situation that we have here, what if

25   we did just -- the reality is in these restrictive covenant

1  cases the parties generally do not exchange exhibits before

2  running into the preliminary injunction hearing.  And the

3  majority of the exhibits I introduced today are emails that

4  came from Rachel or to Rachel.

5       So while I appreciate her lawyer would like to have

6  more time and says he's never seen these things before, I mean,

7  one of my suggestions would be just maybe make it a longer

8  lunch break so he can have more time and finish Ms. Ruffy

9  today, so we can go ahead and finish with the remaining

10  witnesses tomorrow.  What I don't want to do is prejudice my

11  client by delaying these proceedings any longer knowing

12  Ms. Shafer is in possession of the information and doesn't

13  believe she needs to return it or stop using it.

14       THE COURT:  Okay.  It's really more up to you at this

15  point, Mr. Hecht.  I mean, we can do it a couple ways.  I'm not

16  sure exactly what you need to look over and go over with your

17  client.  I don't want to get into your head on that.  We could

18  also break until 4 o'clock and then -- but then you've got to

19  tell me that your cross is going to be an hour or less.  I

20  don't know if you have five hours of cross.  I mean, I don't

21  know.  Tell me to the best you can what you think will work.

22       MR. HECHT:  I still think -- my honest opinion is

23  based on my understanding of how much data was introduced right

24  now that we have seen for the first time, that I will need a

25  good few amount of hours to prepare.  Whether I will be able to

1   do it in less than five hours, I don't know.  And I don't have

2   a reasonable basis to believe I will be able to do it in less

3   than five hours.

4           THE COURT:  All right.  For record purposes, you're

5   talking about a lot of data that was introduced.  I don't see

6   much data.  I don't think you have to go through 2,543 nurses.

7   But, I mean, if you think you have to for some reason,

8   that's -- I certainly want to hear it in terms of your cross.

9   You know, that I don't know.

10          You don't know my schedule next week, right, in terms

11  of Monday, which is -- what's Monday, the 5th, 6th?

12          THE COURTROOM DEPUTY:  Possible trial and then a

13  status conference at 11:00.

14          THE COURT:  Does it say which case is the trial?

15          THE COURTROOM DEPUTY:  US v Merilus.  Let me look.

16          THE COURT:  And the status conference is on what?

17          THE COURTROOM DEPUTY:  At 11:00.  Status conference is

18  on Munro v Fairchild Tropical Botanic Garden.

19          THE COURT:  Oh, boy.  Okay.  What about the 7th?

20          THE COURTROOM DEPUTY:  Nothing on the 7th.

21          THE COURT:  Okay.  All right.  So then --

22          MS. SCHWARTZ:  Your Honor, if I may say one thing.  I

23  think I can finish with Ms. Ruffy right now in two questions.

24          THE COURT:  All right.  We're going to do that

25  regardless.  And then I think I'm probably just going to have

1   you all come back next week.

2          MS. SCHWARTZ:  Oh, okay.

3          THE COURT:  Okay.  So let's do this.  Why don't you

4   finish your direct examination.  I assume then that based on

5   the nature of the break -- because we'll come back Tuesday, the

6   7th, and use that day to resolve the case.

7          I assume then that, Mr. Hecht, you're essentially

8   going to waive all of your overruled objections anyway because

9   at that point you're going to have had --

10         MR. HECHT:  Yes.  Yes, Your Honor.

11         THE COURT:  Sure.

12         MR. HECHT:  Yes, if we continue on the 7th, I'm not

13  going to make anymore notice objections.

14         THE COURT:  Okay.

15         MS. SCHWARTZ:  One request, Your Honor.  We do have

16  Ms. Reed here who is here just to testify very briefly about

17  the security measures the company takes that warrants trade

18  secret protection of this data.  Her testimony will probably be

19  less than 15 minutes.  She is here, and I was wondering if we

20  could just at least finish with her so that she does not need

21  to come back next week.

22         THE COURT:  Sure.  But we're going to have to do that

23  after lunch.  I've gotta give everyone a break.

24         MS. SCHWARTZ:  Yes, after lunch.

25         THE COURT:  Okay.  So let's do this.  Why don't you

1   continue on with your witness, and we'll make sure that she

2   gets some sleep before that early morning flight, and then --

3           THE WITNESS:  Thank you, Your Honor.

4           THE COURT:  -- and then we'll -- once she's done,

5   we'll decide about a lunch break and what witnesses we can

6   finish today, and then we'll come back on Tuesday, the 7th.

7           MS. SCHWARTZ:  Okay.

8           THE COURT:  Okay.

9   BY MS. SCHWARTZ:

10  Q.  All right.  So Ms. Ruffy, you know, you testified today

11  that Ms. Shafer's taking of these documents, soliciting nurses,

12  and working at competitor AHS are violations of her agreement.

13          Do you trust that now she will comply with her

14  agreement absent a Court order requiring her not to compete or

15  solicit and to keep the information confidential?

16  A.  I do not.  She's already demonstrated that she's willing to

17  violate the agreements on all fronts, and I don't trust that

18  she will do it without a proper injunction.

19  Q.  And at any point in time after signing her agreement did

20  Ms. Shafer come to you and say she was denied access to any

21  confidential or proprietary information?

22  A.  She did not.

23  Q.  At any point in time after signing her agreement did

24  Ms. Shafer say to you that she could no longer agree to its

25  terms?

1    A.  No.

2    Q.  And if Ms. Shafer were to take this information and bring

3    it to yet another competitor, would money be an adequate

4    remedy?

5    A.  It would not.  As we saw in the court today, this -- the

6    documents she took from us are our bread and butter.  It's

7    every nurse we have working on assignment today that's actually

8    working now.  And our market is so competitive, especially

9    these days, that any of this information would be highly

10   detrimental to the company.

11           MS. SCHWARTZ:  Your Honor, that's all we have for this

12   witness.

13           THE COURT:  Okay.  Great.

14           All right.  So, ma'am, you're still under oath.

15   You're still on the stand even though we're breaking up your

16   testimony for this time period.

17           THE WITNESS:  Okay.

18           THE COURT:  Obviously, you're allowed to be in court

19   because you're the representative here.  So I just wanted to

20   caution you in that way, so that you remember you're still on

21   the stand.

22           THE WITNESS:  Do I have to tell the truth all the way

23   through next week on everything then?

24           THE COURT:  Not -- what happens in Vegas stays in

25   Vegas.

**App. 188**

1          THE WITNESS:  Okay.  Thank you.

2          THE COURT:  You don't have to worry about that.

3          All right.  In terms of what we're going to do now,

4    let's take an hour and 15 minutes.  We'll come back at 2:15.

5    We'll get as much done as we can.  Our plan is then to come

6    back in the morning on Tuesday, the 7th of November, which is

7    just a week from today, and we'll knock everything out.

8          And then just so everybody has peace of mind, before

9    we leave today why don't we just talk about putting something

10   in place so that nobody has to worry that these records are

11   going to be used in the next week.  I don't think there's going

12   to be any disagreement as to that.  If there is, then we can

13   talk about it when we come back after lunch.

14         MS. SCHWARTZ:  Okay.

15         THE COURT:  Okay?  All right.  Thank you all very

16   much.

17         MS. SCHWARTZ:  Thank you.

18         MR. HECHT:  Thank you.

19      (Recess at 12:58 p.m.)

20      (Call to Order of the Court.)

21         THE COURT:  Please have a seat.

22         We have a new courtroom deputy clerk, so there's a

23   little confusion.  I didn't know she was out here.

24         THE COURTROOM DEPUTY:  Sorry about that.

25         THE COURT:  No worries at all.

 1            So back on the record then.  Do we have any issues

 2    that came up before we keep going forward?

 3            MS. SCHWARTZ:  No, Your Honor.

 4            THE COURT:  Okay.  Great.  So we completed the direct

 5    examination of one witness.  We're going to kind of go out of

 6    order based on some of the issues that were raised.  And then

 7    you had another witness that you wanted to call right now,

 8    right?

 9            MS. SCHWARTZ:  Yes.

10            THE COURT:  Okay.  Whenever you're ready.

11            MS. SCHWARTZ:  So the plaintiff would like to call

12    Amy Reed to the stand.

13            THE COURT:  Sure.

14            THE COURTROOM DEPUTY:  Good afternoon.  Please remain

15    standing and raise your right hand.

16            AMY REED, PLAINTIFF'S WITNESS, SWORN

17            THE COURTROOM DEPUTY:  Thank you.  You may be seated.

18    Give your name again with the spelling for the record.

19            THE WITNESS:  Yes.  Amy Reed.  A-M-Y, R-E-E-D.

20            THE COURTROOM DEPUTY:  Thank you.

21                    DIRECT EXAMINATION

22    BY MS. SCHWARTZ:

23    Q.  Ms. Reed, are you currently employed?

24    A.  Yes.

25    Q.  Who is your employer?

1    A.   CHG Healthcare Services.

2    Q.   And how is CHG Healthcare related to RNnetwork?

3    A.   CHG is the parent company of RNnetwork and several other

4    subsidiaries.

5    Q.   Okay.  And what is your position with CHG?

6    A.   Vice president of product management.

7    Q.   What are your job duties and responsibilities as the vice

8    president of product management?

9    A.   I oversee the technology team that supports RNnetwork and

10   some of our subsidiaries.  I also oversee deciding and choosing

11   technology, along with deploying it and the security that goes

12   around it.

13   Q.   Are you familiar with the programs that RNnetwork has in

14   place to protect its confidential and trade secret information?

15   A.   Yes.

16   Q.   And what steps does CHG or RNN take to protect its

17   confidential trade secret information from getting into the

18   hands of a competitor?

19   A.   A variety of ways.  One of which was mentioned earlier, the

20   employment agreement.  That's first and foremost just to ensure

21   that employees understand confidentiality, noncompete,

22   non-solicitation.

23        We also have a confidentiality agreement at the

24   division level to remind them.  On our screens when we login,

25   username and password, before they can login it has information

**App. 191**

1  again reminding them of the confidential nature of our data.

2       On top of that we have some security systems in place,

3  one of which is called Okta, O-K-T-A, which helps us protect

4  our systems.

5  Q.  Okay.  And does Okta -- can you explain a little bit more

6  about what kind of security Okta provides?

7  A.  Yes.  It's a user authentication system, an identity

8  software.  It allows all of our employee to single sign in to

9  our systems that we give them access to through a username and

10  password.  It also has multifactor authentication or MFA which

11  requires them to use multiple forms of identification to

12  identify this it's them logging into our systems before their

13  username and password.  And that allows a single sign on to a

14  variety of our systems, of which Bullhorn, that was mentioned,

15  is the operating system for RNnetwork.  So if any of our

16  employees try to go directly to the system itself to login,

17  they won't be able to.  They will be directed back to our

18  single sign in system.

19  Q.  Is it a program called Icon that the company uses?  Icon

20  through Okta?

21  A.  Okta.  Well, it's our authentication system.

22  Q.  Is there another program CHG uses or RNN to protect its

23  data call TextUs?

24  A.  TextUs.  So several years back, again, both for the

25  protection of our employees and protection of data of our

1    nurses and providers, we implemented TextUs.  And that allows

2    our internal employees to be able to communicate with our

3    nurses and providers through a text messaging system.  It

4    provides transparency for us to see that.  Those test messages

5    flow into Bullhorn for all of us to be able to see the messages

6    that are going back and forth.  It also protects our recruiters

7    by using their desk phone number instead of personal phones.

8    It allows them to upload that contact information to TextUs.

9    They can use it on their personal phone then, again

10   authenticating through our Okta system, or while in the office

11   or on personal computers.

12   Q.  So just to be clear, recruiters can use their personal cell

13   phones to communicate with nurses, but as long as they're going

14   through TextUs, then their personal cell phone number doesn't

15   appear?

16   A.  Yes.

17   Q.  Is there any reason that a nurse recruiter should be using

18   their personal cell phone number to communicate with nurses at

19   RNnetwork?

20   A.  Not to my knowledge.  That's why we utilize the tool and

21   require them to use that, so we can see the communication.

22   It's not just for our protection.  It's also for the nurses'

23   protection and their information.

24   Q.  Is there any reason knowing that we have this -- knowing

25   that the company has this TextUs software, is there any reason

1  for a recruiter to be storing nurse clients' contact

2  information in their personal cell phones?

3  A.  No.

4  Q.  Is it a violation of company policy for them to be storing

5  nurse personal contact numbers and information in their

6  personal cell phones?

7  A.  Yes.

8  Q.  Does RNnetwork have any type of data theft software?

9  A.  We do, we have a variety of them, between firewalls to look

10 for data breaches.  But we also have software that scans our

11 system for any large data deletions or records that are being

12 deleted to be flagged.  We also have it for large files.

13       Unfortunately, one of the files that was shared with

14 me isn't large enough.  It's considered small.  It was only

15 300 kilobytes.  So it wasn't large enough to be scanned by our

16 system.

17       Now, with that said, we are looking at software to see

18 if it's the right thing to look at files that size, but we're

19 trying to balance allowing employees to do their job and trust

20 them, and that puts some security on our systems that it makes

21 if harder to do their job.

22 Q.  And what is the file that you're referring to right now?

23 A.  It was shared earlier.  The working and awaiting.

24 Q.  Does RNN use any other measures to protect its confidential

25 information and trade secrets?

1   A.  Yes, there's a variety of things between our security

2   systems, cameras, badges in door systems, locking the file

3   cabinets, storage systems off site also help us protect that

4   information.

5   Q.  Does the company use a privacy security team for any

6   reason?

7   A.  We do.  We have a privacy and security division that looks

8   at any regulations that are changing, real-time training, as

9   well as annual training, that all employees have to complete.

10  Q.  And does RNnetwork limit access to information to employees

11  or does everyone have access to the entire database?

12  A.  No.  When employees are brought on, we look at the access

13  they need to our systems.  Not only the systems themselves, but

14  the amount of access within that system.  And then on a

15  quarterly basis we review all of those tools to ensure that the

16  employee in their current role still need access to that system

17  and at what level do they need access.

18  Q.  So I want to turn your attention to what's already been

19  admitted into evidence as Plaintiff's Exhibit 13.  It should be

20  in one of the exhibits in front of you.

21  A.  Yes.

22       MS. SCHWARTZ:  Okay.  And just for everybody else,

23  this is the week ten working and awaiting spreadsheet with the

24  email that Ms. Shafer sent to herself on March 9th, Exhibit 13.

25

1  BY MS. SCHWARTZ:

2  Q.  So do you recognize this document?

3  A.  Yes.

4  Q.  What is this document?

5  A.  Working and awaiting.  It's a list of nurses that are

6  currently working and those that should be beginning soon.

7  Q.  So you can see on that email that Ms. Shafer had sent it to

8  her personal Gmail address.  How would Ms. Shafer get this type

9  of information from the RNnetwork system?

10 A.  It's a report out of our Bullhorn operating system that can

11 be downloaded.

12 Q.  And can you think of any reason why Ms. Shafer would need

13 to send this working and awaiting list to her personal Gmail

14 account?

15 A.  No reason that I can think of.  The reason for Okta, one of

16 the reasons is to allow employees to access their phones

17 through their phones and personal computers, the same

18 information.  It just requires them to login through our system

19 so that we can monitor it.

20 Q.  So when she sent it to her personal Gmail address, not

21 through Okta, did that prohibit the company from monitoring it?

22 A.  Yes.

23 Q.  Is it a violation of RNN's policies to email this type of

24 information to a recruiter's personal email account?

25 A.  Yes.

1   Q.  And how would Ms. Shafer know that exporting this

2   information from RNN's system to her personal email account is

3   a violation of company policy?

4   A.  A variety of ways.  I mean, again, the employment agreement

5   spells it out, as well as every time we log into our computer

6   there is a statement about our data and the information and

7   tools they're utilizing, that they are owned by CHG before they

8   can be promoted to put in their username and password.

9   Q.  I would like to show you what's been premarked as

10  Plaintiff's Exhibit 26.  Do you recognize this document?

11  A.  Yes.

12  Q.  What is this?

13  A.  This is what I was just mentioning.  As we log into any of

14  our CHG systems, this prompt is given before username and

15  password is entered.

16  Q.  Okay.  And the prompt says that this computer is company

17  property.  Company property and business information is the

18  sole and exclusive property of the company.  Is there an

19  agreement anywhere in this prompt?

20  A.  Yes, it says you agree to comply with all applicable

21  policies and procedures of the company regarding use,

22  disclosure, maintenance and security of business information.

23  And by using this computer, they're agreeing to that.  So when

24  they enter their username and password, they're agreeing to

25  this statement.

 1   Q.  Did Ms. Shafer comply with her agreement when she emailed

 2   these sheets to her personal Gmail account?

 3   A.  No.

 4           MS. SCHWARTZ:  I would like to move to admit

 5   Exhibit 26 into evidence.

 6           THE COURT:  Any objection to that?

 7           MR. HECHT:  No.

 8           THE COURT:  Okay.  So 26 will come in.

 9      (Received in evidence Plaintiff's Exhibit(s) 26.)

10   BY MS. SCHWARTZ:

11   Q.  Is there anything reason to think Ms. Shafer would not have

12   signed this acknowledgment or seen it when accessing the

13   system?

14   A.  No.  It's prompted every time you login or log out of our

15   computer systems.

16   Q.  So every single day that she would login it would show up?

17   A.  Yes.

18           MS. SCHWARTZ:  I have no further questions.  Thank

19   you.

20           THE COURT:  Okay.  Thank you.

21           Any cross for this witness?

22           MR. HECHT:  Yes.  I'll be brief, Your Honor.

23           THE COURT:  Sure.

24                        CROSS-EXAMINATION

25

1    BY MR. HECHT:

2    Q.   Ms. Reed, you testified before about a program called

3    TextUs.

4    A.   Yes.

5    Q.   Can you spell it for me?

6    A.   T-E-X-T-U-S.

7    Q.   And you said that the TextUs is some kind of software that

8    employees use internally for text messaging?

9    A.   Yes.

10   Q.   Were you involved in setting up that software for RNN?

11   A.   I was.

12   Q.   And when was that?

13   A.   Almost three years ago.

14   Q.   Okay.  So in 2012, back when Ms. Shafer signed her employee

15   agreement, did such a software like TextUs exist at RNN?

16   A.   No.

17   Q.   Okay.

18   A.   But we do acknowledge our employee handbook every year,

19   which has the confidentiality information in it as well.

20   Q.   Okay.  We'll get to that in a second.

21          Now, you said that there was a policy in the company

22   that employees must use TextUs?

23   A.   Well, sharing our information outside of those systems

24   violates the policy.

25   Q.   No, I'm asking a specific question.  Was there a policy in

1    the company that employees must use TextUs for texting?

2    A.   No.

3    Q.   There was no such policy?

4    A.   No.

5    Q.   So if a nurse recruiter would use her personal cell phone

6    to text, would that be a violation of the company policy?

7    A.   Using our -- the internal CHG information, yes.

8    Q.   No, I'm asking just a particular question.  If an employee

9    is using her personal cell phone to text somebody, would that

10   be a violation of company policy?  In and by itself is that a

11   violation of company policy?

12   A.   No.

13   Q.   Okay.  But you did say before that using TextUs -- using

14   any information outside of TextUs would be a company violation

15   of policy.  Is that what you testified earlier?

16   A.   Yes.

17   Q.   And what did you mean by that, that it would be a violation

18   of company policy?

19   A.   They're taking -- if somebody took information out of our

20   systems and entered into their personal phone, that is against

21   our policy.  We no longer can protect that information, and it

22   can be accessed by anybody public.

23   Q.   Okay.

24   A.   So personal demographic, PPI information shouldn't be

25   shared in their personal equipment without being logged in

1    through Okta.

2    Q.   Okay.  Now, when you say that taking information outside of

3    TextUs into a personal phone would be a violation of company

4    policy, which policy are you referring to?

5    A.   Confidential information, as well as Exhibit P26 where it

6    states the information is owned by CHG.

7    Q.   Do you -- so you say it's part of the employee company

8    policy, part of the employee handbook?

9    A.   Yes.

10   Q.   Do you have a copy of the employee handbook?

11   A.   I do not have one here.

12   Q.   Have you reviewed the employee handbook?

13   A.   I have.

14   Q.   When is the last time you reviewed it?

15   A.   This week.

16   Q.   Do you know which particular provision of the employee

17   handbook this would be a violation of?

18   A.   Confidentiality.

19   Q.   Just in general confidentiality.  Can you be more specific?

20   A.   It states the data that's owned by CHG is proprietary

21   information and shouldn't be shared outside of CHG and outside

22   of our systems, and it violates your employment agreement.

23   Q.   Does it say anything about putting information on a

24   personal cell phone?

25   A.   No.

1   Q.  Does it say anything about emailing to a personal email

2   account?

3   A.  No.

4   Q.  Okay.  So this is your interpretation of what

5   confidentiality means, that these actions would be a violation

6   of the company?

7   A.  Yes.

8   Q.  Okay.  Thank you.  One second.

9           Now let's move to Exhibit 26 that was introduced

10  before, which is a screenshot of the system; is that correct?

11  A.  Yes.

12  Q.  And I believe you testified also earlier that using

13  personal email would be a violation of this particular policy

14  also?

15  A.  I testified that this is sharing.  That any information

16  that CHG should be protected, and you're agreeing to that by

17  logging into the computer.

18  Q.  Okay.

19  A.  So the information that was accessed can only be accessed

20  after entering your username and password on this prompt.

21  Q.  So did you testify that sharing this information on a

22  personal email account is a violation of this policy?

23  A.  Yes.

24  Q.  Okay.  Now, if you read the policy, on the third line it

25  says -- there's something about incidental personal use is

1   permitted.  Do you see that language in the policy?

2   A.   Yes.

3   Q.   What does incidental personal use mean?

4   A.   Again, interpretation means that they can use our Internet

5   even though it's a CHG system.  If they happen to go to the

6   Internet and look something up during the day, they just need

7   to understand it's okay to use that, but it will be monitored.

8   Q.   Okay.  So you're saying incidental personal use does not

9   apply to the information that was obtained through that system

10  just in general for the use of the Internet of the company?

11  A.   Yes.  And incidentally used, but using the actual data from

12  CHG is an incidental use.

13  Q.   Okay.  So --

14  A.   Personal information.

15  Q.   Let me understand.  Are you saying that incidental use

16  refers to giving permission to a recruiter like Ms. Shafer to

17  use the Internet in general?  That's what incidental use means?

18  A.   Yes.

19  Q.   So she needs permission from RNN to do that, right?

20  A.   Yes.

21  Q.   Okay.  Without RNN's permission, she would not be allowed

22  to use the Internet?

23  A.   Correct.

24  Q.   Okay.  Even though she works from home?

25  A.   Correct.

1  Q.  Okay.  Would she be allowed to use her phone without RNN's

2  permission?

3  A.  Yes.

4  Q.  And that wouldn't be incidental use?

5  A.  Incidental use of using her telephone in general?  It's her

6  telephone.  Accessing our data is different.

7  Q.  Okay.  Can you point out to me what particular word or

8  language in this policy would be violated by sending this

9  information to a personal email account?

10  A.  Business information is the sole and exclusive property of

11  the company.  And it goes on to say, regarding use, disclosure,

12  maintenance and security of the business information.  That was

13  business information that was forwarded outside of our

14  firewalls that we no longer have access to watch.

15  Q.  Does it say here anywhere that you're not allowed to take

16  this information outside the firewall?

17  A.  It does not.

18  Q.  It does not.

19        So based on your understanding what it means that it's

20  company property, your interpretation is that company property

21  is not allowed to be sent to a personal email account; is that

22  correct?

23  A.  Correct.

24  Q.  Okay.  So there's no other language other than the fact

25  that it's company property to suggest that sending any

1  information to a personal email account violates this policy?

2  A.  Yes.

3          MR. HECHT:  Okay.  No further questions.  Thank you.

4          THE COURT:  Ms. Schwartz, any follow-ups?

5          MS. SCHWARTZ:  A couple.

6                    REDIRECT EXAMINATION

7  BY MS. SCHWARTZ:

8  Q.  Just to be clear, Plaintiff's Exhibit 26 is the prompt that

9  appears on the screen when an employee is logging on and

10  accessing data, correct?

11  A.  Correct.

12  Q.  It is not the sole basis for the company's confidentiality

13  rules and requirements and policies, is it?

14  A.  Correct.  It's not a full policy.

15  Q.  You testified there's another policy, an employee handbook

16  that discusses confidentiality of company information, correct?

17  A.  Correct.

18  Q.  And we also saw earlier today the noncompete and

19  confidentiality and non-disclosure agreements that employees

20  are required to sign, correct?

21  A.  Correct.

22  Q.  So this one exhibit, 26, is just -- isn't it true it's just

23  one small part of the steps that CHG and RNN take to protect

24  its data?

25  A.  Correct.  It's one step.  It's a reminder.  It's not the

1   policy.

2   Q.  Thank you.

3          MS. SCHWARTZ:  I have no further questions.

4          THE COURT:  Thank you, Ms. Schwartz.

5          Mr. Hecht, anything else?

6          MR. HECHT:  Just one.

7          THE COURT:  Sure.

8                        RECROSS-EXAMINATION

9   BY MR. HECHT:

10  Q.  So just to be clear, you just clarified that this is just

11  one part of the policy, but there's a whole bunch of other

12  policies, such as the noncompete, employee handbook, and all of

13  the other policies that makes up the whole policy, correct?

14  A.  Correct.

15  Q.  Have you seen in any of those policies, any document that

16  makes up the entire confidential policy of the company anywhere

17  that is says that you are not allowed to forward company

18  information to a personal email account?

19  A.  No.

20         MR. HECHT:  Thank you.

21         THE COURT:  Okay.  Thank you, Ms. Reed.  Appreciate

22  it.

23      (Witness was excused.)

24         THE COURT:  And then --

25         MS. SCHWARTZ:  I'm sorry.  Did you say I could ask her

1    one more thing?

2             THE COURT:  Oh.

3             MS. SCHWARTZ:  Or she was stepping down?

4             THE COURT:  Yes, she's stepping down.

5             MS. SCHWARTZ:  Okay.

6             THE COURT:  And then, Ms. Schwartz, do you have

7    another witness?

8             MS. SCHWARTZ:  Yes.  Plaintiff would like to call

9    Keela Briles to the stand.

10            THE COURTROOM DEPUTY:  Hi.  Please raise your right

11   hand.

12               KEELA BRILES, PLAINTIFF'S WITNESS, SWORN

13            THE COURTROOM DEPUTY:  State your name again.

14            THE WITNESS:  Keela Briles.  K-E-E-L-A, B-R-I-L-E-S.

15            THE COURTROOM DEPUTY:  Thank you.

16                          DIRECT EXAMINATION

17   BY MS. SCHWARTZ:

18   Q.  Ms. Briles, are you currently employed?

19   A.  Yes.

20   Q.  Who is your employer?

21   A.  CHG Healthcare.

22   Q.  And what is your position with CHG?

23   A.  Employee relations.

24   Q.  And in your role as employee relations, do you support

25   RNnetwork?

1    A.  Yes.

2    Q.  What are your job duties as an employee relations

3    consultant?

4    A.  It's basically an HR function.  Any other company would

5    call it HR.  So I do investigations, separations, employee -- I

6    advocate for employees when needed, work with leadership on

7    progressive disciplinary action, and ensuring that we're being

8    fair and consistent across the board.

9    Q.  Do you know the defendant Rachel Shafer?

10   A.  Yes.

11   Q.  How do you know her?

12   A.  She was a nurse recruiter at RNnetwork.

13   Q.  And how did her employment with RNnetwork end?

14   A.  We separated her.

15   Q.  What was the reason for that?

16   A.  Her behavior continued to not align with our core values.

17   Q.  And had she been given prior notices before her

18   termination?

19   A.  Yes.  So she has been on a performance improvement plan in

20   2018, she was also on a performance improvement plan in 2020,

21   and then another performance improvement plan in 2023 all for

22   her behavior:  Creating a toxic work environment and bullying

23   others.

24   Q.  Earlier today we heard testimony from Ms. Ruffy about how

25   RNnetwork learned that Rachel Shafer was working at AHS.  Were

1  you involved at all in the investigation in determining whether

2  Ms. Shafer took information with her when she left?

3  A.  Yes.

4  Q.  And what did you find?

5  A.  I went through her email and found that she had sent

6  several emails, approximately 20 or so, to her personal Gmail

7  accounts.

8  Q.  Do you recall what date range she had sent those emails?

9  A.  Yes, they started and March 9th and went through

10 March 30th.

11 Q.  And was March 30th her last day?

12 A.  Yes.

13 Q.  Why is -- was the March 9th date significant?

14 A.  Yes.  So her leader had met with her on March 9th to let

15 her know that we continue to see performance gaps and reminded

16 her that if she continues to create a toxic work environment or

17 bully others, she would be separated.  And then her leader

18 emailed that to her as well on March 9th.  So that's when she

19 started sending herself emails.

20 Q.  What type of documents did you find that Ms. Shafer had

21 sent to herself in the emails?

22 A.  She sent her resume to herself several times.  She had sent

23 a link to apply for a job at a competitor.  She had sent

24 herself the working and awaiting spreadsheet.  She had sent

25 herself TOA.  And she had also sent herself jobs that RNnetwork

1  was currently working on.

2  Q.  What do you mean jobs that that RNN was working on?

3  A.  So our consultant would email out to our recruiters saying,

4  hey, we have this job, and we're looking for X, Y, and Z out of

5  a nurse.  And so she sent that to herself, information a

6  competitor would love to have because they would want to work

7  on that job as well.

8  Q.  In front of you is a bunch of exhibits.  Could you take a

9  look at -- just quickly and let me know if 11, 12, 13, 15, 19,

10  and 20 are emails that you found Ms. Shafer had sent to

11  herself?

12  A.  Yes.  Hold, please.

13      MR. HECHT:  I'm sorry.  Which numbers did you have?

14      MS. SCHWARTZ:  All the ones she sent to herself that

15  we used today.

16      THE WITNESS:  Yes.

17  BY MS. SCHWARTZ:

18  Q.  Did you come to learn -- strike that.

19      During your investigation of Ms. Shafer's post

20  employment activities, did you receive information about

21  Ms. Shafer soliciting RNN nurses from anyone at AHS?

22  A.  Yes.

23  Q.  What happened?

24  A.  I received an anonymous call from a recruiter at AHS

25  stating that she had been taking RNnetwork nurses and putting

1   them to work at AHS.

2   Q.   I'm going to show you what's been premarked as Plaintiff's

3   Exhibit 22.

4   A.   Is that one up here?

5   Q.   No.

6   A.   Okay.

7   Q.   Do you recognize this document?

8   A.   Yes.

9   Q.   What is this?

10  A.   This is an email that I sent to my senior director just

11  from notes from the call that I had with the anonymous caller

12  that called me.

13  Q.   Is Andrea your senior director?

14  A.   Yes.

15  Q.   And did you investigate whether these nurses -- strike

16  that.

17       Let's look at the first paragraph.

18  A.   Okay.

19  Q.   Why are all these nurses' names on your memo?

20  A.   These are nurses that the caller stated that Ms. Shafer was

21  currently working with.

22  Q.   And why would the caller believe you're interested in

23  knowing what nurses she was working with?  Were they RNN

24  nurses?

25  A.   Yes, that she had put into the AHS system.

1  Q.  Did you investigate whether these nurses had ceased doing

2  business with RNnetwork after Ms. Shafer left?

3  A.  We did.  We tried to reach out to them, and we had a few

4  that were nonresponsive to our phone calls, and then we had a

5  few that said they were going to work with Rachel at AHS.

6  Q.  So that was for these nine nurses specifically identified.

7  But did the caller report how many nurses Rachel already had on

8  assignment by August 9, 2023?

9  A.  He said that she had already taken 43 nurses from

10  RNnetwork.

11  Q.  You noted that he told you she has about 80 submissions a

12  week.  What does "submissions per week" mean?

13  A.  That means how many nurses she was putting into a status to

14  submit to work for jobs.

15  Q.  So those were the nurses she was presenting for jobs?

16  A.  Yes.  Thank you.

17  Q.  The third bullet point from the bottom you wrote, "She is

18  telling travelers to give 2 weeks' notice while you get a

19  traveler submittal ready is what she is telling nurses - as

20  seen in their database."  What does that mean?

21  A.  So he was saying that she was asking nurses to give their

22  two-week notice, and during that time she would be

23  credentialing them at AHS so that she would be able to put them

24  to work.

25  Q.  In the first two bullet points you wrote that the AHS

1  employee said, "she is calling these providers from her

2  personal cell phone (noted in their system), and lots of

3  history added on these travelers that she would never know

4  without stealing them."  Is that what he told you?

5  A.  Yes.

6  Q.  What does that mean?

7  A.  It means that she was using her personal cell phone versus

8  the AHS system so that other recruiters wouldn't be able to

9  access the full information.  And then as far as history, that

10 was about knowing their shift, their specialties, things that

11 you wouldn't know unless you had worked with them previously.

12 Q.  In the eighth bullet point down you wrote, "In just 2

13 months she got 8 people on assignment - openly celebrated by

14 leadership at his company - makes us all look bad."  What does

15 that mean?

16 A.  It means that the newer recruiters were often compared to

17 Rachel at AHS, and they were saying why aren't you making these

18 KPIs, why aren't you doing this well.  And he felt it was

19 making him look bad because he had to start with a fresh book

20 of business, which is what Rachel didn't do.  She came with her

21 RNN book of business.

22 Q.  So I want to turn your attention to actually the screen,

23 which is the Excel spreadsheet from Exhibit 13, which is the

24 week ten working and awaiting sheets.

25      MS. SCHWARTZ:  Oh.  Do you have it up there?

1          MR. SCHULTZ:  It's going up.

2    BY MS. SCHWARTZ:

3    Q.  SO if you could look, we're going to scroll down to nurse

4    number 1,572.  Do you recognize this name Alicia Marcia

5    Billings?

6    A.  Yes, that's one of the nurses that the caller mentioned was

7    working at AHS for Rachel.

8    Q.  And is she one of the nurses that RNnetwork had on

9    assignment when Rachel left as her name is in the working and

10   awaiting document?

11   A.  Yes, this is a spreadsheet of all nurses that are currently

12   working.  So she was working with us at that time.

13   Q.  Okay.  If you can please take a look at nurse number 919.

14   A.  Yes.

15   Q.  Okay.  Do you recognize this name Matthew Dean?

16   A.  Yes, also a nurse that the caller mentioned.

17   Q.  Okay.  What did the caller mention about Matthew Dean?

18   A.  The same thing.  That he was going to work for Rachel at

19   AHS.  And this was a nurse that was working with us at

20   RNnetwork.

21   Q.  And he was actually working or awaiting work as of week

22   ten, the March Excel spreadsheet printout, correct?

23   A.  Correct.

24   Q.  All right.  And if you can look at -- in front of you

25   there's Plaintiff's Exhibit 8.  It's a document.  Just let me

1    know when you have that.

2    A.   Got it.

3    Q.   Do you see the name Haley Hohnhorst?

4    A.   Yes.

5    Q.   And do you know who Haley Hohnhorst is?

6    A.   Yes.

7    Q.   Who is she?

8    A.   She is a nurse that was working with us that said she's

9    going to go back to her old recruiter and stop working with us.

10   Q.   Okay.  So now if we can look at nurse number 1,628 on the

11   spreadsheet that Ms. Shafer emailed to herself, Exhibit 13.

12   Does Haley Hohnhorst's name appear on this spreadsheet?

13   A.   Yes.

14   Q.   With her contact information?

15   A.   Yes.

16   Q.   And her last date of the assignment?  Her start and end

17   date of the assignment she was currently on?

18   A.   Yes.

19   Q.   And her shift that she prefers --

20   A.   Yes.

21   Q.   -- is that on there?

22        And what about her specialty?  Is that on there too?

23   A.   Her specialty's on here, her email address is on here, and

24   the hours that she prefers, the night rotation.

25        MS. SCHWARTZ:  I have no further questions.

1          Oh, I would like to move into evidence Plaintiff's

2   Exhibit 22.

3          THE COURT:  All right.  Any objection to Plaintiff's

4   22?

5          MR. HECHT:  Same, Your Honor.

6          THE COURT:  And same in terms of timeliness?

7          MR. HECHT:  Of the notice that we haven't seen this

8   before.

9          THE COURT:  Okay.  I'm going to overrule that

10  objection.  Twenty-two will come into evidence.

11      (Received in evidence Plaintiff's Exhibit(s) 22.)

12          THE COURT:  And then any cross?

13          MR. HECHT:  Your Honor, also I would like to point out

14  that given her evidence is primarily on this document that we

15  haven't seen before, that we would request some time to review

16  it before we can do cross.

17          THE COURT:  So this document is a one-page letter.

18  I'm not sure how long you would need to review a one-page

19  letter.

20          MR. HECHT:  What I want to do is, there are eight

21  names of nurses that they claim that goes to show a certain

22  behavior of my client, and I would like to be able to go

23  through these eight names and figure out what actually happened

24  to them.  I mean nine names, actually.

25          THE COURT:  There's nine plus now Haley Hohnhorst.  So

1    ten really.

2           Look, I mean, I'm trying to give you the time you need

3    on certain things, but this relates to ten nurses that worked

4    at RNN that allegedly were called by your client and moved from

5    RNN to AHS.  So I think you gotta either cross or not.  I mean,

6    this was all disclosed on Friday of last week.

7           MR. HECHT:  Okay.  Okay, Your Honor.  We will cross.

8                          CROSS-EXAMINATION

9    BY MR. HECHT:

10   Q.  Okay.  Ms. Biles, is that your name?  B-I-L-E-S?

11   A.  Briles.

12   Q.  Briles.  Okay.  With the R.

13          Ms. Briles, you testified before that you were

14   involved also in the investigation?

15   A.  Yes.

16   Q.  Okay.  And you said that part of your investigation was to

17   go through Ms. Shafer's emails?

18   A.  Correct.

19   Q.  Okay.  Are you trained in IT?

20   A.  No.

21   Q.  So how did you search Ms. Shafer's emails?

22   A.  I went to the sent folder and looked at what she sent to

23   her Gmail account.  I searched first by her Gmail address and

24   saw what she sent to herself, and then I just start

25   additionally going through all of them to make sure I didn't

1    miss any.

2    Q.  Now, when you looked in that sent folder, did you notice

3    how long back the sent folder was retaining emails in there?

4    A.  I didn't.

5    Q.  Okay.  So is it possible that the sent folder only had

6    emails let's say from the last 90 days?

7    A.  Potentially, but all of the emails that we're talking about

8    were emailed between March 9th and March 30th.

9    Q.  Okay.  That wasn't my question.  My question is when you

10   looked in the sent folder, is it possible that it only had

11   emails let's say for the last 90 days that were sent, not all

12   the emails?

13           MS. SCHWARTZ:  Objection.  Calls for speculation.

14           THE COURT:  I think she already answered that she

15   didn't look, so anything is possible.

16   BY MR. HECHT:

17   Q.  And you said that as part of your investigation you saw

18   some emails related to jobs?

19   A.  Yes.

20   Q.  Okay.  Can you elaborate what emails you're referring to

21   when you said that she was emailing herself some jobs from RNN?

22   A.  Yes.  I'm not sure if they're printed here.  Do you mind if

23   I go through and look?

24   Q.  Sure.

25   A.  Okay.  But they do say the client, they say the shift, they

1   say the specialty of the job that they're -- that RNN's looking

2   for nurses to fill.

3   Q.  Okay.  Can you point me to a specific email that -- where

4   she emailed herself certain jobs?

5           MS. SCHWARTZ:  Objection, Your Honor.  Your Honor,

6   these are not exhibits that were introduced through Ms. Briles.

7   He's asking her to search through documents, she doesn't even

8   know what's been admitted into evidence, to see if she can find

9   the document that may or may not even be in there.

10          THE COURT:  Okay.  So I guess your question is if she

11  knows off the top of her head like dates of emails or --

12          MR. HECHT:  If she can identify a particular email

13  that she found that talks about jobs.

14          THE COURT:  Sure.  So to the extent you can in terms

15  of your memory.  I don't know that you can look through what's

16  so far been admitted into evidence.

17          THE WITNESS:  Right.  Yeah, so it would be -- like I

18  said, I know that there were at least two that were jobs that

19  were sent from our client's side, consultants, to our

20  recruiters stating the client, the specialty, the shift that

21  the client was looking for for our recruiters to fill the job.

22  BY MR. HECHT:

23  Q.  Okay.  Do you remember the names of those clients?

24  A.  No, not off the top of my head.

25  Q.  As part of your investigation when you saw the names of

1   these clients, you said there were at least two, did you check

2   to see whether these clients actually left RNN and went to work

3   for someone else?

4   A.  Well, it was client side so it's a facility.  So they

5   potentially were -- they -- so they wouldn't have gone to work

6   with Rachel as a recruiter because Rachel had provider side and

7   this was our clients' side.

8   Q.  Okay.  So these were not names of nurses then that you

9   found, right?

10  A.  No, it was a job that she could still take to AHS and say,

11  hey, I know a job, go after that job so I can fill that job.

12  Q.  Okay.  So just so I understand, these were not jobs listing

13  a nurse's personal information, right?

14  A.  No.  It was jobs listing job information that still would

15  be great for a competitor to have.

16  Q.  So it would be like similar to let's say a hospital saying

17  we need a nurse?

18  A.  We need an ER nurse on "X" dates for "X" shift, correct.

19  Q.  Now, is it common in that industry that when a hospital

20  needs a nurse, they put out the notice to everybody saying I

21  need a nurse?

22  A.  Well, our client side consultants would share it with all

23  of the recruiters so the recruiters knew to recruit nurses for

24  that position or to pull from their current database to fill

25  that position.

1   Q.  Okay.  No, that wasn't my question.  My question is when,

2   let's say, a hospital or some kind of facility needs a nurse,

3   would they put it out to the public to say we are looking for a

4   nurse?

5   A.  Not if they're working with a staffing agency.  They would

6   just share it with the agency.

7   Q.  So sometimes they would put it out to the public, sometimes

8   they wouldn't?

9          MS. SCHWARTZ:  Objection.  Mischaracterizes her

10  testimony.

11         THE COURT:  I'll allow the question.  You can answer

12  the best you can.

13         THE WITNESS:  Yeah, from an HR perspective that's not

14  really something that I would know.  So I don't know how to

15  answer that.

16  BY MR. HECHT:

17  Q.  So you don't know whether these jobs that Ms. Shafer

18  emailed herself were jobs that were publicly available to

19  everybody on the Internet, correct?

20  A.  No, I don't know that -- they could potentially have been

21  available on the Internet or on the Internet of course.  But

22  again, they would only be hiring through staffing agencies.

23  Q.  Did you check as part of your investigation to see whether

24  those jobs are publically available on the Internet?

25  A.  I didn't.  I just saw that she emailed them to herself

1   potentially to use with a competitor.

2   Q.   Okay.  But you didn't investigate whether this information

3   was available through the Internet, correct?

4   A.   No.

5   Q.   Okay.  And you don't recall the names of these facilities

6   either, correct?

7   A.   No.

8   Q.   Okay.  Now, moving onto your email dated August 9, 2023,

9   where you emailed to Andrea, correct?

10  A.   Yes.

11  Q.   And you said you received an anonymous caller on Ring

12  Central?

13  A.   Correct.

14  Q.   What is Ring Central?

15  A.   It is one of -- it's an app that we use to -- for our work

16  phone.

17  Q.   Okay.  So would that be some kind of a phone line?

18  A.   Yes.

19  Q.   Okay.  So this was a telephone call that you received?

20  A.   Correct.

21  Q.   And you personally picked up the phone?

22  A.   I didn't the first time.  He left me a voice mail, and then

23  I checked the voice mail and waited, and he ended up calling me

24  back pretty quickly again, a second time, and then I answered.

25  Q.   Okay.  Now, when he left you a voice mail, did he leave you

 1   a callback number?

 2   A.  He didn't.  But Ring Central, it has caller ID.  So I could

 3   see his name and phone number.

 4   Q.  So you could see his name and his phone number?

 5   A.  Yes.

 6   Q.  And what was the name that you saw?

 7   A.  Well, he asked to be -- he asked to remain anonymous, but

 8   his name was Marc Hester.  He's a -- we looked him up on

 9   LinkedIn.  He's a recruiter at AHS.

10   Q.  Okay.

11   A.  He started a couple months before Rachel.

12   Q.  So it was not really an anonymous caller then, it was just

13   he asked you not to disclose his name?

14   A.  Yes.

15   Q.  Okay.  How long did that phone call last?

16   A.  It wasn't very long.  But I did keep him a little bit

17   longer because I was trying to type everything that he said

18   word for word.  So I would say probably 15 minutes.  But again,

19   I don't know exactly for sure how long.

20   Q.  Okay.  And you said he gave you -- I think you put down in

21   the email nine individual nurses?

22   A.  Correct.

23   Q.  And what did he tell you about these nine individual

24   nurses?

25   A.  That they were working for AHS.

1  Q.  Did he tell you that all of these nurses are working at

2  AHS?

3  A.  Yes, under Rachel.

4  Q.  Okay.  And what else did he tell you about these nine

5  nurses?

6  A.  He was just giving examples of nurses that she knew a lot

7  of information about and had very quickly, after she had

8  started, was able to put to work.

9  Q.  Okay.  Did he tell you that these nurses were RNN nurses?

10  A.  No, we looked that up in our system ourselves.

11  Q.  Okay.  And you mentioned before that when you looked it up,

12  you looked up some of them but not all; is that correct?

13  A.  Oh, these searches?  We looked up all these nurses, yes.

14  Q.  So all of these nine nurses were working for RNN?

15  A.  They were working for RNnetwork.

16  Q.  They were working for RNnetwork?

17  A.  Yes.

18  Q.  And when you say they were working for RNnetwork, when did

19  they stop working for RNnetwork?

20  A.  I don't have the dates for all of them in front of me.  I'm

21  not sure.

22  Q.  But at that time -- I guess this call took place on

23  August 9, 2023.  Did you find any of these nurses that were

24  still working for RNnetwork as of August 9, 2023?

25  A.  No.

1    Q.  So none of them was working for RNnetwork on August 9,

2    2023?

3    A.  No, they were working -- they would have been working for

4    AHS at that time, according to the caller.

5    Q.  I'm asking as part of your verification to see whether they

6    worked for RNN.  Did you verify that none of them was working

7    for RNN as of August 9, 2023?

8    A.  Yes.  Correct.

9    Q.  Okay.  And do you know the last date that any of these

10   nurses worked for RNN?

11   A.  I don't recall that.

12   Q.  Was that part of -- did you check that at the time?

13   A.  Yes.

14   Q.  And you verified that it was prior to August 9, 2023?

15   A.  Correct.

16   Q.  Okay.  Now, after August 9, 2023, did you go back to check

17   again to see whether any of these nurses came back to work for

18   RNN?

19   A.  I did not.

20   Q.  Okay.  So would it be possible that some of these nurses

21   are currently working for RNN?

22   A.  Yes.

23   Q.  Okay.  Now, did that caller express animosity towards

24   Rachel Shafer?

25   A.  Not to her personally.  Just the situation.

1    Q.   Can you describe that animosity?

2    A.   Just like he said.  Like it's openly celebrated by

3    leadership, and it was making him as well as other new

4    recruiters look bad.

5    Q.   Okay.  So was it your understanding that that caller was

6    personally upset about it?

7    A.   Yes.

8    Q.   Now, in one of the bullet points you have you say that she

9    has about 80 submissions a week currently.  What's your

10   understanding of the word 80 submissions a week?

11   A.   That she had 80 nurses that she submitted or -- to

12   different jobs, different facilities at AHS.

13   Q.   What does "submitted" mean?

14   A.   Presented them to work.  Like here's this nurse and here's

15   all their information, and then the client would choose if they

16   wanted to interview and work with that nurse.

17   Q.   In your experience when you do a submission, is there some

18   kind of documentation related to that submission?

19   A.   I'm not in sales.  I'm in HR.  But I know that they note it

20   and -- from an RNnetwork standpoint, they know in Bullhorn and

21   the nurse actually moves through the submission to the hire or

22   to the next steps.

23   Q.   Okay.  So in your experience you don't know whether a

24   submission would be documented or not?

25        MS. SCHWARTZ:  Objection.

1          THE WITNESS:  At RNnetwork a submission would be

2     documented, yes.  You have to put in Bullhorn that you are

3     submitting the nurse for the job.

4     BY MR. HECHT:

5     Q.  Okay.  So in your experience at RNnetwork when there is a

6     submission, there is a record of that submission in the system,

7     correct?

8     A.  Yes.

9     Q.  Okay.  Do you have any reason to believe that AHS would not

10    follow the same system that a submission would be documented in

11    their system?

12    A.  I don't know what systems they use.  I know that when I was

13    talking to the caller, he was actively typing in nurses' names

14    and reading them to me.  So I would assume that they used a

15    similar system.

16    Q.  What do you mean by "actively typing"?

17    A.  He was writing.  He was looking under Rachel and pulling

18    nurses' names to share with me.

19    Q.  So it was your understanding that while he was conveying

20    this information, he was looking at some kind of system and

21    that's where he was getting the information from?

22    A.  Correct.

23    Q.  Okay.  And so you said you had no reason to believe that

24    they would use a different type of system than RNN?

25    A.  Correct.

1    Q.   Okay.   Now, on bullet point three you say "These providers

2    are already on assignment.   She has 43 already taken from RNN."

3    What does "already taken" mean?

4    A.   That she had worked with the RNnetwork that came with her

5    to AHS.

6    Q.   So would taken mean that she put him on assignment?

7    A.   I just wrote his words, so I'm not sure what he exactly

8    meant in that moment.   But he did say that were already on

9    assignment and taken from RNnetwork, so yes.

10   Q.   What is your understanding of "already on assignment" mean?

11   A.   That they were already working on an assignment at AHS

12   under Rachel.

13   Q.   Okay.   So would that mean that these nurses already signed

14   a contract with AHS?

15   A.   Yes.

16   Q.   Okay.   Now, in bullet point number eight you said "in just

17   2 months she got 8 people on assignment," right?

18          Wouldn't that be a contradiction to bullet point

19   number three where she says she has already 43 taken?

20   A.   I think he was referring to like overall she has the 43,

21   but at that -- in her first two months she already got eight

22   nurses on assignment, which was typically unheard of in the

23   recruitment world.

24   Q.   What is your understanding, how long has Rachel been

25   working for AHS at that time?

1  A.  I don't know when she started there.

2  Q.  Okay.  So let me understand clearly how you explained this

3  discrepancy.  You're saying that eight was just in the first

4  two months and 43 was in the overall time?

5  A.  Correct.

6  Q.  So if it turns out that at that time she only worked there

7  for two months, then these two would be a contradiction?

8  A.  Then the caller would have told me two different things,

9  and I just took notes of what he was saying.

10  Q.  Okay.  Now, if you look at the bullet point, the one before

11  the last bullet point, it says "She started in May and have 43

12  already," right?

13  A.  Uh-huh.

14  Q.  So basically he told you when she started working there,

15  correct?

16  A.  Yeah.

17  Q.  And how many months are between May and August?

18  A.  Four.

19  Q.  And did he tell you that these 43 submissions were all from

20  RNN?

21  A.  No.

22  Q.  So the only one he mentioned from RNN were eight?

23  A.  By name, yes.

24  Q.  And "by name" you mean from the first list that he gave you

25  there?

1   A.   Correct.

2   Q.   Okay.  But that list is nine, not eight, correct?

3   A.   Yes.

4   Q.   So there were a lot of inconsistencies in the information

5   he gave you?

6   A.   I wouldn't say they were inconsistencies.  He was just

7   sharing information.  It may not have been in the correct

8   chronological order, but overall his information seems to

9   match.

10  Q.   Okay.  Was this the first time that you got such an

11  anonymous caller telling on other recruiters?

12  A.   Like in my role --

13  Q.   Yes.

14  A.   -- in general?  Yes.

15  Q.   Okay.  Did you record that conversation?

16  A.   No.

17  Q.   Do you still have a recording of the voice mail he left

18  you?

19  A.   Yes.

20          MR. HECHT:  I don't have any further questions at this

21  time.

22          THE COURT:  Okay.  Thank you, Mr. Hecht.

23          Ms. Schwartz, any follow-ups?

24          MS. SCHWARTZ:  No follow-up, Your Honor.

25          THE COURT:  Great.  Okay.  Thank you, Ms. Briles.

1          THE WITNESS:  Thank you.

2       (Witness was excused.)

3          THE COURT:  And then, Ms. Schwartz, what would you

4   like to do at this point?  Is this a time where we should break

5   and come back on Tuesday to finish up with your witness, or

6   what's your plan?

7          MS. SCHWARTZ:  So my last witness, Your Honor, is

8   Ms. Shafer, and I don't believe we will even finish the direct.

9   It's already 3:20, and you mentioned I think around 4:00 or

10  4:30.  So I think if we're going to be coming back for another

11  day, it's best to just continue with Ms. Shafer after

12  Ms. Ruffy's cross-examination.

13         THE COURT:  All right.  And any issues, Mr. Hecht,

14  from your perspective?

15         MR. HECHT:  No issues.  But I would just ask the

16  Court -- maybe I'm offering a suggestion -- that if she wants

17  to call Ms. Shafer as a witness and Ms. Shafer is also our

18  witness, maybe she can do -- we would agree to her -- when she

19  does the cross on our witness, to use her also as the primary

20  for her so we don't have to have her twice on direct.  Would

21  you be open to something like that?  That may save some time

22  also I would think.

23         THE COURT:  Well, your client's your only witness,

24  right?

25         MR. HECHT:  Correct.

1       THE COURT:  So what we can do is assuming that the one

2   witness that has cross left is the last plaintiff's witness,

3   we'll do that cross, and then the only witness left would be

4   your client.  And so we can kind of do it all in one pot.  I

5   mean no disrespect.  It's actually a compliment.  You've been

6   leading your own witnesses pretty well.  So I think you can

7   both lead or do it however you want with Ms. Shafer as long as

8   there's no objection.

9       MR. HECHT:  Yes.

10      MS. SCHWARTZ:  I guess I wasn't really clear on what

11  his question was.  And my thought was since she's on both

12  witness lists, we would just both do a direct examination.

13      THE COURT:  So, look, that's fine.  I will just tell

14  you I think where his question comes from is most of these

15  hearings that I do, the defendant gets called twice.

16      MS. SCHWARTZ:  Okay.

17      THE COURT:  From my perspective it's not the best use

18  of time.  But the way this is going, since it's all going to be

19  together, we might as well just call her once.  And I think

20  he's offering that up.

21      MS. SCHWARTZ:  That's generally how I handle these

22  hearings, Your Honor, and that's why she's last, so -- for that

23  reason, so that we would not call her twice.

24      THE COURT:  Better for me.  As long as you guys are on

25  board with that, I'm fine.  That would be great.

1          So how about 10 o'clock, Tuesday, the 7th.  And we'll

2     just keep going forward.

3          Mr. Hecht, you know, right at this point some more

4     evidence has come out, including those lists which, you know,

5     your client's in possession of.  It's probably good just to

6     have a talk with her just so that nothing happens between now

7     and next Tuesday in terms of more use, if there is any use of

8     it.  It would just be best to kind of sit on things and keep us

9     in status quo.

10         MR. HECHT:  Sure, Your Honor.  I'll have that

11    conversation with my client.

12         THE COURT:  That would be great.

13         Anything else before I let you all go?

14         MS. SCHWARTZ:  Not from the plaintiff, Your Honor.

15         THE COURT:  Okay.  Listen, thank you all for your hard

16    work.  My Cole, Scott, Kissane team, you don't have to be back

17    on the 7th.  I'm not ordering you to be back.  It's completely

18    up to you.

19         MR. MAYA:  Thank you, Your Honor.

20         THE COURT:  I just didn't want you to feel like,

21    uh-oh, we gotta be there and sit there.  It's completely up to

22    what you and your client want.

23         MS. SCHWARTZ:  Your Honor, RNN's response -- I'm

24    sorry, reply brief in support of its motion for preliminary

25    injunction responding to Ms. Shafer's response is due today.

1  We filed yesterday a motion for extension of time because we

2  had the hearing today.  It was opposed.  And so I guess I need

3  to know if it's due in two hours.

4          THE COURT:  How much time do you need?  I didn't look

5  at it.  I'm sorry.

6          MS. SCHWARTZ:  We asked for an extension until Monday.

7          MR. SCHULTZ:  Tuesday, but Monday is fine.

8          THE COURT:  I couldn't hear that.

9          MR. SCHULTZ:  We asked for until Tuesday, but we can

10  do it Monday just before the hearing.

11          THE COURT:  Will that work for you?  It will come in

12  Monday, which is ahead of the hearing.

13          MR. HECHT:  Your Honor, I just wanted to point out --

14  and we actually -- I think she mentioned it -- in all credit to

15  Ms. Schwartz, she mentioned it in her motion.  Our primary

16  objection is that we wanted to be fully briefed before the

17  evidentiary hearing so we know what legal issues we have to

18  address.  And I think this is especially true here because they

19  filed initially their motion under Florida law.  We responded

20  it's Utah law applies.  So there's a chance here that they may

21  come back with a whole bunch of new case law about Utah law

22  that we haven't seen before, and we may need an opportunity to

23  address it.  That was the primary reason why we objected.

24          And we do think that it would be right -- at least the

25  Court should give us an opportunity to address it if she does

1    file a reply before the Court makes a ruling.  So if the Court

2    doesn't make a ruling on the evidentiary hearing, then at least

3    give us some time maybe after that to review it and maybe if we

4    have to file a short reply or the Court orders some further

5    briefing, then we can address it.

6            THE COURT:  Okay.  So here's what I think.  If you

7    could give me your submission by close of business Monday.

8    We'll come back Tuesday for the hearing, finish the hearing.

9    Once the evidentiary part of the hearing is complete, I'm just

10   going to want you all, if you wish, to give me a little bit of

11   closing, kind of like how you gave me an opening, and then I

12   always ask for proposed findings of fact and conclusions of law

13   in a written submission.

14           Being that that's the 7th, I would probably ask to

15   have those get to me by the 17th, which is the Friday before

16   Thanksgiving week.  That way you don't have to worry about it,

17   either side, during Thanksgiving week, and it will give you ten

18   days.

19           My other thought would be, since we have this time, if

20   you're inclined to want transcripts from today and from Tuesday

21   of next week for your submissions for the 17th, let Karl know

22   today so he can at least get this part done, and that would be

23   great.  But that would be the plan.  And so that way you'll

24   have time to incorporate whatever you have to in whatever you

25   give me by the 17th.  And then typically what I get from the

1    17th, I just have you both file it at the same time.  You know,

2    close of business on the 17th.

3          MS. SCHWARTZ:  Okay.

4          THE COURT:  Okay?

5          MR. HECHT:  Okay.

6          THE COURT:  That will be the plan.

7          MR. HECHT:  I would just ask -- because I just know my

8    calendar.  On the 17th I'm actually not going to be here.  If

9    the Court puts a date -- if you can put it on the 16th maybe,

10   because I'm leaving on vacation on the 17th.

11         THE COURT:  Okay.  That's better for you.  A day

12   earlier.  The 16th then we'll say.  Close of business on the

13   16th.  But you don't have to come here to file it.  Just file

14   it in CM/ECF.

15         MR. HECHT:  I will be on a cruise.  I don't know if my

16   Internet is going to work.

17         THE COURT:  I got it.  That's true.

18         So what it is, he doesn't want to file it on the 16th

19   and you get to see it before you file it on the 17th.

20         MS. SCHWARTZ:  I understand.

21         THE COURT:  So close of business on the 16th.

22         MS. SCHWARTZ:  Okay.

23         THE COURT:  Fair enough.  Thank you all for your hard

24   work.  I really appreciate it.  Look forward to seeing you next

25   week.  Be safe tonight, especially if you're out in the car

1  with a lot of little kids out on Halloween.  And don't forget

2  that Sunday is daylight savings.  So don't get here an hour

3  earlier, an hour late on the 7th.

4        Okay.  Take care, everyone.

5        MR. HECHT:  Thank you so much, Your Honor.

6        MS. SCHWARTZ:  Thank you, Your Honor.

7     (Recess at 3:26 p.m., until 10:00 a.m., November 7, 2023.)

8

9

10                    C E R T I F I C A T E

11     I, Karl Shires, Registered Merit Reporter and Federal

12  Certified Realtime Reporter, certify that the foregoing is a

13  correct transcript from the record of proceedings in the

14  above-entitled matter.

15     Dated this 4th day of November, 2023.

16

17  _____
   Karl Shires, RMR FCRR

18

19

20

21

22

23

24

25

**App. 237**

# DE 63

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-CIV-61703-SINGHAL

CHG MEDICAL STAFFING, INC, d/b/a    )
RNNETWORK, a Delaware Corporation,  )
                                    )
            Plaintiff,              )
                                    )
        -v-                         )
                                    )
RACHEL SHAFER, an individual,       )
LISLEY ROSSI, an individual, AHS    )
STAFFING, LLC, an Oklahoma Limited  )
Liability Company,                  )
                                    )
            Defendants.             )    Fort Lauderdale, Florida
                                    )    November 7, 2023
_____)    10:20 a.m.


    TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS - DAY 2

                BEFORE THE HONORABLE RAAG SINGHAL

                        U.S. DISTRICT JUDGE

Appearances:


For the Plaintiff:          JACKSON LEWIS PC
                            BY:  JENNIFER SCHWARTZ, ESQ.
                            BY:  ADAM SCHULTZ, ESQ.
                            2 South Biscayne Boulevard
                            Miami, Florida  33131

For the Defendant:          SHLOMO HECHT, ESQ.
Shafer                      3076 North Commerce Parkway
                            Miramar, Florida  33025


Reporter:                   Karl Shires, RMR, FCRR
(954) 769-5496              Official Court Reporter
                            299 East Broward Boulevard, # 110B
                            Fort Lauderdale, Florida  33301

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

**App. 239**

1                         I N D E X

2    WITNESS                                      PAGE

3    ELEANOR RUFFY, PLAINTIFF'S WITNESS, SWORN ................13
     CROSS-EXAMINATION BY MR. HECHT ...........................13
4    REDIRECT EXAMINATION BY MS. SCHWARTZ .....................66

5    RACHEL SHAFER, PLAINTIFF'S WITNESS, SWORN ................72
     DIRECT EXAMINATION BY MS. SCHWARTZ .......................73
6    CROSS-EXAMINATION BY MR. HECHT ..........................131
     REDIRECT EXAMINATION BY MS. SCHWARTZ ....................187

7

8

9    EXHIBITS                                  RECEIVED

10   DEFENDANT'S EXHIBIT(S) 1 .................................60
     PLAINTIFF'S EXHIBIT(S) 34 ...............................77
11   PLAINTIFF'S EXHIBIT(S) 17 ...............................82
     PLAINTIFF'S EXHIBIT(S) 16 ..............................113
12   PLAINTIFF'S EXHIBIT(S) 18 ..............................115
     DEFENDANT'S EXHIBIT(S) 2 AND 3 .........................169
13   DEFENDANT'S EXHIBIT(S) 4 ...............................171
     DEFENDANT'S EXHIBIT(S) 5 ...............................174
14   PLAINTIFF'S REBUTTAL EXHIBIT(S) 3 AND 4 ................190

15

16

17

18

19

20

21

22

23

24

25

1    (Call to Order of the Court.)

2    THE COURT:  Okay.  We are going to continue on with

3 CHG Medical Staffing, Incorporated versus Rachel Shafer, et al.

4 It's Case 23-CV-61703.

5    Let me get appearances again, just for today, and then

6 we'll keep going.

7    MS. SCHWARTZ:  Good morning, Your Honor.  Jennifer

8 Schwartz and Adam Schultz from the law firm of Jackson Lewis on

9 behalf the plaintiff CHG.  And with us is our corporate

10 respective Eleonore Ruffy.

11    THE COURT:  Nice to see you.  I hope Las Vegas treated

12 you well.

13    How about for the defense?

14    MR. HECHT:  Good morning, Your Honor.  Sam Hecht here

15 on behalf of Rachel Shafer.

16    THE COURT:  Nice to see you both as well.  Your table

17 seems a lot emptier today, but I understand.

18    So normally I start by asking if there's any issues

19 you want to discuss before we get into the witnesses again.

20 I'm assuming there are based on some of the late filings that I

21 got yesterday.

22    In essence, Mr. Hecht, you had made an effort to

23 subpoena the witness that was mentioned in some testimony, and

24 then it looks like AHS filed a motion for protective order for

25 a number of different reasons.  Do you want to talk about that

1  here at the outset or do you want to get into continuation of

2  the witnesses?

3          MR. HECHT:  Yes, Your Honor, we just wanted to check

4  how the Court wishes to address that because we do believe that

5  since a big chunk of plaintiff's case rests on that witness and

6  we did subpoena the witness to come and testify.  He wasn't

7  identified before.  The first time we got notice of that

8  witness was during the previous hearing.  So he said he is

9  available probably tomorrow or maybe available another date.

10  His unavailability seems to be broken in two.  He says he is

11  not available today because he has some kind of a doctor's

12  appointment, but then he's also claiming that he lives far away

13  and he wants to see if he can perhaps appear remotely.  So we

14  just wanted to see if the court -- what the Court prefers to

15  do.

16          Alternatively, he also submitted an affidavit, and his

17  affidavit pretty much outlines that he does not recall anything

18  about that phone call and he doesn't have any access -- he

19  doesn't have any information about Ms. Shafer's whereabouts,

20  which completely contradicts the testimony that the plaintiff

21  has introduced to rely on.  So we do think it's a critical

22  witness for the disposition of this issue, and we want to know

23  how the Court would prefer to address that.

24          THE COURT:  Sure.

25          MS. SCHWARTZ:  May I respond, Your Honor?

**App. 242**

1          THE COURT:  Sure.  Yes, before I say anything, let me

2     hear from plaintiff's side.

3          MS. SCHWARTZ:  So as an initial matter, the first time

4     I learned that Mr. Hecht had subpoenaed this individual to

5     appear to testify in this case was last night when I saw AHS's

6     motion to quash.  I was never notified that this individual was

7     going to be served with a subpoena to be here.  I was never

8     given an opportunity to assert any objections or to have any

9     discussion about it.

10          That being said, I do not agree that the testimony

11     about him comprises a huge chunk of our case.  In fact, I think

12     it's a small, little part of our case.  And given his

13     declaration if he is available to testify, I will have no

14     objection to that.  I do object to continuing this hearing

15     beyond one more day, today, for that purpose because I don't

16     believe his testimony is really all that critical given the

17     significant amount of evidence that we have to support the

18     claim apart from that call.

19          Second --

20          THE COURT:  Let me ask you this.  Oh, okay.  Go ahead.

21     I didn't know you had a second.

22          MS. SCHWARTZ:  It also came to my attention yesterday

23     that Mr. Hecht and Ms. Shafer have been email my client's

24     directors and managers threatening them that if they don't

25     provide information that they want, that they will be

1   receiving -- they will be dragged into this litigation.

2          So I don't know what additional surprise witnesses may

3   be on Mr. Hecht's unannounced lists for today.  I think this

4   conduct is inappropriate and needs to stop.  And I would object

5   to him calling any of the witnesses that they were threatening

6   to drag into the lawsuit and that -- he's planning to do that.

7   All of this has come as a last minute surprise to me.

8          THE COURT:  Okay.

9          MR. HECHT:  Judge, may I respond briefly?

10         THE COURT:  To that last part?

11         MR. HECHT:  To both parts.

12         THE COURT:  Okay.

13         MR. HECHT:  Number one, Your Honor, it's inaccurate.

14  On Wednesday, November 1, a day right after this -- the last

15  hearing, I sent an email copying opposing counsel with the

16  subpoena.  So she became aware that we would like to subpoena

17  Mr. Hester the very next day after the hearing.  And, Your

18  Honor, I have a copy of this email here with the attached

19  subpoenas that we sent to AHS.  We asked AHS if they would

20  accept service.  And Ms. Shafer -- I mean, opposing counsel,

21  Ms. Schwartz, was copied on that email.  So she had notice

22  about that.

23         As far as contacting the other party, Your Honor,

24  counsel -- I have not contacted anybody there directly.  My

25  client wanted to verify some information from her old bosses.

1 She showed me the email that she sent simply asking to confirm

2 where the specific people worked at RNN or didn't work at RNN.

3 And again, these are all of the new people, the new nurses or

4 persons that were identified for the first time in the last

5 hearing. And she just -- she didn't threaten anybody. I saw

6 those emails, and they're not threatening emails. They're just

7 asking simply for information. And my client has a right to

8 defend herself.

9      THE COURT: Okay. So a couple things, just working

10 backwards. As far as your client contacting CHG Medical or any

11 of the employees there, I mean, just not a good course of

12 practice. You've got to talk to her about that. I do

13 understand that she wants to do the best she can with regard to

14 the evidence, but, you know, even how this whole case was set

15 up before me, what I was told is, look, you've got this case,

16 Judge, and there's also going to be a separate ADA case and

17 there's an EEOC complaint. And so I just don't know that the

18 clients should be talking.

19      I mean, certainly, Mr. Hecht, you can have whatever

20 conversations you think are appropriate with opposing counsel.

21 And it's probably best that I say it that way because

22 sometimes -- like I was a lawyer before I was a judge.

23 Sometimes clients need to hear it from the judge, rather than

24 their own lawyer. It's just truly a better course of practice

25 that you lawyers handle things. So let's kind of put an end to

1    that contact, whether it's nefarious or not.  Let's just put an

2    end to that, and you all going forward just handle that.

3          Second thing is with regard to just fair notice, you

4    do you have to file a witness list.  You know, you do have to

5    file an amended witness list.  And so that would be the

6    preferable way to do things in terms of how we have our dockets

7    set up.  That having been said, the first thing my law clerk

8    told me when we walked out of court after the last hearing was

9    he's going to subpoena Marc Hester.  So I'm not looking at it

10    as a huge surprise.  But from a notice standpoint, we just

11    gotta do it that way.

12          Let me inquire about your position, though, with

13    regard to the affidavit.  Is it your position that I can

14    consider that affidavit?

15          MS. SCHWARTZ:  Yes, I actually have rebuttal evidence

16    that refutes the affidavit.  So if Your Honor would like to

17    accept that affidavit, I will just present my evidence and

18    Mr. Hester need not appear, unless he's available today.

19          THE COURT:  Sure.  So there are several independent

20    reasons why Mr. Hester can't be compelled to appear today.

21    Main one being where he lives.  I could set up something over

22    Zoom.  It appears that he has several important doctors'

23    appointments today.  It sounds like his personal health

24    condition is awful.  And, you know, that was all laid out in

25    the motion.

1     I think really, though, what it comes down to is this.

2   CHG has to prove its case, and the quality of the testimony is

3   always going to be in question.

4     From Ms. Shafer's perspective, the testimony that the

5   individual gave regarding the email she received from

6   Mr. Hester, your argument, Mr. Hecht, is that that's false.

7   But there's two levels to that.  Was the email sent by

8   Mr. Hester?  We don't know.  Two, was the email sent by someone

9   else using Mr. Hester's name?  We don't know.  Three, was the

10  email never sent and you're saying the witness made it all up?

11  I've got to hear all of that in terms of what's offered in the

12  case.

13     The best way that I can look at it really is this.  If

14  this were a criminal case and you were the prosecution and the

15  police based their investigation on an anonymous tipster who

16  then came forward and said I never sent these emails, I don't

17  know what's going on, then, Mr. Hecht, you've got a great

18  argument.  But in a civil case, even if all of that testimony

19  is false but CHG can establish what they have to establish

20  independent of that testimony, you still have an issue.  I'm

21  not saying they've established it.  I'm not saying they

22  haven't.  But I view it completely differently for that reason.

23     And in terms of going forward.  So Mr. Hester's email

24  essentially listed nine people that Ms. Briles testified were

25  people that Ms. Shafer stole.  I won't base a decision based on

1    Mr. Hester's email alone.  I mean, I've got to hear everything.

2    And so you can rest assured that it's got to be more than that.

3    But keep in mind we do have separate emails from, for example,

4    an individual saying, hey, I'm going to go with my old

5    recruiter.  So I think you gotta really focus, both sides, on

6    what I have independently, and we'll see if it meets the four

7    elements.

8          I'm happy to consider that affidavit.  I'm happy to

9    hear your argument that, hey, Hester never sent this email.

10   I'm happy to hear whatever argument opposing counsel makes as

11   well.  I don't know that you need to call a witness, even by

12   Zoom, if they're just going to testify consistent with that

13   affidavit.  I'll accept what that affidavit says.

14         So I think that's my position going forward.  I think

15   that you've got out what you need to get out.  And I'll

16   certainly hear rebuttal as well, and we'll go from there.

17         MR. HECHT:  Your Honor, I just want to correct.  I

18   think the Court mentioned multiple times referring to an email

19   sent by somebody alleging to be Mr. Hester.  I don't think

20   that's what they presented, Your Honor.  They presented an

21   email sent internally about a conversation that somebody had

22   with Mr. Hester.  There was only an allegation about a phone

23   call, not about an email.

24         THE COURT:  You're exactly right.  You're exactly

25   right.  So I misspoke there.  But let's say it was John Doe

1   says, hey, this is Marc Hester.  That's what I meant.  I don't

2   know what the argument is that's going to be going forward.

3         So what I'm saying is there's a number of

4   possibilities.  It could be Hester, and he's really ill, and he

5   doesn't remember.  It could be John Doe posing as Hester.  It

6   could be neither of the two and completely made up.  My point

7   is that we go forward no matter which one of those three it is

8   and focus on the quantum of evidence that's going to come in.

9         Anything else on that issue before we keep going?

10         MS. SCHWARTZ:  I do have one thing, Your Honor.

11         THE COURT:  Sure.

12         MS. SCHWARTZ:  I was wondering if Mr. Hecht or the

13   other counsel here for AHS has Mr. Hester's phone number and

14   could tell me what that number is.  Because I have evidence

15   that I would like the Court to consider along with that

16   affidavit if the number is consistent with what's appearing on

17   this document.

18         THE COURT:  Well, I mean, you all can talk about that.

19   But, I mean, this individual was an employee of CHG, so I'm

20   sure CHG has his number.

21         MS. SCHWARTZ:  He was an employee of AHS.

22         THE COURT:  Oh, of AHS.  Understood.  Understood.

23         So, I mean, I'm sure we can go ahead, but I think

24   we're all missing the point.  If, let's say, they have a number

25   and, let's say, John Doe called from his number, let's say John

1    Doe cloned his number.  I mean, either way I think we go

2    forward and we have a witness who's saying he has no memory --

3                MS. SCHWARTZ:  Okay.

4                THE COURT:  -- you know?  Okay.

5                All right.  Then what's the preference?  To put the

6    witness back on whose direct is completed and go to cross or --

7    and I think that that's where we left off.  And then after that

8    witness we would go to Ms. Shafer, and that seemed like it

9    would be the bulk of the witnesses, or if there's a different

10   plan let me know.

11               MS. SCHWARTZ:  I think that's fine, Your Honor.

12               THE COURT:  Okay.  All right.  Mr. Hecht, anything

13   else before we keep going?

14               MR. HECHT:  No, I think that's it.

15               THE COURT:  Okay.  All right then.  Ready?  Come on

16   up.

17               MR. HECHT:  Your Honor, just as an administrative

18   matter, I want to know if the Court still has all the exhibits

19   that were introduced in the primary testimony, and does the

20   witness also have access to all of the exhibits introduced to

21   her?

22               THE COURT:  I have the exhibits.  I think she came up

23   empty-handed, but there's a stack in front of her.  If she

24   doesn't have access, someone can give her access.

25               MR. HECHT:  Okay.

1          THE COURT:  Remember when you left, I said you remain

2     under oath, but we're going to swear you in anyway.

3          THE COURTROOM DEPUTY:  Raise your right hand.

4          ELEANOR RUFFY, PLAINTIFF'S WITNESS, SWORN

5          THE COURTROOM DEPUTY:  You may be seated.  State your

6     name and spell your last name for the record, please.

7          THE WITNESS:  Eleanor Ruffy, R-U-F-F-Y.

8          THE COURT:  And then, Mr. Hecht, I think the ball is

9     in your court at this time.

10                         CROSS-EXAMINATION

11    BY MR. HECHT:

12    Q.  Good morning, Ms. Ruffy.  I would like to go over some of

13    the elements of the testimony you've given here last week.

14    Let's start with the responsibilities of Ms. Shafer.

15          You described certain responsibilities of Ms. Shafer,

16    which includes develop relationships.  Do you recall giving

17    this testimony?

18    A.  I do.

19    Q.  Okay.  Can you explain to me what does it mean "develop

20    relationships"?

21    A.  Developing relationships to us would mean when a nurse

22    expresses interest in a particular job that we're posting

23    somewhere.  That lead would be routed to Ms. Shafer, and she

24    would call the nurse, get to know the nurse, find out what the

25    nurse's interests are, develop a business relationship with

1    that provider, that nurse, and then help that nurse get placed

2    within a facility.

3    Q.  Was it Ms. Shafer's responsibility also to find nurses in

4    the first place?

5    A.  Typically she would not find nurses outside of our system,

6    no.  She would typically either respond to leads we received or

7    sourced through our database for nurses who might still be

8    looking.

9    Q.  Okay.  And then after she develops a relationship with that

10   nurse, what would be -- what else would she be involved in as

11   far as a job position?

12   A.  She would be helping the -- be a resource for the nurse as

13   she goes through the placement process.  So sending the resume

14   over to the job, helping that happen, help with the

15   credentialing process.  Not actually credential the nurse, but

16   maybe run interference if there's an issue.  If there's an

17   issue with payroll down the line, help with interference.  Keep

18   in touch with the nurse weekly throughout the assignment.  And

19   then towards the end of the assignment, help place that nurse

20   hopefully to another assignment with RNN.

21   Q.  Okay.  Now, which part -- is that all the responsibilities

22   she had or did she have other responsibilities as well?

23   A.  That's the bulk of the responsibilities she had.

24   Q.  Okay.  Now, which part of her responsibility required the

25   most skill?

**App. 252**

1    A.   Uhm, the -- well, there would be the -- just generally

2    learning our nursing staffing in general.  So the specialties

3    themselves.  We work with any kind of nurse from home health to

4    ICU to ER.  So being able to utilize the right language with

5    the nurse that calls in.  So learning all of the specialties to

6    be able to qualify the nurse is a big skill set needed.

7         There would also be the payment process.  So there's a

8    job that posts at a certain rate, the nurse wants a certain pay

9    rate, and she could negotiate the pay package.  There's a lot

10   of details involved there with regards to knowing state laws

11   for payment, there's overtime and all those things.  So she

12   needs to have a fairly complex knowledge of the pay placement

13   process.

14        Besides that, there are other professionals who do the

15   credentialing piece.  So she doesn't need to know that, but she

16   does help the provider through if there are issues.  So having

17   some knowledge of all of the credentialing needed to send a

18   nurse on assignment.

19   Q.   Okay.  You mentioned that when it comes to payment, she has

20   to have specialized knowledge in certain areas, and you said it

21   has to do with payment loss and overtime pay?

22   A.   Uh-huh.

23   Q.   Okay.  Was there any other specialized knowledge she had to

24   know that had to do with payment?

25   A.   Not that I can think of.  Are you looking for something

1  specific?

2  Q.  No, I'm asking you.  Like what specific skills -- what are

3  the skills she's required to do to handle payment, and you

4  mentioned two specific skills -- skill sets, which has to do

5  the loss and overtime.  I'm asking if there are any others that

6  you can think of.

7  A.  Not that I can think of.

8  Q.  Okay.  Now, you said that there is a certain skill set she

9  has to have when she initially talks with a nurse, and

10 basically you said something about understanding what types of

11 positions there are, correct?

12 A.  Uh-huh.

13 Q.  Is that -- would you itemize that as a special skill set

14 that she needs to have?

15 A.  Yeah, it would be specialized training.  Not necessarily a

16 skill set, like a talent, but it's specialized training that we

17 provide our recruiters is how to read a job description,

18 whether it's an OR or an ER or a home health nurse.  We train

19 all of our recruiters to be able to read a job description.

20 Q.  Okay.

21 A.  But it's not a skill set per se.  It's a trained --

22 something we teach them --

23 Q.  Okay.

24 A.  -- to do.

25 Q.  So the skill set is essentially to be able to differentiate

1   between different types of nurses?

2   A.   Yes.

3   Q.   Okay.  And all these letters that you mentioned, these are

4   different types of nurses, right?  For example, OR.  Can you

5   tell me what "OR" means?

6   A.   Oh, yes.  "OR" is operating room nurse, where "ER" would be

7   an emergency room nurse.  Home health would be a home health

8   nurse that comes to your home.  They're all different types of

9   nurses with different trainings, backgrounds, and

10  certifications.

11  Q.   Okay.  And are these distinctions between different nurses,

12  are they well known within the industry or is it something

13  that's unique to RNN?

14  A.   They would be well known within the nursing industry or

15  within the nurse staffing industry.

16  Q.   Okay.  So, for example, it's well known that when you have

17  a job description that says OR, it means operating room nurse,

18  right?

19  A.   Well known within our industry?  Yes.

20  Q.   Right.  Okay.  But I mean, it's not unique to RNN.  It's

21  not like RNN came up with the term OR or a distinction between

22  those different nurses, correct?

23  A.   Correct.  It's an industry nomenclature for an operating

24  room nurse, yes, OR nurse.

25  Q.   So part of her skill set is to understand the different

1   terms of different nurses?

2   A.   Yes.

3   Q.   Okay.  Are there any other skill sets that you can think of

4   that she needs to have when it comes to recruiting a nurse?

5   A.   Well, there's the basic skill sets of working with -- as an

6   agency recruiter working with people looking for work.  So

7   Rachel didn't have a sales background, so we would have taught

8   her basic sales skills; questioning, handling objections.

9   Those traditional sales skills would also be something that she

10  learned at RNnetwork.

11  Q.   Okay.  Now, last time you testified about a training

12  process.  I believe you mentioned that there are like three

13  different phases of training.  You said the first phase is --

14  the first eight weeks there's a specialized training.

15         Do you have a specific name that you refer to when you

16  talk about the first eight weeks of training?

17  A.   Uhm, the new hires go, what we call, into core training.

18  That's the internal term we use.

19  Q.   So core training would consist of the first eight weeks of

20  training?

21  A.   Yes.

22  Q.   And when you say the first eight weeks, would that be the

23  first eight weeks after they're initially hired?

24  A.   Correct.

25  Q.   Okay.  And how would you describe the core training?

1  A.  So the core training of the new hires are in on their own

2  team with a specific trainer.  So they're not in the sales

3  process yet.  And over the course of eight weeks, they're

4  taught everything from sales skills to the specialty skills, I

5  mentioned, to how to build a package, a compensation package

6  for the nurses, and then what happens down the line.

7          And then at around four weeks they'll start receiving

8  one or two leads that they can start working with that with

9  providers under the supervision of a trainer.

10 Q.  Now, we talked before about a specific skill set involved

11 in developing relationships with new nurses.  Would it be fair

12 to say that the core training, the first eight weeks, is when a

13 new employee develops that skill set to develop relationships

14 with nurses?

15 A.  Uhm, no, I wouldn't say so.  Most of the eight weeks is

16 technical training.  We obviously do train how to connect with

17 nurses and develop those relationships, but being a skilled

18 recruiter takes a long time to really get good at it.  So this

19 is why we have continuous training throughout.  Even a seasoned

20 recruiter gets ongoing training because they need to continue

21 to hone their skill sets.

22 Q.  Now, can you identify a specific skill set that's not

23 taught in the core training the first eight weeks that the

24 recruiter would need in order to develop relationships?

25 A.  Uhm, I would say no.  The core training is for brand-new.

1  As I mentioned when I testified last week, we typically don't

2  hire seasoned recruiters.  So the core training is to teach

3  brand-new folks who have never ever been in the industry.  But

4  then we repeat much of the training throughout the years of

5  recruiters to re-hone their skills, update the training, and

6  refresh.  So I can't think of anything we teach in core that we

7  wouldn't teach ongoing.

8  Q.  Okay.  Now, you mentioned also that when it comes to

9  training, there's a secondary period of training after the core

10  training, and I believe you said something about eight to nine

11  months; is that correct?

12  A.  Right, from week eight.  At week eight they graduate and

13  move onto a sales team with a sales leader.  And during that

14  time, the sales leader takes over the leadership and the

15  oversight of that employee.  But the trainers have -- spend

16  extra time with them each week to continue with some training.

17  And that would be from week eight to month nine.

18  Q.  So would it be fair to say that would be like an additional

19  like seven months of training?

20  A.  Yes.

21  Q.  And can you describe what skill sets new employees are

22  being trained within that secondary period, from week eight to

23  month nine?

24  A.  It's reinforcement training and higher level, if you will.

25  If you're -- for example, we teach all the nurse specialties in

1    the first eight weeks.  It takes a long time to absorb all of

2    the details.  So we'll do another couple of series of trainings

3    to teach at a little bit higher level so that they get fully

4    proficient in each of the specialties.

5          For example, similar with the pay packages, we -- it's

6    sort of like pay package 2.0, if you will.

7    Q.  And you used the word they become fully proficient after

8    the nine-month training, correct?

9    A.  I wouldn't say that.  That's why we have ongoing training

10   each week and each month and require even our seniors to

11   attend.  Our industry does change over time.  And requirements

12   change, laws change, so we have continuous training on, for

13   example, pay packages.  Laws change over years.  We have to

14   readjustment, and we have ongoing training.  So I would not say

15   after nine months anybody's fully proficient, no.

16   Q.  Okay.  Now, do you have a certain internal term that you

17   use for that secondary training between week eight and month

18   nine?

19   A.  Yes, we call it core to floor.

20   Q.  Core to floor?

21   A.  So out of the core training group into the sales floor.

22   Q.  And what does "floor" mean in that context?

23   A.  Floor would be that you -- a recruiter is now on a

24   recruitment team with a sales leader and is receiving -- is on

25   the job full time and no longer in training.

1    Q.   Okay.  So the "floor" means that they transition from

2    training into actually working on the floor?

3    A.   Right.

4    Q.   Okay.  Now, you also mentioned that there's ongoing

5    training, correct?  And how would you describe the ongoing

6    training?  Does it happen once a week or once a month or how

7    frequent does it happen?

8    A.   Well, it's evolved over time.  I mean, obviously, we've

9    been doing this for years and things change over time.  During

10   the COVID period, it was different than pre-COVID.  It was a

11   little different than now.  So it's a little hard to answer

12   your question accurately.

13        Our attempt is a minimum once-a-month training.  There

14   have been periods of time where we've done weekly trainings,

15   sometimes twice a month.  We'll have to do specialized training

16   if there's, for example, a new situation.  So it really does

17   vary.  We don't have a set program once a recruiter moves out

18   of core to floor.

19   Q.   Okay.  Now, how is that training performed?  Is there a

20   specific person that comes in and does the training or --

21   what's the format of those trainings?

22   A.   Well, that's evolved as well.  Prior to COVID, they were

23   live training sessions in the office, or at times the leaders

24   are trained and the leaders train at the team level or at the

25   individual level one-on-one.  So it could depend on the

1  magnitude of the training.  Nowadays we do a lot of it via Zoom

2  or recorded self-service trainings.  And we do also offer live.

3  So it's varied over time.

4  Q.  Okay.  How long have you been with AHS?

5  A.  I work at CHG.

6  Q.  I mean CHG.  I'm sorry.

7  A.  I have been with CHG for 15 years and with RNnetwork for

8  six years.

9  Q.  Okay.  So RNnetwork is the office that we are talking about

10  that's involved in this particular case, and for RNnetwork

11  you've been only six years?

12  A.  Yes, I joined in 2017.

13  Q.  Okay.  And can you describe the specific skill sets that

14  are being trained during those weekly or monthly continuous

15  training?

16  A.  Again, it varies depending on what we feel the recruitment

17  teams most need.  Sometimes it's technical training to improve

18  on processes or how to use our software.  Sometimes it's a

19  training on how to speak with the nurse and help them through,

20  for example, the health consequences of COVID, how to build

21  strong earn relationships with the nurses given the ups and

22  downs.  It really has varied.  Sometimes it's training on how

23  to best build a pay package to be competitive in the

24  marketplace.  Again, things changed a lot over the years, so

25  there was a multitude of trainings in all sorts of aspects for

1    recruiters.

2    Q.   Are these trainings being recorded somewhere?

3    A.   Today they are, yes.  I don't know if you're asking back in

4    the day.  But, yes, they are recorded.

5    Q.   And what format is it recorded?

6    A.   We typically do Zoom training.  We do a hybrid training,

7    including zoom, and record them and then make them available

8    after for anybody who missed the training.

9    Q.   Okay.  And are there also materials that are being

10   presented to the trainees for all of these trainings?

11   A.   Most of the time there's material.  Not always, but most of

12   the time, yes.

13   Q.   Okay.  Now, you described all of these three different

14   levels of trainings, right?  The core training, the core to

15   floor, and the continuous training.

16          Do you have a specific name that you use for the

17   continuous training, like --

18   A.   No, just ongoing training.

19   Q.   Okay.  Have you participated in any of these trainings

20   personally?

21   A.   Uhm, yeah, I have.  I don't go to all of them, but I do

22   participate in some of them, yes.

23   Q.   Okay.

24   A.   Not all of them, no.

25   Q.   And when you say you participate in all of them, have you

1  participated in the core training?

2  A.  I participate in some of them.  Core I do not, no.  When I

3  first started in '17, I went through core as a trainee to get a

4  feel for it.  And I've gone into some of the core classes since

5  just to audit and see how they're doing.  But, no, I don't

6  attend core now.

7  Q.  How about the core to floor?

8  A.  No.  Similar.  I went -- I attended them early on when I

9  joined in '17 and not since then.

10 Q.  How do you know about the training process of RNN?

11 A.  How do I know about it?

12 Q.  Yes.

13 A.  I oversee the training department.  I have a training team

14 and a leader and a senior leader, and they report up to me.

15 Q.  Okay.  So the training team reports to you and that's how

16 you know about it.  And you mentioned before you started to

17 work for RNN in 2017.

18      Do you know anything that RNN -- how RNN operated with

19 its training prior to 2017?

20 A.  I do know core was in place when I started, but I don't

21 know how far -- how long it had been there, if that's what

22 you're asking.  But, no, prior to '17 I don't have a clear

23 knowledge of what they did.

24 Q.  So do you have any knowledge about RNN's core to floor

25 training prior to 2017?

1  A.  That was added during my time, so it did not exist before

2  '17.

3  Q.  Okay.  Do you know anything about the ongoing weekly or

4  monthly training that happens at RNN prior to 2017?

5  A.  No.

6  Q.  Okay.  Do you know if Ms. Shafer received core training?

7  A.  I don't.

8  Q.  Do you know --

9  A.  I don't know if she did or not.

10  Q.  Okay.  Do you know if Ms. Shafer received core to floor

11  training?

12  A.  I do not know if she received that.

13  Q.  Do you know if Ms. Shafer received ongoing training?

14  A.  That I do know.  She received ongoing training.  She had an

15  opportunity to attend all of our ongoing trainings during at

16  least my time there.

17  Q.  Now, when you say she had an opportunity to attend, what do

18  you mean by that, she had an opportunity to attend training?

19  A.  All of our trainings are either required or best practice.

20  For our seniors many times we would encourage them, not require

21  them.  But we made them available to her at all times.  And in

22  some cases we required them.

23  Q.  Okay.  Do you have any personal knowledge whether

24  Ms. Shafer actually attended any of these trainings?

25  A.  I do not.

1   Q.   Okay.  But all you know is that training was made available

2   to her?

3   A.   Correct.

4   Q.   Now, you've also testified here last time about the nurses

5   lists that RNN has, correct?

6   A.   The -- you mean -- which list are you referring to?

7   Q.   The lists that -- like a database of nurse lists that

8   recruiters have access to and they can go and use that for

9   recruiting nurses.

10  A.   Our Bullhorn database, the actual ATS, or the working and

11  awaiting list?

12  Q.   I'm not talking withing about a specific report.  I'm

13  talking in general.

14  A.   Okay.

15  Q.   You've testified about RNN has a big list of nurses,

16  correct?

17  A.   Yes, a database of nurses.

18  Q.   I believe you said -- correct me if I'm wrong.  Did you say

19  they have about 400,000 nurses in that database?

20  A.   Yes.

21  Q.   Okay.  In your testimony you described how RNN obtained

22  those lists, correct?

23  A.   I did.

24  Q.   And you mentioned something by the initials CB.  Do you

25  recall that?

1  A.   CB?

2  Q.   I believe -- I believe so.  I think you said we use CB, we

3  use Indeed.

4  A.   CareerBuilder.

5  Q.   CareerBuilder.  Okay.  So "CB" stands for CareerBuilder?

6  A.   As an example, yes.

7  Q.   So RNN uses CareerBuilder to get lists of nurses?

8  A.   No, we contract with CareerBuilder to post our jobs, and

9  then the nurses apply to our jobs through CareerBuilder and we

10  receive the lead.

11  Q.   Okay.  And the same thing with Indeed?

12  A.   Correct.  We contract with about 10 or 15 different

13  companies like that.

14  Q.   Okay.  And can you describe the contracts?  Like what type

15  of contract is that?  What do they do for you and what do you

16  do for them?

17  A.   I'm not intimately involved in that.  That's our marketing

18  department.  So I'm not sure I'm qualified to answer.  I know

19  the marketing department does contract, for example, with

20  Indeed, and we pay them to allow us to post our jobs onto their

21  site, but that's as much as I can tell you.

22  Q.   Okay.  Now, the extent of your knowledge about how RNN

23  established those databases, do you have any personal knowledge

24  on that?

25  A.   I'm sorry.  I don't understand the question.

1   Q.  Do you have any personal knowledge about the process RNN

2   goes through to establish its database of nurses?

3   A.  Besides the front desk enters all the leads and that's how

4   the provider gets added?  I do have personal knowledge of that.

5   I've seen that work being done, and I've helped establish the

6   processes.

7   Q.  Okay.  So you have personal knowledge about people actually

8   putting in data in the system?

9   A.  Uh-huh.

10  Q.  Do you have personal knowledge about where this data is

11  coming from?

12  A.  Well, I don't know what you mean by "personal knowledge."

13  Like, have I seen it with my own eyes?  I mean, I see the inbox

14  where the leads come in and it says CareerBuilder at the top,

15  and then I see the front desk take it, decide which recruiter

16  it goes to, keys it into Bullhorn.  I've witnessed all of that.

17  Is that personal knowledge?  I guess I don't understand

18  "personal knowledge."

19  Q.  So you described now a source that you know certain emails

20  that you've seen coming in from CareerBuilder and people

21  putting in that information into the system.  Do you have any

22  other source of information that you can use to tell you where

23  these nurses are coming from?

24  A.  Where else besides what I described?  Is that what you

25  mean?

1    Q.   Yes.

2    A.   Uhm, yeah, I mean, there are recruiters that do some

3    recruitment through their own sourcing and will put in leads

4    from -- that they found on their own, if that's what you're

5    getting at.  That does happen from time to time in our business

6    as well.

7    Q.   Okay.

8    A.   I would say 90 percent of it is sourced through how I

9    described it.

10   Q.   And what do you mean by how you described it 90 percent?

11   A.   The leads are coming in through different -- from our job

12   postings.

13   Q.   Okay.  And how do you know that this is 90 percent?

14   A.   Uhm, because I've review our leads every week and can see

15   where they come from.  And we have a report each week of where

16   every new -- I can pull a report if you would like to see it.

17   I'm happy to show it to you.  But I do every six months audit

18   where we get our leads and how they're placed, and I can tell

19   you that 90 percent of them come from one of those sources.

20   Q.   Now, you've identified two sources.  You said CareerBuilder

21   and Indeed, and then you said other third-party sources.  Can

22   you describe what you mean by "other third-party sources"?

23   A.   Yes.  So there are other companies.  For example,

24   travelnurse.org.  We also contract with them.  In that case, a

25   nurse who's interested in travel nursing but didn't actually

1    apply to our job but will enter in travelnurse.org, I'm

2    interested in traveling nursing, I would like to travel in May,

3    I'm an ER nurse, that travel nurse will match us, it's called

4    third-party matching, and will send us the leads.  So they

5    didn't actually apply to our job, but they have expressed

6    immediate interest in travel nursing.  We pay that company to

7    give us that name.  And similar to how I described before, it

8    comes into our inbox, our front desk receives it, and it's

9    routed to a recruiter.

10   Q.   Okay.  Now, you mentioned before that 90 percent comes

11   through similar -- third parties.  Is that included in the

12   90 percent?

13   A.   Yes.

14   Q.   Okay.  Do you know what percentage of nurses you receive

15   through these websites that nurses post their resumes on?

16   A.   I'd have to look it up.  It's a healthy half of the

17   90 percent.  So maybe in the 40s or something.  I'm not exactly

18   sure.

19   Q.   So is it fair to say that a big chunk of the nurses that

20   you receive are from nurses that have posted their resumes on

21   this particular website?

22   A.   Yes.

23   Q.   Okay.  And what was the name of that website again?

24   A.   Travelnurse.org.

25   Q.   Is it just one website or there are multiple websites like

1  travelnurse.org that nurses can post their resumes?

2  A.  That's the largest one.  There are a few others.  Again,

3  I'm not in marketing, so I'm not intimately aware of every

4  single contract we have.  But I know -- there's a --

5  betternurse.org would be a secondary newer one.  Those are the

6  two primary ones I know of.  I could be missing some, though.

7  It's not my profession.

8  Q.  Is it fair to say that a healthy chunk of nurses that RNN

9  receives are from these types of websites where nurses post

10 their resumes, correct?

11 A.  Yes.

12 Q.  Okay.

13 A.  And we pay to receive that information from them.

14 Q.  Okay.

15 A.  Yes.

16 Q.  Now, you say you pay to receive these copies of these

17 resumes, correct?

18 A.  Yes.

19 Q.  Do you pay per resume or you pay a subscription?

20 A.  Again, I'm not in marketing.  I'm not familiar with every

21 contract.  I believe it's a per lead cost, but I would have to

22 check.  Some of them are monthly.  We pay a chunk for the month

23 and receive up to -- I'm making these numbers up -- 50 leads in

24 a month, and sometimes we pay per lead.

25 Q.  Okay.  Now, does RNN have exclusivity agreements with these

1  websites, that they're the only ones that can receive these

2  resumes?

3  A.   No.

4  Q.   Okay.  So theoretically I can go now, sign up with that

5  website, and get access to all of these resumes?

6  A.   I'm not sure if you could.  But, yes, other agencies can.

7  I don't know how it works.  But, yes, other agencies do.  That

8  I know.

9  Q.   Right.  Do you have any reason to believe that this

10 information is made available exclusively to RNN?

11 A.   No.

12 Q.   Okay.  So is it fair to say that this information is

13 available to any recruiter?

14 A.   I don't think so, but I don't know.  That would be a

15 marketing question.  I don't believe they retail out that

16 information.  I believe they only wholesale it, but I don't

17 know for sure.

18 Q.   Would it be fair to say that it's available wholesale; to

19 anyone who's looking for this information wholesale, it's

20 available, correct?

21 A.   I'm not sure.  Again, I don't work with these.  I don't

22 contract myself, so I'm not sure.

23 Q.   Okay.  And all somebody would have to do -- the only

24 requirement to get access to this information is to pay a fee,

25 correct?

1          MS. SCHWARTZ:  Objection.  She testified five times

2    she doesn't know.

3          THE WITNESS:  I don't know.  I don't know how they

4    work.  I don't know if they -- you have to have an agency.  I

5    don't know.

6          THE COURT:  I think we can kind of move forward at

7    this point.

8          MR. HECHT:  Okay.

9    BY MR. HECHT:

10   Q.  Now, you mentioned before -- let's go back to the

11   trainings.  You mentioned that RNN typically does not hire

12   experienced nurses and, therefore, every nurse they hire has to

13   go through the core training, correct?

14   A.  Experienced recruiters.

15   Q.  I mean experienced recruiters.

16   A.  Yes.  We do actually hire nurses, but not experienced

17   recruiters.

18   Q.  Okay.  Are there some exceptions where RNN does hire

19   experienced recruiters?

20   A.  Uhm, the -- the only one I can think of that comes to mind

21   is one that had been a recruiter for us prior that we rehired

22   who had retired for a while to take care of her children.  I

23   don't remember any others.

24   Q.  Okay.  So when RNN rehires somebody that's been hired

25   before, somebody that's already an experienced recruiter, would

1  that new recruit go through the same core training again?

2  A.   Yes.

3  Q.   And what would be the purpose of going through that core

4  training again?

5  A.   Well, it depends on how long they've been out of the

6  industry.  But again, just like in the nursing industry, the

7  industry does change and regulations change and the way you can

8  build pay packages changes.  So any new returning recruiter

9  would go through training to get freshened up, if you will.

10 Q.   Now, is there a specific time period for how long that

11 recruiter was out where no training would be required?

12      MS. SCHWARTZ:  Objection, Your Honor.  At this point

13 we are far outside of the scope of the direct and spent a lot

14 of time rehashing the same questions over and over.  It's

15 outside the scope of the direct.

16      THE COURT:  Sure.  So Mr. Hecht, I'll give you some

17 leeway on this.  I mean, I understand -- or at least it seems

18 to me you're trying to establish that Ms. Shafer's position,

19 one, wasn't a special position and, two, that the information

20 is readily available, but I think if we can focus on -- focus

21 that a little more, that would be great.

22      MR. HECHT:  I just want to clarify to the Court.  We

23 are trying to establish also -- because the noncompete,

24 non-solicitation was signed in 2012, but they acknowledge that

25 she was working before.  So it's relevant when she received the

1  training.

2          THE COURT:  Okay.  I don't have a problem if you ask

3  that.  Just, you know, I -- and I'm not trying to limit you

4  globally, but I am trying to kind of narrow it a little bit.

5  So thanks.

6  BY MR. HECHT:

7  Q.  Okay.  Ms. Ruffy, I would like to go over some documents

8  that were introduced previously in your direct testimony.

9          Can we start with Plaintiff Exhibit 5, which is the

10 notice of noncompete?

11 A.  Okay.  I have it.

12 Q.  You have it.

13         Okay.  Ms. Ruffy, does this represent a document that

14 was given to Ms. Shafer the day she was fired?

15 A.  Uhm, it was emailed to her is my understanding.  It was

16 emailed from Keela on the day she was fired, yes.

17 Q.  Okay.  Is this the standard document that RNN sends to

18 every employee that it fires?

19 A.  We have to confirm with Keela.  She's in HR.  I'm in sales.

20 But my understanding is, yes, this is standard.

21 Q.  Okay.  Now, if you move down to paragraph 4 -- no not --

22 sorry, not paragraph 4.  After paragraph 4.  The last sentence

23 in that document.  It talks about, "IT will be shipping you a

24 box.  Once you have received it, please place your laptop,

25 docking station, and power cords inside and drop it off at your

1  nearest Fed-Ex location," correct?

2  A.   Uh-huh.

3  Q.   Okay.   Does that document -- does that notice say anywhere

4  about -- anything about destroying documents?

5  A.   It does not.   But it is in the noncompete, which is on the

6  first page here, to remind her to review it.

7  Q.   Okay.

8  A.   Special attention concerning noncompetition,

9  non-solicitation of customers and non-solicitation of

10 employees.   And, no, it doesn't reference destroying documents.

11 It references not keeping documents.

12 Q.   Okay.   Was RNN aware at that time that Ms. Shafer has

13 working and awaiting reports in her possession?

14 A.   We did not, no.

15 Q.   Was RNN aware that Ms. Shafer had any other commission

16 reports in her possession?

17 A.   We would have known she had commission statements, yes,

18 because we would have sent her commission statements throughout

19 her tenure with us.

20 Q.   Okay.

21 A.   But not the working and awaiting.

22 Q.   So RNN was aware she has commission statements?

23 A.   Yes.

24 Q.   And are some of these commission statements titled "Gross

25 Margin Report"?

1   A.   Uhm, I'm not exactly sure what our commission folks call

2   them.   It sounds right.

3   Q.   And that would be like a sheet that has all the nurse

4   names?

5   A.   Yes, it would have any assignment that Rachel would be

6   receiving commission on for the month.

7   Q.   Okay.

8   A.   It would have nurse names.

9   Q.   And it would have also the facilities where those nurses

10  worked at?

11  A.   Yes.

12  Q.   And it will have the begin date of their contract?

13  A.   And the end date, yes.

14  Q.   And it will have also the rates they received?

15  A.   Yes.

16  Q.   Okay.  Did RNN ever request Ms. Shafer to destroy those

17  gross margin reports?

18  A.   We requested she return everything, yes.

19  Q.   Where was that request?

20  A.   Uhm, I believe it was in our cease and desist letter.  I

21  don't know if I have it here.

22  Q.   I mean, do you see --

23  A.   Once we were made aware that she had taken it.

24  Q.   But in this email is there anywhere an identification?

25  Does the email identify documents that she should be

1  destroying?

2  A.  No, it does not.  We didn't know she had them or we would

3  have told her to destroy them at the time.

4  Q.  What you just said, that you didn't know that she had

5  commission reports, correct?

6  A.  No, commission reports we knew she had.  Commission reports

7  we had been sending her each month in a pdf format as a due

8  course of action so that she could audit commissions and ensure

9  that we were paying her correctly.

10 Q.  Okay.

11 A.  The working and awaiting we were not aware that she had

12 taken.

13 Q.  Okay.  Did RNN expect her to destroy the gross margin

14 reports?

15 A.  No.  We did expect her not to use them, but we didn't

16 expect her to destroy them.  She could keep them for her own

17 records.

18 Q.  Okay.  RNN did put in a notice the return of the laptop,

19 correct?

20 A.  Yes.  In this letter?  Yes.

21 Q.  Can you tell me the reason why that's the only thing that's

22 identified in this document to be returned?

23 A.  Because we don't expect our employees to have our

24 information in their cell phones or their laptops.  We would

25 have no reason to ask them to return it because we wouldn't

1  expect them to have it.

2  Q.  So --

3  A.  And what we are allowing them to have, they're welcome to

4  keep for their own personal records.

5  Q.  Okay.  So this document only identified information RNN

6  knew at that time that Ms. Shafer has, correct?

7  A.  Correct.

8  Q.  Okay.  Now, let's move onto Exhibit -- Plaintiff Exhibit

9  No. 10, which I believe is an email solicitation from Amanda

10  Jean Fobar, correct?

11  A.  Yes, I have it.

12  Q.  Okay.  Have you checked whether Amanda Jean Fobar

13  previously worked for RNN?

14  A.  Yes, and she did previously work for RNN.

15  Q.  And do you know when she worked for RNN?

16  A.  I don't have all of the assignment dates memorized, but she

17  has done several assignments with us, yes.

18  Q.  Do you know if she worked for RNN within three years of

19  June 22, 2023?

20  A.  I don't know.

21  Q.  Is it possible she worked for RNN only more than three

22  years prior to that?

23  A.  It's possible.

24  Q.  Okay.  So you don't have any specific knowledge whether she

25  actually worked for RNN within the last three years?

1  A.  Correct.  I'm sorry.  You're asking if she worked outside

2  of the three years or within the last -- current three years?

3  Q.  No, I'm asking -- just to clarify, my question is this

4  email was sent on June 22, 2023.

5  A.  Yes.

6  Q.  Do you have any knowledge that she worked for RNN within

7  three years prior to June 22, 2023?

8  A.  Oh, yes.  She was currently working at the time of this

9  email with RNnetwork.

10  Q.  So at the time this email was sent, she was working with

11  RNN?

12  A.  Yes.

13  Q.  Okay.  Is she still working today with RNN?

14  A.  She is.

15  Q.  Okay.  Do you have -- did she continuously work for RNN

16  since June 22, 2023?

17  A.  So there was -- yes, she was on assignment with -- I don't

18  exactly know where -- at the time that this employment

19  agreement offer came.  We became aware of it.  And as I

20  testified Tuesday, this is how we first became aware that

21  Rachel worked at AHS.  Because there was a -- Amanda let us

22  know she received an offer from Rachel at AHS, a competing

23  offer.  As it turns out, she stayed with us at RNN after that.

24  Q.  So Amanda Jean Fobar never accepted the offer from Rachel,

25  correct?

1  A.  Correct, unless she's working two assignments.  That I

2  can't attest to.  But she is working an assignment with us.

3  Q.  Is it common for nurses to work two assignments at the same

4  time?

5  A.  No.

6  Q.  Okay.  So that would be unlikely, would you say, that she

7  works two assignments?

8  A.  It's unlikely.

9  Q.  Okay.  Now, would you describe the document attached to

10 that email as an offer, correct?

11 A.  Yes, it's an employment agreement offer.

12 Q.  It's not a contract that was ever executed and signed

13 between the parties, correct?

14 A.  I don't know if it was executed and signed and Amanda

15 changed her mind.  I can't speak to that.

16 Q.  Okay.  Are you aware that RNN is suing Ms. Shafer for

17 damages?

18 A.  Am I aware that RNN is suing Ms. Shafer for damages?  Yes.

19 Q.  Okay.  Do you know if RNN is seeking damages as it relates

20 to Amanda Jean Fobar?

21 A.  We haven't reached that point in the discussions is my

22 understanding.  But, no, I don't -- we would need to find

23 out -- no.  From my understanding and what I testified on

24 Tuesday is Amanda Jean Fobar is how we got to know that she

25 worked at AHS.  I did not testify that she's currently working

1  and we're going to be seeking damages.  That wasn't the point

2  of this testimony.

3  Q.  Okay.  Do you have any reason to believe that Amanda Jean

4  Fobar ever went to work for Rachel?

5  A.  I don't.

6  Q.  Do you have reason to believe that she, in fact, did not

7  end up working for Rachel?

8  A.  I don't.

9  Q.  But you do know that she's currently still working for RNN,

10 correct?

11 A.  Yes.

12 Q.  All right.  Let's move onto Plaintiff Exhibit 11.

13 A.  Okay.  I have it here.

14 Q.  And I believe you testified this is an email that

15 Ms. Shafer emailed to herself on March 28, 2023?

16 A.  Correct.

17 Q.  And did you testify also as to the purpose of why she

18 emailed this document to herself?

19 A.  I testified what my thoughts were as to why, yes.

20 Q.  And what was your testimony as to your thoughts?

21 A.  So this is an internal process describing what were to

22 happen if somebody -- an internal employee were to find out

23 that a departed employee went to a competitor or was soliciting

24 employees.  And I presume she sent it to herself so that she

25 could have knowledge of what our process is.

1   Q.   Okay.   What is the basis for your thought that she did that

2   in order to compete?

3   A.   The basis is this is an internal process that describes a

4   procedure to mitigate that kind of behavior.   She wasn't

5   involved during her employment with us with any other employee.

6   There would be no reason for her to know this as a current

7   employee because she's not a leader and she doesn't necessarily

8   need to be involved in any of this escalation.   So the only

9   reason for a recruiter to know this is if they wanted to learn

10   how to circumvent it.

11   Q.   Okay.   Now, you said that part of why she didn't know --

12   part of your thought process was because she was not a leader?

13   A.   Correct.

14   Q.   But would leaders have access to this document?

15   A.   Yes, this is -- this is -- this process is available to any

16   employee of RNnetwork.   It's in our process section.

17   Q.   Okay.   So this is available within the RNnetwork for

18   anybody, correct?

19   A.   Yes.

20   Q.   So did Ms. Shafer violate any company policy by accessing

21   this document?

22   A.   She did not.

23   Q.   Okay.   And how would Ms. Shafer -- how would somebody know

24   that such a document exists?

25   A.   Well, it was a process that we rolled out in October of

1   2022 throughout the division.  At my level we rolled it out to

2   leaders.  The leaders then shared it with their teams.

3   Q.  So this document is shared with the teams?

4   A.  Uh-huh.

5   Q.  So do you have reason to believe it was shared with

6   Ms. Shafer as part of the team?

7   A.  I can't attest to that one way or the other.  I did not

8   share it with her directly, but it could have.

9   Q.  Is it possible that Ms. Shafer reviewed that document so

10  she understands what she's allowed to do and what she's not

11  allowed to do?

12       MS. SCHWARTZ:  Objection.  Calls for speculation.

13       THE COURT:  Again, I'll give you some leeway, but

14  these "is it possible questions," it doesn't really matter what

15  her answer is.  Thanks.

16  BY MR. HECHT:

17  Q.  Okay.  Let's move onto Exhibit 23, Plaintiff's 23.

18  A.  Okay.  I have it.

19  Q.  And I believe your testimony was that this is an email that

20  reflects some text messages between Ms. Shafer and Emily Sporl?

21  A.  Correct, this was reported to us by Emily Sporl.

22  Q.  Okay.  And I believe you also said that Emily Sporl is not

23  a nurse?

24  A.  Correct.  She's an internal employee.

25  Q.  Okay.  But you also said that even though she is not a

1   nurse, she is entered in the system as a nurse?

2   A.   Yes.   She entered her own name and contact information into

3   our database and pretended to be a nurse in there, put nurse

4   information, so that she could test our software system that is

5   targeted for nurses.

6   Q.   Okay.   And can you describe what you mean she can test your

7   software system?

8   A.   So our nurses who are interested in applying with us go

9   into an app and enter their information, and all their -- and

10  then upload their documents.   And we had a new software system

11  that we introduced some time ago, we have two versions, and as

12  a recruiter assistant she entered in her information into that

13  application which put her information in our database as a

14  nurse, and then she kept it alive so she could continue to

15  monitor as a nurse what our processes look like.

16  Q.   Do you know when Emily Sporl entered her information in the

17  system as a nurse?

18  A.   I do not.

19  Q.   But you know that she did?

20  A.   I do.   I did confirm her name was in the database --

21  Q.   And --

22  A.   -- as a nurse.

23  Q.   And how did you confirm that?

24  A.   I checked when we received this.

25  Q.   And when was that?

1    A.   Uhm, I'm not exactly sure when I received the first

2    notification from Emily.  I would have to look at my records.

3    But Emily reported to her leader and then her leader reported

4    to me I believe each time that she received a text from Rachel.

5    So on or around the 23rd and the 17th and then the 30th.

6    Q.   The email has a date of August 30?

7    A.   Yes.

8    Q.   Okay.  Is it fair to say that that's the day that she

9    reported that, that Emily Sporl reported that?

10   A.   The last time, yes.

11   Q.   Okay.  But you said it may have been that she reported

12   previous times on prior occasions as well?

13   A.   I believe she may have.  I'm not a hundred percent certain.

14   Q.   Do you remember her sending any notifications prior to

15   August 30?

16   A.   Uhm, I remember her -- Christina notifying me of one other

17   prior, yes.

18   Q.   You remember her notifying you on August 30 of a prior

19   incident or you remember on a prior occasion that she notified

20   you?

21   A.   I remember being notified.  I don't have it in front of me.

22   I know that all of that I send up to legal as soon as I hear

23   about it and then I move on with my day.  So I don't have an

24   exact recollection of whether I was notified.

25   Q.   Okay.

1   A.  But I can tell you Emily recognized it.

2   Q.  Okay.  So on August 30 there is an email that the

3   notification came to you through an email.  Was that a typical

4   method used in the office to notify you about an incident like

5   that?

6   A.  You mean would I typically receive it via email?

7   Q.  Yes.

8   A.  Not necessarily, no.  Sometimes I receive it via internal

9   message.  Sometimes it's a phone call.  It could be various

10  ways.

11  Q.  Okay.  Have you checked if you have any internal messages

12  or any emails from Emily Sporl or anybody else about this

13  incident prior to August 30?

14  A.  Have I checked if I received anything?  No.

15  Q.  Now, these messages were sent by text message, correct?

16  A.  Correct.

17  Q.  These are not -- when I say "messages," I mean the message

18  alleged that's coming from Ms. Shafer to Ms. Sporl.  These are

19  test messages, correct?

20  A.  Yes.

21  Q.  Okay.  And I asked you before if you know when Emily Sporl

22  was entered in the system as a nurse.

23      Okay.  Do you have any information that she was

24  entered as a nurse in the system prior to August 30?

25      MS. SCHWARTZ:  Objection.  Asked and answered multiple

1    times.

2            THE WITNESS:  I don't know.

3            THE COURT:  So, I mean, it has been asked and

4    answered.  I think we really need to keep moving forward.  I'll

5    sustain that.

6    BY MR. HECHT:

7    Q.  Okay.  Now, if you look in page number 3 of that document,

8    first entry, there is a date there.  It says March 17, 2022.

9    A.  Yes.

10   Q.  What is your understanding that this date means?

11   A.  It's the date that this graph was entered in our system,

12   but I can't read what the graph is.

13   Q.  What is the date of Friday -- below there there is a date

14   Friday, June 23.  What does that date mean?

15   A.  It's the date that this text was sent.  My understanding is

16   the date that the text was sent from Rachel to Emily.

17   Q.  Okay.  And then there is in the bottom another date,

18   Thursday, August 17th.  What does that date represent?

19   A.  That would be the date that the second text was sent from

20   Rachel to Emily.

21   Q.  Okay.  Now, do you have any reason to believe that the

22   first date, March 17, 2022, represents a date when a text was

23   actually sent?

24   A.  I don't follow the question.  It's kind of irrelevant,

25   isn't it, what happened in March of 2022?

1    Q.  All right.  Would it be fair to say that it reflects a

2    date -- the March 17, 2022, reflects a date of when a text

3    message was received?

4    A.  That graph you mean?

5    Q.  Yes.

6    A.  Yes.

7    Q.  Okay.

8    A.  Correct.

9    Q.  So that graph was a text message?

10   A.  Yes.

11   Q.  Okay.  So based on this document, Ms. Sporl and Ms. Shafer

12   have communicated via text message back in March 17, 2022,

13   correct?

14   A.  Yes.

15   Q.  Okay.

16   A.  She was a recruiter assistant, so it's likely they

17   communicated quite often, not just this text.

18   Q.  Okay.  So is it your understanding that Emily Sporl was a

19   colleague of Ms. Shafer?

20   A.  Yes, she was.

21   Q.  Is it your understanding that she knew Ms. Shafer well?

22   A.  Yes, she did.

23   Q.  Okay.

24   A.  She was her assistant for a short period of time.

25   Q.  Okay.

1    A.  Which begs the question on why Rachel thinks she's a travel

2    nurse today, but maybe you'll get to that question.

3    Q.  Do you have colleagues that you work with at RNN?

4    A.  I do.

5    Q.  Do you have their contact information in your cell phone?

6    A.  I have some, yes.

7    Q.  Okay.  So is it fair to say that colleagues communicated

8    via text message between each other?

9         MS. SCHWARTZ:  Objection.  This calls for speculation

10   and outside the scope of the direct again.

11        THE WITNESS:  It is fair -- I'll answer.

12        THE COURT:  Well, no.  Listen, we have to move it

13   forward.  I mean, I think one thing sometimes lawyers forget is

14   that the Court's been around a long time.  I'm just short of my

15   60th birthday.  I mean, people communicate by text.  You don't

16   have to establish that kind of stuff.  I mean, you can -- I'll

17   let you argue all of that because I think it's a given.

18   BY MR. HECHT:

19   Q.  Last time in your testimony we introduced a document called

20   "Working and Awaiting," and I believe that document had a few

21   thousand nurses in it.

22        Did you check that document, if Emily Sporl was

23   included in that document?

24   A.  Yes, Emily Sporl is not included in that document.

25   Q.  Okay.  I believe we introduced multiple documents with

1  reports about nurses that Ms. Shafer emailed to herself, right?

2  A.  Correct.

3  Q.  Did you check all of those documents if Emily Sporl was

4  included in any of those documents?

5  A.  I have not checked.

6  Q.  Okay.  But the ones that you did check, she was not

7  included as a nurse in that document, correct?

8  A.  She was not in our working and awaiting because she was not

9  a working nurse, correct.

10  Q.  Okay.  Now, you recall the working and awaiting document

11  that we have here, it had some information included in it --

12  A.  Uh-huh.

13  Q.  -- about the nurse.  Did it include a phone number?

14  A.  It did not.

15  Q.  Okay.  So the working and awaiting reports do not include

16  phone numbers of nurses, correct?

17  A.  Correct.

18  Q.  Okay.  So if someone would want to text a nurse, they would

19  not be able to text a nurse based on a working and awaiting

20  report, correct?

21  A.  Correct.  It would have to have been taken directly out of

22  our database.

23  Q.  Okay.  Now, we have your testimony last week about RNN's

24  system, IT system, that they track all of the access of their

25  employees.  Is that your understanding?

1    A.  Yes.  I'm not the IT expert however.

2    Q.  But is it your understanding that RNN tracks access of its

3    employees?

4    A.  Yes.

5    Q.  Okay.

6    A.  I have a rudimentary knowledge of how that works, but I'm

7    aware, yes.

8    Q.  Okay.  So based on your understanding and your knowledge

9    about the RNN's tracking access of employees, would RNN be able

10   to track if Ms. Shafer accessed Emily Sporl's information in

11   your system?

12   A.  Uhm, depends how she would have accessed it.  If she pulled

13   up Emily's account and handwrote it on a piece of paper or put

14   it in her cell phone, we would have no way to see that.  If she

15   somehow tried to move the data, yes, we would have seen it.

16   Q.  Did you check to see if she -- if there's any recording in

17   the system about Ms. Shafer accessing Ms. Sporl's information?

18   A.  I did not.

19   Q.  Okay.  Let's move over to Exhibit -- Plaintiff's Exhibit 8.

20   A.  Okay.  I have it.

21   Q.  Okay.  Now, you remember you testified about this email as

22   well --

23   A.  Yes.

24   Q.  -- in your direct examination?

25        Can you describe to me what is this email?

1  A.   So this is an email sent from one of Rachel's peers,

2  Alaina, to her leader Chrissy alerting her --

3       I'm sorry.  Were you talking about the top section or

4  the bottom section?  Because there's two things here.  The top

5  section -- I'm starting to describe the top section.

6  Q.   Okay.

7  A.   Yeah.

8  Q.   Yeah.

9  A.   And it was a provider that notified -- a former provider of

10 Rachel's now being serviced and helped for by Alaina who tried

11 to approve an extension assignment.  And the nurse let her know

12 that she was going to be going back to her old recruiter, which

13 would be Rachel, and that -- but if the rate was right, that

14 her and her friend would travel for whoever pays the most.

15 Q.   Now, who is Haley Hohnorst?

16 A.   She is a provider that used to work for -- an RNN provider

17 on assignment that was under Rachel's care at the time of her

18 departure and then was given to Alaina to help.

19 Q.   Okay.  So is it fair to say that she is a nurse?

20 A.   Yes.

21 Q.   Okay.  Do you know when she started working for RNN?

22 A.   I don't.

23 Q.   Okay.  Do you know if at the time of this email, which is

24 July 14, 2023, whether Haley was working for RNN?

25 A.   Yes, she was.

1   Q.  She was.

2          Do you know if prior to working for RNN if she worked

3   for any other company?

4   A.  I don't.  I don't know.

5   Q.  Does RNN typically have this type of information about a

6   nurse, whether she worked for another company?

7   A.  Sometimes if the nurse shares that information.  Well, yes,

8   in their resumes it would show where they worked prior.  So we

9   would have that information on file.  I just don't have it.

10  Q.  Okay.  Did you check if she worked for another company

11  prior to working for RNN?

12  A.  I did not.

13  Q.  Okay.  Now, she says I'm probably going back to my old

14  recruiter, correct?

15  A.  Uh-huh.

16  Q.  And you said that the old recruiter means Rachel?

17  A.  Correct.

18  Q.  How do you know that she's referring to Rachel?

19  A.  As opposed to a different recruiter?  I don't know that

20  fact.

21  Q.  Okay.  So it's possible that she is talking about the old

22  recruiter that she worked with prior to RNN?

23  A.  Possibly, yes.

24  Q.  Okay.  Did she say here the old recruiter asked her to come

25  work for her?

1  A.  I only see what you see, and the answer would be no.  It

2  says what it says here.

3  Q.  So based on your understanding of reading this message, you

4  don't see anything that Ms. Hohnorst is saying that she was

5  solicited by an old recruiter to come work for her, correct?

6  A.  Correct.

7  Q.  Okay.  Does Haley Hohnorst still work for RNN today?

8  A.  I don't know.

9  Q.  Did you check to see if she is still working for RNN today?

10  A.  I did not check.

11  Q.  Okay.  Now, by the end she says I will "travel with whoever

12  pays the most," correct?

13  A.  Correct.

14  Q.  Is that typical?  Is that your typical experience with

15  nurses, that they go to whoever pays the most?

16  A.  No, not always.  I mean, yes, they might if they have the

17  same exact job with better pay here, but sometimes they choose

18  a location or recruiter over pay.

19  Q.  Okay.  Now, the message starts with, "Morning!  The one

20  week extension was approved."  Do you see that, the first part

21  of the message?

22  A.  I do.

23  Q.  Do you know what the one-week extension she's referring

24  here to?

25  A.  Would be a -- Haley's offer from her current employer to

 1   work an extra week at that facility.

 2   Q.  Would it be fair to say that based on this message that

 3   within a week her employment with RNN would be complete?

 4   A.  No, that wouldn't be fair to say.  She could be extended

 5   again and again and again.  That's quite often.  40 percent of

 6   our placements are extensions.

 7   Q.  Okay.  Do you know if Haley Hohnorst ever went to work for

 8   AHS Staffing?

 9   A.  I don't know.  I personally do not know.

10   Q.  Okay.  Do you have any reason to believe that she is not

11   working for RNN today?

12   A.  No.

13   Q.  Okay.  All right.  Now, the second -- the second part of

14   the email -- there's an additional part of the email I believe

15   that doesn't refer to Haley Hohnhorst anymore?

16   A.  Correct.

17   Q.  What is that part of the email?

18   A.  This is a -- our HR Department found a text communication

19   between Elizabeth Streber, who was the recruiter who took over

20   for Rachel working with Jordan Newstadt, who is the nurse, and

21   her attempt to continue to work with her.  And it's a text

22   string between Jordan and Elizabeth.

23   Q.  Okay.  So is this a text message between Jordan and

24   Elizabeth?

25   A.  Correct.

1   Q.  And the portion that says "Comments" is the actual content

2   of that text?

3   A.  Correct.

4   Q.  Okay.  So there's a comment going back to April 7, 2023.

5   Is that a text that Jordan Newstadt sent to Elizabeth?

6   A.  Correct.  It says "Inbound SMS."  It's an inbound text from

7   Jordan to Elizabeth letting us know she was not going to work

8   with us anymore.

9   Q.  Okay.  Now, who is Jordan Newstadt?

10  A.  She's a nurse.

11  Q.  Okay.  Was she a nurse working for RNN?

12  A.  She was.

13  Q.  Do you know when Jordan Newstadt had her last assignment

14  with RNN?

15  A.  I would have to check the dates.  I don't have that in

16  front of me.

17  Q.  Okay.  Do you know if Jordan Newstadt was a nurse with RNN

18  within the three-year period of August -- I mean April 7, 2023?

19  A.  Yes, she was -- this is one of Rachel's -- the nurses that

20  Rachel had that we transitioned to Elizabeth.

21          MR. HECHT:  Your Honor, we would like to introduce

22  impeachment evidence here, an affidavit that we obtained from

23  Jordan Newstadt stating that he was not a nurse for RNN.  We

24  obtained this affidavit yesterday from him.

25          THE COURT:  Okay.  Obviously, show it to opposing

1   counsel so she knows whether she has any objection to it.  You

2   know, I'm happy to look at it.  I may be remembering the

3   testimony incorrectly in terms of what I'm reading, but, I

4   mean, is part of your argument that the email responses,

5   including, I'm going to go back to my previous recruiter, were

6   authored by someone else?

7           MR. HECHT:  That's part of the argument.  But, Your

8   Honor, we're also arguing that he was not working as nurse for

9   at least five to six years prior to that email from RNN.  Even

10  if she was soliciting, she wouldn't be soliciting somebody

11  that's worked within the three years, in violation of that

12  agreement.

13          THE COURT:  I'm happy to look at it.  But any

14  argument?

15          MS. SCHWARTZ:  I mean, I -- just the obvious argument

16  that I have no way to question the witness about the

17  authenticity of the document or the veracity the statements in

18  the document.  I understand hearsay is admissible in these

19  proceedings.

20          THE COURT:  Sure.  I mean, I'll go ahead and take it.

21  I mean, I do think these things need to be disclosed.  I guess

22  you can fall back and say it's impeachment.  But I'm happy to

23  take it if you want to pass it up.

24          Okay.  Just so I know going forward in any order I

25  write, is Jordan Newstadt a man or a woman?

1          MS. SHAFER:  Man.

2          MR. HECHT:  It's a man.

3          THE COURT:  Okay.  So you wanted to move this into

4    evidence.  This will come in as -- we'll just call it -- you

5    just want me to call it Defense 1 or how do you want me to --

6          MR. HECHT:  Yes, we can call it Defense 1.

7       (Received in evidence Defendant's Exhibit(s) 1.)

8    BY MR. HECHT:

9    Q.  Ms. Ruffy, do you see here the affidavit of Jordan Newstadt

10   where he said that on June -- in June of 2023 he approached

11   Ms. Shafer and prior to that he did not work for RNN for at

12   least five to six years?

13   A.  I do see that, yes.

14   Q.  Okay.  After seeing that statement, do you still recollect

15   that he worked for RNN within three years prior to June 2023?

16   A.  Yeah, I apologize.  For us, anybody who's worked with us

17   any time in the past, we call them alumni and we treat them as

18   active providers.  I have not checked the records to see when

19   he last worked with us.

20   Q.  Okay.  So you recant your statement that you checked

21   that --

22   A.  I didn't say I checked.  I said I knew him to be a working

23   provider with RNnetwork.

24   Q.  Okay.

25   A.  But I did not check the final date when he ended.

1          THE COURT:  One question, Mr. Hecht.  This case wasn't

2    even filed until September of 2023.  This affidavit is from

3    June.  What's going on?

4          MR. HECHT:  I think, Your Honor, I -- I got it

5    yesterday.  He just put the dates wrong.  It's actually 11/6,

6    but he put 6/11, like the European style.  It was done with a

7    pdf signature.  And I have the documents that shows that we got

8    it signed yesterday.

9          THE COURT:  That's a fair explanation.  You're saying

10   instead of 6/11, it's really the 6th of November.

11         MR. HECHT:  Yes.

12         THE COURT:  All right.

13   BY MR. HECHT:

14   Q.  Now, let's go back to the Plaintiff Exhibit 8 where

15   Mr. Newstadt talks about -- the text message that goes with

16   Mr. Newstadt.  Just so I understand correctly, are both text

17   messages received from Mr. Newstadt or some of them are sent to

18   Mr. Newstadt?

19   A.  Neither are sent to Mr. Newstadt.  One is received from

20   him, and the other one is an internal note.

21   Q.  Which one is the internal note?

22   A.  The one on the first page.  "Not very happy with us as a

23   company.  Mad about Rachel, but I let her know to reach out for

24   anything."

25   Q.  So that's not a text that Mr. Newstadt sent, right?

1    A.   It was not.

2    Q.   Okay.   This is just a text that was entered by Elizabeth

3    Streber?

4    A.   Yes.

5    Q.   Okay.

6    A.   Yes, his text is the "Oh, unfortunately RNN fired my

7    favorite recruiter after 17 years so I won't ever be working

8    with this company again."  That's his text to Elizabeth.

9    Q.   So is Mr. Newstadt expressing in that text that he does not

10   wish to continue working with RNN?

11   A.   Yes.

12   Q.   Okay.  I'll ask you again the same question I asked before

13   about another nurse.  Is RNN in its complaint seeking damages

14   related to Mr. Newstadt in this case?

15        MS. SCHWARTZ:  Objection, Your Honor.  This is again

16   outside the scope of the direct, and this is a preliminary

17   injunction prior to any discovery being taken, we have not

18   prepared any evidence or testimony on damages.

19        THE COURT:  Okay.  If you want to rephrase it as to

20   the word "damages," I'll allow the question.  I mean, if you're

21   asking is CHG arguing that Rachel Shafer violated the

22   restrictive covenant through her actions with Jordan Newstadt,

23   I'll allow that question.

24   BY MR. HECHT:

25   Q.   Can you answer that question?

1  A.   Sorry.  Could you re-ask it?

2  Q.   Did Ms. Shafer violate her CHG agreement by hiring -- by

3  soliciting or hiring Mr. Newstadt?

4  A.   Well, that's what we would like to find out.  We have

5  officially asked for her to return all her records pertaining

6  to any interactions with RNN nurses so that we could assess if

7  there were any damages due, or if she could -- according to the

8  testimony from Mr. -- I can't remember his name -- the

9  anonymous caller, this is a provider that has worked at AHS

10  through Rachel.  We would like to assess that.

11  Q.   Okay.  Now, other than that information that you received

12  from the anonymous caller, do you have any information either

13  based on this text or based on any other information that it's

14  RNN's position that Ms. Shafer violated her noncompete by

15  hiring Mr. Newstadt?

16  A.   No.

17        MR. HECHT:  Okay.  Your Honor, can we take a five

18  minutes to see if I --

19        THE COURT:  Let me ask you this before we take the

20  five minutes, because it's also a reasonable time to break for

21  lunch.  Are we taking the five minutes because you may have

22  concluded?

23        MR. HECHT:  Yeah.

24        THE COURT:  Okay.

25        MR. HECHT:  I just want to review one more time to see

1    if I have something.

2              THE COURT:  Sure.  Let's take five minutes then.

3              I'm not going to get up and go anywhere.  Let me know

4    when you've made that decision.  And if you think it's -- we're

5    just 10 or 15 minutes away, we'll go ahead and finish up your

6    examination before we break for lunch.  Thank you.

7              MR. HECHT:  Thank you, Your Honor.

8         (Recess at 11:59 a.m.)

9              MR. HECHT:  I just have one more question.

10             THE COURT:  Sure.

11   BY MR. HECHT:

12   Q.  Ms. Ruffy, if you remember before, we were talking about

13   two different reports.  There's a working and awaiting report

14   and there's a gross margin report.  And I asked you whether you

15   expect Ms. Rachel to destroy the gross margin report, and you

16   said no because she needs it for her commissions, correct?

17   A.  Correct.

18   Q.  But you wanted her to destroy the working and awaiting?

19   A.  I would like for her to return it to us.

20   Q.  Okay.  What's the main reason -- what distinguishes the

21   working and awaiting report from the gross margin report that

22   makes it -- that you want her -- what's the main reason you

23   want her to destroy it?  What information is on that report

24   that you don't want her to have?

25   A.  Well, in addition to -- there's additional information.

1    For example, the candidate's email, their specialty, their

2    preferred shifts, which would make it easier for future

3    placement.  But the biggest thing in addition to that is that

4    all of the providers that RNnetwork has under placement, not

5    just Rachel's.  So every recruiter in our company that's made a

6    placement she has access to.  We would like for her to return

7    it to us so she cannot solicit.

8    Q.  Okay.  Is it fair to say that the main reason you want her

9    to destroy that document is because it contains nurses that she

10   did not recruit?

11   A.  And additional information on her own nurses, yes.

12   Q.  Okay.  Thank you.

13        MR. HECHT:  No further questions at this time.

14        THE COURT:  Thank you, Mr. Hecht.

15        Ms. Schwartz, what's your position in terms of

16   redirect?  Do you have any?  If so, how long?

17        MS. SCHWARTZ:  I have a little bit.  I think maybe

18   five minutes, Your Honor.

19        THE COURT:  Oh, okay.  Why don't we give that a shot,

20   too.

21        MS. SCHWARTZ:  Okay.

22        THE COURT:  Knock that out and be concluded with the

23   witness.

24        MS. SCHWARTZ:  Okay.  Sounds good.

25        THE COURT:  Okay.

REDIRECT EXAMINATION

BY MS. SCHWARTZ:

Q.  Ms. Ruffy, you've been asked a lot of questions about why RNnetwork wants to get the working and awaiting sheets back from Ms. Shafer's possession but is okay with her retaining the commission reports.

Okay.  Do you have the gross margin commission report in front of you to even refer to when answering Mr. Hecht's questions?

A.  I do not.

Q.  And do you have any idea what's even on those reports as he was asking you those questions?

A.  Not the specific ones he's referring to.

Q.  Okay.  But you did testify that you know that the commission reports that were sent to Ms. Shafer, they don't have -- do they have any contact information for nurses?

A.  They do not.

Q.  Were they sent to her in an Excel spreadsheet that would be easily searchable if she needed to make a quick placement?

A.  No, they are in pdf format.

Q.  Did the commission reports contain information about 2,500 nurses?

A.  No, just her nurses that worked during that time period.

Q.  Okay.  And you testified that the commission reports would not identify the nurses' specialties, correct?

1   A.   Correct.

2   Q.   Why is that important?

3   A.   Because it allows to make the placement.  So as I

4   mentioned, we work with nurses across the country in dozens of

5   different specialties.  So the jobs that come in are very

6   specialized.

7   Q.   Do the commission reports contain information about the

8   shifts that the nurses prefer to work --

9   A.   Correct.

10  Q.   -- due to the commissions report?

11  A.   They do.  No, not the commissions report.  The working and

12  awaiting does.  The commissions reports do not.

13  Q.   Okay.  And can you tell from the working and awaiting

14  documents how much money is being billed to health care

15  facilities all over the country for the nurses that RNN places

16  there?

17  A.   Yes.  Not just Rachel's, but everybody's.

18  Q.   Okay.  And is information pertaining to -- strike that.

19        So fair to say that the working and awaiting

20  spreadsheets contain significant trade secrets that do not

21  exist in the commission reports?

22  A.   Yes.  Absolutely.

23  Q.   Now, even though RNN gave Ms. Shafer the commission

24  reports, was there any expectation that she would not take them

25  over to a competitor?

1  A.  Yes, it was in her noncompete, non-solicit.  It's part of

2  confidential information, that she's not to use it outside of

3  her own -- for her own purposes, which in this case would be

4  reconciling her commissions, and that's it.

5  Q.  When Ms. Shafer asked RNnetwork to send her commission

6  reports following her termination, did the company know that

7  she was working at AHS?

8  A.  We did not.

9  Q.  If the company knew that she was working at a competitor,

10  would it have sent her that information?

11  A.  We would not have.

12  Q.  You testified kind of at length about the specialized

13  training that nurses receive at RNnetwork with regard to

14  knowing how the credentialing process works in different states

15  around the country and knowing how to sell jobs to nurses by

16  understanding how to read the postings for the different types

17  of jobs.  Do you remember that testimony?

18  A.  Yes.

19  Q.  And I believe you also testified Ms. Shafer had never

20  worked in the nurse recruiting industry before she was hired at

21  RNnetwork, correct?

22  A.  Correct.

23  Q.  How would she know how to do this job and be the top third

24  recruiter in the country if she never received any training?

25  A.  She wouldn't have.  She learned everything she knew through

 1  RNnetwork.

 2  Q.  I just want to direct your attention very quickly to

 3  Plaintiff's Exhibit 8.

 4  A.  I have it.

 5  Q.  What is the title, the subject title of the email that RNN

 6  employee Alaina Robertson wrote?

 7  A.  Alaina's subject title is "Nurses leaving us to work with

 8  Rachel."

 9  Q.  Does that title indicate to you that Ms. Robertson believed

10  Haley Hohnhorst was going to work with Rachel or some other

11  prior recruiter?

12  A.  Yes, it would lead me to believe that Alaina had concluded

13  based on her exchange with Haley that Haley had announced her

14  intention to work with Rachel specifically.

15  Q.  And finally I want to turn your attention to Defendant's

16  Exhibit 1, which is the un-notarized affidavit of Jordan

17  Newstadt.

18  A.  I have it.

19  Q.  Okay.  Now, according to that affidavit, it says that

20  Jordan did not work with RNN for five years prior to 2023.

21         So Mr. Hecht asked you would it have then been a

22  violation of Rachel's agreement to solicit Jordan to go work at

23  AHS.  Do you remember that question being asked of you?

24  A.  I do.

25  Q.  Would it be a violation of Rachel's agreement if she used

1   RNN information about Jordan in order to place him at AHS?

2   A.  It would be.

3   Q.  Even though he hadn't worked for the company for

4   five years?

5   A.  Yes, that's correct.

6   Q.  If that's even true.

7        Would keeping -- was keeping information that belonged

8   to RNN about its nurses a violation of Rachel's agreement?

9   A.  Yes.

10  Q.  Was using RNN's information about nurses a violation of her

11  agreement?

12  A.  Yes.

13  Q.  What about the fact that Rachel was working at AHS so that

14  she was in a position to even place Jordan Newstadt less than

15  12 months after her termination.  Was her employment with AHS a

16  violation of her agreement?

17  A.  Yes.

18        MS. SCHWARTZ:  I have no further questions.

19        THE COURT:  Thank you, Ms. Schwartz.

20        Mr. Hecht, anything else?

21        MR. HECHT:  No, Your Honor.

22        THE COURT:  Okay.  I just have one question, and it's

23  just something I may have missed.

24        You had testified that you were 15 years with CHG, six

25  years with RNN.  The case is CHG doing business as RNN.  So I

1  guess my question is, is the six a subset of the 15 or is it 15

2  plus six or --

3          THE WITNESS:  It's a subset.

4          THE COURT:  Okay.  Got it.

5          THE WITNESS:  I joined CHG in 2008, transitioned over

6  to RNN's division in 2017.

7          THE COURT:  All right.  Thank you very much.  Thank

8  you for your time.

9      (Witness was excused.)

10          THE COURT:  Everyone, let's take an hour and 15

11  minutes for lunch, that will bring us back at 1:30, and then

12  we'll continue on.  Thank you so much.

13      (Recess at 12:15 p.m.)

14      (Call to Order of the Court.)

15          THE COURT:  Okay, everyone.  Please have a seat.

16  Welcome back.

17          We're going to continue on then with CHG Medical

18  Staffing versus Rachel Shafer.

19          Is Ms. Shafer the last witness for both sides?

20          MR. HECHT:  Yes, Your Honor.

21          THE COURT:  Okay.  I know we had talked about it

22  briefly.  What did we decide?

23          Ms. Schwartz, are you going to call Ms. Shafer as part

24  of your case or are you just going to kind of end your

25  presentation and then it goes over to Mr. Hecht to call the

1    witness?  It doesn't matter to me.

2         MS. SCHWARTZ:  No, I'm going to call Ms. Shafer as

3    part of our case.

4         THE COURT:  All right.  And then as far as the

5    questioning, though, since she's the last witness, I mean,

6    let's just get it all done with her on the stand once as

7    opposed to calling her and then calling her again in the

8    defense case.  Make sense?

9         MR. HECHT:  Yes.  Your Honor, I would just suggest

10   that since Ms. Shafer is my primary witness, I don't think we

11   going to be doing cross.  So I think it may be more efficient

12   if we start with Ms. Shafer and then she can cross her and have

13   her as a primary witness in the same time so we don't have her

14   three times back and forth.

15        MS. SCHWARTZ:  I disagree.  Ms. Shafer is a witness on

16   our witness list.  It's plaintiff's case.  We're still on

17   plaintiff's case in chief, and we're calling her.

18        THE COURT:  You can call her.  That's completely up to

19   you.  I think his point was that he would direct and you would

20   cross.  But I understand if you want to direct.  That's fine.

21        So Ms. Shafer, come on up.

22        THE COURTROOM DEPUTY:  Would you raise your right

23   hand, please.

24         RACHEL SHAFER, PLAINTIFF'S WITNESS, SWORN

25        THE COURTROOM DEPUTY:  You may be seated.  State your

1   name and spell your last name for the record, please.

2           THE WITNESS:  Rachel Shafer, S-H-A-F-E-R.

3                     DIRECT EXAMINATION

4   BY MS. SCHWARTZ:

5   Q.  Ms. Shafer, when was your first day of work at RNnetwork?

6   A.  I don't remember the exact month, but 2006.

7   Q.  Okay.  And isn't it true that you quit a couple years later

8   to work as a nurse?

9   A.  Uhm, I worked part time for them while I was in nursing

10  school, and for six months I separated and then came back.

11  Q.  So is the answer, yes, you did quit to go work as a nurse?

12  A.  Yes.

13  Q.  And what year did you quit your job at RNnetwork?

14  A.  I don't recall the exact year.  Somewhere around 2008-ish,

15  2009.

16  Q.  And before you quit from RNnetwork in 2008 or nine, you

17  testified that you were working part time.  What position were

18  you working part time in?

19  A.  Uhm, I did whatever they needed to.  So if a recruiter was

20  out, I would cover their desk, I would enter jobs for them.

21  Q.  Are you finished?

22  A.  Things of that nature.

23  Q.  So isn't it true that when you performed work for RNnetwork

24  on part-time basis before you quit in 2009, you were working as

25  a part-time associate recruiter who was more of an assistant to

1   the nurse recruiters?

2   A.   No.

3   Q.   Well, you just testified that you would do whatever they

4   needed help with, correct?

5   A.   As a recruiter.

6   Q.   And so is it your testimony that you never worked as an

7   assistant to the recruiters at RNnetwork?

8   A.   Correct.

9   Q.   You never held a job as assistant recruiter?

10  A.   Correct.

11  Q.   So after you quit in 2009 to work as a nurse, when did you

12  reapply for a job at RNnetwork?

13  A.   Uhm, in 2012 the president called me and asked that --

14  asked.   I had 24 hours to decide whether I wanted to continue

15  with nursing or come back, and I decided to come back.

16  Q.   And isn't it true that in 2012, that was the first time you

17  were hired to work at RNnetwork in the position of full-time

18  nurse recruiter?

19  A.   False.

20  Q.   You just testified that you worked as a part-time employee

21  prior to quitting in 2009.

22  A.   You just said that I wasn't basically a full-time recruiter

23  before then.   From 2006 until I was part time I was a

24  recruiter.

25  Q.   When you came back to work at RNnetwork in 2012, what

1   position did you come back to?

2   A.   A recruiter.

3   Q.   Is that a full-time nurse recruiter?

4   A.   Yes.

5   Q.   Did you sign an employment agreement upon hire?

6   A.   Yes.

7   Q.   What was your primary job duty as a nurse recruiter for

8   RNnetwork in 2012?

9   A.   Sourcing candidates, finding them, qualifying them,

10  building relationships with them, continued contact.  I also

11  gave them my personal cell phone for 24/7 emergency contact

12  since our emergency line didn't ever pick up.

13  Q.   My question was what was your primary job?

14  A.   Recruiter.  All sorts of recruiter jobs.

15  Q.   Would you say it was your primary job duty to place travel

16  nurses in temporary positions at health care facilities?

17  A.   Correct.

18  Q.   Okay.  And those are the same jobs duties you performed at

19  AHS Staffing, correct?

20  A.   Yes.

21  Q.   I'm sorry?

22  A.   Yes.

23  Q.   Okay.  And did you have any experience in nurse staffing

24  before you were hired by RNnetwork?

25  A.   No.

1  Q.  I would like to show you what I'm having marked as

2  Plaintiff's Exhibit 34.

3         Exhibit 34 is a printout of your public LinkedIn page,

4  correct?

5  A.  Correct.

6  Q.  And on page 2 of the document that's where you identify

7  your employment history, the last employer being AHS Staffing.

8  Do you see that?

9  A.  Correct.

10 Q.  Where did you work before you were hired at RNnetwork?

11 A.  It's not on here, but student nursing and the nurse

12 overlaps RNnetwork.

13 Q.  Okay.  So did you work as a student nurse at Baptist Health

14 before you were hired at RNnetwork?

15 A.  No.

16 Q.  Did you work anywhere for any employer prior to being hired

17 by RNnetwork?

18 A.  Yes.

19 Q.  Where did you work?

20 A.  Uhm, I worked for the Continental Group as an assistant to

21 a property manager, property management group.

22 Q.  Okay.  Now, when you came back to RNnetwork in 2012, you

23 were required to sign an employment agreement that contained

24 confidentiality, noncompetition, and non-solicitation

25 provisions, correct?

1   A.   Correct.

2   Q.   Okay.  So I would like to direct your attention to

3   Exhibit 2.  It should be in front of you.  Let me know when you

4   have that.

5          MS. SCHWARTZ:  And, Your Honor, I would like to move

6   to admit Exhibit 34 into evidence.

7          THE COURT:  Any objection?

8          MR. HECHT:  No, Your Honor.

9          THE COURT:  34 will come in.

10         (Received in evidence Plaintiff's Exhibit(s) 34.)

11  BY MS. SCHWARTZ:

12  Q.   Do you have the agreement, Ms. Shafer?

13  A.   Yes.

14  Q.   Okay.  This is the employment agreement, including

15  confidentiality, noncompetition, and non-solicitation

16  provisions that you signed when you were hired on July 26,

17  2012, at RNnetwork, correct?

18  A.   Correct.

19  Q.   And if you turn to the last page, is that your signature

20  above where it says "Signature of Employee"?

21  A.   Yes.

22  Q.   Did you understand that RNnetwork was not going to hire you

23  or give you access to its database with its confidential

24  information and trades secrets unless you signed this

25  agreement?

1  A.  Correct.

2  Q.  I would like to direct your attention to paragraph 2, which

3  is entitled "Confidential Business Information."

4        Now, it states that, among other things, all

5  information relating to clients, health care personnel, their

6  names, phone numbers, email addresses, preferences, types of

7  recruitment, placement services, and financial information

8  relating to the company is considered confidential and

9  proprietary information of the company.  That's what it says,

10  correct?

11  A.  Correct.

12  Q.  And you understood when you signed this agreement that

13  nurse provider lists or client lists, even the ones that you

14  created or added to or had access to during your employment,

15  belonged to RNnetwork, right?

16  A.  Correct.

17  Q.  Did you receive an employee handbook during the time you

18  worked at RNnetwork?

19  A.  I don't remember.

20  Q.  Do you remember receiving a link to an employee handbook on

21  the portal that you would certify year after year that you've

22  received?

23  A.  Yes.

24  Q.  I'm going to show you what's been marked as Plaintiff's

25  Exhibit 17.

1          I'm showing you what's been marked as Plaintiff's

2     Exhibit 17.  It is the June 2021 employee handbook for CHG

3     Healthcare.

4          Were you employed by RNnetwork in June of 2021?

5     A.   Yes.

6     Q.   Can you please turn to page 15.  It is the proprietary and

7     information policy.  Please let me know when you're there.

8     A.   I'm there.

9     Q.   Okay.  So according to this policy, in the second sentence

10    it says, "employees must not remove, or use outside of the

11    scope of your employment with CHG, the following materials and

12    information, including electronic copies of same."  And the

13    first bullet point says, "Names, addresses, and phone numbers

14    of CHG employees, clients, healthcare professional, and

15    potential customers."  That's what it says, right?

16    A.   Right.

17    Q.   And did you understand that a health care professional also

18    referred to nurses?

19    A.   Yes.

20    Q.   And, in fact, aren't nurses also considered W-2 employees

21    of RNnetwork?

22    A.   Yes.

23    Q.   All right.  And so knowing of this policy and the agreement

24    you signed, you still made the decision to -- I think you said

25    send your personal cell phone number to the nurses that you

 1   worked with?

 2   A.   Yes.

 3   Q.   Okay.  And did you obtain their personal cell phone numbers

 4   and put those in your personal cell phone?

 5   A.   If they contacted me.  And they contacted me all the time

 6   because that's the fastest way they could get an answer.  A lot

 7   of times TextUs had issues and would freeze up or the emails

 8   wouldn't come in on time.  This way they could call me at the

 9   middle of the night if they were having an issue and I could

10   help walk them through it, whereas no one else from RNnetwork

11   would pick up the call at 11 o'clock, 12 o'clock at night and

12   help them.

13   Q.   So you are familiar with the TextUs program that was at

14   RNnetwork?

15   A.   That constantly was broken, and it was only there for the

16   last three years.  It never worked.

17   Q.   Is that a, yes, you are familiar with the program?

18   A.   Yes.

19   Q.   And did you install that program on your system that you

20   used when you worked for RNnetwork?

21   A.   Yes, and deleted it many times because it never worked.

22   Q.   Okay.  And did you -- how many nurses' personal contact

23   information did you save in your personal cell phone?

24   A.   I am not sure.

25   Q.   More than ten?

1    A.   I don't know.

2    Q.   How many nurses did you have on assignment in March of

3    2023?

4    A.   90, approximately.

5    Q.   Do you have 90 nurses from RNN's personal cell --

6    A.   No.

7    Q.   -- phone --

8              Let me ask the question for the record.

9              Do you have the information for 90 nurses with whom

10   you worked at RNnetwork in your personal cell phone?

11   A.   No.

12   Q.   Do you still have contact information for any of the nurses

13   that you worked with at RNnetwork in your personal cell phone?

14   A.   Yes.  Some of them are even my friends.  I know them

15   outside of work.  They came to me as referrals.  We hang out.

16   So, yes, they contact me even on a personal level.

17             MS. SCHWARTZ:  I would like to move to have Exhibit 17

18   admitted into evidence.

19             THE COURT:  Any objection?

20             MR. HECHT:  Your Honor, this is something we haven't

21   seen before.  If she wants to admit it only for that particular

22   purpose of what she just demonstrated, which is page 15, we

23   don't have an objection.  But beyond that scope we would have

24   to review it first.

25             THE COURT:  I'll allow it in.  You know, you can ask

1    other questions that are based on the employee handbook.  And

2    if any such questions come up, Mr. Hecht, just object if it's

3    something that you have an objection to.

4         (Received in evidence Plaintiff's Exhibit(s) 17.)

5              MR. HECHT:  Okay.

6    BY MS. SCHWARTZ:

7    Q.  So I would like to direct your attention back to Exhibit 2,

8    which is your agreement with RNnetwork.

9    A.  Okay.

10   Q.  And in paragraph 4(a) there is a provision entitled "Duty

11   of Confidentiality."  Do you see that?

12   A.  Yes.

13   Q.  You agreed that you would not at any time use any of

14   RNnetwork's confidential business information for any reason

15   other than to perform your job duties for the company, right?

16   A.  Correct.

17   Q.  Okay.  And in paragraph 4(c) you agreed that upon your

18   termination from employment with the company, regardless of the

19   manner or reason of termination, you would immediately return

20   all confidential business information and property to the

21   company and, quote, shall not retain any copies thereof,

22   whether in hard copy or electronic form.  That's what you

23   promised, right?

24   A.  Yes.  But what if that was to make sure -- what if that

25   document was to compare to my commission report to make sure

1   that I was being paid correctly?

2   Q.  You don't actually get to ask questions during the

3   proceeding.  Sorry.

4       But you did retain copies of information that you had

5   obtained during your employment and didn't return it after your

6   termination, correct?

7   A.  Correct.  I thought they were mine.

8   Q.  Okay.  Now, on and after March 9, 2023, isn't it true you

9   emailed to your personal Gmail account working and awaiting

10  lists with contact information for thousands of RNnetwork

11  nurses?

12  A.  My assistant compiled a report, which I had no idea how to

13  compile, by the way, and I thought it was only my nurses.  The

14  only confidential information is their email.  And everything

15  else on there I pretty much have memorized because of working

16  with them for so many years.  And so, yes, I sent myself a

17  report that I thought was only my nurses.

18  Q.  Okay.  And those lists, that report is still in your

19  possession today, correct?

20  A.  Correct.

21  Q.  And, in fact, one of them, the working and awaiting

22  document for week ten, is on your exhibit list for this case as

23  Exhibit 5, right?  It's not in front of you.

24  A.  Oh, I'm not sure.

25  Q.  Are you aware that you have identified the working and

1  awaiting list for week ten as one of your exhibits in this

2  case?

3  A.  I'm not sure.

4  Q.  Okay.  Isn't it true that you began forwarding to your

5  personal Gmail account confidential business information of

6  RNnetwork on March 9 because you knew that your job was about

7  to be terminated?

8  A.  No, I sent it to myself every single week since I started.

9  Well, since I started I printed it.  But once I moved to

10 working from home, I had to email it to myself to be able to

11 print the document because they would not allow me to connect

12 my printer to my work computer.  So I had to send it to myself

13 to print.

14 Q.  Why do you think they would not allow you to attach the

15 printer to your work computer, Ms. Shafer?

16 A.  It doesn't matter.  They knew what I was doing, and I was

17 trained to print that report every single week and mark it off

18 and work by hand off of that.  I'm a paper person.

19 Q.  My question is why did RNnetwork not allow you to attach

20 your printer to your work computer, Ms. Shafer?

21 A.  Because of firewalls and stuff.  I don't know.  Safety.

22 Q.  Safety of what?

23 A.  Their information.

24 Q.  Right.  So that you couldn't print their business

25 information off of your work computer onto --

1    A.  But they told me --

2    Q.  -- your home printer?  You have to let me --

3           THE COURT:  Wait.  One at a time.  This is really

4    pretty simple.

5    BY MS. SCHWARTZ:

6    Q.  I'm sorry.  I know it's awkward.  You need to allow me to

7    ask the whole question for the record before you give your

8    answer so the reporter can take us both down.

9    A.  Okay.

10   Q.  You understood that RNnetwork would not allow you to

11   connect your printer to your work computer so that you wouldn't

12   be able to print its confidential information off of its

13   systems, right?

14   A.  Yes.  And I asked IT to allow me, and they told me that I

15   could print it the way I was printing it.

16   Q.  So if I understand your testimony correctly, knowing that

17   and knowing what you agreed to in this agreement, you were

18   printing these working and awaiting lists off of the system and

19   then began emailing them to yourself when you started working

20   remotely?

21   A.  Correct.  So that I could print them from home from my --

22   working off of it weekly.

23   Q.  I would like to show you what's already been admitted as

24   Plaintiff's Exhibit 19.  It should be in front of you.

25           Actually, before we get to Exhibit 19, when did you

1  start emailing to your personal Gmail address working and

2  awaiting spreadsheets from RNN's systems?

3  A.   2016, when I went on maternity leave.

4  Q.   And do you still have copies of those documents --

5  A.   No.

6  Q.   -- in your possession?

7  A.   No.

8  Q.   If you -- did you email those documents from your RNnetwork

9  email account?

10  A.   Correct.

11  Q.   So if we were to look in the email system for RNnetwork, is

12  it your testimony then we should be able to see you have

13  actually forwarded to yourself other working and awaiting

14  spreadsheets before March 9, 2023?

15  A.   Correct.  Every single week the working and awaiting and

16  the TOA reports so I could print them out.

17  Q.   Do you have any explanation as to why none of those showed

18  up during RNnetwork's investigation?

19  A.   Maybe you didn't know to look that far.

20  Q.   Did you delete any of the emails from your sent box before

21  your last day of work?

22  A.   No.  Why would I have emails from 2016?  Your Gmail doesn't

23  even save them that long.

24  Q.   Do you currently have any printouts of any of RNnetwork's

25  data in your home possession?

1  A.  No.

2  Q.  Do you currently have any other working and awaiting

3  spreadsheets on your Gmail account other than the week ten and

4  week six from 2023?

5  A.  No.  I mean, I didn't delete it.  So I should have -- I

6  sent it to my lawyer and I should have it because you said

7  don't delete it.  But I don't have anything else.  Whatever I

8  have, you have.

9  Q.  What was your last day of work at RNnetwork?

10  A.  Uhm, I think it was April 30th.

11  Q.  Okay.  So then why -- if you were emailing yourself those

12  working and awaiting spreadsheets every single week, why are

13  those the only two that remain in your possession that have not

14  been deleted?

15  A.  Because I needed to compare those to my commission reports

16  that you guys were going to send me once I was let go to

17  compare, to see if there's any errors.  And there were errors,

18  and there are still are errors, and you still owe me money.

19  Q.  Okay.  Let's look at Exhibit 19.  This is an email that

20  your supervisor Chrissy Evans sent to you on March 9, '23, at

21  2:17 p.m. about your job performance at RNnetwork, correct?

22  A.  Correct.

23  Q.  Okay.  Prior to this date you had been given a performance

24  improvement plan and meeting with Chrissy on a weekly basis to

25  discuss your performance, right?

1   A.   I did not meet with her weekly.

2   Q.   Had you been given a performance improvement plan prior to

3   March 9th?

4   A.   Yes.

5   Q.   Had you been given a performance improvement plan three

6   times prior March 9?

7   A.   Yes.

8   Q.   And what was the date of your most recent performance

9   improvement plan prior to March 9, 2023?

10  A.   I don't know.

11  Q.   Okay.  If you look at the first sentence in Chrissy's email

12  it says, "As discussed and addressed in the performance

13  improvement plan issued on February 15, 2023, we'll be meeting

14  weekly to discuss the previous week's performance."

15       So was that last performance improvement plan issued

16  to you on February 15, 2023?

17  A.   I don't recall if that date is correct, but we will assume

18  it is.

19  Q.   Okay.  In the second paragraph Chrissy states, quote, we

20  continue to discuss ongoing concerns with your communication

21  that do not align with our core values, end quote.

22       And on the second page of the exhibit, at the top, she

23  told you that your communication does not meet the expectations

24  established in the PIP.

25       Do you see that?

1  A.   Yes.

2  Q.   And then in the second to last paragraph on that page, in

3  the last sentence, she wrote, "Your communication is and has

4  been at the core of your behavioral issues and has reached a

5  point of zero tolerance."

6        And at the end says, "Lack of significant improvement

7  or any further infractions of unsatisfactory behavior and

8  ongoing deficiencies in your behavior or performance, will

9  result in further disciplinary action, up to and including

10 separation."  That's what she told you, right?

11 A.   Correct.

12 Q.   And did you believe at this time that your job at RNnetwork

13 was in jeopardy?

14 A.   I asked her if it was, and she couldn't tell me.  But,

15 obviously, this is a negative writeup, and a lot of it wasn't

16 even true, and I knew that it didn't matter.  Someone didn't

17 like me here.  So I knew to perhaps start looking for other

18 opportunities.

19 Q.   So Chrissy sent you this email at 2:17 p.m.  And what time

20 did you forward it to your personal Gmail account?

21 A.   Probably right away because I wanted to keep a copy and for

22 my husband to see it.

23 Q.   Okay.  So according to the first page of the exhibit, it

24 looks like you sent it to yourself two minutes later at

25 2:19 p.m.; is that right?

1  A.  Correct.

2  Q.  What is the next thing that you did?

3  A.  I -- what do you mean?

4  Q.  Do you recall what the next thing you emailed to your

5  personal Gmail account was on this day?

6  A.  No.

7  Q.  Isn't it true that about 30 minutes later you emailed to

8  your personal Gmail account the working and awaiting Excel

9  spreadsheets with thousands of nurses' information who were

10  actively on assignment?

11  A.  Once again, my assistant created that document, and I can

12  only see my names on this.  I sent it to myself to be able to

13  compare to my commission report knowing that this is

14  probably -- I was going to be let go soon, especially --

15  there's other issues here that you're not seeing with my

16  doctor, obviously.  And I sent myself that document to be able

17  to compare for errors, which I did find and we have proof that

18  there were errors.

19  Q.  I would like to direct your attention to Exhibit 13.

20  Please let me know when you have it in front of you.

21  A.  I have it.

22  Q.  This email was admitted into evidence as Plaintiff's

23  Exhibit 13.  And what date and time did you send this email to

24  your personal Gmail account?

25  A.  I have no idea.  Does it say on here?

1   Q.  Yes.  So on the first page where it says from Rachel Shafer

2   to rachelshafer@gmail.com, it says that this working and

3   awaiting week ten spreadsheet was sent March 9 at 2:58 p.m.  Do

4   you see that?

5   A.  Yes.

6   Q.  And that's about 30 minutes, 40 minutes after Chrissy sent

7   you the recap emails?

8   A.  Correct.

9   Q.  Now, I have on the screen or will the Excel document that

10  was attached to this email.

11      Okay.  So if you look at the screen, we're looking at

12  the email that's Exhibit 13.  And you can see -- do you see the

13  Excel attachment entitled "Team Shafer W&A" --

14  A.  Yes.

15  Q.  -- "week 10"?

16  A.  Yes.

17  Q.  Okay.  Ms. Shafer, if you don't mind just waiting until I

18  ask the complete question.  I'm speaking slowly for the court

19  reporter.  Thank you.

20      Okay.  So if we click on that attachment that you

21  forwarded to your Gmail account --

22      MS. SCHWARTZ:  Can you click on it?

23  BY MS. SCHWARTZ:

24  Q.  So this is the attachment you forwarded to yourself,

25  correct?

1  A.  Correct.  Then this is the attachment I need to compare to

2  my commission sheet.

3  Q.  That's a "yes" or "no" question, Ms. Shafer.

4       All right.  So you can see from this spreadsheet it

5  contains the names, the states, the email addresses for nurses,

6  the specialties that they work in, their shifts, the bill

7  rates, the gross margin, the start and end dates, and the

8  client where each nurse is placed, correct?

9  A.  Correct.

10 Q.  And this is for over 2,400 nurses?

11 A.  Not that I was aware of.  I thought it was only mine.

12 Q.  Okay.  So if we scroll to the bottom of the page --

13 A.  No one ever taught me how to see it and --

14 Q.  There is no question pending.

15       THE COURT:  Wait.  You all changed the page.

16       MR. HECHT:  Your Honor, I would just like to point

17 out on the record --

18       THE COURT:  Hang on.  You all just changed the page.

19       MS. SCHWARTZ:  We're scrolling to the bottom.

20       THE COURT:  No, no.  The one you showed was not in

21 order from one through whatever thousand.  The numbers were not

22 in order.

23       MS. SCHWARTZ:  Oh.

24       THE COURT:  Go back to what was on the screen, which

25 is what you asked her the question about.  You see how it

1    started; 7, 33, 4?  So you asked her questions based on a much

2    shorter attachment, and then your next question you switched it

3    to the one that has 2,400.

4            MS. SCHWARTZ:  So I should explain, Your Honor.  So

5    this is the same document.  It's the same Excel spreadsheet.

6    When you first open the spreadsheet, you have to expand all of

7    the columns.

8            THE COURT:  I understand that.  You can't ask her a

9    question and show her that, though, when the real document is

10   the 2,451.

11           MS. SCHWARTZ:  Okay.  So I will rephrase the question.

12           THE COURT:  Okay.

13   BY MS. SCHWARTZ:

14   Q.  So in front of you is the Excel spreadsheet that was

15   attached to the March 9, 2023, email in its non-expanded form.

16           When you click to expand all of the information on

17   this document and you scroll to the bottom of it, you can see

18   that there's contact information here for more than 2,000

19   nurses, correct?

20   A.  Right.

21           MR. HECHT:  Your Honor, I would like to point out an

22   objection, and I would ask opposing counsel to clarify to the

23   Court exactly what she did to get from the shorter list to the

24   longer list.  She did some clicks with a button but, obviously,

25   something is happening here that's changing the list from a

1   smaller to a bigger one, and I would ask her to clarify exactly

2   what she's doing.

3          THE COURT:  So that she doesn't have to do, but you

4   can handle it on cross.

5          MS. SCHWARTZ:  And just for the record, we did it all

6   on the screen by clicking the "Clear" filter.

7          THE COURT:  Okay, guys.  You know, I just said that

8   she doesn't have to do, but you can handle it on cross.  That

9   means move onto your next question.

10         MS. SCHWARTZ:  Okay.

11  BY MS. SCHWARTZ:

12  Q.  Ms. Shafer, isn't it true that there are nurses that appear

13  on this list that are not nurses that you placed at RNnetwork?

14  A.  Can you repeat that?

15  Q.  Isn't it true that there are nurses appearing on this Excel

16  spreadsheet that you emailed to yourself who are not nurses for

17  whom you were the recruiter at RNnetwork?

18  A.  Now that you show me, yes.  But did I know that?  No.

19  Q.  Is it your testimony that after 17 years of working in

20  nurse recruiting you never learned how to use an Excel

21  spreadsheet?

22  A.  No, I know how to -- actually, I'm very bad on Excel, and I

23  had two assistants, not one, two, that would do things like

24  that for me.  I am an expert in recruiting, not Excel or typing

25  of resumes.

1   Q.  Now that you see the list expanded in front of you, isn't

2   it true that this is a list of all of the nurses who were

3   working and scheduled to work as of March 2023, including those

4   placed by other recruiters?

5   A.  It looks like it.

6   Q.  So, for example, the first recruiter who appears -- the

7   first nurse who appears on the screen is Katina King.

8   A.  I can't see that.

9   Q.  We're going to scroll up in a moment.

10  A.  But even from memory I know whose nurse that is.  That's

11  how I have it memorized.

12  Q.  So you did not place Katina King at Orlando Health Regional

13  Center?

14  A.  No.  Michelle Fuger does.  She's a very well known name in

15  the nursing industry.

16  Q.  Isn't it true that every month you would receive a

17  commissions report from RNnetwork?

18  A.  Yes.

19  Q.  Okay.  So why then did you send yourself a working and

20  awaiting spreadsheet --

21  A.  Because they --

22  Q.  -- on March 9th?

23  A.  Because they would omit names all the time.  It was

24  incorrect.  And that's how I was able to check off all the

25  names and the start and end dates.  And as you can see, I have

1  to be very meticulous because I don't have five nurses.  I have

2  90 nurses.

3  Q.  Why have you refused to return this information to

4  RNnetwork ever since they sent you a cease and desist letter?

5  A.  I didn't know what they were talking about, and I thought

6  this was my information.  Again, because they owe me money and

7  I still have to compare to the commissions that they owe me.

8  Q.  Did you take this information to help you place nurses at a

9  different company, like AHS, after your employment with

10 RNnetwork terminated?

11 A.  I did not, nor do I need to.  Because again, I'm one of the

12 top recruiters in the country.  I don't even need leads.  I get

13 referrals.  Most -- 90 percent of my lead source is referrals.

14 Q.  How many nurses did you place during your employment at

15 AHS?

16 A.  A total of 15.

17 Q.  And did you work with all of those nurses at RNnetwork?

18 A.  No.

19 Q.  Did you work with any of them at RNnetwork?

20 A.  Some, but they worked many, many years ago.

21 Q.  So going back to Exhibit 13, the spreadsheet in front of

22 you.  Can you find this document anywhere on the Internet?

23 A.  No.

24 Q.  How long would it take you to recreate this document if you

25 had nothing other than the Internet and/or a phone book?

1  A.  I don't really need to recrate it, but I could because I

2  have it all memorized.  If I had their names, I can tell you

3  what unit they are on, what shift they like, their -- how many

4  kids they have.  You know, I build relationships and I remember

5  this stuff.

6  Q.  But you just testified that there are thousands of nurses

7  on this spreadsheet with whom you never even worked.  You don't

8  know their information, right?

9  A.  No, I don't.  Just mine.

10  Q.  So how long would it take you to recreate a document like

11  this from publically available sources?

12  A.  It's not possible.

13  Q.  Could you find information in the public realm about what

14  compensation a nurse prefers or requires?

15  A.  Yes, just ask them easily.  And they can send me a contract

16  or when they can send me their resume, I would know everywhere

17  that they worked at.

18  Q.  Right.  You would have to speak with them to find that out,

19  correct?

20  A.  Or it's on their LinkedIn or Facebook.

21  Q.  Is it your testimony that nurses put the compensation they

22  require on their LinkedIn page?

23  A.  No, but a lot of times they'll write it on Facebook and in

24  those forums, the nursing forums.

25  Q.  And where -- is there anywhere in the public realm that you

1    could find information about whether certain nurses require

2    housing?

3    A.  95 percent of nurses use housing allowance.  It's very rare

4    for a nurse to use housing because they lose out on

5    compensation.  So unless they're in a dire need, they are going

6    to take housing allowance.  And that's irrelevant because it

7    doesn't matter.  It can change from assignment to assignment.

8    Q.  Okay.  But you agree, you would have to actually talk to

9    these nurses to find out what pay they want, what shifts they

10   want, and what housing they want, correct?

11   A.  It's posted on Facebook a lot of times too, exactly what

12   they're looking for.

13   Q.  What is the next thing that you did after you emailed this

14   spreadsheet to your personal Gmail account on March 9th?

15   A.  I don't know.  You would have to tell me.  I don't have --

16   Q.  Is that when you began to look for jobs at other nurse

17   staffing agencies?

18   A.  No, but I was interested in the top agency, which RNnetwork

19   blocked me from working with, and I sent myself a link to check

20   it out at home.

21   Q.  So I would like to direct your attention to what's been

22   admitted into evidence as Exhibit 15.  Let me know when you

23   have it in front of you.

24   A.  I have it.

25   Q.  Okay.  What is this link that you sent to yourself at

1  4:28 p.m. on March 9th, 2023?

2  A.  The biggest nurse recruiting agency there is, and I sent

3  myself a link at 4:30 p.m. to check out after work hours.

4  Q.  So Aya Healthcare is another nurse staffing company; is

5  that right?

6  A.  The biggest one.

7  Q.  Isn't it true Aya Healthcare also places other types of

8  positions, not just nurses?

9  A.  Correct.

10  Q.  But when you sent this link to yourself, you were looking

11  for nurse recruiter jobs, correct?

12  A.  I didn't know what I was looking for yet.  I was connecting

13  myself to Aya to look at what was available.

14  Q.  Okay.  Now, you sent this email to your -- link to Aya

15  Healthcare jobs at 4:28 p.m.  That's just about 90 minutes

16  after you sent the working and awaiting Excel spreadsheets that

17  we just looked at as Exhibit 13, right?

18  A.  Right.

19  Q.  Okay.  And 4:28 p.m., that's the middle of your workday for

20  RNnetwork, correct?

21  A.  I can email myself at work.

22  Q.  I'm sorry?

23  A.  I can email myself at work.

24  Q.  Did you apply for any jobs at Aya Healthcare?

25  A.  No, not at this time.  Maybe like a month later or a few

1    weeks later.

2    Q.   And what job did you apply for?

3    A.   Uhm, I don't know.  Several.  So I don't know exactly.  I

4    applied for a lot of jobs recently.

5    Q.   Did you apply for a nurse recruiting job at Aya Healthcare?

6    A.   Yes.

7    Q.   Why did you apply for a nurse recruiting job at Aya

8    Healthcare?

9    A.   Because I needed work and they had the most jobs and they

10   have the most recruiters and the industry right now is very

11   difficult.  So they have -- I can make the most money with

12   them.

13   Q.   As a nurse recruiter?

14   A.   Correct.

15   Q.   Did you forward any other documents or links to your

16   personal email address on that date?

17   A.   Maybe the travelers on assignments that I had.  That's the

18   only other thing I can recall.  But that -- all that document

19   has is the recruiter's name and how many nurses they have

20   working for that eight weeks.

21   Q.   So I would like to show you what's been marked as

22   Plaintiff's Exhibit 20.

23        This is an email that you sent to yourself from your

24   RNnetwork account to your personal Gmail account on March 9 at

25   7:22 p.m., correct?

1  A.  Correct.  It's an older version of my resume that I was

2  going to tweak.

3  Q.  Were you tweaking your resume on March 9 because you were

4  about to begin looking for new jobs as a nurse recruiter at

5  another company?

6  A.  Yes.

7  Q.  Okay.  Even though you signed a one-year noncompete

8  agreement with RNnetwork, it was still your intention to go

9  work for a competitor in nurse recruiting anyway?

10  A.  To my knowledge, noncompetes don't mean anything in

11  Florida.

12  Q.  But you knew that you signed the agreement, right?

13  A.  Correct.

14  Q.  And so you were just disregarding it?

15  A.  And I had other coworkers that RNnetwork didn't go after

16  that went straight from one agency to another.

17  Q.  If we turn to the second page of the exhibit of your

18  resume.  In the very first paragraph, the second sentence, you

19  wrote, "I go above and beyond for my nurses as I appreciate all

20  that they do.  Being a nurse helps me to connect with my

21  clients on a different level than most recruiters can."  Is

22  this the resume that you sent to Aya Healthcare?

23  A.  No.

24  Q.  What's different about this resume from the one you sent to

25  Aya Healthcare?

1    A.  I changed that first -- I changed that first sentence.  I

2    changed -- I changed a few things on this resume.  I --

3    Q.  Do you see where you wrote "Over 100 TOA Currently

4    March 2023"?

5    A.  Uh-huh.

6    Q.  What does that mean?

7    A.  That I have -- I had 90 to 100 nurses working for me in

8    March 2023.  I had to change that, you know, to be more

9    correct.  And then I had 185, that's 100 percent correct, at

10   the peak of the industry in 2022.

11   Q.  Okay.  And is that the information that you included on

12   your resume to Aya Locum --

13   A.  Yes.

14   Q.  -- or Aya Healthcare?

15          You also wrote in this resume that you brought over

16   $6.6 million in profit for 2023 to RNnetwork; is that true?

17   A.  Yes.

18          MR. HECHT:  Your Honor, objection to this line of

19   questioning as to relevance.

20          THE COURT:  Well, yes.  I guess, tell me where you're

21   going with this.  I mean, it seems like we're going over facts

22   that are in evidence.

23   BY MS. SCHWARTZ:

24   Q.  Basically, you were updating your resume for the purpose of

25   finding another job in nurse recruiting in violation of your

1  noncompete, correct?

2  A.  Correct.

3  Q.  Now, the working and awaiting spreadsheet that you emailed

4  yourself March 9, which was updated as of March 2023, was that

5  missing information for any nurses who may have fallen off that

6  chart from the prior month?  Strike that.  Let me ask this way.

7       On the morning of March 10, 2023, did you go back into

8  RNnetwork's systems to forward to your personal Gmail account

9  the working and awaiting spreadsheet for work six?

10  A.  Yes, because they do fall off because the nurses work 13

11  weeks.  So I need to capture a bigger picture to make sure that

12  my commissions were correct.

13  Q.  And is that why you forwarded the week six email with the

14  Excel spreadsheet of 2,000 nurses to yourself on March 10?

15  A.  Again, I didn't know that it was 2,000 nurses.  I thought

16  what my assistant sent me was just mine.

17  Q.  I would like to turn your attention to Exhibit 11.  Is this

18  an email that you sent to yourself at RNnetwork with a link to

19  the company's noncompete and non-solicit process on March 28,

20  2023?

21  A.  Yes, but I was working fast and just typed in noncompete,

22  and this came through.  And I just sent it to myself without

23  reading it.

24  Q.  So why did you send this to yourself?

25  A.  Because I wanted to have a copy of our noncompete.

1  Q.  Why did you want that?

2  A.  I wanted to send it to my lawyer, and I wanted to see what

3  was in it in specific because I hadn't seen it in a while.

4  Q.  But on the date that you sent this email to yourself, you

5  were still an active employee of RNnetwork, correct?

6  A.  Correct.  But you had written me up.  And also I asked for

7  accommodations that I was denied for and basically told too

8  bad, so sad.  Even if you got paperwork filled out by your

9  doctor, nothing's going to change.  I knew things were coming

10  to an end.

11  Q.  But you didn't have any paperwork filled out by your

12  doctor, did you?

13  A.  I did not.  I just spoke to him.  And she said even if I --

14  HR, Briles, said that even if I did speak to my doctor and fill

15  it out, it would mean nothing.  So I spent $300 making an

16  appointment with my psychiatrist to get nowhere.

17  Q.  So your employment with RNnetwork terminated by March 30th

18  of 2023, correct?

19  A.  Correct.

20  Q.  And on that date were you sent a letter by email with a

21  copy of your employment agreement reminding you of your

22  noncompete, non-solicit, and confidentiality obligations?

23  A.  Yes.  But again, I was told that it doesn't mean anything

24  in Florida, the noncompete, and my coworkers went to other

25  agencies to work and nothing happen to them.

1  Q.  Who told you that the noncompete doesn't mean anything in

2  Florida?

3  A.  Many people have.

4         MR. HECHT:  Objection, Your Honor.  If she's asking

5  for any communications with her attorney, we assert an

6  attorney-client privilege.

7         THE COURT:  Sure.  So I'll just let the answer stand

8  when she said many people, but I'll sustain as to any

9  discussions that she may have had with you or any other lawyer.

10 BY MS. SCHWARTZ:

11 Q.  So I would like you to take a look at Exhibit 5 in front of

12 you.

13 A.  Okay.

14 Q.  Is this the email that you were sent by Keela Briles on

15 March 30 after your employment was terminated?

16 A.  Yes.

17 Q.  Did it have a number of attachments included --

18 A.  Yes.

19 Q.  -- on the email?

20        And was one of the attachments the employment

21 agreement that you signed?

22 A.  Yes.

23 Q.  Did you read it?

24 A.  Uhm, I skimmed through it.

25 Q.  Okay.  After you received this letter from Ms. Briles

1  reminding you of your obligations under the employment

2  agreement --

3          MR. HECHT:  One second, Your Honor.  Just an objection

4  here.  I notice you said an email.  You just gave us two

5  documents.  But you're referring that there were other

6  attachments to this email that's not included in these two

7  documents?

8          MS. SCHWARTZ:  It's referenced on the subject line.

9          MR. HECHT:  But it's not part of the exhibit you

10  introduced, is it?

11          MS. SCHWARTZ:  This exhibit's already been admitted

12  into evidence.

13          MR. HECHT:  But now you're mentioning that there is

14  some additional attachments to it that's not included here, and

15  you're asking the witness about those attachments.  So I'm

16  entitled to know -- if there is something else to it and we

17  didn't get it, we want to know what it is.

18          MS. SCHWARTZ:  Well, if you'll look at the first page

19  of the exhibit, it expressly says, next to the word

20  "Attachments," Noncompete, Offboarding Resources, What Happens

21  to My Benefits When I Leave CHG.pdf," and Ms. Shafer has

22  personal knowledge of what was attached, which she is

23  testifying to.

24          THE COURT:  So is there a pending question?

25          MS. SCHWARTZ:  Yes, I was asking the question when he

**App. 344**

 1  suddenly objected to the use of the admitted exhibit.

 2        MR. HECHT:  Your Honor, we're objecting that she's

 3  asking her about attachments to these documents and there is no

 4  attachment here.  And the way it was introduced into evidence

 5  is without any attachments.  And now she is mentioning there

 6  are additional documents here that we don't see and we didn't

 7  get any copy of.

 8        THE COURT:  Well, when you say we didn't get any copy

 9  of it, didn't we go over all of this a week ago, each of these

10  documents?

11        MR. HECHT:  No, but this is something that she already

12  admitted into evidence.  But she admitted two pages into

13  evidence.  But now she's saying that in addition to these two

14  pages there are additional exhibits, and she's asking

15  Ms. Shafer about those exhibits, and we don't see it here.

16        MS. SCHWARTZ:  The question was did you read the

17  employment agreement that's already been admitted as Exhibit 2,

18  which she testified was attached to the email.

19        THE COURT:  Sure.  So listen, I mean, I think we

20  should all kind of continue to move forward, continue to narrow

21  the issues.  In all candor, I don't know what the relevance of

22  the employment agreement is anymore based on the answer that

23  covenants not to compete don't mean anything in Florida.  So

24  what does it matter?

25        MS. SCHWARTZ:  Well, what does -- sorry.  What does

1    what matter, Your Honor?  The fact that she violated the

2    noncompete because she said covenants don't --

3        THE COURT:  She agrees she signed the document.  She

4    agrees it has a covenant not to compete in it, and she says

5    that she was told it doesn't mean anything.  Why now try to go

6    around and try to show her the words in something she agrees

7    she signed and that she says she didn't follow?

8        MS. SCHWARTZ:  Because I was also addressing the

9    misappropriation of trade secrets and the violation of the

10   non-solicitation provision in the agreement, Your Honor.

11       THE COURT:  I think go to that then.  Just ask her

12   about that.

13   BY MS. SCHWARTZ:

14   Q.  Okay.  After you received this letter from Ms. Briles, why

15   did you not then return any of the information that belonged to

16   RNnetwork?

17   A.  I didn't know that it belonged to RNnetwork.  I returned

18   the computer and everything right away.  Actually, they didn't

19   ask me for it, and I kept asking them to send me the box to

20   send back all their stuff.  Because they didn't send anything

21   to me for weeks.  And I didn't realize what I sent myself was

22   illegal to send and that would cause issues.  I thought it was

23   for me to compare to my commission report, the end.  Not to

24   recruit, not to do anything negative.

25   Q.  After you received this letter from Ms. Briles, did you

**App. 346**

1  take any steps to delete any information from your cell phone

2  or your Gmail account pertaining to nurse contact information?

3  A.  No.  No.

4  Q.  And why did you retain nurse contact information in your

5  cell phone when you knew that information was considered

6  confidential and proprietary to RNnetwork?

7  A.  You guys told me -- first of all, you told me not to delete

8  anything.  Second of all, nurses contact me on their own daily

9  on my cell phone that's blasted all over the Internet,

10 Facebook, LinkedIn, through other nurses.  Again, I get

11 90 percent of referrals.  I'm not working right now and people

12 are contacting me to place them.  I don't need leads in a

13 database.  I don't need paid leads.  I'm that high up in the

14 industry where referrals come to me, free referrals, and that's

15 how I place most of my nurses.

16 Q.  In that case, do you have any problem returning and

17 deleting the spreadsheets from RNnetwork that you forwarded to

18 your personal email account?

19 A.  Not at all.

20 Q.  And in that case, do you have any problem deleting and

21 wiping from your personal cell phone and your email account all

22 contact information for the nurses with whom you worked at

23 RNnetwork?

24 A.  I don't know who it is, who I worked with, who I didn't

25 work with.  And what if I worked with them ten years ago?

1    There's no way to -- as you can see, I texted someone that I
2    thought was a nurse.  I don't have -- what, do you want me to
3    wipe out every contact in my cell phone?
4    Q.  Is it your intention to continue soliciting the nurses with
5    whom you worked at RNnetwork if you find another job as a nurse
6    recruiter in the next 12 months?
7    A.  I never solicited anyone.  Again, they come to me.
8    Q.  The test message that you were referring to -- let me just
9    show it to you.  Let me show you what I'm having marked as
10   Plaintiff's Exhibit 16.
11        Do you recognize this email that you sent between your
12   personal Gmail account and your RNnetwork account on March 15
13   regarding JR Borges?
14   A.  Yes.  So she -- we were probably texting, and I emailed
15   myself this note to put in the system, for RNnetwork system, so
16   we knew where we were with this nurse.
17   Q.  What is JR Borges' name?
18   A.  I forget.  Maybe Judith.
19   Q.  Is this an email or a text message from this nurse that you
20   were forwarding to your email account?
21   A.  It looks like it would be a text message and that I was
22   sending it to RNnetwork to put into their system so they had a
23   copy of it.
24   Q.  And did you also upload a copy of JR Borges' information
25   into AHS's system?

1  A.  No.

2  Q.  Did you upload information for any nurses into AHS's

3  system?

4  A.  No.

5  Q.  Really?  Not even Jordan Newstadt?  You didn't upload his

6  information into AHS's system?

7  A.  If they contacted me and wanted to work with us, then I

8  would have.  But again, Jordan hasn't work with RNnetwork for

9  about seven or eight years.

10 Q.  My question was did you upload nurse contact information

11 for any of the nurses that you worked with at RNnetwork into

12 AHS's system?

13 A.  If they came in as a lead and wanted to work with me, yes.

14 And if they weren't in the system already, yes.

15 Q.  Where would you upload that information in AHS's system?

16 A.  Just as a new candidate or I would update if they were

17 already in the system.

18 Q.  So if you logged onto the system, what application would

19 you click on to upload that information?

20 A.  They have their own system.  I think it's called Insight.

21 Q.  Okay.  And where on the Insight system would you enter the

22 information for the RNnetwork nurses?

23 A.  Any nurse would just be entered as a new candidate.

24 Q.  And would your name be attached to that nurse in their

25 system?

 1   A.  It could be.  It could not be.  If someone took over, it's

 2   probably not going to be in my name anymore.

 3   Q.  When you first put the information in the system, was it

 4   attached to your name?

 5   A.  Yes, it would be attached.

 6   Q.  Do you still have this nurse Judy Borges' information in

 7   your cell phone --

 8   A.  I don't know.

 9   Q.  -- or in your Gmail account?

10   A.  I don't know.  I would have to -- it's not in my Gmail.

11   It's -- I'm sending myself her updated email and note for

12   RNnetwork system to update their system.

13   Q.  So if you look at Exhibit 16, in the second email, it's

14   from rachel.shafer@gmail.com.  Do you see that?

15   A.  Correct.  So what happened was the nurse texted me on my

16   personal cell phone and I copied it from my Gmail to RNnetwork.

17   Q.  And did you delete the email from your Gmail account?

18   A.  Yes.

19   Q.  Why did you do that?

20   A.  My Gmail automatically deletes like every certain amount of

21   days.  But if it's -- I don't know.  If it's March, if it's

22   recent, it might still be there.

23   Q.  What do you mean your Gmail automatically deletes every so

24   many days?

25   A.  Just like every other email account, it clears your trash

1  every 30 days.

2  Q.  Okay.  But does it clear the emails that are not sent into

3  the trash bin?

4  A.  No.

5          MS. SCHWARTZ:  I would like to move to have Exhibit 16

6  admitted into evidence.

7          THE COURT:  Any objection?

8          MR. HECHT:  Same.  Same what we were referring to last

9  week, the notice issue.  Last week Your Honor said that

10  whenever you want to raise the notice issue, that we haven't

11  seen this before, we should just say "same."

12          THE COURT:  Right.  But then when we closed business

13  on the 31st and moved the case to the 7th, I said does that in

14  effect waive your notice objection, and you said yes.

15          MR. HECHT:  So, yeah, let me withdraw the objection.

16  Sorry.

17          THE COURT:  Okay.  So 16 will come into evidence.

18      (Received in evidence Plaintiff's Exhibit(s) 16.)

19  BY MS. SCHWARTZ:

20  Q.  Showing you what I've had marked as Plaintiff's Exhibit 18.

21  Exhibit 18 appears to be a screenshot that you took of a text

22  message from a nurse that you emailed from your personal Gmail

23  account to your RNnetwork email on March 12th; is that right?

24  A.  Yes.

25  Q.  Why --

1   A.  Why do I do that?

2   Q.  Why were you not using the TextUs software designed so that

3   these messages would automatically be saved in Bullhorn and not

4   your personal cell phone?

5   A.  Because TextUs never worked for me and it wasn't reliable.

6   And if it did work, it was a big lag.  And this girl is a

7   friend.  It's -- not just a nurse.  And I have issues sending

8   pictures on my phone from Outlook.  So I send it -- I send

9   myself things from my cell phone to my Gmail to RNnetwork to

10  have a copy and proof of what the nurse has said to be put into

11  RNnetwork's system.

12  Q.  Do you have Natalie Turner's contact information in your

13  cell phone right now?

14  A.  Uhm, yes.

15  Q.  Did you upload it into AHS's system?

16  A.  Uhm, she -- yes.  She wanted to work with AHS, but I didn't

17  end up placing her.

18  Q.  So you did upload her information --

19  A.  Correct.

20  Q.  -- into AHS's system?

21  A.  Correct.

22  Q.  Did you provide her with an offer of employment agreement

23  like the one that we saw earlier for Amanda Fobar?

24  A.  I don't remember.

25          MS. SCHWARTZ:  Okay.  I would like to move to have

1  Exhibit 18 admitted into evidence.

2            THE COURT:  Any objection?

3            MR. HECHT:  No.

4            THE COURT:  18 will come into evidence.

5         (Received in evidence Plaintiff's Exhibit(s) 18.)

6  BY MS. SCHWARTZ:

7  Q.  Isn't it true that during your employment at AHS you

8  contacted nurses whose information appeared in the working and

9  awaiting spreadsheets that you took to see if they would be

10 interested in the working with you at AHS?

11 A.  I don't recall.

12 Q.  I want to direct your attention back to Plaintiff's

13 Exhibit 10, which is in front of you.

14            Amanda Fobar is a nurse that you worked with during

15 your employment at RNnetwork, correct?  That's a "yes" or "no"

16 question.

17 A.  Yes, but she went by Mandy, M-A-N-D-Y, and so I didn't

18 connect the dots until -- I can tell you the whole story.

19 Q.  Okay.  But my question is you worked with her at RNnetwork,

20 right?

21 A.  Yes.

22 Q.  And she was actively on an assignment with RNnetwork in

23 March of 2023 when you forwarded the week ten working and

24 awaiting spreadsheets to your personal email account, right?

25 A.  I guess so.

1          MS. SCHWARTZ:  Okay.  If we can just put Exhibit 13

2    back on the screen, line 872.

3          THE WITNESS:  May I speak?

4    BY MS. SCHWARTZ:

5    Q.  There's no question pending.

6          So here we see Amanda Fobar was placed on assignment

7    at Highlands Hospital in California from January 4, 2023,

8    through April 22, 2023, by you, right?

9    A.  Yes.

10   Q.  And when you sent this spreadsheet to yourself on March 9,

11   you were able to see that one month later, in April, Amanda was

12   going to be ready for a new placement, correct?

13   A.  I wasn't using --

14   Q.  You could see that, correct?

15   A.  I didn't look at it for that reason.

16   Q.  But you can see it is my point.

17   A.  If I looked, yes.

18   Q.  And you could also tell from this spreadsheet that Amanda's

19   specialty was in RN babies postpartum nurse and that she works

20   12-hour days, meaning dayshifts, right?

21   A.  Amanda has five specialities and will be flexible to any

22   shift.

23   Q.  Okay.  But you can see from the spreadsheet the information

24   I just told you, right?

25   A.  Yes.

1  Q.  And you also have on this spreadsheet Amanda's personal

2  Gmail address, correct?

3  A.  Correct.

4  Q.  And you can tell how much money she was being paid from the

5  bill rate and the gross margin, correct?

6  A.  Which doesn't matter.

7  Q.  But you can see that on the spreadsheet, right?

8  A.  Yes, and I'm the one who created that.

9  Q.  As we can see from Exhibit 10, one of the first nurses you

10  tried to bring over from RNnetwork to AHS was Amanda Fobar in

11  California, correct?

12  A.  False.

13  Q.  Was she one of the second nurses you tried to bring over?

14  A.  False.  And she contacted me.  And she had -- on her resume

15  she had three places that she was actively working.  So I

16  didn't even realize that she was working with RNnetwork until

17  she said something when I got her an offer.  And then when she

18  told me who she was working with, her recruiter, I had her take

19  this exact offer through RNnetwork.  That's the kind of person

20  I am.

21  Q.  Just to make sure I understood your testimony, though, you

22  did try to make a placement for Amanda at AHS Staffing, right?

23  A.  Correct.

24  Q.  Okay.  So I want to direct your attention to Plaintiff's

25  Exhibit 23, which is in front of you.  Just let me know when

1  you have it.

2  A.  I have it.

3  Q.  Okay.  So if you can please turn to the last page of the

4  exhibit.  It's the text message dated June 23, 2023.

5  A.  Uh-huh.

6  Q.  You sent this text message to Emily asking if she is still

7  travel nursing and stating you would love to work with her

8  again, right?

9  A.  Correct.

10  Q.  And you also texted her that you are currently at AHS

11  Staffing in this message, right?

12  A.  Correct.

13  Q.  When you did not hear back from Emily, you then sent her

14  this second message on August 17th, 2023, stating, "Hi are you

15  still travel nursing?  I would love to work with you!  I have

16  17 years of experience," and again left your full name and that

17  you are at AHS, right?

18  A.  Right.

19  Q.  And then when you still did not hear back from Emily, on

20  the second page of the exhibit you sent her this third text

21  message stating, "Hi Emily, after 17 years I switched

22  companies.  Are you still travel nursing?"  And you left your

23  name, but this time you also left your cell phone and your AHS

24  Staffing email address, correct?

25  A.  That's my -- that's not my cell phone.  It was my work

1   number.

2   Q.   Okay.  This chain of test messages is pretty indicative of

3   the way you went and sought out business for AHS, correct?

4   A.   This is how I -- I'm a texter.  I don't call.  I text and

5   email.  So, yes, this is how I look for nurses.  And I guess

6   Emily must have been covering as my assistant for a little bit,

7   and I forgot and I had her in my cell phone.  So I was going

8   through referrals and texted her.  I thought she was a nurse.

9   Q.   So these test messages saying that you switched companies

10  and you're at AHS, this is the type of text message that you

11  were sending out through your cell phone to nurses that you

12  worked with at RNnetwork?

13  A.   No.  Every nurse.  Because again, my name is very well

14  known in the industry.  My cell phone is all over Facebook,

15  LinkedIn, everywhere.  So people ask me even now what company

16  you're with.  People follow me.  So I was letting them know the

17  company that I'm with now.

18  Q.   Okay.  So it is your testimony that you would send these

19  test messages to every nurse, the ones you worked with at RNN

20  and ones that may not have worked with you at RNN; is that your

21  testimony?

22  A.   I -- if I -- if they worked with me at RNnetwork recently,

23  I didn't send it to them.  When I left the company, yes, I did

24  tell people that I am no longer with RNnetwork.  And if they

25  asked me where I was, I let them know.  But, yeah, I'm going to

1  tell people where I'm working so they can contact me and

2  research the company to come on board.

3  Q.  So you kept texting Emily month after month even though she

4  never responded.

5  A.  Isn't that how you recruit?

6  Q.  I didn't ask the question.  My question is you kept texting

7  her month after month even though she never responded.  Is that

8  because you know that travel nurse assignments only last 12

9  weeks at a time?

10 A.  Correct.  And you have to keep calling, texting, emailing.

11 And that's how you eventually get to them.

12 Q.  Okay.  And do you have a record in your cell phone of all

13 the test messages you sent when you joined AHS just like this

14 one?

15 A.  Uhm, no.  AHS actually -- their text messaging system

16 worked really well.  So I texted a lot through their computer

17 system.  So they should have a record, yes, of my text

18 messages.

19 Q.  And did you use your personal cell phone to --

20 A.  Yes.

21 Q.  -- exchange text messages?

22 A.  Yes, I do.  My personal cell phone is my bread and butter.

23 People reach out to me on it all the time for work.

24 Q.  And do you -- did you preserve those text messages in your

25 cell phone?

1  A.   Yes.

2  Q.   So you still have them there today?

3  A.   Yes.

4  Q.   How much money did AHS make in gross margin from your

5  placements there?

6  A.   I have no idea.

7  Q.   How much money in commissions did you make at AHS?

8  A.   It's the -- they had a deal with me of -- a financial deal

9  where it had nothing to do with how many nurses I had for

10  six months.

11  Q.   And what was that deal?

12  A.   Uhm, I had a base salary of 50,000, and they gave me 3,000

13  in commission per month to bridge what I was -- you know, to

14  get me closer to the RNnetwork pay.  And then they would give

15  me a $10,000 bonus for ten nurses, another $10,000 bonus for 20

16  nurses, another $10,000 bonus for 30 nurses.  This is nothing

17  compared to what I was making with RNnetwork because of the

18  amount of years I worked for them, and they're basically making

19  me start from scratch financially.

20  Q.   When you were uploading information about RNnetwork's

21  nurses into AHS's system, did you upload the working and

22  awaiting spreadsheets to their system or just information about

23  each individual?

24  A.   If I added an individual, it was -- they contacted me and I

25  was adding them as their name and whatever information they

1  gave me.  I did nothing -- I did not upload anything like a

2  working and awaiting.

3  Q.  Did you save information about submissions in a different

4  place on AHS's system than where you saved the actual

5  placements?  In other words --

6  A.  Oh.  Did they have like a different file?

7  Q.  Yes.

8  A.  Yes.

9  Q.  Where did you save information that you uploaded about the

10 nurses you submitted for assignments in AHS's system?

11 A.  Uhm, it just automatically saves.  And you can talk to

12 AHS's law firm because they wouldn't give my lawyer a copy of

13 it.

14 Q.  Did you see the memo that Keela Briles drafted regarding

15 the conversation she had with an AHS employee about you?

16 A.  I -- I listened to it, yes.

17 Q.  Did you have 80 nurses submitted during your employment

18 with AHS Staffing?

19 A.  No.  And she was saying -- and if I recall, they were

20 saying 80 a week.

21 Q.  Were you given a company cell phone or computer at AHS?

22 A.  A computer.

23 Q.  Do you still have that computer?

24 A.  Yes.

25 Q.  You have not returned it to AHS?

1    A.   They haven't sent me a box.   I've asked them.

2    Q.   Okay.   You made President's Club at RNnetwork in 2022,

3    correct?

4    A.   Yes, many years.

5    Q.   And what did you have to do for that?

6    A.   Excuse me?

7    Q.   What did you have to do to make President's Club?

8    A.   It changes every year, but I don't remember exactly.   Maybe

9    2.5 million.   I don't remember.   You would have to ask someone

10   at RNnetwork.   It changes yearly.

11   Q.   Okay.   And I think your lawyer represented you made over

12   $615,000 in 2022 at RNnetwork; is that right?

13   A.   Correct.

14   Q.   Okay.   And you testified you were one of the company's top

15   producers, third in the country, correct?

16   A.   I didn't say third in the country.   I was between one and

17   three top recruited in like the last ten years.   But while

18   leaving, I was number three.

19   Q.   And isn't it true that you accomplished all of that using

20   the information that's residing in the working and awaiting

21   spreadsheets you sent to yourself?

22   A.   No.   That I became a top recruiter from the working and

23   awaiting list?

24   Q.   No.   Isn't it true that the information contained in those

25   spreadsheets is information you used to become one of the top

1  recruiters in the company?

2  A.   No.

3  Q.   In those working and awaiting spreadsheet is at least a

4  hundred of the nurses' information that you had on assignment

5  in March of 2023, right?

6  A.   Yes.

7  Q.   Okay.  So isn't that information that led to you being so

8  successful at RNnetwork?

9  A.   No.  The success is me, my expertise and my referrals, my

10  relationship building, okay?  Maybe what helps me is the jobs

11  that RNnetwork has so that I can bring these nurses into those

12  jobs.  But I taught myself.  I got two weeks of training back

13  in 2006.  I taught myself through sweat, tears, many hours,

14  working Saturdays, Googling information, speaking to other

15  recruiters, making forums with other recruiters, collaborating.

16  I'm the only recruiter at RNnetwork that trains other people to

17  become recruiters that are assistants.

18  Q.   Okay.  And just to be clear, the only place you ever worked

19  as a nurse recruiter prior to AHS was RNnetwork, right?

20  A.   Correct.

21  Q.   So everything you learned over the course of your 17 years

22  there you learned during your employment at RNnetwork?

23  A.   With trial and error.

24  Q.   Okay.  Now, you testified earlier that AHS Staffing does

25  travel nurse staffing, the same thing RNnetwork does, right?

1  A.   Yes.

2  Q.   Okay.  They're direct competitors, correct?

3  A.   Yes, except for they place a few more specialties than

4  RNnetwork does.

5  Q.   What are the other specialties that AHS places?

6  A.   Oh, like technologists, medical assistants.  You know,

7  different parts of the medical field.  They don't just place

8  nurses.

9  Q.   So why didn't you apply to work in a position staffing

10  something other than nurses?

11  A.   I placed medical assistants too.  I could do whatever I

12  wanted --

13  Q.   Okay.

14  A.   -- going in.

15  Q.   So you have experience placing medical assistants?

16  A.   Correct.

17  Q.   And that's not something you did at RNnetwork, correct?

18  A.   Correct.  It's the same thing as placing a nurse, just less

19  money and smaller margins.

20  Q.   So that's another type of job that you can perform while

21  complying with your obligations in your agreement with

22  RNnetwork, right?

23  A.   No.  My agreement with RNnetwork, especially the one that

24  you sent, basically -- the paperwork you sent after I was fired

25  said I couldn't work anywhere in health care at all.

1  Q.  Well, we'll look at that in a moment.  But when did you

2  apply for the position at AHS?

3  A.  Uhm, I applied there a couple weeks before I was hired, so

4  I want to say beginning to mid May.

5  Q.  Did you fill out an application?

6  A.  No.  They were given my name as a referral.

7  Q.  Who gave them your name as a referral?

8  A.  Dana Haley, but I also knew a couple of people that worked

9  there.

10 Q.  Okay.  So it is your testimony that AHS reached out to you

11 about a job?

12 A.  No.  Well, I don't know if you consider an employee of AHS.

13 Q.  Where did you work for AHS?

14 A.  Where?

15 Q.  Yes.

16 A.  Remotely.

17 Q.  Okay.  Were you working remotely at RNnetwork as well?

18 A.  Yes.

19 Q.  So just to go back to your --

20      MS. SCHWARTZ:  And I'm almost finish, Your Honor.

21 BY MS. SCHWARTZ:

22 Q.  -- to go back to your employment agreement, Exhibit2.

23      On paragraph 5, which is page 4 of the noncompetition

24 agreement.  I am not going to spend time going over this

25 because it's your testimony that you never believed this was

1  going to be enforceable anyway, right?

2  A.  Correct.

3  Q.  But if you look at it, it says that you would not be

4  employed by another entity that competes with the types of

5  staffing you were engaged in during your last three years of

6  employment with the company, right?

7  A.  Right.

8  Q.  And the type of staffing you were engaged in during the

9  last three years was travel nurse staffing, right?

10  A.  Right.

11  Q.  So you could have worked in any other area of health care

12  staffing, like medical assistant staffing that you were doing,

13  and not violate this agreement?

14  A.  There's no money in that, first of all.  And second of all,

15  whatever you sent me after I got separated said differently.

16  It said no health care whatsoever.  No physicians, nothing.  So

17  maybe you want to look at that paperwork again.  And --

18  Q.  So when you testified that the documents said you couldn't

19  work in any health care staffing, you're not referring to the

20  employment agreement, you were referring to a letter?

21  A.  It was part of the packet that was sent to me for

22  separation.

23  Q.  Okay.  Did you know that RNnetwork would view your

24  employment with AHS as a violation of its agreement?

25  A.  Yes --

1  Q.  Okay.

2  A.  -- in their eyes.

3  Q.  To be clear, in paragraph 5, the non-solicitation

4  provision, it gives a bunch of examples on the following pages

5  of the types of work you could work and not violate this

6  agreement.  Do you see that paragraph?

7  A.  Yes.

8  Q.  And it gives examples, right?  It says, by way of further

9  example, if the employee worked in, supported, managed,

10  et cetera, physician staffing, then the employee could not work

11  in physician staffing but could work in other types of

12  staffing.

13  A.  Again, what I was sent after separation was different, and

14  it said I cannot work in health care at all.  And this is all I

15  know for 17 years.  I'm the main breadwinner in my family, and

16  you're telling me to start a new specialty from scratch.

17  Q.  But now that we're looking at this agreement together, you

18  can see that the only type of work you are prohibited from

19  performing during the restricted period is nurse staffing,

20  right?

21         MR. HECHT:  Objection, Your Honor.  She's asking for a

22  legal opinion.  The document speaks for itself.

23         THE COURT:  Okay.  If we could just keep moving

24  forward on this one.  I think this has been asked and answered

25  a few times.

 1          MS. SCHWARTZ:  All right.

 2    BY MS. SCHWARTZ:

 3    Q.  So to direct your attention to paragraph 6, which is the

 4    non-solicitation of health care personnel or clients.

 5          Here you agreed that during the one year restricted

 6    covenant period you would not solicit, recruit, offer, or

 7    otherwise provide services that are the same as RNnetwork's to

 8    any current or prospective health care personnel with whom you

 9    worked during the last three years of your employment with the

10    company.  That's what it says, right?

11    A.  Right.

12          MR. HECHT:  Same objection, Your Honor.  She's asking

13    for a legal opinion.  The document speaks for itself.

14          THE COURT:  It certainly speaks for itself.  I don't

15    know what the ultimate question is.  If we could just get to

16    it.  I'll give you some leeway.

17    BY MS. SCHWARTZ:

18    Q.  And you worked with Amanda Fobar during your last three

19    years at RNnetwork, correct?

20    A.  Correct.  I know her as Mandy.

21    Q.  And you offered Amanda a position or to help her place her

22    somewhere in a position through AHS, correct?

23    A.  Correct, until I realized -- until she opened up and said

24    that she was working with RNnetwork, who her recruiter was.

25    And I gave on a silver platter the offer.  And she is currently

1  working at RNnetwork at that exact hospital in New Mexico

2  through them.

3  Q.  Did you work with Matthew Dean during your last three years

4  at RNnetwork?

5  A.  Yes.

6  Q.  And did you work with Alicia Marcia Billings during your

7  last three years at RNnetwork?

8  A.  Yes.

9  Q.  And you worked with Haley Hohnhorst during your last three

10  years at RNN, correct?

11  A.  Yes.

12  Q.  And there are other nurses that you worked with during your

13  last three years at RNnetwork who you reached out to for

14  business when you began at AHS?

15  A.  No, they reached out to me.  And we have paperwork signed

16  by them that they reached out to me.

17       MS. SCHWARTZ:  Okay.  I have no further questions.

18       THE COURT:  All right.  Let's take ten minutes, and

19  then we'll start up with cross.  Okay?  Thank you.

20    (Recess at 2:57 p.m.)

21    (Call to Order of the Court.)

22       THE COURT:  Okay, everyone.  Back on the record then

23  in CHG versus Rachel Shafer.

24       Any issues before we continue on with Ms. Shafer?

25       Okay.  Come on back up.

1          All right.  Ms. Shafer, you continue or you remain

2   under oath.

3          And Mr. Hecht, whenever you're ready.

4                    CROSS-EXAMINATION

5   BY MR. HECHT:

6   Q.  Good afternoon, Ms. Shafer.

7   A.  Good afternoon.

8   Q.  How would you describe your professional work for the last

9   17 years?  What have you done?

10  A.  I have found nurses and placed them into specific

11  positions.  Every 13 weeks they would change, depending on

12  where they wanted to go.  I would qualify them of course.  And

13  build relationships with them so that they would send me

14  referrals and stay with our company for the long run versus

15  company hop, which most nurses tend to do.

16  Q.  When did you start working as a nurse recruiter?

17  A.  2006.

18  Q.  And did you become a proficient nurse recruiter back in

19  2006?

20  A.  I had about two weeks training.  And then after a couple of

21  months of trial and error and experience, I started becoming a

22  stronger and stronger recruiter.  And about -- I would say

23  about six months I would -- I was one of the fastest.

24  Actually, I was the fastest growing recruiter that they had

25  back then, and I would consider myself proficient at that

1  point.

2  Q.  Now, you say you were the most proficient recruiter back in

3  2006?

4  A.  The fastest growing recruiter that they had back then.  And

5  an article was even written about me.

6  Q.  Are you saying there was an article that was published

7  about you back in 2006 about you being the fastest recruiter?

8  A.  Correct.

9  Q.  Okay.  And who was the article published by?

10  A.  The RNnetwork or at CHG.  Back then we had like a magazine.

11  Q.  Okay.  So CHG back in 2006 published an article that you

12  were one of the best recruiters?

13  A.  Correct.

14  Q.  Now, when you work as a nurse recruiter, how would you get

15  the nurses, the list of nurses to recruit?

16  A.  It depends.  When you're a new recruiter, you are dependent

17  on the leads that the company buys and whatever is in the

18  system as far as names and numbers.  As you grow your business,

19  you start to get more referrals.  And then that's how you would

20  get your prospects, candidates.

21  Q.  And when you say "referrals," can you please elaborate

22  exactly what you mean be by "referrals"?

23  A.  A referral is when a nurse is so happy with your work that

24  they bring and refer their friends and colleagues to you, and

25  they also get a referral bonus from the company for doing so.

1  Q.  Okay.  So you're saying that at some point when you become

2  more proficient, when you're not a new recruiter, you rely

3  mostly on referrals?

4  A.  Correct.

5  Q.  Did there come a point where you relied only on referrals?

6  A.  Yes.  I got -- I want to say the last about five years.

7  And it got to a point where in the last like two to three years

8  I had to tell them to stop sending me leads because I could not

9  handle the amount of people wanting to work with me.  I needed

10 to just work with the referrals.

11 Q.  Okay.  And when you say you asked them to stop sending me

12 leads, who do you mean by "them"?

13 A.  I asked my manager to shut off leads for that week for me,

14 and it would be every week that I would ask for that.

15 Q.  And that would be your manager at RNN?

16 A.  Correct.

17 Q.  Do you recall the specific name of the manager?

18 A.  Christine Pogey, Bill Cornhoff.

19 Q.  Okay.  So you would say for the last five years in RNN you

20 relied primarily on referrals?

21 A.  Correct.

22 Q.  Did you have any use from a nurse list at that time, for

23 the last five years?

24 A.  I didn't really need it because, again, the referrals were

25 so overwhelming.  But anyone can use a nurse list.  But like

1  again, I didn't even have time to call the leads from

2  RNnetwork's database, which is the nurse list, because I was

3  overwhelmed, didn't have time to even mass text them, I didn't

4  even have time to mass email them.  I was focusing on my own

5  referrals.

6  Q.  Okay.  And just to clarify, when you say you received

7  referrals, these are referrals that nurses bring directly to

8  you, right?

9  A.  Correct.

10  Q.  It's not that they bring it in general to the company, to

11  RNN?

12  A.  Correct.

13  Q.  They just refer to Ms. Shafer directly, correct?

14  A.  Yes, and I can use them with whatever company I am with.

15  Q.  Okay.

16  A.  Or if I wanted to be mean, I could just direct them to

17  another recruiter at another company, you know.  But, yeah.

18  Q.  Okay.  Now, you mentioned that back in 2006 when you

19  started working for RNN, you received some training, correct?

20  A.  Two weeks back then.  That's all you got.

21  Q.  Do you remember what kind of training you received back

22  then?

23  A.  Yes.  They basically teach you about the company and the

24  specialties.  And you do practice runs on finding jobs with the

25  nurses to talk about kind of errors that can happen or

1    difficult times, difficult questions.  And then you're

2    basically left on your own to just figure it out.

3         And there was a manager that, you know, would be there

4    if you had any questions.  But I had to learn myself.  I had

5    to -- I remember having -- crying at my desk because of me

6    getting a contract and another company stealing it from me, and

7    I didn't know what to do or how to go about it.  But you learn.

8    When something like that happens, you learn.  And I was able to

9    teach myself and become strong enough to train other people on

10   how I do it my way, which differs from other recruiters.

11   Q.  Now, when you say that after the first two weeks of

12   training back in 2006, did you receive any additional training

13   from RNN after that?

14   A.  Uhm, I don't recall, unless something new came out, like a

15   new gross margin calculator, a new law or something like.  I

16   don't remember any real sitdown trainings, unless it -- we had

17   to do some online trainings like for HR, but not formal this is

18   how you recruit.  I don't think it's something that you can

19   really teach.  You either have it or you don't.

20   Q.  Now, you've heard before some testimony about something RNN

21   calls core training for the first eight weeks.  Have you ever

22   received such a core training?

23   A.  No.  This is their new training nowadays, and they also fly

24   people to Utah to see the corporate office and do some kind of

25   training there.  I never had any of that.

1  Q.  And you also heard them say about something called core to

2  floor training?

3  A.  I've never seen or heard that, about that.

4  Q.  And there was also testimony about weekly or monthly

5  continuous training.  Have you ever received any weekly or

6  monthly continuous training with RNN?

7  A.  No.

8  Q.  Did RNN ever provide you with an instructions manual that

9  tells you how to recruit nurses?

10 A.  No.  I don't think there's such a thing for any company.

11 Q.  Okay.  How did you learn how to recruit nurses?

12 A.  Just -- I mean, I worked six days a week, even Saturdays,

13 when I started, and just called a million people and just,

14 just, just trial and error, you know.  You just see what things

15 work and what doesn't work.  And right now the industry is

16 changing again.  And you have to do the same thing, start from

17 scratch and teach yourself, and be open to making 100 phone

18 calls a day and really putting in the hours and time and

19 effort.  A lot of people don't want to do that, you know, in

20 the beginning.  And you just learn over the years.  Every day

21 you learn something new.

22 Q.  Is it fair to say that you learned nurse recruiting on your

23 own?

24 A.  Yes.

25 Q.  Now, you're aware in the complaint that RNN filed against

**App. 374**

1    you they claim that they taught you -- they provided you with

2    information that helps you make placements faster than RNN

3    competitors.

4    A.   No.  The only thing that would make it faster for a company

5    to place someone is the amount of jobs and connections that

6    they have with the hospital and how fast their internal staff

7    works.

8          RNN would take two days to send out my presentation,

9    which is unheard of.  A job is closed within hours.  I even

10   asked if I could learn how to do this myself and do it after

11   hours for free, and they would not let me.

12         Other companies, they let you send out your

13   presentation yourself.  So it goes directly to the hospital.

14   So they actually have the advantage versus RNnetwork because

15   their file gets their fastest.  The early bird gets the worm.

16   Q.   Okay.  So would it be an accurate statement to say that not

17   only was RNN not making your recruiting faster, but they

18   actually slowed down your recruitment process?

19   A.   Yes.  At one point they couldn't even handle the amount of

20   presentations I was, I was putting out, and they limited me to

21   four per nurse because they didn't want to teach me how to send

22   the files out myself, and they didn't have enough staff, or

23   they wouldn't ask their staff to work overtime, and it was

24   hindering my book of business and all around business.

25   Q.   Now, RNN is also alleging in their complaint against you

**App. 375**

1    that they've provided you with certain business strategies.

2    Did RNN provide you with certain business strategies?

3    A.   Maybe, but I didn't always listen to them because I just

4    had my own way that worked and that's why I was a successful

5    recruiter, and they didn't like that.   So I had my own

6    strategies that worked and brought in the 6.6 million.

7    Q.   So you say maybe they provided you with business

8    strategies.   Do you recall any specific business strategy that

9    they ever provided you?

10   A.   Not one that other companies wouldn't have.   Like they

11   wanted me to get the application in first, then the resume.

12   And for me that didn't work.   I got in the resume first, then

13   the application, which they didn't like.   You know, simple

14   things like that.   But there's -- there was no -- I didn't

15   follow any strategies.   I did things really my own way, which

16   is what set me apart from other recruiters.

17   Q.   Now, RNN is also alleging that they provided you with

18   market research.   Did RNN ever provide you with any market

19   research?

20   A.   I don't really know what that is besides -- no, I don't

21   really know what that is.

22   Q.   To the best of your understanding, what does "market

23   research" mean?

24   A.   Maybe they could tell me that other companies are not doing

25   well, that they're laying off, that jobs are low, hospitals are

1   wanting to hire personal.  But this is information that

2   everyone knows, right?

3   Q.  Do you recall ever using market research in your nurse

4   recruitment jobs?

5   A.  No.

6   Q.  Did you rely on any market research to help you with your

7   nurse recruiting?

8          MS. SCHWARTZ:  Objection, Your Honor.  She testified

9   she doesn't know what market research is and that didn't stop

10  the continuing questions on market research.

11         THE COURT:  Okay.  Mr. Hecht, if we can just move

12  forward, that would be great.

13  BY MR. HECHT:

14  Q.  Now, did RNN ever provide you with leadership training?

15  A.  No, I didn't want it.

16  Q.  So you were never involved in RNN's leadership training

17  program?

18  A.  No, I was never interested.

19  Q.  Okay.

20  A.  It was offered to others, whoever wanted it, but I was

21  never interested.

22  Q.  So you were never interested and they never provided you an

23  actual leadership training course, correct?

24  A.  Correct.

25  Q.  Did RNN ever provide you with employee coaching and

1  development?

2  A.   Uhm, things that they did call, like a writeup that they

3  would call a coaching and development, but it's -- with my

4  issues, there was no real coaching and development really

5  there.  I mean, I didn't communicate to people.  Because

6  they're saying I have a communication issue.  I do not

7  communicate with people over the phone.  I only email and text.

8  So anything that you look for should be in writing, first of

9  all.  And I -- there was no real coaching, no.

10 Q.   Okay.  So the only thing you can think of that's coaching

11 and development are those writeups you're talking about?

12 A.   Yes.

13 Q.   Can you explain what those writeups you're referring to

14 are?

15 A.   Uhm, like the ones that said that I'm having issues with

16 communication, that -- I mean, maybe a coaching would be that I

17 should take a deep breath before I send an email.  But,

18 obviously, that's a common thing, you know.  It's not real

19 coaching.

20 Q.   Now, did RNN provide you with any cost control strategies?

21 A.   No.  I was a senior recruiter, so I could create whatever

22 pay packages I pretty much needed to.  And if it was at a

23 certain level where I needed to ask for a sign-off, I would

24 just have a manager sign off on it.

25 Q.   But they never provided you any training about cost

1 control?

2 A.   No.

3 Q.   Okay.  Now, is it fair to say that in order for you to do

4 your job you just had to use common sense?

5 A.   No.  It takes common -- it takes common sense, but it also

6 takes experience.  You know, it does take knowledge.  You need

7 to learn a lot about the industry and the nurses.  I went to

8 nursing school, so I know also a lot more than the average

9 RNnetwork person.  I am on the level of the nurse manager

10 there.  When there is clinical issues that happen, I know

11 what's going on, what to say.  I know where a certain nurse can

12 work that might be a different label than their initial

13 specialty, where a new recruiter or another recruiter wouldn't

14 know this.  So I have that background as well that makes me a

15 stronger recruiter.  Most nurse recruiters are not nurses

16 themselves.

17 Q.   So is it fair to say that being a nurse yourself helped you

18 with your nurse recruiting job?

19 A.   Definitely.  And I keep my license up to date for the fact

20 that they can look it up and see that.  And that is a huge

21 thing that does help me become successful or be successful is

22 that they see that I know what it feels like to work nights on

23 a unit; when you get too many patients, what to do; when you

24 get too many patients, what to do when something's happening

25 incorrectly in the hospital and how to react.  So I know all of

1    these, all these things.

2    Q.  Okay.  And just to be clear, did RNN train you to become a

3    nurse?

4    A.  No.

5    Q.  Okay.

6    A.  I got a full scholarship and went to nursing school when I

7    was working at RNnetwork.

8    Q.  And you became a nurse prior to 2012?

9    A.  Correct.

10   Q.  And RNN did not pay for your nursing school, correct?

11   A.  Correct.

12   Q.  Now, let's talk about your compensation at RNN.  How were

13   you compensated by RNN?

14   A.  Well, now that I speak to other companies, not fairly at

15   all.  They give you a very low percentage.  They started me at

16   35,000, which most companies start you out 50.  And they only

17   give you up to 8.75 percent of the commission, whereas my last

18   company gave 15 percent.

19   Q.  So is it fair to say that your compensation consists of

20   salary plus commission?

21   A.  Yes.  Primarily commission.

22   Q.  Okay.  And how much was your salary in the last year you

23   were at RNN, just the base salary?

24   A.  Uhm, I'm sorry, I forgot.  But it's either between 50 or

25   53, somewhere around there.

1  Q.  And how much have you earned in commissions in 2022?

2  A.  About 600,000.

3  Q.  Okay.  Is it fair to say that your primary income at RNN

4  was commissions, correct?

5  A.  Correct.

6  Q.  Now, how was your commissions calculated?

7  A.  By the amount of nurses that I had working that one month.

8  And so -- and how much money they brought in.  And depending on

9  the amount of money after things were subtracted for, you know,

10 costs, they would put you into a tier of -- you know, 100,000

11 to 150 would be this percent, 200,000 to 250 would be this

12 percent.  But the top I think was 8.75 percent, which is super

13 low in the industry.

14 Q.  Okay.  Now, you mentioned that there were certain tiers

15 that you would be broken down to.

16 A.  Yes.

17 Q.  Can you describe a little -- in more detail how those tiers

18 are calculated and what do you mean?

19 A.  Uhm, I don't really know how they calculate them, but it's

20 basically from -- if you bring in zero dollars -- they have a

21 little chart.  From zero dollars to 50,000, then you make this

22 percentage.  And it goes up and up until you get to

23 8.75 percent.

24 Q.  Okay.  And does zero dollars to 50,000, or whatever tiers

25 we have, are they on an annualized basis?

1   A.   Monthly.

2   Q.   Okay.

3   A.   So month.  It's what you bring in that month.

4   Q.   Okay.  So what was the standard process used at RNN to pay

5   you those commissions?

6   A.   They always paid it a month behind.  So they would have to

7   analyze, you know, what hospital didn't pay or any penalties,

8   take that out, and then they would pay you the following month

9   on the percentage that you brought in for that amount of money

10  that the nurses brought in for that month.

11  Q.   Okay.  Now, is it true that while you were paid

12  commissions, you would regularly receive a report called gross

13  margin details?

14  A.   Yes.

15  Q.   Okay.  And that was a monthly report that you received from

16  RNN?

17  A.   Yes.

18  Q.   Okay.  And what was the purpose of that report?

19  A.   So you can see who you're being paid on and any things

20  that -- any items, line items where you lost money for that

21  particular nurse.  Like if the hospital didn't pay for

22  orientation or the nurse didn't go to the assignment, the

23  hospital charges you a $2,000 penalty, that would come out of

24  your final number.  So that's the report that would get sent

25  every month.  But a lot of times it was inaccurate.

1   Q.  Okay.  So the gross margin report that you received would

2   reflect the amount that RNN wants to pay you for that

3   particular month; is that correct?

4   A.  Yes.  And there's no way to know if it's really correct or

5   not, honestly, because they could put whatever numbers they

6   want.  There is no way for a person to really 100 percent know

7   if the numbers are correct.

8   Q.  Okay.  Now, did RNN also send you working and awaiting

9   reports?

10  A.  Every Monday, yes.

11  Q.  So when you say you received that report every single

12  Monday, how long back would you say you started receiving those

13  working and awaiting reports?

14  A.  From day one.  Once you place a nurse, you get a report.

15  That's all of your nurses that are on assignment.

16  Q.  Did you have to make a specific request to get the working

17  and awaiting?

18  A.  No, it's my -- it's sent to the recruiters.  But it was

19  sent to my assistant every Monday, and she would correlate

20  it -- sort it, I should say, by start and end date, the way I

21  wanted, and send it to me.

22  Q.  Okay.  Did every nurse recruiter at RNN receive a working

23  and awaiting report?

24  A.  If they had nurses, yes.

25  Q.  Okay.  So this was a standard business practice in RNN to

1   send the working and awaiting report to every nurse recruiter

2   on a weekly basis?

3   A.  Correct.

4   Q.  Okay.  And what was your understanding of the purpose of

5   the working and awaiting report?

6   A.  Twofold.  One is to see which nurses I have that are ending

7   so I know to find them a new assignment.  It's just easier to

8   see.  It's right there next to me.  And also for me to remember

9   to touch base with them, keep in close contact.  I have a list

10  right here.  And also I used that report to compare to my

11  commissions report to make sure that my commissions were

12  correct, that no names were left off.

13  Q.  Okay.  So would you say -- would it be fair to say that the

14  working and awaiting report was used as a tool to reconcile

15  whether the commissions on the gross margin reports reflect the

16  accurate -- reflect accurately the nurses that you had that

17  particular time period?

18  A.  Correct.

19  Q.  Now, I believe you testified before that you're more a

20  paper person, you're not such a text savvy person; is that

21  correct?

22  A.  Correct.

23  Q.  Okay.  So you like to work pen and paper?

24  A.  Yes.

25  Q.  More than technology, right?

1    A.  Correct.

2    Q.  How would you describe your level of sophistication working

3    with Excel?

4    A.  Bad.

5    Q.  Very bad?

6    A.  I mean, I really know Word.  When it comes to like DocuSign

7    and Adobe, I'm very bad.  This is why I have assistants.  I

8    learned the program from the company and I've become an expert

9    on that, but I have never been good with Excel and stuff like

10   that.  And that's -- your assistants are there to do that, to

11   sort it, to -- I shouldn't be spending time on this.  I should

12   be spending time on recruiting, right?

13   Q.  Did RNnetwork ever provide you a course in Excel?

14   A.  No.

15   Q.  Did RNN provide you a course in any technology?

16   A.  No.  Well, Bullhorn, but it was -- it changes from time to

17   time.  But, yes, when we got a new system, we got a fast

18   training on that system.  It's their computerized system that

19   they use for their company.

20   Q.  Okay.  Can you describe your standard practice of what you

21   did on a regular basis once you received the working and

22   awaiting report?  What did you do next?

23   A.  I would check who's ending, who's ending first, and know

24   that that's who you need to start communicating with at a

25   higher level and start looking for jobs.  I would write notes

1    on it of who I know who was going perm, who I already found an

2    assignment for.  And what else?  It has been a while since I've

3    used one.

4    Q.  How about as it relates to your commission; what did you do

5    as far as reconciling it with your commissions?

6    A.  See -- I would compare it and see if any names were missing

7    from the commission report that were on the working and

8    awaiting.

9    Q.  Okay.  Now, when you made these comparisons, did you make

10   the comparisons like in Excel or on your computer or you made

11   it on --

12   A.  Paper.

13   Q.  -- pen and paper?

14   A.  Paper.

15   Q.  So in order for you to be able to make comparisons based on

16   your level of knowledge with Excel or systems, it was necessary

17   for you to print those reports?

18   A.  Yeah.  I just like to write notes and put it side by side

19   and be able to highlight.  You know, I find that much easier

20   than the computer screen.

21   Q.  Okay.  Now, in your experience history with RNN, did

22   anybody ever at RNN tell you that you are not allowed to print

23   any reports?

24   A.  No.

25   Q.  Are you aware of any company policy at RNN that prevented

1  employees from printing any documents?

2  A.  No.

3  Q.  Okay.  Was it standard practice in the company for

4  employees to print documents?

5          MS. SCHWARTZ:  Objection.  Calls for speculation.

6          THE COURT:  Okay.  Only if you know.  I mean, I know

7  you work remotely.  So if you don't know, don't answer.

8          THE WITNESS:  Well, I know I was trained from day one

9  by my manager to print those reports, put them on a clipboard,

10  and how to look for things and mark things when I signed a

11  contract.  So I would keep track to be able to see that

12  everything the following week was calculated for it.  If it

13  wasn't, to follow up on.

14          And even back in the day I used to use files and write

15  everything by hand because the number one recruiter who I

16  watched and learned from did that.  And that just worked for

17  me.  And when I had to switch to computer, it was difficult.

18  But I did, you know, switch to non-paper.

19          But those two reports, to the last day -- to the last

20  week I was there, on my clipboard, right by my desk, you know.

21  I wrote notes for myself.

22  BY MR. HECHT:

23  Q.  Okay.  So you say not only was it not against public

24  policy -- against company policy to print, but you were

25  actually trained by your boss to print?

1   A.   Correct.

2   Q.   Okay.  Now, did you have a problem printing these reports

3   from your RNN email account?

4   A.   Yes.  I don't know why I had issues with Outlook.  So I

5   would have to -- I would sometimes even have issues with Gmail.

6   But it was easier for me to print from Gmail.  And that's why I

7   would send it to my Gmail and print it on my computer.

8   Q.   So in order to print the file, you had to first forward it

9   to your Gmail account?

10  A.   Yes.

11  Q.   And you were not aware of any other way to get this file

12  printed unless you forwarded it first to your Gmail account,

13  correct?

14  A.   Yes.

15  Q.   And can you explain why were you able to print it from your

16  Gmail account?  What was different about your Gmail account

17  that was not available on your RNN account?

18  A.   It's something with any phone.  I don't know what it is.  I

19  had the same issue with AHS where I couldn't even sometimes

20  email like a picture or something to myself to the AHS account.

21  I would have to send it my Gmail to AHS.  And I did that there

22  too.

23  Q.   Would you -- would it be fair to say that your -- that it's

24  easier for you to work with Gmail versus another email

25  provider?

1   A.  Yes.

2   Q.  And that's the reason you forwarded it to your Gmail

3   account?

4   A.  Yes.

5   Q.  Okay.  And was it customary practice for you to forward it

6   to your Gmail account?

7   A.  Yes, I did everything.  Like if a nurse texted me a

8   document or a communication, I would forward it to my Gmail and

9   send it to the work account and then copy it into their system,

10  copy and paste it and make it a note into their system.

11  Q.  Now, you heard testimony here from RNN where they said that

12  they did a search in your sent box and they only found emails

13  from March 9, 2023, where you forwarded the working and

14  awaiting email to your personal account; is that correct?

15  A.  That's not correct.  We even have reports from I think

16  '21 where I have done the same thing.

17       MR. HECHT:  Okay.  Your Honor, I would like to

18  introduce at this time rebuttal evidence to show that she's

19  done that practice of forwarding to her personal account before

20  March 9, 2023.

21       THE COURT:  Okay.  So when you say "rebuttal

22  evidence," what is it?

23       MR. HECHT:  We have emails dating back prior to

24  March 9 where she has forwarded to her personal Gmail account

25  more than a year before that.

1          THE COURT:  Okay.  Show it to opposing counsel.  Let

2    her take a look, number one.  Number two, I don't know if

3    you're contesting that even.  I'm not sure.

4          MS. SCHWARTZ:  I haven't seen it.  But she did testify

5    that she destroyed all prior copies and only has the week ten

6    and week six, but here we are.  So I don't know.

7          THE COURT:  Well, take a look and let me know.

8          THE WITNESS:  Your Honor, may I have a tissue, please?

9          THE COURT:  Oh, yes.

10          MS. SCHWARTZ:  I suppose I object to this document.

11    It's not an appropriate rebuttal document because it's a

12    completely different -- it's a commission detail sheet, as

13    opposed to the working and awaiting sheet.

14          THE COURT:  Okay.  So here's what I'll do.  Noting

15    that objection, I'm going to allow you to get into it,

16    Mr. Hecht.  But, you know, obviously I'm going to give you some

17    brief redirect as to that difference, if you need to go into

18    it.  Let's see what happens.

19          MR. HECHT:  Okay.  May I approach?

20          THE COURT:  Sure.

21    BY MR. HECHT:

22    Q.  Ms. Shafer, do you see here there's an email that's -- that

23    you forwarded to me, but it's also dated -- the original email

24    is dated May 23, 2022?

25    A.  Yes.

1    Q.   And who's the sender of that email?

2    A.   I am.

3    Q.   Okay.  And which email account did you use as the sender of

4    this email?

5    A.   Uhm, my RNnetwork to my Gmail.

6    Q.   Okay.  Would this be an example that back in May 23, 2022,

7    you have forwarded an email with your commission details sheet

8    to your personal Gmail account?

9    A.   Yes, I would -- like I said, anything that I thought was

10   important, I would send it to Gmail and keep it.

11   Q.   Okay.

12            THE COURT:  So, Mr. Hecht, and I'll let you get into

13   this as much as you want, but the only issue I have looking at

14   this document, although I will let it into evidence, is I don't

15   think plaintiff has any problem with this.  I think what they

16   have a problem with is not commission detail sheets, but

17   it's --

18            MS. SCHWARTZ:  Working and awaiting.

19            THE COURT:  -- these things.

20            MR. HECHT:  We will introduce evidence to that effect,

21   too.  But I want to first demonstrate that this was a standard

22   business practice that she did back before she even -- before

23   firing was even contemplated.  That was not the purpose of her

24   forwarding the emails.  She just forwarded it because she had

25   to print it, and we can see evidence the year before she also

1    did it.

2         THE COURT:  But again, there's a big difference

3    between this and this.  So, look, I'll let you get into it.

4    But, again, I don't think this is an issue.

5         MR. HECHT:  Plus, Your Honor, I think during the

6    course of these proceedings they've changed positions.  But in

7    their complaint they're alleging that the commission details

8    report was also a trade secret.

9         THE COURT:  Okay.  Fair enough.

10        MR. HECHT:  I think during the course they have

11   changed positions, but initially -- in the complaint, in the

12   motion for preliminary injunction, in both of these they

13   presented that this document is a trade secret.

14        THE COURT:  Okay.

15   BY MR. HECHT:

16   Q.  So Ms. Shafer, does that email reflect that back in May of

17   2022, more than a year ago, you forwarded an email with some

18   commission details to your Gmail account, correct?

19   A.  Yes.  And it's very similar to the working and awaiting,

20   this report, which is why I compared the two.

21   Q.  Okay.  Did anybody threaten to fire you at RNN back in May

22   of 2022?

23   A.  No, not that -- not that I recall.

24   Q.  Okay.  Can you think of the reason why you forwarded that

25   email to your Gmail account back in May of 2022?

1   A.  To print it.

2   Q.  Okay.  So the same reason you forwarded it on March 9,

3   2023, right, to print it?

4   A.  (No audible response.)

5   Q.  Is that a "yes"?

6   A.  Yes.  Sorry.

7   Q.  If you can, because we have a court reporter.  So if you

8   can, instead of nodding, answer verbally.

9           MR. HECHT:  Your Honor, opposing counsel has

10  introduced a document electronically that they have gone

11  through on the computer.  We want to be able to demonstrate the

12  same document.  We didn't get electronic copy of it.  So I want

13  to ask if we can get that document to present it to the witness

14  to go over with electronic version.

15          We talked about the working and awaiting document

16  that's --

17          THE COURT:  Here's the issue.  It's going to have to

18  be under a confidentiality order.  That's the exact document

19  they don't want anyone else to have.  But I guess what we could

20  do is rather than sending it to you, I could have you all put

21  it on the screen and then Mr. Hecht could ask the questions.

22  That way you retain --

23          MS. SCHWARTZ:  Your Honor, it's Exhibit 5 on his

24  exhibit list.  He has it.

25          THE WITNESS:  This.

1          MR. HECHT:  But I don't have the exact version that

2    she introduced.  I can introduce a copy that's similar to that

3    one that was forwarded to me, but I really want to go over that

4    particular exhibit.

5          If you will stipulate that the copy I sent over to

6    myself is the same one, then I can go ahead and use mine.

7          MS. SCHWARTZ:  You never produced yours to us, but I

8    don't see why it would be different.

9          THE COURT:  All right.  I mean, if you want to do it

10   that way, we can do it that way.  But we really need to keep

11   moving.  So you want to use the computer screen then from your

12   table?

13         MR. HECHT:  Yes.  Can I use this microphone instead?

14         THE COURT:  Sure.

15   BY MR. HECHT:

16   Q.  Ms. Shafer, you see here is an email that was previously

17   introduced into evidence, which is dated March 9, 2023?

18   A.  Yes.

19   Q.  And the title of the email is "Working and Awaiting Week

20   10," correct?

21   A.  I don't see the title.  Oh, yes.

22   Q.  And again, this is an email that was forwarded from your

23   RNN account to your Gmail account, correct?

24   A.  Correct.

25   Q.  Now, you see in the bottom the origin of the email, it's

1  coming from a person by the name of Jessica Eichel?

2  A.  Yes.

3  Q.  Who is Jessica Eichel?

4  A.  My main assistant.  And Abraham at the time was the second

5  assistant who was cc'd, I believe.

6  Q.  And is this similar to the reports that you received on a

7  weekly basis --

8  A.  Correct.

9  Q.  -- with working and awaiting?

10  A.  Correct.  And as you can see, she writes that the other

11  report's not ready yet so she's going to send it to me a little

12  bit later.

13  Q.  When she was referring to the other report that's not ready

14  yet, which report is she referring to?

15  A.  Travel on assignment, TOA.

16  Q.  You see in the bottom of the email there's an attachment

17  that's called "Working and Awaiting"?

18  A.  Yes.

19  Q.  Let's open that email.

20  A.  And as you can see, it's only my name.  And she takes out

21  different columns that we just don't need or -- even emails.

22  See, she makes it small.  So I don't have the email when I

23  print it, as you can see here.

24  Q.  So is this the format you received that file?

25  A.  Yes.

1   Q.   Okay.

2   A.   I like to see who's ending first, as you can see, so I can

3   start working with them first.  And she makes it smaller so

4   that it fits on one page.  This report is usually legal size

5   and has more information on it.

6   Q.   If you go down to the bottom -- and I think Google Sheets

7   helps you out with that.  If you look at the bottom on the

8   number of records that you see in that file, how many records

9   are in that file that you received?

10  A.   113.

11  Q.   Okay.  And you see on column G of that file it has your

12  name on it?

13  A.   Correct.

14  Q.   What does column G reflect on that file?

15  A.   The recruiter who signed the contract for all these nurses.

16  Q.   Okay.  So it would be fair to say that when you opened the

17  file, you saw a list of about 113 nurses that you recruited?

18  A.   Correct.  Some of them are going to be duplicated here if

19  I've booked multiple assignments for them.

20  Q.   So it may not be 113 unique nurses, correct?

21  A.   Correct.

22  Q.   Okay.  But would it be fair to say that at that time, back

23  in March of 2023, this reflected an active list of nurses that

24  you were working with?

25  A.   Correct.

1  Q.  Okay.  And would be fair to say that the information you

2  see on that sheet was necessary for you to be used to reconcile

3  whether you received proper commission for these nurses?

4          MS. SCHWARTZ:  Objection.  Your Honor, he converted

5  this document into some Google Sheet thing that is not the

6  Excel spreadsheet that was attached to her original email.  So

7  all of these questions pertain to this manipulated document

8  that is not the actual document she had emailed.

9          THE WITNESS:  But that is what --

10          THE COURT:  Hold on.

11          So Mr. Hecht, talk to me about that.  And it's pretty

12  obvious that this is converted because what plaintiff's counsel

13  put on the screen didn't go from 1 to 113.  It skipped numbers

14  throughout the 2,500 people.  And so this is clearly a

15  converted document.  Talk to me about that.

16          MR. HECHT:  Right.  Your Honor, we are using here

17  Gmail to access these files.  It's the same Gmail account that

18  was forwarded to her.  Gmail has a default function.  When you

19  click on a file, Gmail will pick what software to open the file

20  in.  This is obviously an Excel file.  As we can see, it ends

21  with xlxs.  Google has an Excel file reader.  It's not a

22  different file.  It's exactly the same file.  It's just a

23  different tool that's used to open that file.

24          THE COURT:  So --

25          MR. HECHT:  Whereas they can use Excel to open the

1   file, we're using here a Gmail software which comes by default

2   with a Gmail account to open these types of files.  But it's

3   exactly the same file.

4        Now, we will get to the point why it's counting is a

5   little different.  Your Honor, we'll get to that point.

6   Because what's obvious in this file, that there is some kind of

7   a setting of this file that somebody with some technology --

8   someone with some technological background has to understand on

9   how to remove that setting to see a lot more than 113 records.

10        THE COURT:  Okay.  So what you're saying is when

11  Jessica or Abraham forwards this email to Ms. Shafer, she

12  clicks on it in her Gmail, and that's what comes out.

13        MR. HECHT:  That's exactly what's coming up.  Yes,

14  Your Honor.  And I'm also using a Gmail account.  That's why I

15  think -- it reflect accurately exactly how the Gmail software

16  works.

17        THE COURT:  Okay.  I'll hear the testimony, and this

18  will all be part of the argument then.

19        MR. HECHT:  Okay.  The Internet keeps disconnecting.

20        THE COURT:  That's fairly normal here, unfortunately,

21  but you should be okay.

22  BY MR. HECHT:

23  Q.  So Ms. Shafer, to the best of your knowledge when you

24  received this file and you clicked on it, the same way I'm

25  clicking on it right now, you saw here 113 records, correct?

1   A.   Correct.

2   Q.   Were you aware that there is any way you can modify this

3   file to see more than 113 records?

4   A.   Not at all.  I didn't even think about it because, again,

5   my assistant formatted it for me and so why would I get

6   anyone's information or I don't even know why RNnetwork would

7   make that available to everyone.  And half of this stuff I

8   don't even need to know.  I need to know their name, the

9   hospital, the start and the end date.  That's it.

10  Q.   So on March 9, 2023, when you received this file, did you

11  print it out?

12  A.   Yes.

13  Q.   And when you printed out this file, did you print out the

14  113 records on this file?

15  A.   No, it's usually about five pages.

16  Q.   So it was about five pages total --

17  A.   Yes.

18  Q.   -- that came out when you printed this file, right?

19  A.   Correct.

20  Q.   Do you know approximately how many records you have on each

21  page?

22  A.   No.  It depends on how thick the lines are, the way she

23  spaces it.

24  Q.   Okay.  You think you have like a thousand records on one

25  page?

1   A.   No.

2   Q.   It's more like 20 or 25 records per page?

3   A.   Maybe 25, yeah.  25.  Or you could just -- yeah, about 25.

4   Q.   Okay.  And you said you printed out this document in five

5   pages, correct?

6   A.   Correct.  Four to five, yeah.

7   Q.   And what was the purpose of printing out that document?

8   A.   For me to be able to highlight and write notes on it.  You

9   know, who I've already placed, who I need to work on that week.

10  It was my, my, my week's main focus to work through these two,

11  not lose any nurses.

12          So like Catherine Finch would be the first person I

13  would need to focus on to not lose her to another company, to

14  find her an assignment right away.  So I know Katherine,

15  Priscilla, and Danielle I have to focus on.

16          And then I -- I like the hospital names so that if

17  they call me, I can just quickly see where they're working at

18  without having to look it up in the system and be able to talk

19  to them about their assignment.

20          But I don't really use anything else on this

21  spreadsheet at all.  I don't need to know the GM.  I'm the one

22  who created that.  I don't need to know the bill rate.  That

23  fluctuates on a daily basis.  I don't need to know any of these

24  other names.  I don't need to know their shifts.  That changes

25  all the time.  And I pretty much have their specialities and

1   what they like memorized.

2   Q.  Now, you emailed this document to yourself back in March 9,

3   2023, correct?

4   A.  I believe so.

5   Q.  And you were fired from RNN on March 30, 2023, right?

6   A.  Uhm, was it March or April?

7   Q.  I believe -- the complaint at least alleges that you were

8   fired on March 30, 2023.

9   A.  Okay.

10  Q.  Now, between March 9th and March 30th did you continue to

11  work for RNnetwork?

12  A.  Yes, a lot of hours.

13  Q.  You continued to recruit nurses for RNnetwork?

14  A.  Yes.  I was actually in shock when they called me after my

15  vacation, two days after my vacation to let me know that we

16  were separating.

17  Q.  So you printed out this document for the purpose of

18  recruiting nurses for RNnetwork, correct?

19  A.  Correct, and to match up with my commission sheets.

20  Q.  Now, you see here in column G the first row says -- I

21  believe it says "Recruiter."  It may be a little bit cut out.

22  But you see the word "Recruiter" there?

23  A.  Yes.

24  Q.  You see next to the word "Recruiter" there is a little

25  icon?

1   A.   Uh-huh.

2   Q.   Do you know what that icon is?

3   A.   No.

4   Q.   Do you have any idea what this icon represents?

5   A.   No.

6   Q.   Have you ever --

7   A.   The only thing I know that -- is that you can press on

8   start and end date and it will move the numbers.  But then even

9   that, like I'm scared to do that, that it's going to put the

10  names not in order with the information.  So I don't touch

11  anything.  If it's sorted the wrong way, I go back to the

12  assistant and say it's sorted the wrong way, please redo it and

13  send me a copy.

14  Q.   Now, I'm trying to click now this little icon and nothing

15  happens.  So let's open it in Excel.

16       Okay.  So you see now when I open this file in Excel,

17  you see -- can you see next to "Recruiter" there is a copy of

18  the same little icon, correct?

19  A.   Yes.

20  Q.   Okay.  Now, here if I click on the icon, you see in the

21  bottom, you see there's a section that says "Sort" and then

22  there's another section that says "Filter"?

23  A.   Uh-huh.  Yes.

24  Q.   Okay.  See if I go to "Filter" and I say "Select All,"

25  okay --

1   A.   Uh-huh.   Yes.

2   Q.   -- now the file becomes a lot bigger?

3   A.   Yes.   I didn't know this.   I never manipulated the files.

4   So the second that I got it it went to the printer.

5   Q.   Okay.   Let's go down here to demonstrate how big the file

6   is once we removed the filter on that file.   You see now, if

7   you look at the bottom, how many records do we have in this

8   file?

9   A.   2,467.

10  Q.   Okay.   Were you ever aware that this file has 2,467 records

11  on it?

12  A.   No, and I don't think it's a good idea that they even make

13  a file like this and send it to every recruiter.   It should be

14  your person information only.

15  Q.   Okay. I think I'm done with this.

16       You recollect that the day you were fired from RNN,

17  they sent you an email telling you certain steps you should

18  take after your termination, correct?

19  A.   Correct.

20  Q.   And do you recall in that email they told you that you

21  should return your computer?

22  A.   Yes.

23  Q.   Did you return the computer?

24  A.   It took me weeks.   I kept asking them to send me a box, and

25  then they finally, after the second or third phone call, yes,

1  sent it, and I sent all of their stuff back.

2  Q.  So you returned the computer as they instructed you?

3  A.  Correct.

4  Q.  Okay.  Did that email identify any data that you have that

5  they want you to delete or return?

6  A.  No.  They even went ahead -- and I used to have a Google

7  Sheets spreadsheet that I created on my own, in my own personal

8  Google Sheets, and the second that I was let go, they deleted

9  it on their own.  So, you know, like I didn't think anything

10  was being done wrong or that I had anything that was illegal.

11  Q.  Okay.  Now, later on they sent you a -- some kind of a

12  cease and desist letter?

13  A.  Correct.

14  Q.  Did you recall RNnetwork ever identifying in that cease and

15  desist letter any particular file that they want you to delete?

16  A.  No.

17  Q.  Okay.  Now, let me ask you this.  Had they identified the

18  working and awaiting and they told you that this file has 2,400

19  records in it, would you have deleted that file?

20  A.  Of course.

21  Q.  Okay.  Now, let me ask you this.  Sitting here today after

22  I've demonstrated to you the file and showing you that there's

23  a way to manipulate this file to see more than 113, but you can

24  see the whole 2,400 nurses from RNN, do you agree to delete the

25  file?

1   A.   Yes.

2   Q.   And do you agree also to delete every single working and

3   awaiting work file you ever received from RNN?

4   A.   Yes, except for the ones -- I would like you to have the

5   last couple ones to keep in your possession to make sure that

6   I'm still being paid correctly.  We need to figure out what I'm

7   being owed financially.  But I can delete it from my

8   possession, yes.

9   Q.   Okay.  Now, you know RNN made allegations that you have

10  used their file working and awaiting to recruit nurses for AHS?

11  A.   I'm aware of the allegations, but they are not true.

12  Q.   Did you in fact use the working and awaiting file from RNN

13  to recruit nurses for AHS?

14  A.   No.  It didn't even have their phone numbers.  What good

15  use of that?  Most nurses don't even respond to emails.  But,

16  no I did not bring that into the office space.

17  Q.   Okay.  Did you use the working and awaiting file for any

18  purpose other than reconciling your commission after you were

19  terminated from RNN?

20  A.   No.

21  Q.   Now, is it true that after you were terminated from RNN,

22  they sent you commission reports to your personal Gmail

23  account?

24  A.   Yes.

25  Q.   And is it true that RNN sent you the gross margin detail

1    report to your Gmail account?

2    A.  Yes.

3         MR. HECHT:  Your Honor, I would like to introduce an

4    exhibit that's on our exhibit list, which is an email dated

5    May 1 from Mary Coombs addressed to Ms. Shafer's personal Gmail

6    account.

7         THE COURT:  Any objection?

8         MS. SCHWARTZ:  No objection.

9         THE COURT:  Okay.  Just for recordkeeping purposes,

10   what did you want to call this?  What number?

11        MR. HECHT:  I believe that will be Exhibit 2.  You

12   know what, Your Honor?  I think, depending on how we going to

13   treat the previous exhibit that I introduced, the email which

14   is a replica of the file they sent us but we used our own

15   version, I don't know if the Court wants to see it as a

16   separate exhibit or refer as the same exhibit number the

17   plaintiff used.

18        THE COURT:  To the extent that it could potentially be

19   different because of the opening it up through the Gmail

20   application, I guess you should just have it in on your side of

21   the case.

22        MR. HECHT:  So we will use that as Exhibit 2, and this

23   will be our Exhibit 3.

24        THE COURT:  Okay.

25

1        (Received in evidence Defendant's Exhibit(s) 2 and 3.)

2    BY MR. HECHT:

3    Q.  Ms. Shafer, you see this email that was sent to you by Mary

4    Coombs on May 1, 2023?

5    A.  Yes.  And if you can see, I saved and had trouble opening

6    up this file.  That's how great I am with IT stuff.

7    Q.  So she sent you this file first in a different format and

8    you had trouble opening it?

9    A.  Correct.  A secured file, and I couldn't open it.

10   Q.  Okay.  So you asked her to resend it?

11   A.  Uh-huh.

12   Q.  And she sent it to your personal Gmail account?

13   A.  Unsecured, yes.

14   Q.  Okay.  Who is Mary Coombs?

15   A.  I'm not sure.  I guess someone in their payroll department,

16   I'm thinking.

17   Q.  And you see here in the bottom to that email there is

18   attached four different files, correct?

19   A.  Yes.

20   Q.  You see here the next page we have, which is a pdf printout

21   of the files that is attached.  You see in the top of the

22   file -- on the top of the first page of the file it has a

23   description of the file there?

24   A.  Yes.

25   Q.  What does it say there?

1   A.   Commission -- "Gross Margin Details."

2   Q.   So is that the gross margin details report that RNN sent

3   you on a regular basis that contained your commissions?

4   A.   Which is very, very similar to working and awaiting.

5   Q.   Okay.  Very similar to the working and awaiting that you

6   received that was filtered, correct?

7   A.   Correct.

8   Q.   Okay.  And just to be clear, on May 1, 2023, you're already

9   fired from RNN, correct?

10  A.   Yes.

11  Q.   Okay.  And after you were fired, they sent you a file to

12  your personal Gmail account?

13  A.   Yes.

14  Q.   Now, after they sent you this file, did they ever send you

15  a notice or request to delete this file?

16  A.   No.

17  Q.   Did you get any other indication from RNN that they wished

18  you to delete this file?

19  A.   No.

20  Q.   And, in fact, did you still need this file even after

21  May 1, 2023?

22  A.   Yes.  I compared it to the working and awaiting and

23  actually found a huge error in payment.  I think like about

24  $10,000.

25  Q.   Now, you mentioned that you found an error in the

1    commissions files after they sent it to you, correct?

2    A.  Correct.

3    Q.  Can you describe what you mean by "error"?  What kind of

4    error did you find?

5    A.  I compared it to -- I compared all these names to my

6    working and awaiting that I had emailed myself and found what

7    was missing, emailed back Mary Coombs or the HR person, I can't

8    remember, to look into it, and they acknowledge yes.  And it

9    was about $10,000 that was missing.  And we spoke about a

10   couple of other people that I had questioned them about.  And

11   when I worked at RNnetwork, we did that with the internal

12   controller, if I had any questions about missed payment.

13          MR. HECHT:  I would like to introduce another email

14   coming from Keela Briles dated April 7, 2023, that's also in

15   our exhibit list.

16          THE COURT:  Any objection?

17          MS. SCHWARTZ:  No objection.

18          THE COURT:  Okay.  So that will be Defense 4?

19          MR. HECHT:  Yes.

20       (Received in evidence Defendant's Exhibit(s) 4.)

21   BY MR. HECHT:

22   Q.  Now, you see that email that's sent to you from Keela

23   Briles.  The fourth paragraph from the top, can you read the

24   fourth paragraph from the top?  It starts with "For provider

25   Samantha Carlson".

1    A.   "For provider Samantha Carlson we'll be making a manual

2    adjudgment for that one.  Provider sent in time sheets for

3    those weeks, but it looks like they were never uploaded.  The

4    manual adjustment of $9,456 in GM will be included in her 4/28

5    check."

6    Q.   Okay.  Do you recall what happened to that particular

7    record with Samantha Carlson?

8    A.   No.

9    Q.   Was that -- is it your understanding from this email that

10   she's referring about an adjustment of $9,000 related to

11   Samantha Carlson?

12   A.   Yeah, but to me I think she miswrote "in her check," but

13   she meant "my check."

14   Q.   Okay.  So aside from that mistake that she made about her

15   check versus your check, she's talking about applying a

16   credit -- a manual adjustment of $9,456?

17   A.   Correct.

18   Q.   And that's an adjustment because -- what does it mean when

19   she says "manual adjustment"?

20   A.   It means they found an error and they are going to manually

21   cut me a -- or add it to my check.  And if I didn't find this

22   myself, I would have been out that much money.

23   Q.   Okay.  So was it your -- did you bring this mistake to

24   their attention?

25   A.   Yes.

1  Q.  And how were you able to find this mistake?

2  A.  By comparing my commission report to the working and

3  awaiting report.

4  Q.  Now, Ms. Shafer, you talked before that you were terminated

5  from RNN on March -- your employment was terminated on

6  March 30th?

7  A.  Yes.

8  Q.  Why were you fired?

9  A.  They say it's for my communication and conduct.

10  Q.  What do you think the reason they fired you?

11  A.  I think they fired me for asking for help and

12  accommodations for my disorder.

13  Q.  Okay.

14  A.  Which in part relates to what they might see as my

15  communication issues, which I don't think is an issue.

16  Q.  Ms. Shafer, were you ever diagnosed for a mental disorder?

17  A.  Yes.

18  Q.  Did you make an accommodation request in February of 2023

19  to RNN?

20  A.  Yes, but I spoke about it years prior.  My managers always

21  knew what was going on, when I was going for doctors'

22  appointments, when my medication was being changed.  So they

23  were in the know.  And, you know, I have proof, even text

24  messages speaking to them about it.

25  Q.  Now, after you were terminated from RNN, did there ever

 1  come a point where you found out that RNN was still using your

 2  name to send communications to its nurses?

 3  A.  Yes, for over a month they were.  And the nurses were

 4  contacting me and emailing me and forwarding me emails to me

 5  asking why they were still using my name and signature.

 6            MR. HECHT:  Your Honor, we would like to introduce

 7  here a text message screenshot from Griffin Kabala.

 8            THE COURT:  Ms. Schwartz, any objection to this?

 9            MS. SCHWARTZ:  No objection.

10            THE COURT:  This will be Defense 5.

11       (Received in evidence Defendant's Exhibit(s) 5.)

12            THE COURT:  Message to give Griffin Kabala using

13  Rachel's name.  Is it that one?

14            MR. HECHT:  Yes.

15  BY MR. HECHT:

16  Q.  Okay.  Ms. Shafer, this is a short text message

17  communication between you and another individual by the name of

18  Griffin Kabala, correct?

19  A.  Correct.  And they also mass emailed everyone in my -- in

20  the database that I had with them with my name.

21  Q.  Okay.  So the first message in the -- is this a printout of

22  your phone's text screen?

23  A.  Yes.

24  Q.  Okay.  Now, you see the first message is like a screenshot

25  of some kind of an email communication, correct?

1   A.   Oh, okay.  Yes.

2   Q.   The one that starts with the black section.

3   A.   Uh-huh.

4   Q.   And you see there it says the sender is Rachel Shafer?

5   A.   Yes.

6   Q.   And the title of the email is "Griffin how did you like

7   working with RNnetwork," correct?

8   A.   Correct.

9   Q.   And what's the date of that email?

10  A.   April 10th.

11  Q.   Okay.  Would that be ten days after you were fired from

12  RNN?

13  A.   Yes.

14  Q.   Okay.  So ten days after you were fired from RNN, they sent

15  an email -- an email was sent from your name to Griffin asking

16  her did you like working with RNnetwork, correct?

17  A.   Correct.  And it went further then ten days.  Over a month.

18  Q.   And then if you look down after the screenshot, after the

19  black screenshot, there is a text message that looks -- that

20  says, "Is this you?"  You see that?  It's on page number 2.

21  A.   Yes.

22  Q.   Who is asking this question "Is this you"?

23  A.   Griffin is asking me if this was me who texted him or

24  emailed him this email.

25  Q.   And what was your response?

1  A.  Nope.

2  Q.  Okay.  So at that point after you were terminated from RNN,

3  RNN kept using your name to send email to nurses on your

4  behalf, correct?

5  A.  Correct.  Emails and text messages.

6  Q.  Okay.  Did you ever raise this issue to RNN?

7  A.  Yes.  And all they said was, I'll look into it, several

8  times, and they did not do anything about it.

9  Q.  Did you ever get a confirmation from RNN telling you that

10  they stopped doing it?

11  A.  No.

12  Q.  Okay.  So is it true that that continued to happen you said

13  for months after that?

14  A.  Yes.

15  Q.  Do you know if it ever stopped?

16  A.  I'm not aware.

17  Q.  Okay.  So is it true that because of this happening, you

18  wanted to do something about it to rectify it so nurses know

19  that you no longer work for RNN?

20  A.  Correct.

21  Q.  And what did you do?

22  A.  I let them know that I was no longer working with them,

23  that we separated, we parted ways, and that I was now with AHS

24  Staffing.

25  Q.  So part of the purpose on why you reached out to nurses

1   from RNN telling them that you switched company was to make

2   sure that RNN does not spread false information about you that

3   you're still working for RNN, correct?

4   A.  Correct.

5   Q.  Now, after you were terminated from RNN, you started

6   working for AHS?

7   A.  Yes.

8   Q.  Okay.  Now, when you worked for AHS, did you use any of

9   these working and awaiting gross margin details or any other

10  data you received from RNN to help you recruit nurses in your

11  new company at AHS?

12  A.  No.  Unlike RNnetwork, their database was a free-for-all.

13  So any recruiter could reach any nurse.  It wasn't separated

14  by -- at RNnetwork you have so many nurses in your name, and

15  that's the only nurses you can contact.  With AHS, it's the

16  whole system.  There's rules, you know.  You can't contact

17  someone within maybe two weeks or 30 days if someone has been

18  communicating.  But you have a much bigger pool.

19          And then they gave me my very own access to Vivian,

20  which RNnetwork didn't.  So I would get leads every week like

21  with a full resume, everything, vetted.  Again, full resume.

22  They gave you leads.

23          So because I'm starting at a new company, I don't have

24  a book of business, I don't want to touch RNnetwork nurses, I

25  had to call prospects like a brand-new recruiter and use the

1  paid leads.  And then I had referrals too.  But, of course, I

2  was only there for a short period of time and people were just

3  now getting to know where I was.

4  Q.  So is it fair to summarize that AHS provided you with an

5  abundance of nurses that you can tap into and recruit?

6  A.  Yes.

7  Q.  Did they provide you more nurses than RNnetwork provided

8  you?

9  A.  Uhm, I can't really tell because I don't know how many

10 nurses -- well, yeah, if you -- if you count all of their

11 nurses in their pool, it has to have been larger than the pool

12 that I had just for myself.  So yes, yes.

13 Q.  Did they also provide you better quality lists of nurses?

14 A.  Uhm --

15 Q.  You mentioned before vetted.  Can you --

16 A.  Like, Vivian.  Yeah.  RNnetwork did not give me my own

17 personal access to Vivian.  They would send it to the front

18 desk.  By the time you got a lead, which was a half a lead, the

19 person was gone.  Where they -- AHS actually paid for me to

20 have a Vivian account where I could login and talk to the

21 person the second that they messaged me.  It would be a full

22 resume, references, documents, everything ready to go.  And it

23 was easier, much easier to get that person placed faster.

24 Q.  Did you have any need in AHS to use any of the RNN data?

25 A.  Data?  No, not at all.  They had different -- they had

1  different hospitals, different needs.  They functioned

2  differently.

3  Q.  Now, are you aware that RNN makes an allegation against you

4  from an anonymous caller about certain activities that you did

5  in AHS?

6  A.  Yes.

7  Q.  Okay.  Are you aware that there is an allegation against

8  you that you recruited 80 nurse candidates per week?

9  A.  I don't know how that's possible when I had 15 total.

10  Q.  So when you say "15 total" --

11  A.  15 total signed contracts.

12  Q.  Okay.  So that's --

13  A.  How is that even humanly possible in five months?  The best

14  recruiter in the whole wide world cannot recruit 80 people in

15  five or six months.

16  Q.  So is it your understanding then that when somebody comes

17  and says -- and alleges that you would recruit 80 nurse

18  candidates per week, that it's patently falls on its face?

19  A.  Correct.  I had 90 nurses total at RNnetwork.  The top

20  recruiter at AHS had 30 nurses.

21  Q.  Okay.  So in your nurse recruiting experience, there's not

22  a single person on this planet that can recruit 80 nurses per

23  week, correct?

24  A.  Correct.

25  Q.  Now, while you're working for AHS, did you solicit any

1  nurses that were working for RNN?

2  A.  No, but a lot did come to me and text me and want to work

3  with me.

4  Q.  Okay.  So you're saying you had RNN nurses that reached out

5  to you that they want to work with you, but you did not solicit

6  any of those?

7  A.  Correct.

8  Q.  Okay.  Now, when somebody reached out to you and you knew

9  that that person comes from RNN, what would be your response?

10 A.  I redirected them and asked them to just keep in touch and,

11 you know, tell me how their assignment is going and eventually

12 we will connect one day.

13 Q.  Now, was your intent that when you say "eventually we will

14 reconnect one day" to reconnect after a year when your

15 non-solicitation, noncompete agreement is over with RNN?

16 A.  Correct.  And even if they had a travel partner that never

17 worked with RNN, I could have placed the travel partner, and I

18 didn't.  I said go take an assignment somewhere else and we'll

19 reconnect after my noncompete is over.

20 Q.  So when you got an RNN -- not only you did not solicit RNN

21 nurses, but if you got somebody from RNN that reached out to

22 you, you actively refused to accept them into -- to work for

23 AHS, correct?

24      MS. SCHWARTZ:  Objection.  Leading.

25      THE COURT:  The whole thing has been leading, both

 1  sides.  So I'll allow it because, look, here's the thing.  We

 2  don't have much time left today.  So after a few questions, I

 3  kind of have to figure out how much longer we have and figure

 4  out how to accommodate you all.  So just go ahead, Mr. Hecht.

 5  BY MR. HECHT:

 6  Q.  Now, Ms. Shafer, you saw there was a list of about -- there

 7  was an email introduced into evidence with a list of about nine

 8  nurses that alleged anonymous caller told RNN that you

 9  recruited for AHS?

10  A.  Yes.

11  Q.  Okay.  Now, did you recruit those nine nurses?

12  A.  Uhm, not all of them.  The list is not correct.

13  Q.  So some of those nurses you never even recruited?

14  A.  Correct.

15  Q.  And some of those nurses you actually sent them back to

16  RNN?

17  A.  Correct.

18  Q.  And there was one nurse you mentioned, a Newstadt?  Jordan

19  Newstadt, was that a name?

20  A.  Yes.

21  Q.  That you were aware that he worked for RNN, but he worked

22  for RNN more than three years prior to that?

23  A.  Correct.

24  Q.  And it was your understanding that because such a long time

25  has passed since they worked for RNN, you're no longer in your

1  noncompete, violating a non-solicitation at that point,

2  correct?

3  A.  Correct.

4  Q.  Now, Ms. Shafer, we talked before about what you did for

5  the last 17 years that you were a nurse recruiter, correct?

6  A.  Correct.

7  Q.  Is it fair to say that the only job that you know right now

8  that you can excel in is being a nurse recruiter?

9  A.  Correct.

10 Q.  Is it fair to say that you cannot earn a decent income if

11 you don't do nurse recruiting?

12 A.  Correct.

13 Q.  Okay.  Now, before when the RNN attorney examined -- direct

14 examined you, she asked you whether you can do some other types

15 of recruiting, correct?

16 A.  Correct.

17 Q.  And your answer was that it would be a lot less money,

18 correct?

19 A.  And a lot of training, you know, and who knows if I would

20 be good at it.

21 Q.  Okay.  So there is no easy path for you to dive into a new

22 recruiting field at this point?

23 A.  Correct.

24 Q.  Okay.  Now, Ms. Shafer, are you the primary breadwinner in

25 your household?

1  A.  Yes.

2  Q.  How many people rely on you?

3  A.  Four.

4  Q.  Can you itemize who those four people are?

5        MS. SCHWARTZ:  Objection, Your Honor.  This is not

6  relevant to the --

7        THE COURT:  Sure.  So what's the relevance, et. al, in

8  terms of the issues before the Court whether she has to work

9  hard to get a new job or a new line of work?

10       MR. HECHT:  Your Honor, we just think it's relevant

11  about the harm that it's causing to her.  And one of the

12  elements of balancing the harms in an injunction is to balance

13  the harms between both parties, the harm it will cause her for

14  not being able to work versus the harm it will cause them for

15  enforcing a noncompete.  So we believe it is relevant to

16  emphasize what type of harm it will cause her.

17       THE COURT:  I think, though, if that were really what

18  they meant by balancing the harms, wouldn't that apply in every

19  restrictive covenant case across the board?  I mean, basically

20  a restrictive covenant is you can't work in this particular

21  line of work in this jurisdiction for this time frame.  So that

22  harm would exist for literally everybody, right?

23       MR. HECHT:  The Court can take -- there's no limit in

24  the law that says that certain types of harm the Court may not

25  consider.  So we believe the Court may consider every possible

1   harm.

2          THE COURT:  I guess my question is, your argument,

3   going back to opening, was she's not specialized.  She's just a

4   regular, common worker.  And now you're saying there's no other

5   work she can do.  So it's a little bit -- I'm a little confused

6   in terms of that argument, but I'll let you make it.  I'll let

7   you have a few questions.

8          Look, I think we only have ten minutes left today,

9   though.  So I think what we'll do is you go as far as you can,

10  and then we'll -- I'm going to bring you back tomorrow.

11         MR. HECHT:  Your Honor, I think we're done at this

12  point.

13         THE COURT:  But Ms. Schwartz still has questions, I'm

14  sure.  So ask your questions and then we'll figure out where we

15  are.  But I'll give you a little bit of leeway on that.  But I

16  just -- you know, as far as relevance, it's marginal I would

17  say, but go ahead.

18         MR. HECHT:  Okay.

19  BY MR. HECHT:

20  Q.  So Ms. Shafer, the last question we asked was you said that

21  there are four people dependent on you and I asked who are

22  those four people.

23  A.  My twins, my husband, and my mother-in-law.

24  Q.  Okay.  Ms. Shafer, are you currently employed?

25  A.  No.

1  Q.  What happened to AHS?

2  A.  They let me go because of this legal mess.  I guess

3  RNnetwork contacted them.

4  Q.  Is it your understanding that AHS terminated your

5  employment because of this lawsuit?

6  A.  Yes, 100 percent.

7          MR. HECHT:  I believe, Your Honor, we're done at this

8  point.

9          THE COURT:  You're sure?  I'm not trying to cut you

10  off, but you're done?

11          MR. HECHT:  Yes.

12          THE COURT:  Okay.  Redirect, what do you think?

13          MS. SCHWARTZ:  I would like to try to quickly just

14  move through the redirect just hitting the high points so we

15  don't have to come back another day.

16          THE COURT:  Okay.

17          MS. SCHWARTZ:  I would suggest that because of the

18  time crunch that we're in, unless there's something specific

19  Your Honor has to ask, we shouldn't do long, lengthy closings

20  because I don't want to have to come back just to do a closing

21  argument.

22          THE COURT:  Here's the thing.  Why don't you do your

23  redirect.  I don't really need to hear closings from you both

24  since close of business 11/16 you all are going to be

25  submitting proposed findings of fact and conclusions of law.

1    You can separately, if you want, give me a few pages of what

2    you would say in closing, but I think you can kind of roll it

3    all into that document.

4              MS. SCHWARTZ:  I agree.

5              THE COURT:  Is that fine with you, Mr. Hecht?

6              MR. HECHT:  Yes, Your Honor.  That's fine.

7              THE COURT:  Okay.

8              MR. HECHT:  I would just ask if the Court can give us

9    a little guidance about what areas mostly to address in those

10   documents.

11             THE COURT:  Well, it's interesting because one thing

12   that we really haven't talked about is this Florida versus Utah

13   law thing.  We haven't talked about it at all.  So I guess

14   really in that sense there's no evidence that needs to be

15   offered that would suggest that Utah law applies or Florida law

16   applies.  So I do think you all need to speak to that.

17             And then I guess one question I have, and maybe if you

18   want to roll it into whatever you were going to ask,

19   Ms. Schwartz, but here's my ultimate question.  How many

20   recruiters are there -- I'm just kind of throwing it out there.

21   How many nurse recruiters are there at RNnetwork globally?

22             MS. RUFFY:  Right now today, 60.  A little over 60.

23             THE COURT:  60, six zero?

24             MS. RUFFY:  Yes, Your Honor.

25             THE COURT:  Okay.  Do all 60 have access to that

1   document of the 2,500 nurses?

2           MS. RUFFY:  Yes.

3           THE COURT:  And fair statement that of the 60,

4   Ms. Shafer was in the top three?

5           MS. RUFFY:  At the time she left, yes.

6           THE COURT:  Okay.  All right.  So that just at least

7   gives me something to go on in terms of that.

8           Ms. Schwartz, if you have five minute's worth of

9   questions, that would be great.

10          MS. SCHWARTZ:  Yes.  I will do my best, Your Honor,

11  just to hit the high points.

12          THE COURT:  Sure.

13          MS. SCHWARTZ:  And I know Your Honor did not want to

14  talk about this, and I'm not going to get into it, but since

15  Ms. Shafer did read --

16          THE COURT:  Tell me what it is.  Is it the reason for

17  termination thing?

18          MS. SCHWARTZ:  I just had one question on that.

19          THE COURT:  Yes, you can -- just get into what you

20  have to.

21                      REDIRECT EXAMINATION

22  BY MS. SCHWARTZ:

23  Q.  Ms. Shafer, you testified that you believed the reason you

24  were terminated from RNnetwork is because you requested an

25  accommodation for your condition, right?

1   A.   Uh-huh.

2   Q.   What was that accommodation?

3   A.   Uhm, well, I was asking them to meet with me to figure out

4   what it would be, what a fair accommodation would be given my

5   psychological disease.  What I had before, the type of

6   manager -- actually, director years prior was working

7   perfectly.

8   Q.   Okay.  The accommodation you requested was a new

9   supervisor, right?

10  A.   It was part of it.  But I asked them to -- I definitely

11  wanted a new supervisor and a new director.  I asked years past

12  that they would not be assigned to me.  Chris, my current

13  manager, I knew personally, on a personal --

14  Q.   Just in an abundance of time if you can just answer my

15  question so we can wrap up.

16  A.   That was part of it.  But I needed to get with them to find

17  out what a good accommodation would be that would work for us

18  all.

19  Q.   Okay.

20  A.   And I was denied.

21  Q.   I'm going to show you Rebuttal Exhibit 3 for the plaintiff.

22       This is an email that you sent to Keela Briles in

23  Human Resources on February 20th, a few days after you -- I'm

24  sorry.  Isn't it -- strike that.

25       Isn't it true that this is an email that you sent to

1  Keela Briles?

2  A.  Yes.

3  Q.  The email was sent February 20th entitled "Rachel Shafer

4  Accommodation"?

5  A.  Yes.

6  Q.  Okay.  And that was written one day after you were given

7  the last performance improvement plan, correct?

8  A.  Correct.

9  Q.  And this letter, here you are requesting as an

10  accommodation that Scott Schwartz be your new director?

11  A.  That was part of it, yes.  And I spoke to them.

12  Q.  My question is that was your accommodation request, right?

13  A.  Part of it.

14  Q.  Okay.  And then after you submitted this request for a new

15  supervisor, you were given documentation through the Leaves

16  Department to support your ADA accommodation request, correct?

17  A.  Correct, but I didn't need a leave.  That wasn't the issue.

18  Q.  Right.  But you were asked to provide documentation to

19  support your accommodation request that your supervisor be

20  changed, right?

21  A.  No.  She asked me to in general provide documentation from

22  my psychiatrist, but told me you can do it, but it's not going

23  to work so you're wasting your time.

24  Q.  I'm going to show you what's being marked as Rebuttal

25  Exhibit 4.

1  A.  And that was verbally.

2  Q.  There is no question.

3        THE COURT:  Mr. Hecht, any objection to Rebuttal 3 and

4  Rebuttal 4?

5        MR. HECHT:  I would only object on the basis of

6  relevance here.  The Court has guided the parties to just raise

7  the issue that exists, but not to go into details.  So

8  apparently she is trying to go into detail about that case.  We

9  have a whole case that's pending, and there's documents filed

10  by all parties with tons of exhibits, and this doesn't

11  represent an accurate detail about a case.  So either -- if

12  she's going to introduce these exhibits, then we want to

13  introduce the entire case file.  Or better to just abide by the

14  Court's guidance to just mention that such a case exists,

15  that's what we did on direct, and move on.

16        MS. SCHWARTZ:  I just have one question about this,

17  and it's because she opened the door to it during the direct.

18        THE COURT:  See, that's the thing is, I do think some

19  questions were asked on what we'll call cross related to this.

20        So go ahead, Ms. Schwartz.

21     (Received in evidence Plaintiff's Rebuttal Exhibit(s) 3

22  and 4.)

23  BY MS. SCHWARTZ:

24  Q.  Rebuttal Exhibit 4 is an email to you dated March 13th

25  entitled "ADA Accommodation Request," right?

1   A.  Yes.

2   Q.  And according to this email, it states that the ADA

3   paperwork was due back on March 10 and that your request was

4   being closed out because you never turned in the documentation,

5   right?

6   A.  Correct, because she on the phone told me don't even waste

7   your time.  If you're going to go and get it done, nothing's

8   going to be done.  So too bad, so sad.

9   Q.  And it's your testimony you were fired because you asked

10  for a new supervisor?  Your accommodation request, right?

11         MR. HECHT:  Objection.  Misstating her testimony.

12         THE COURT:  She can say, no, that's not her testimony

13  then.

14         THE WITNESS:  No.

15  BY MS. SCHWARTZ:

16  Q.  I want to direct your attention back to Defendant's

17  Exhibit 3, which is the email from Mary Coombs dated May 1 with

18  the commission report.

19         If you look at page 5, you'll see a page of the gross

20  margin details.  Do you see that?

21  A.  Yes.

22  Q.  Now, do you remember testifying that you did not need to

23  use the working and awaiting spreadsheets you took because

24  you've memorized the shifts, specialties, pay and, quote,

25  things that nurses liked so you didn't need to take it?

1  A.  That part.  But I didn't have 90 names memorized to where I

2  can match it to my commission.  But, yes, when you get to know

3  someone, you know what shift they like, where they like to go,

4  what they like, what ratio, do they live in RVs.

5  Q.  And for how many nurses did you memorize all that

6  information?

7  A.  Most of them.

8  Q.  Would you agree that you should at least know that

9  information for the most recently placed nurses that you had?

10 A.  Yes, but that's not the information that I used to compare

11 to my commissions.

12 Q.  So if you look at this commission report --

13 A.  What I'm using on this case --

14 Q.  -- 18 lines down you will see Amanda Fobar, correct?

15 A.  Correct.

16 Q.  And this is reflecting that you had placed Amanda Fobar who

17 was actively working in March of 2023, correct?

18 A.  Correct.

19 Q.  And yet you testified, when I showed you the AHS agreement

20 that you gave to Ms. Fobar, that you didn't even recall that

21 she was someone who you had place with RNnetwork.  Do you

22 remember that testimony?

23 A.  Yes, she went by Mandy and I don't have all 90 people

24 memorized, especially since there was a large gap of me looking

25 at these nurses and dealing with them.

1  Q.  So you couldn't remember Ms. Fobar's first name, even

2  though you had recently placed her, but it's your testimony

3  that you didn't need to keep those working and awaiting sheets

4  because you had all of those columns memorized?

5  A.  Not every single column.  I said what they preferred, their

6  likes, which is -- you don't even need to put it on that

7  report.

8  Q.  So you testified that you needed those working and awaiting

9  spreadsheets to see in one place who was coming up and whose

10  contract was ending so you knew who to touch base with.  That

11  was your testimony, right?

12  A.  Correct.

13  Q.  That's what you used those spreadsheets for, correct?

14  A.  For when I was at RNnetwork.  But if I'm at another

15  company, there's no number or anything to contact them for,

16  with.

17  Q.  But on those spreadsheets, unlike the commissions reports,

18  you have the email addresses for each of the nurses, right?

19  A.  And they don't respond to emails.

20  Q.  "Yes" or "no."  You have the email addresses on the working

21  and awaiting spreadsheets but not the commission reports,

22  correct?  Yes?

23  A.  It's kind of not correct because my assistant cut them out

24  when she made these small, and emails were not on there.  So I

25  didn't even know the emails were on there.

1   Q.  When Mary Jacobs sent you the commission report, it doesn't

2   contain a single email address on here for any of the nurses,

3   right?

4   A.  Correct.

5   Q.  And on the working and awaiting spreadsheets there are

6   email addresses for all of the nurses, correct?

7   A.  Not the version I had.

8   Q.  Just to be clear, the version you had is the one your

9   lawyer showed on the screen, correct?

10  A.  Where it was all cutoff?  Correct.  It's exactly what my

11  assistant compiled for me.

12  Q.  So you testified that the working and awaiting spreadsheets

13  were emailed to you every week; is that right?

14  A.  Yes.

15  Q.  And you testified that you forwarded them to your personal

16  email address so that you could print them out and use them,

17  right?

18  A.  Correct.

19  Q.  Why is it that the only working and awaiting spreadsheets

20  that showed up in your sent box and that are in your possession

21  electronically are the week ten and week six spreadsheets?

22  A.  I don't know, but I emailed and printed every single week

23  because that's how I worked.

24  Q.  So the ones that we looked at you emailed to yourself on

25  March 9th.  Did you email any working and awaiting spreadsheets

1   to yourself on March 2nd?

2   A.   I don't remember the dates, but I'm telling you it was

3   usually every Monday I emailed and printed them to myself.  And

4   if I forgot, then I would do it a couple days later.

5   Q.   You also didn't email any to yourself on March -- the week

6   after March 9th, on March 16th, did you?

7   A.   I did.

8   Q.   You did?

9   A.   Every week I printed them out and used them.

10  Q.   Then you should still have all of these working and

11  awaiting spreadsheets in your Gmail account, correct?

12  A.   We'll have to see.

13  Q.   Okay.  We'll see.

14       I want to direct your attention to Defendant's

15  Exhibit 4, which is the email from Keela Briles to you dated

16  April 7th.

17  A.   Which number?  I'm sorry.

18  Q.   Defendant's Exhibit 4.  Your lawyer introduced it dated

19  April 7th from Keela Briles to you about Samantha Carlson.

20  A.   Yes.

21  Q.   So at the bottom the page it says, "A manual adjustment of

22  $9,456 in gross margin will be included in the 4/28 check."

23  That's not money that was going to you, is it?

24  A.   I got paid.  I got paid for whatever mistake this was, yes.

25  Q.   Because it's of the gross margin, isn't it true that you

1   would only get 8 percent of that amount?

2   A.   I don't recall what the amount was or what part of this

3   error it was.

4   Q.   But you know how the gross margin works --

5   A.   Yes.

6   Q.   -- in your industry, right?

7   A.   Right.

8   Q.   And so you know that you weren't entitled to the gross

9   margin, which is RNnetwork's profits, right?

10  A.   Okay.

11  Q.   Is that right?

12  A.   Right.

13  Q.   So you were paid $750 for this --

14  A.   I would have check in my bank statement.  There's other

15  errors too.  There's other errors, payment errors too.

16  Q.   I want to direct your attention to Defendant's Exhibit 5,

17  which is the Griffin text message.

18          So Griffin is a nurse that you worked with at

19  RNnetwork; is that right?

20  A.   A long time ago.

21  Q.   And he sent you a text message to your use personal cell

22  phone --

23  A.   Correct.

24  Q.   -- showing you this email; is that right?

25  A.   Uh-huh.

1  Q.  Yes?

2       And so you still retain Geffen's personal contact

3  information in your cell phone today?

4  A.  Yeah.  Obviously, he texted me and then I put him in --

5  back in my phone.  And he's actually I think permanent now.

6  Q.  Now, you testified after -- strike that.

7       He's permanent now through?

8  A.  Permanent means not travel nursing.

9  Q.  So you testified when your lawyer showed you this document

10 that you, quote, let all the nurses know who I worked with at

11 RNnetwork, that you were no longer with the company.

12       MR. HECHT:  Objection.  I believe she is misquoting.

13       THE COURT:  Sure.  If you can rephrase.

14 BY MS. SCHWARTZ:

15 Q.  Do you recall testifying when your lawyer showed you this

16 text message that you then let the nurses at RNnetwork -- let

17 the nurses with whom you worked at RNnetwork that you were no

18 longer employed by RNnetwork?

19 A.  I posted it on my Facebook.

20 Q.  Did you contact anybody beyond just posting it on your

21 Facebook?

22 A.  Uhm, yes, I did contact some people and let them know I'm

23 no longer with the company.

24 Q.  When you say you "contacted some people," you're referring

25 to nurses?

1  A.  Yes, if they -- yes, if they were in my cell phone and I

2  knew that they were a nurse, I let them know I'm no longer with

3  RNnetwork, and if they -- if RNN is sending them an email from

4  me, to please forward it to me, which they did.

5  Q.  Now, you testified earlier that you don't like to have

6  conversations so all your communications are in text messages

7  and emails.  Do you remember that testimony?

8  A.  Yes.  And RNnetwork employees too.

9  Q.  Okay.  So when you let all of these nurses know that you

10 were no longer at RNnetwork, did you do that in text message or

11 emails?

12 A.  Text message and Facebook.

13 Q.  Okay.  And did you have phone conversations with any of

14 these nurses?

15 A.  Not that I recall.

16 Q.  And in your Facebook Messenger and text messages with these

17 nurses did you tell them that you were at AHS Staffing?

18 A.  Yes.

19 Q.  And at that point did they contact you at AHS Staffing for

20 placements?

21 A.  Most of them are assignment, so no.  Or some of them were

22 even permanent.  Some of them are nurse practitioners, and you

23 guys messaged them.

24 Q.  Okay.  And just my last point.  You were asked questions

25 about had you been told in RNnetwork's cease and desist letter

1  that had you had documents that needed to be returned, you

2  would have returned them?

3  A.  Correct.

4  Q.  I would like to show you what's been marked as Plaintiff's

5  Exhibit 28.

6        MR. HECHT:  Objection, again.  I think she's

7  misquoting the particular testimony.

8        THE COURT:  I agree.  But if you just want to try to

9  wrap it up.  His word wasn't "return."  His word was "destroy."

10  BY MS. SCHWARTZ:

11  Q.  So I'm showing you the cease and desist letter that was

12  sent to you on July 14, 2023.  Do you recognize this document?

13  A.  Yes.

14  Q.  I want to direct your attention to the second paragraph on

15  the first page in the second sentence.  Do you see where it

16  says, "CHG also had learned that you improperly retained

17  confidential client and provider contact information that you

18  acquired during your employment"?

19  A.  Yes, and I didn't know what that meant.

20  Q.  Okay.  And then on the second page under subsection (b) in

21  the second paragraph do you see where it says, "This means not

22  only are you required to keep confidential information, such as

23  client names, provider names, and contact information, among

24  other things confidential, but that you cannot use this

25  information to further your interests at AHS or to harm CHG

1  subsequent to your separation from the company.  The fact that

2  you have retained client and provider contact information and

3  have been using it to place providers you worked with at CHG

4  through AHS is a direct breach of your confidentially

5  agreement."  Did you read that in this letter when you received

6  it?

7  A.   Yes.

8  Q.   And was it clear at that point that CHG knew you retained

9  the client and provider contact information?

10 A.   No, I didn't know what you were talking about.  Again, my

11 working and awaiting did not have email addresses, and I use it

12 to compare my compensation, and it's given to us every week.

13 Q.   And you testified you retained provider -- nurses' contact

14 information in your Gmail account and in your personal cell

15 phone, correct?

16 A.   A lot of them have become my real -- my real life friends.

17 Q.   Okay.  But at this point you knew that this contact

18 information that you had retained pertaining to the nurses that

19 work with RNnetwork was information that CHG believed you

20 needed to give back, right?

21 A.   So my referral is their's?

22 Q.   My question is you understood when you got this letter that

23 you needed to return this information that you kept?

24 A.   I didn't know what information they wanted to return or

25 else I would return it.

1   Q.   Okay.  As you sit here today --

2   A.   Or destroy.

3   Q.   As you sit here today, will you now return the information

4   and destroy it from your cell phone and from your email

5   account?

6   A.   Yes.

7   Q.   Including the nurse provider email addresses and cell phone

8   numbers that you are maintaining in your personal cell phone

9   right now?

10  A.   Yes.

11  Q.   And you will also return and destroy all of the contact

12  information and documents from RNnetwork that reside in your

13  cloud storage account for your Gmail address?

14  A.   Yes.

15  Q.   And will you agree to do that through a mutual third party

16  forensic examiner who is an expert in retrieving and wiping

17  that information?

18  A.   Whatever my lawyer agrees to.

19  Q.   But you have no problem returning it, correct?

20  A.   Correct.

21           MS. SCHWARTZ:  I have no further questions.

22           THE COURT:  Mr. Hecht, anything?

23           MR. HECHT:  No, Your Honor.

24           THE COURT:  Okay.

25        (Witness was excused.)

1          THE COURT:  All right.  Then a couple things came up

2     in terms of the questioning there.  Ms. Shafer agreed to all of

3     those remedies, so I think the other thing you have to address

4     now is whether there needs to be an injunction.

5          Second thing is her question that she just asked is a

6     pretty important one, I think, in terms of everyone's

7     understanding.  She said, "My referral is there's?"  And so I

8     would like some guidance on that.  Because what she's saying is

9     she's getting referrals in, she places them over the course of

10    years through RNN.  Do they then become RNnetwork's property or

11    do they remain hers?  And that would be something else I would

12    like to know.

13         MS. SCHWARTZ:  Okay.  So you don't want us to argue

14    that now?

15         THE COURT:  No, it's because that five minutes was 20

16    minutes --

17         MS. SCHWARTZ:  Sorry.

18         THE COURT:  -- so we have to kind of move on out of

19    here.

20         And then I'm looking forward to your submissions close

21    of business 11/16.

22         It was great having you all in court.  These

23    restrictive covenant cases are really tough.  And, you know,

24    like I always say, they're like a corporate divorce.  They're

25    people that used to get along and like each other and work

1    together that now just can't get along, you know.  And so I

2    appreciate all the hard work that both sides put into it.

3        Be safe, look forward to seeing you in person in the

4    future, and have a nice cruise.

5        MR. HECHT:  Thank you, Your Honor.

6        MS. SCHWARTZ:  Thank you, Your Honor.

7        MR. HECHT:  Can the Court also give guidance like how

8    long after the submission the Court will issue an order?

9    Because --

10        THE COURT:  That I can't answer.  And I'll tell you

11    why.  We would love to do everything as quickly as possible.

12    And just based on volume and all, it's difficult sometimes.

13    But I can only say as quickly as possible.  You know, because

14    it's important, you all have waited a while, you all need

15    resolution, so, you know, we'll digest it.  Not before

16    Thanksgiving certainly, but we'll figure it all out.

17        MS. SCHWARTZ:  There is one more matter, Your Honor,

18    and I completely forgot.

19        THE COURT:  Okay.

20        MS. SCHWARTZ:  With regard to the affidavit of

21    Mr. Hester.

22        THE COURT:  Yes.

23        MS. SCHWARTZ:  I do have one exhibit that I would like

24    you to consider if you're going to be considering that

25    affidavit, and it is a transcription of the voice mail

1    recording.  It's a screenshot of what appeared on the computer

2    showing Marc Hester's name, number, and word by word what it is

3    he stated on August 9, which is the date of Ms. Briles

4    memorandum.  And given Mr. Hester's affidavit stating he has no

5    recollection, this provides further evidence that the call did

6    occur.

7         And I would like to ask the Court to take judicial

8    notice that the Port Orange area code is 386, which is what is

9    in Mr. Hester's declaration.

10        THE COURT:  I'm happy to take that.  Again, I don't

11   have any idea whether Mr. Hester just doesn't remember, whether

12   somebody else used his phone.  You know, certainly Ms. Briles

13   isn't going to be able to say she knows his voice or what he

14   looks like or anything like that.  But I'll take it.  I'll

15   review the affidavit and this document as well.

16        In all candor, it would be really relevant to me if

17   this were a criminal case with a police officer saying that he

18   based his reasonable suspicion or probable cause based on that

19   anonymous tipster.  It's not all that relevant to me --

20        MS. SCHWARTZ:  Okay.

21        THE COURT:  -- in terms of this, but please pass it

22   forward.

23        I do have to tell you, though, you all need to kind of

24   look at your exhibits and make sure Val has copies of all of

25   them before you leave because that's the record really.  So if

1   you can do that, that would be great.

2       Okay.  Anything else before I tell Karl to hit the off

3   button?

4       MS. SCHWARTZ:  None from the plaintiff, Your Honor.

5       THE COURT:  Mr. Hecht, anything at all?

6       MR. HECHT:  I'm sorry?

7       THE COURT:  Anything at all before I tell Karl to sign

8   off?  You were about to say something about guidance.

9       MR. HECHT:  No, I was just asking about a time frame,

10  when we can expect an order, but the Court answered that.

11      THE COURT:  I'll do the best I can, really, you know.

12      MR. HECHT:  Thank you.

13      THE COURT:  Okay.  Thanks, everyone.

14      MS. SCHWARTZ:  Thank you.

15      MR. MAYA:  Thank you.

16      (Proceedings concluded at 5:16 p.m.)

17                  C E R T I F I C A T E

18      I, Karl Shires, Registered Merit Reporter and Federal

19  Certified Realtime Reporter, certify that the foregoing is a

20  correct transcript from the record of proceedings in the

21  above-entitled matter.

22      Dated this 9th day of November, 2023.

23

24  _____
    Karl Shires, RMR FCRR

25

# DE 75-1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### CASE NO.: 0:23-CV-61703-AHS

CHG MEDICAL STAFFING, INC.,
                    *Plaintiff*,

-vs-

RACHEL SHAFER et al.,
                    *Defendants*.

_____/

## AFFIDAVIT OF RACHEL SHAFER

   1. My name is Rachel Shafer.

   2. During this lawsuit, I was made aware that the excel sheets titled Working & Awaiting, were sent to me in a filtered format, and can be modified to see a larger list of nurses, including nurses that were not assigned to be during my work for RN Network.

   3. After I was made aware about the full extent of the content of these files, I deleted all the Working & Awaiting files in my control or possession.

   4. I also became aware that RN Network claims I completed a final interview, and expect to start a new position at Nightingale Nurses.  This statement is not true.

   5. Further affiant sayeth naught.

**Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.**

Signature: _Rachel Shafer_____
               Rachel Shafer (Nov 20, 2023 17:58 EST)

Date:    _20/11/2023_____

**App. 445**

# DE 86

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-61703-CIV-SINGHAL

CHG MEDICAL STAFFING, INC.
d/b/a RNNETWORK, a Delaware
Corporation,

      Plaintiff,

v.

RACHEL SHAFER, an individual,
LISLEY ROSSI, an individual,
AHS STAFFING, LLC, an Oklahoma Limited
Liability Company,

      Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court upon Plaintiff's Motion for Leave to File Amended

Proposed Findings of Facts and Conclusions of Law ("Motion") (DE [78]).  In its Motion,

Plaintiff CHG Medical Staffing ("Plaintiff" or "CHG") requests leave to amend its proposed

Findings of Facts and Conclusions of Law (DE [74]) to address key evidence produced

for the first time in Defendant Rachel Shafer's ("Shafer") Proposed Findings of Fact and

Conclusions of Law and Affidavit in support of same (DE [75]). For the reasons set forth

below, Plaintiff's Motion is denied.

When a party drafts and then eventually submits proposed findings of facts and

conclusions of law, it is not an opportunity to introduce new evidence or fashion new

arguments.  Instead, it presents an opportunity for the parties to synthesize all the

arguments and evidence presented in their motions and at the evidentiary hearings.  As

such, when reviewing the parties proposed findings of fact and conclusions of law (DE

[74]) and (DE [75]), the Court will only review and consider evidence or arguments actually

**App. 447**

presented in the parties' motions or at the evidentiary hearings held on October 31, 2023 and November 7, 2023.  The Court can therefore deny Plaintiff's Motion as moot because it cannot consider the new evidence and arguments that Shafer raised in her Proposed Findings of Fact and Conclusions of Law and Affidavit.[1]

All this being said, the Court is extremely concerned about the destruction of evidence relevant to this case.  Though Plaintiff, in its request for preliminary injunctive relief, is asking for the destruction of any confidential information or trade secrets improperly in Shafer's possession, the request was to do so "pursuant to a forensic protocol by an agreed upon third party forensic expert."  (DE [12] at 21).  Destruction is typically requested and performed in this manner for many reasons.  First, and most obvious, is so that the party seeking destruction can be sure that the information is actually deleted.  If it comes to the point that litigation is necessary, the level of trust between the parties is often at an all-time low and it is unfair to require a party to simply trust that the other party deleted the information in question.  Moreover, forensic experts are better equipped to ensure that everything has in fact been deleted and wiped from the other party's computers and devices.  Laypersons are often not intricately familiar with how computers save information, and it is possible that one thinks everything has been deleted, when they in fact left traces of it somewhere on their device or in the cloud.

The second reason destruction is typically performed by forensic experts is because very often the metadata surrounding where the confidential information and trade secrets is located on a party's device is relevant to the case.  As Defendant does not seem to realize in their response to Plaintiff's Motion (DE [83]), Plaintiff's request for preliminary injunctive relief is just one of its many requested forms of relief in this case.

---

[1] The Court can, and must, consider this evidence only to the extent that it moots any portion of the need for the Court to impose a preliminary injunction.

Plaintiff's Complaint (DE [1]) contains eight other claims against the Defendants in this case. The Complaint also requests damages in addition to the injunctive relief that Shafer thinks she has mooted. Where the documents that Shafer claims she deleted were located, what the actual documents were, and whether the data could have been transferred to any other persons or locations, among other missing facts could be relevant to the rest of Plaintiff's claims or to damages. To attempt to obtain this potentially lost information and to ensure that Shafer does not tamper or destroy any other evidence relevant to this case, the Court orders Shafer to turn over her personal devices to an agreed upon third party forensic expert so that they can be imaged, searched, and wiped of all potential confidential information and trade secrets.[2] Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Leave to File Amended Proposed Findings of Facts and Conclusions of Law (DE [78]) is **DENIED.**

It is **FURTHER ORDERED AND ADJUDGED** that, within seven (7) days of entry of this order, Shafer is to disclose her personal devices (computers, computer hard drives, or memory devices and all other Devices in her possession that reasonably could contain the confidential information and trade secrets at issue[3]) to an agreed upon third party forensic expert so that they can be imaged, searched, and wiped of all potential confidential information and trade secrets. *The failure for Shafer to do so will result in sanctions without further warning*.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 19th day of December 2023.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

---

[2] Shafer should have no problem conforming to this order since she agreed, both at the hearing and by her own actions, to destroy this information in the first place.

[3] This includes any smart phones, tablets, desktop computers, laptop computers, and disks, memory files, flash drives, hard drives, etc.

Copies furnished counsel via CM/ECF

# DE 96

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-61703-CIV-SINGHAL

CHG MEDICAL STAFFING, INC.,

       Plaintiff,

v.

RACHEL SHAFER *et al.*,

       Defendants.

_____/

## <u>ORDER</u>

**THIS CAUSE** is before the Court upon Defendant Rachel Shafer's Motion for Clarification on Court Forensic Expert Order ("Motion") (DE [89]).  In its Motion, Defendant Rachel Shafer ("Defendant" or "Shafer") seeks clarification on the Court's December 19th Order where it required Shafer to "disclose her personal devices to an agreed upon third party forensic expert so that they can be imaged, searched, and wiped of all potential confidential information and trade secrets."  (DE [86] at 3).  Specifically, Shafer is seeking clarification on the scope of Shafer's personal devices to be disclosed to a forensic expert, the scope of the forensic examination, and which party should bear the cost to comply.

The purpose of the December 19th order was to ensure that *any* trade secrets and confidential information in Shafer's possession be forensically preserved and then wiped from her possession.  Shafer wrote in her affidavit attached to her proposed findings of fact and conclusions of law that she "deleted all the Working & Awaiting files in my control or possession."  (DE [75-1]).  Shafer testified that she routinely emailed the Working & Awaiting spreadsheets to her personal email account.  (DE [63] at 84:8-13).  To ensure

**App. 452**

that all Working & Awaiting files are deleted and wiped from her possession, the Court orders that her email address must also be imaged, searched, and then wiped.[1]

The scope of the forensic examination should also extend to January 2023.  Shafer testified that she emailed herself W&A spreadsheets between 2017 to 2023 on a weekly basis. (DE [63] at 84:8-13; 85:16-22).  Therefore, whether Shafer currently has any W&A spreadsheets (and what information she intentionally deleted), where she transferred them, and what other RNN information she wrongfully possesses can only be determined by a search of Shafer's email accounts.  To get a complete picture of what Shafer did, Plaintiffs could have demanded that the forensic analysis date back to 2017.  Plaintiff's request, at this stage, to limit the analysis to January 2023 forward with search terms and a forensic protocol to be agreed upon is therefore more than reasonable.

Finally, it is plainly clear that Shafer should bear the cost to comply with the Court's December 19th order.  The parties are in this position because of Shafer's actions.  It neither seems fair, nor logical, to then require Plaintiff to bear the cost to attempt to recover the evidence that Shafer potentially destroyed.  Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Shafer's email address rachel.shafer@gmail.com and cloud storage account associated with this email is to be forensically searched, imaged, and then wiped.  The temporal scope of the forensic examination should be from January 1, 2023, to the present, with search terms and a forensic protocol for the forensic expert to follow to be agreed upon by the Parties.

---

[1] Though the Court appreciates Plaintiff's concern about Shafer apparently forwarding RNN information to rachelchap96@gmail.com, it cannot order imaging of an email address not in Shafer's possession.  That said, it finds Shafer's initial explanation—"an accidental email erroneously sent to an incorrect address"—to be inadequate.  (DE [92] at 2 n.2).  While emails can get sent to the wrong person or an unintended recipient, random email addresses do not just appear in the "To" line of a draft email.  Shafer is therefore required to provide more information as to who this email belongs to if it does not belong to her.

**App. 453**

2.  Within ten (10) days of entry of this Order, Shafer must provide Plaintiff with sufficient detail showing that the email address rachelchap96@gmail.com does not belong to her and the steps she took to discover to whom it belongs.

3.  Shafer is ordered to pay the costs associated with any forensic examination stemming from the Court's December 19th order (DE [86]) and this Order.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 1st day of February 2024.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF

**App. 454**

# DE 101

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-61703-CIV-SINGHAL

CHG MEDICAL STAFFING, INC.,

      Plaintiff,

v.

RACHEL SHAFER et al.,

      Defendant.

_____/

**ORDER**

    **THIS CAUSE** is before the Court upon Defendant Rachel Shafer's ("Defendant" or "Shafer") Motion to Stay Pending Appeal ("Motion to Stay") (DE [99]).  In the Motion to Stay, Shafer moves pursuant to Fed. R. App. P. 8(a)(1) for a stay of the Court's prior rulings on Plaintiff's Motion for Leave to File Amended Proposed Findings of Facts and Conclusions of Law (DE [86]) and the subsequent order on Defendant Shafer's Motion for Clarification (DE [96]).  To put it more succinctly in Shafer's terms, she wishes to "stay the injunction pending appellate review" of the Court's two prior orders.  (DE [99] at 2).

    To make a point of clarification before reaching the merits of Shafer's Motion to Stay, the Court has yet to issue an order on Plaintiff's preliminary injunction motion.[1]  As the Court's two prior orders make clear, the sole matter at issue in those orders—and the purpose of ordering a forensic analysis and requiring Shafer to pay for it—is because, during the pendency of a litigation, Shafer took it upon herself to delete key evidence relevant to this case.  The Court's prior orders were merely trying to preserve that evidence, evidence that Plaintiff is also entitled to receive during discovery.  In other

_____

[1] Defendant Rachel Shafer also filed a Notice of Appeal, where she stated that she is appealing the portions of the Court's orders "related to injunctive relief."  (DE [97]).

**App. 456**

words, Shafer conflates two completely different issues.  On the one hand, she attempts to conceal or destroy evidence.  On the other hand, she asks for appellate review of a not yet decided issue that ultimately will be dependent upon the evidence she has concealed or destroyed.

That said, Shafer has nevertheless filed an appeal of the Court's prior orders and now also seeks a stay of those orders pending the completion of the appeal.  But *again* the discovery orders are separate and apart from the petition for injunctive relief.  Courts generally enjoy broad discretion in deciding how best to manage the cases before it. *See Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1269 (11th Cir. 2001) ("[The Eleventh Circuit] accord[s] district courts broad discretion over the management of pre-trial activities, including discovery and scheduling.").  This discretion includes whether to issue a stay pending the appeal of one of its rulings.  *See id.*  In light of this discretion and because Shafer has not put forth a compelling case for a stay, the Court denies her request for one.[2]

In the Motion for Stay, Shafer argues that district courts should consider four factors when considering whether to issue a stay.  (DE [99] at 2).  Those factors are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).  District courts are further required to assign greater weight to the first two factors. *Id.*  Here, Shafer's arguments fail across the board.

---

[2] The Court understands that Plaintiff RNN has not had an opportunity to respond to Shafer's motion. Because the Court denies Shafer's request and to prevent Shafer from continuously delaying the case any longer, the Court decided to rule on the Motion to Stay expeditiously.

Plaintiff's Motion to Stay begins by arguing that there is a substantial likelihood of success on the merits.  This argument is completely misplaced.  Even if Shafer were to win the injunction issue, this case has numerous other issues and concealing or destroying evidence that applies to each of the issues has no place in our court system.  In stating her position, Shafer relies on functionally the same arguments that she relied on in her Motion for Clarification.  *Compare* (DE [89] at 4) (Shafer's Motion for Clarification where she relied on *All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, 2022 WL 2340997, at *9 (S.D. Fla. Apr. 8, 2022) to show likelihood of success on the merits) *with* (DE [99]) (Shafer's Motion for stay where she also relies on the same case to prove likelihood of success on the merits).  Just as the Court found these arguments unpersuasive in the context of the Motion for Clarification, it does so today.[3]

Another problem with Shafer's arguments is that she argues that she is likely to succeed on the merits of an issue that is not relevant to the Court's orders that she is appealing.  As mentioned above, the Court's prior orders did not order any injunctive relief.  Instead, it made a series of discovery rulings because Shafer deleted key evidence that the Court is trying to preserve.[4]  Defendant Shafer could therefore have argued that the Court's discovery rulings were improper, that she was likely to succeed on those grounds on appeal, and that a stay is therefore warranted.  Instead, as mentioned above,

---

[3] In the Motion to Stay Shafer is really asking the Court to reconsider its prior ruling on the Motion for Clarification.  But a motion for stay is not the proper vehicle in which to do so.  To the extent the Court were to even reclassify the Motion to Stay as a motion for reconsideration, Shafer's motion would still fall well short of justifying why the Court should in fact reconsider its prior rulings. *See, e.g., Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D. Fla. 1994) (discussing how motions for reconsideration should only be granted in extraordinary circumstances justified only by a change in law or facts upon which the decision is based).  Shafer has presented no change in facts or law that would warrant such a reconsideration.

[4] To the extent the Court's prior orders overlapped with the forms of relief that RNN requested in its Motion for Preliminary Injunction, it is relevant.  Shafer had a duty to preserve electronically stored information ("ESI") in her possession during the pendency of a litigation. *See* Fed. R. Civ. P. 37(e) (enunciating a litigant's duty to preserve ESI and providing district courts remedies if a litigant fails to do so).  Shafer, however, failed to do so.

**App. 458**

she attempts to argue that she is likely to succeed on the merits of an injunctive relief motion.  Since that issue does not underlie the portion of the merits that Shafer would need to demonstrate that she is likely to succeed upon on appeal, her Motion to Stay independently fails for that reason as well.[5]

In addition to not being able to demonstrate that she is likely to succeed on the relevant merits, Shafer has also not demonstrated that she would suffer irreparable harm. Shafer argues that she would suffer irreparable harm in that a forensic analysis would "expose her most intimate personal life matters and interpersonal communications to a complete stranger."  It is not clear if the "complete stranger" Shafer is referring to is the forensic analyst or RNN, but either way her argument is unpersuasive as it ignores a bedrock discovery rule.

It is well known that litigants "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  In other words, if a party contains documents or evidence that is relevant to the case and it is not burdensome to produce it, the opposing party is entitled to discover it.  *See id.*  Absent a valid privilege claim or a demonstration that the otherwise discoverable evidence is burdensome and disproportional to the needs of the case, a party is unable to hide behind claims of privacy or intimacy to prevent discovery.[6]

---

[5] Though the Court has yet to rule on Plaintiff's Motion for Preliminary Injunction, (DE [12]), "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020) (quoting *Northeastern Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)).  The Court's order today and its prior orders were decided with the purpose of achieving that same goal and maintaining the status quo so the case could be properly and fairly adjudicated.

[6] To the extent the otherwise discoverable information contains sensitive or private information, upon a showing of good cause a litigant is able to file the documents under seal or redact certain information so that the public cannot review it.  *See Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007).

Here, Shafer argues that a forensic analysis of her emails and personal computer devices would reveal her most intimate details to a stranger.  But to the extent it does, it is irrelevant if her emails and personal computer also contain discovery that is "relevant to any party's claim or defense and proportional to the needs of the case."  *See id.*  Since nowhere in her Motion to Stay does Shafer claim a privilege or that production is burdensome and disproportional to the needs of the case, Shafer has essentially provided no grounds for why RNN would not otherwise be entitled to discover this information during the discovery phase of this case.  And if Shafer would eventually have to disclose this information to RNN, it does not seem possible for Shafer to be able to make a compelling argument today that it would suffer *irreparable* harm by disclosing it now.

To be sure, the Court's prior order providing for the forensic analysis does not give the forensic expert carte blanche access to Shafer's email, computer, and personal effects to go rummaging around.  The order was tailored so that the scope of the examination would no greater than necessary for what RNN would need to ensure that Shafer no longer possesses the Working and Awaiting files and that relevant evidence is not destroyed for good.  Specifically, the order was to conduct a forensic analysis with the "temporal scope . . . from January 1, 2023, to the present, with search terms and a forensic protocol for the forensic expert to follow to be agreed upon by the Parties."  (DE [96] at 2).  In light of the rules of discovery and the order only permitting reasonable searches for documents relevant to this case, Shafer has not demonstrated that she would suffer irreparable harm absent a stay of the Court's prior rulings.

Because the first two factors weigh against granting the stay, and courts are to assign greater weight to these two factors, and because the last two factors generally tilt

in the favor of the party opposing the stay, it is unnecessary to address the third and fourth

*Swain* factors.  *See Swain*, 958 F.3d at 1088.  Accordingly, it is hereby

      **ORDERED AND ADJUDGED** that the Motion to Stay (DE [99]) is **DENIED**.

      **DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 21st day of

February 2024.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 8, 2024, I electronically filed the foregoing document with the Eleventh Circuit Court of Appeals using CM/ECF and thereby served counsel of record.

*/s/ Shlomo Y Hecht*
SHLOMO Y HECHT